JS 44   (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CATHRINE VEIKOS

### DEFENDANTS

TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA

**(b)**  County of Residence of First Listed Plaintiff     Alameda
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*

Julie A. Uebler, Esquire Console Mattiacci Law, LLC 1525 Locust Street, 9th Floor Philadelphia, PA 19102 (215) 545-7676

Attorneys *(If Known)*

Michael Banks, Esquire Morgan Lewis 1701 Market St. Philadelphia, PA 19103 (215) 963-5387

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☒ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2   U.S. Government Defendant | ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | Protection Act ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty **Other:** | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding | ☐ 2  Removed from State Court | ☐ 3  Remanded from Appellate Court | ☐ 4  Reinstated or Reopened | ☐ 5  Transferred from Another District *(specify)* | ☐ 6  Multidistrict Litigation - Transfer | ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
42 U.S.C. § 2000e, et seq;43 P.S. § 951, et seq.;Phila. Code § 9-1101, et seq

Brief description of cause:
Plaintiff brings this action against Defendant for gender discrimination and retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ in excess of $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____     DOCKET NUMBER _____

DATE
9/9/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 631 62nd Street Oakland, CA 94609 _____

Address of Defendant: _____ 1 College Hall, Room 100 Philadelphia, PA 19104 _____

Place of Accident, Incident or Transaction: _____ Philadelphia, PA _____

---

**RELATED CASE, IF ANY:**

Case Number: _____     Judge: _____     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?        Yes ☐     No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?        Yes ☐     No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?        Yes ☐     No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?        Yes ☐     No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __9/9/2020__      _____Julie A. Uebler_____      __71297__
                        *Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.     *Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☑ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.     *Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Julie A. Uebler, Esquire__, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: __9/9/2020__      _____Julie A. Uebler_____      __71297__
                        *Attorney-at-Law / Pro Se Plaintiff*      *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| CATHRINE VEIKOS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TRUSTEES OF THE UNIVERSITY | : | |
| OF PENNSYLVANIA | | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( X )

| | | |
|---|---|---|
| 9/9/2020 | *Julie Q. Uebler* | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 545-7676 | (215) 501-5957 | uebler@consolelaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATHRINE VEIKOS, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : CIVIL ACTION NO. |
| | : |
| | : |
| | : |
| TRUSTEES OF THE UNIVERSITY | : |
| OF PENNSYLVANIA, | : JURY TRIAL DEMANDED |
| | : |
| Defendant. | : |
| | : |

## COMPLAINT

Plaintiff, Cathrine Veikos ("Plaintiff"), by and through her counsel, files this Complaint and asserts claims of discrimination based on gender and familial status and retaliation against the Trustees of the University of Pennsylvania ("Defendant" or "Penn").

## INTRODUCTION

Penn, one of the country's premier educational institutions with an annual budget of over $11 billion, likes to pride itself on its diversity and efforts to support women faculty. Despite its outward branding, Penn blatantly violated Cathrine Veikos' civil rights by enabling a male Department Chair to sabotage her academic career because he resented her for taking advantage of a supposedly "family friendly" policy following the birth of her son.

When Professor Veikos complained to her Dean and other members of the administration about the Department Chair's misconduct, Penn circled the wagons, tried to dissuade her from enforcing her civil rights, and refused to investigate her allegations. When Professor Veikos refused to be silenced in the face of the discriminatory and retaliatory denial of her tenure

application, Penn conducted a "re-evaluation" of her tenure case that was plagued by retaliatory bias.

At the same time Penn advertised its commitment to the diversity of the University's faculty by gender and its adoption of "family friendly" policies to retain faculty with caregiving responsibilities, Penn deliberately engaged in discriminatory and retaliatory conduct that ruined Professor Veikos' career in academia. Professor Veikos brings this lawsuit to hold Penn accountable for its intentional and willful discrimination against her because of her gender (female) and familial status (mother), and for retaliating against her when she attempted to protect her rights and salvage her career.

<u>JURISDICTION AND VENUE</u>

1.      This discrimination case is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, <u>et seq.</u>, as amended.

2.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

3.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction with respect to Plaintiff's claims for gender discrimination and retaliation under the Pennsylvania Human Relations Act ("PHRA"), as amended, 43 P.S. § 951, <u>et seq.</u>, and for gender and familial status discrimination and retaliation under the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code § 9-1101, <u>et seq.</u>

4.      This case is not subject to compulsory arbitration because Plaintiff seeks injunctive relief and the amount in controversy exceeds the jurisdictional amount for arbitration of One Hundred Fifty Thousand Dollars ($150,000), exclusive of interest and costs.

5.      Plaintiff has exhausted her administrative remedies, having timely filed complaints of gender discrimination and retaliation with the Equal Employment Opportunity

Commission ("EEOC"), and complaints of gender and familial status discrimination and retaliation with the Philadelphia Commission on Human Relations ("PCHR").

6.      The first administrative filings alleging gender and familial status discrimination and retaliation were filed in October 2011 (EEOC No. 17-G-2012-0083C; PCHR No. E12026008). The second administrative filings alleging gender and familial status discrimination and retaliation were filed in October 2012 (EEOC No. 17-G-2013-0035C; PCHR No. E12116127).

7.      Plaintiff also notified the Pennsylvania Human Relations Commission ("PHRC") of the administrative filings at the EEOC and PCHR in order to exhaust her administrative remedies under the PHRA.

8.      The PCHR issued its Dismissal and Notice of Rights on June 26, 2020.

9.      Venue is properly invoked pursuant to 29 U.S.C. § 1391(b) because the actions complained of herein occurred within the jurisdictional limit of this Court.

<u>PARTIES</u>

10.     Cathrine Veikos is a female citizen of the United States who currently resides in Oakland, California.

11.     The Trustees of the University of Pennsylvania, operating as the University of Pennsylvania, is a private educational institution comprised of twelve (12) schools, including Design, Communications, Arts & Sciences, among others.

12.     Penn is located in Philadelphia, PA 19106.

13.     At all times relevant to this Complaint, Penn was an employer within the meaning of Title VII, the PHRA, and the PFPO.

14.     At all times relevant to this Complaint, Professor Veikos was an employee of Penn within the meaning of Title VII, the PHRA, and the PFPO.

<u>FACTUAL ALLEGATIONS</u>

<u>Professor Veikos' Distinguished Career Prior to Joining the Penn Faculty</u>

15.      Professor Veikos received her Bachelor's degree in Architecture from Barnard College in 1985.

16.     Professor Veikos received her Master of Architecture degree from the Harvard University Graduate School of Design in 1989.

17.     Following her graduation, Professor Veikos had a successful professional design practice, which received positive recognition in both publications and exhibitions.

18.      Prior to joining the faculty at Penn, Professor Veikos taught at Harvard University in Boston, the Parsons School of Design in Paris,  Tulane University in New Orleans, and the Illinois Institute of Technology in Chicago. She was also a Cass Gilbert Visiting Professor at the University of Minnesota's College of Architecture and Landscape Architecture.

19.     Professor Veikos' area of expertise is in Visual Studies in Architecture, which considers architecture and design work in the cultural context of art and emerging technologies.

20.     Professor Veikos joined Penn's Faculty in the Department of Architecture within the School of Design in 1999.

<u>School of Design's Tenure Procedures and Related Policies</u>

21.     The various schools at Penn each have their own set of policies and procedures relating to the tenure and promotion process.

22.     The School of Design's process for tenure includes a review by the candidate's Department as well as a school-specific Personnel Committee.

23.     By policy, the School of Design expects its tenured faculty to be thought leaders in their fields, to have an identifiable area of work in which they are creating new knowledge and visions, and to be working in fields that their department and school consider important for the future.

24.     Tenure-track Assistant Professors are in a "probationary" period for seven (7) years, and the tenure review often takes place during the sixth year of the probationary period. This allows for a "terminal year" on faculty in the event the candidate is not granted tenure.

25.     The tenure review process includes a process by which the Department solicits recommendations from external "consultants" or "reviewers," who are generally faculty members at other institutions in the same field as the candidate.

26.     Penn's Guidelines for Selection of External Consultants during the tenure promotion process identify the purpose of the consultants. According to the Guidelines, external consultants are expected to provide an unbiased and impartial assessment of a candidate's scholarship, reputation and standing in a specific field.

27.     In evaluating a case for tenure, the standing faculty of the Department considers the candidate's dossier and the external review letters, and then meets to discuss and vote on the case. The Chair of the Department is responsible to oversee the entire tenure process, and then communicate the Department vote to the Personnel Committee.

28.     The Personnel Committee, which consists of five (5) members of the various Departments within a particular School, reviews the candidate's full dossier with input from the Department Chair. The Personnel Committee then votes on the case and communicates its decision to the Dean.

29.     The Dean then reviews the case and decides whether to seek approval for the promotion from the Provost's office. The School of Design's policies expressly grant discretion to the Dean to forward recommendations for tenure to the Provost that did not receive a positive endorsement of the Personnel Committee.

Penn's Adoption of Career-Family Balance Initiatives

30.     In the mid-1990s, Penn considered and approved various family-related policies, including a policy to allow the extension of the tenure probationary period for junior faculty who give birth. Over the years, Penn reviewed and updated the policy.

31.     Penn adopted the policy to make it clear that the tenure clock "stopped," and academic production was not expected during that year.

32.     As of February 2006, Penn approved a revised Policy on Extension of the Probationary Periods that Apply to Granting of Tenure or Promotion to Associate Professor, which allowed male and female tenure track professors to seek a one-year extension of the probationary period following the birth of a child into the faculty member's household if the faculty member is the primary or co-equal parental caregiver.

33.     As part of that policy, the letters soliciting evaluations from external reviewers are to explicitly state that the candidate has taken an extension pursuant to the policy, and that Penn would evaluate the productivity of each candidate who has been granted an extension as if he or she had been in probationary status for the normal duration, so that the candidate is not penalized for having received the extension.

Penn's Recognition of the Gender Imbalance in Faculty and its Purported Investment Improving The Presence and Experiences of Women Faculty

34.     As reflected in its various Progress Reports on Gender Equity, Penn purports to be committed to increasing the presence and improving the experience of women faculty.

35.     With respect to women faculty in 2011, the year in which Professor Veikos was considered for tenure, Penn reported that the proportion of women faculty at Penn was 30.7%. As reported by Penn, within the School of Design, 57% of Assistant Professors (non-tenured) were women, but only 15.4% of Full Professors were women. In the same year, Penn reported that 50% of Assistant Professors (non-tenured) in the Department of Architecture were women, but only 20% of Full Professors (1 out of 5) were women. These statistics clearly demonstrate that the low percentage of tenured faculty was not a "pipeline" problem.

36.     At the time it evaluated Professor Veikos' tenure case, Penn's President, Provost, and the rest of the University's Administrators were fully aware of the gender imbalance in the tenured faculty, as well as the federal, state, and local laws prohibiting discrimination on the basis of gender and/or family status in evaluating tenure.

<u>Department of Architecture's Preferential Treatment of Male Professors Prior to Professor Veikos' Consideration for Tenure</u>

37.     In 1999, Penn's Department of Architecture had one open  tenure track position, for which Professor Veikos applied and interviewed.

38.     At that time, Gary Hack (male) served as Dean for the School of Design, Richard Wesley (male) was Chair of the Department, and William Braham (male) was Chair of the Selection Committee.

39.     The Department of Architecture Faculty narrowed its search for the open tenure track position to three candidates: Cathrine Veikos; Ali Rahim (male); and Branko Kolarevic (male).

40.     Despite the Faculty's preference to hire Professor Veikos into the tenure track position, Dean Hack and his male colleagues extended tenure track offers to both of the male candidates (Ali Rahim and Branko Kolarevic), but not to Professor Veikos. Penn made two

offers for tenure track positions to the two male candidates, even though there had been only one position posted.

41.     Instead, Professor Wesley, as Department Chair, offered Professor Veikos an appointment as a Full-Time Lecturer, which she accepted.

42.     At the time David Leatherbarrow (male) applied for tenure in the Department of Architecture, his tenure dossier included a number of published articles and two books that were under contract, but as yet unpublished. Penn approved Professor Leatherbarrow's tenure application.

43.     Penn recruited Detlef Mertins (male) from another institution to serve as Chair of the Architecture Department. Penn reviewed his tenure application the same year he joined the Faculty. At the time, Professor Mertins' only sole-authored published book  was an introduction to a translated work. Penn approved Professor Mertins' tenure application.

44.     At the time Annette Fierro (female) submitted her tenure application, her tenure dossier included one published book. Penn approved Professor Fierro's tenure application.

45.     At the time William Braham (male) submitted his tenure application, his tenure dossier included only his Ph.D. thesis, which was an introduction to a translated work. Penn approved Professor Braham's tenure application.

46.     The Department of Architecture first considered Ali Rahim (male) for tenure in the sixth year of his probationary period. Upon information and belief, the Faculty did not support Professor Rahim for tenure, but the Dean, Gary Hack, and former Chair, Richard Wesley, and the Chair, Detlef Mertins all strongly supported his candidacy.

47.     Upon information and belief, with the support of his male mentors within the Department and University administration, Professor Rahim withdrew his tenure application rather than risk a denial of his tenure application.

48.     Upon information and belief, Richard Wesley characterized the situation with Professor Rahim as follows: We are not going to ruin a young man's career over this.

49.     Thereafter, Penn allowed Professor Rahim to leave the University for a year during which he taught as a Visiting Professor at another institution.

50.     During the year Professor Rahim taught away from Penn, the Department considered his tenure application and the Faculty vote was split. Nevertheless, the Chair of the Department, Professor Mertins (male), strongly advocated for Professor Rahim to the Personnel Committee, where again the vote was split.

51.     Despite a split vote for Professor Rahim's tenure case at the Personnel Committee, Dean Hack enthusiastically supported Professor Rahim to the Provost.

52.     Penn approved Professor Rahim's tenure application.

53.     A female student in Professor Rahim's studio experienced sexual harassment from other students in the class. Later, Professor Wesley hired her to teach in the undergraduate program. When her undergraduate students were told that the only reason she was hired to teach was because she had an affair with Professor Wesley, the female lecturer requested a meeting with Professor Wesley and Professor Mertins.

54.     In that meeting with the male professors, the female lecturer requested that they ask the student who defamed her to publicly apologize and that Professor Wesley take steps to put an end to the false rumor. Instead, the male professors told the female lecturer that she should

be "flattered," that these types of rumors were "common" and "inconsequential," and that she should not take the issue further or it would "ruin" her career.

55.     The actions of Professor Braham, who became Interim Chair of the Department when Professor Mertins went on medical leave, were also motivated by gender bias. For example, Professor Braham assigned more significant administrative duties to female faculty members, including Professor Veikos as set forth herein, but not the men.

56.     In addition, when Professor Veikos became aware that a male faculty member had copied a syllabus from one of her courses, Professor Braham dismissed her concerns and made little effort to address the male faculty member's inappropriate conduct.

57.     Another time, a female student approached Professor Veikos about concerns about working with a male partner with whom she had been assigned to work in one of her studios. The student had already spoken to Professor Braham, but he had not taken any steps to address the female student's concerns. When Professor Veikos asked Professor Braham about the situation, Professor Braham claimed that he had the situation in hand and that the student who complained was being "hysterical."

58.     In 2009, Penn offered workshops on the subject of unconscious bias in selection decisions to its various schools, including the School of Design.

59.     In 2010, Vice Provost for Faculty, Lynn Hollen Lees, conducted training sessions on how to conduct effective faculty searches for the members of search committees. In one such training session, Vice Provost Lees confirmed that unconscious bias adversely affected the consideration of female candidates, and she recommended that decision makers become familiar with research on bias and take steps to conduct structured, evidence-based reviews of candidates.

60.     At a Department of Architecture Faculty meeting on December 1, 2010, Professor Ali Malkawi (male) presented on the status of a search for a new Assistant Professor in Environmental Building Design. In that context, Professor Fierro raised the issue of unconscious bias in hiring, and referenced the University's communications on the subject.

61.     In response, several male Professors in the Department became very defensive, indicating that there was no way they could be biased based on gender because there was (supposedly) no way to tell the gender of the candidates from the search materials. Professor Witold Rybczynski (male) said the concept of unconscious bias was "bullshit."

62.     The Minutes of the Department meeting, distributed by Professor Braham, include the following summary of the discussion: "The concept of Objective Bias [sic] was raised but discounted by the committee, especially in terms of gender, because [we] did not have this information to be biased by."

Professor Veikos' Tenure Probationary Period and Qualifications for Tenure

63.     Penn appointed Professor Veikos as an Assistant Professor on a tenure track on July 1, 2003 for a four (4) year term. In accordance with Penn's policies, Professor Veikos anticipated her application for tenure would be reviewed during the 2008/2009 academic year.

64.     Professor Veikos sought approval to travel with students to Brazil during the 2004/2005 academic year in order further her research in support of the publications that would be required for tenure. At the time, Professor Veikos had been awarded a Rotch Traveling Studio Scholarship to support field research in Brazil during the 2004/2005 academic year.

65.     Professor Mertins (male), as Chair of the Department, denied her request. Instead, Professor Veikos was forced to delay her trip  to Brazil to  the following year.

66.     In May 2006, Penn confirmed Professor Veikos' reappointment as Assistant Professor for three (3) years, effective July 1, 2007.

67.     In anticipation of the birth of her son, Professor Veikos sought and received a 50% reduction in her teaching obligations for the 2006/2007 academic year, which meant that she would continue her duties throughout the year, except that she would not be required to teach during the Fall Semester 2006.

68.     Without Professor Veikos' consent, Professor Braham and Dean Hack nominated her to partner with Drexel University in its bid to host the Annual Meeting of the Association of Collegiate Schools of Architecture (ACSA) to be held in March 2007. Dean Hack did not inform Professor Veikos of the situation until the bid was accepted. Although he gave Professor Veikos the opportunity to refuse this academic service duty, which required significant time and effort, he framed the situation as a reasonable substitute for her reduced teaching obligations. Professor Veikos agreed to complete the additional work.

69.     Professor Veikos gave birth to her son, Alexander, on September 28, 2006. She resumed her full duties, including a full teaching schedule, for the Spring semester.

70.     In Spring 2007, Professor Veikos applied for and received a one-year extension of her tenure probationary period pursuant to Penn's "family-friendly" policies.

71.     At that time, Professor Veikos was working on a book project that included an extensive Appendix in which she was translating a prior work by Lina Bo Bardi, a female Brazilian architect. Given the timing of the birth of her son, the scope of the project, and her goal to have at least one book published prior to the end of her probationary period, Professor Veikos decided to shift her focus to publishing an introductory essay to the translated work as a separate book.

12

72.     Professor Veikos made her decision in consultation with Faculty mentors, including David Leatherbarrow, who expressly supported her decision to focus on publishing the introductory essay and translation first as a separate book, rather than an appendix to her other book.

73.     Professor Leatherbarrow also confirmed at the time that publication of the translation with an introductory essay, rather than an original work, would not negatively impact Professor Veikos' tenure review, since Penn granted tenure to Professor Mertins (male) on one published translation as well.

74.     In Fall 2007, Professor Braham scheduled Professor Veikos' "junior research leave," which was a leave from teaching to conduct research required for her tenure publications. In light of Professor Veikos' extension of her probationary period, this leave should have been delayed by one year. However, Professor Braham never consulted with Professor Veikos about the timing of the research leave; he just went ahead and did not schedule her to teach that semester.

75.     On October 1, 2008, Marilyn Jordan Taylor (female), an urban design practitioner with no academic experience, was appointed Dean of the School of Design, replacing Gary Hack.

76.     In the 2009/2010 academic year, Professor Veikos had the opportunity to apply for tenure even though she had one year left in her probationary period. At that time, in consultation with both Department Faculty and the Dean, Professor Veikos decided that she would postpone her tenure application to the following academic year to ensure that she would be able to include a publishing contract for her first book, *Lina Bo Bardi: The Theory of Architectural Practice*, in her tenure dossier.

77.    Professor Veikos and her Faculty mentors also discussed a preference to postpone the tenure review to the next year in order to allow the newly appointed Dean to become familiar with her responsibilities and role in connection with tenure cases.

78.    At around the same time, Dean Taylor appointed Professor Veikos to the Search Committee for a new Chair of the Department, corroborating the Dean's perception that Professor Veikos had a role in determining the direction of the Department moving forward. In that conversation, Dean Taylor advised Professor Veikos that she had "nothing to worry about" with respect to her case for tenure.

79.    At the time of her review, Professor Veikos clearly met the criteria for tenure at Penn. By then, Professor Veikos had published numerous peer-reviewed articles and papers in the field of Visual Studies. Professor Veikos was also widely recognized in academia across the country as a result of her publications and presentations, her Rotch Traveling Scholarship Award, Cass Gilbert Fellowships, Graham Foundation for the Advancement of the Arts Award, Alice Paul Research Fellowship, and other prestigious research grants and awards.

80.    Professor Veikos' status as a thought leader in the field of Visual Studies was clearly demonstrated through all of her writing, her invited workshops and lectures, and through her numerous former students and mentees who were actively teaching her ideas at universities around the world.

81.    With regard to Professor Veikos' forthcoming *Bo Bardi* book, Professor Leatherbarrow opined that it would be an "important book for some time in the future" and be "followed by others of similar significance." As to Professor Veikos' scholarship, Professor Leatherbarrow characterized it as "original and significant."

14

82.     Similarly, Kenneth Frampton, Ware Professor of Architecture at Columbia University, who also recommended Professor Veikos' book for publication, praised the range and subject matter of her writing.

<u>Braham's Discriminatory Handling of Professor Veikos' Tenure Application</u>

<u>Braham's Intentional Sabotage of the External Review Process</u>

83.      As interim Chair of the Department of Architecture, Professor Braham had the authority and responsibility to oversee Professor Veikos' tenure application process, lead the faculty discussion, record the Department vote, and make the case before the Personnel Committee.

84.     Professor Braham's responsibilities also included submitting the dossier on the candidate in accordance with University and School of Design procedures and ensuring the appropriateness of external reviewers and the quality of the reviews conducted by the faculty and any ad hoc committees.

85.     Throughout the process, Professor Braham led Professor Veikos to believe that he supported her candidacy for tenure, and was committed to managing the process effectively.

86.     However, rather than facilitating Professor Veikos' tenure review in a professional and objective manner, Professor Braham purposely sabotaged her application because of her gender and her familial status, particularly the fact that she had taken advantage of Penn's policy to extend her tenure probationary period following the birth of her son.

87.     Professor Braham initiated his facilitation of Professor Veikos' tenure review in December 2010, by sending her a draft letter to be sent to external reviewers that referred to her with male pronouns.

15

88.     This was the same month that the men in the Department of Architecture declared the topic of unconscious gender bias to be "bullshit."

89.     Professor Braham had an affirmative obligation to frame Professor Veikos' area of expertise as Visual Studies, and to select external reviewers who were well positioned to opine on her candidacy in that area. Instead, Professor Braham's communications about the scope of Professor Veikos' expertise were limited to the work of Bo Bardi, and he did not fulfill his obligations with respect to his selection of external reviewers.

90.     Aside from his own inappropriate selection of reviewers, Professor Braham violated Penn's policy relating to Professor Veikos' ability to select reviewers.

91.     The School of Design's rules permit the tenure candidate to select up to three of the external reviewers. In Professor Veikos' case, however, Professor Braham only allowed her to choose two names.

92.     Rather than allow Professor Veikos to make a third selection, Professor Braham actually required her to select a reviewer whose work was ideologically opposed to her own. The selection of such a reviewer was inappropriate regardless of whether it was on the University's list or Professor Veikos' list.

93.     In the letters soliciting the opinions of the external reviewers, Professor Braham also violated Penn policy by not including the required language about Professor Veikos' extension of her probationary period.

94.     By doing so, Professor Braham invited a biased assessment from reviewers who would inaccurately assume Professor Veikos had an extra year in which to produce material for her tenure dossier, an outcome Penn's policy was expressly designed to avoid.

16

95.     Professor Braham also rushed the external review process so that the external reviewers were not even aware that Professor Veikos' book had been accepted for publication by Routledge, Taylor & Francis Group, a well-regarded scholarly press.

96.     Specifically, Professor Braham knew that Professor Veikos was expecting confirmation of a publication contract for her book in early 2011, which was ultimately received on March 24, 2011.

97.     However, Professor Braham set the deadline for the responses from the external reviewers in early March 2011, without notice or confirmation that the publishing contract for Professor Veikos' book was expected to and/or had been secured.

98.     Presumably to hide his misconduct, Professor Braham repeatedly told Professor Veikos that he would communicate the status of her book to the reviewers, even though he did not.

99.     Not surprisingly, Professor Braham's discriminatory efforts to present Professor Veikos in a negative light by making ill-advised reviewer selection decisions, leaving out the fact that her probationary period was extended by one year, and hiding the fact that her book had been accepted for publication, among others, were successful.

100.    Although many letters from external reviewers were extremely positive, several of the letters contained negative opinions about Professor Veikos' tenure candidacy that were clearly and improperly based on incorrect information about Professor Veikos' status and the contents of her dossier.

101.    As Professor Veikos had feared, the external reviewer that Professor Braham forced Professor Veikos to include in her list wrote a very negative letter questioning her scholarship.

17

Braham's Intentional Sabotage of the Faculty Voting Process

102.     Prior to the Faculty vote on Professor Veikos' tenure case, Professor Braham solicited letters from the Faculty.

103.     Professors Leatherbarrow and Fierro both submitted letters strongly supporting Professor Veikos' tenure case.

104.     The School of Design's procedure for utilizing an Ad Hoc Committee for tenure reviews expressly contemplates that a senior faculty member who is knowledgeable about the candidate's field will conduct a careful reading of the dossier and offer a written appreciation of it for the benefit of the various groups of internal reviewers (faculty, personnel committee, dean, and university committees).

105.     In violation of this procedure, Professor Braham selected Professor Rahim and Professor Weiss for the Ad Hoc Committee. Neither Professor Rahim nor Professor Weiss had a sufficient understanding of Visual Studies to serve on the Ad Hoc Committee.

106.     Moreover, both Professors Rahim and Weiss had been tenured on their design work, rather than their scholarship, and their letter about Professor Veikos' candidacy improperly assessed her design work, rather than her scholarship in Visual Studies.

107.     Upon information and belief, Professor Braham selected Professor Rahim to serve on the Ad Hoc Committee with knowledge that he  opposed Professor Veikos' candidacy.

108.     In addition to being improperly focused on Professor Veikos' design work as opposed to her scholarly achievements in Visual Studies, Professors Rahim and Weiss were improperly evaluating her candidacy based on the "quantity" of her work (which they described as "limited"), rather than its quality, which was the purpose of the Ad Hoc Committee.

18

109.     This improper focus was exacerbated by the fact that Professors Rahim and Weiss inaccurately identified the start of Professor Veikos' probationary period to be 2002, instead of 2003, which suggests they were evaluating her work as if she had an additional year for production.

110.     On April 6, 2011, six (6) of the eight (8) members of the tenured Faculty in the Department of Architecture met to discuss and cast their votes for Professor Veikos' tenure application. Present in the room were: William Braham; Annette Fierro; David Leatherbarrow; Frank Matero; Ali Rahim; and Witold Rybczynski. Ali Malkawi and Marion Weiss were not present.

111.     As interim Chair, Professor Braham collected the paper ballots and announced the vote as five (5) in favor and one (1) against. The tally at the meeting included a  vote in favor from Professor Braham.

Braham's Intentional Sabotage of the Personnel Committee Process

112.     Despite the overwhelmingly positive support Professor Veikos received from the tenured Faculty, Professor Braham intentionally sought  to defeat her tenure candidacy in his presentation of her case to the Personnel Committee.

113.     In violation of past procedures in the Department of Architecture, Professor Braham did not circulate a draft of his letter to the Personnel Committee about Professor Veikos' candidacy prior to submitting it.

114.     In that letter, forwarded to the Personnel Committee on April 6, 2011, Professor Braham represented that the Department vote was four (4) in favor and two (2) against, with his vote changed from how it was communicated in the Faculty meeting.

19

115.    In the same letter to the Personnel Committee, Professor Braham also explicitly advocated against Professor Veikos' tenure promotion, supposedly because he could not "dismiss" the negative feedback from the external reviewers relating to the *quantity* of her scholarly production, a false perception that he had purposely created.

116.    Specifically, Professor Braham highlighted excerpts from the external consultants, who "lauded the scholarship, but questioned whether there was a *sufficient quantity of work*," and who "found the *total body of work less substantial than expected.*"

117.    Knowing that the opinions of the external reviewers were based on an inaccurate perception of Professor Veikos' publication record, which he caused, Professor Braham encouraged the Personnel Committee to accept the assessments of those external reviewers over the overwhelmingly positive support from the Faculty vote.

118.    In addition, in violation of the intent of Penn's policy relating to the extension of the tenure probationary period for birth of a child, Professor Braham wrote: Professor Veikos was "reappointed in 2006, and then the following year *was granted an additional year* in her *tenure-probation period* because of the birth of her son" (emphasis added).

119.    Throughout his advocacy against Professor Veikos to the Personnel Committee, Professor Braham focused on the purported inadequacy of the volume of her published work, but never questioned the quality of her scholarship.

120.    The School of Design Personnel Committee met on April 8, 2011 to consider Professor Veikos' tenure application. At the meeting, Professor Braham actively advocated against tenure. The Personnel Committee voted against tenure by a vote of zero (0) for and four (4) against.

121.    In subsequent discussions with Professor Veikos about the Personnel Committee's consideration of her tenure case, Professor Braham told her that the external reviewers had questioned her decision to focus on publishing the Bo Bardi translation as her first book separate from her broader project.

122.    In that context, Professor Veikos reminded Professor Braham that she made that decision in consultation with Faculty mentors, with the expectation that publishing the first book would be sufficient for tenure, and he had done the same thing. In response, Professor Braham claimed the shift was because she was "having trouble with the first book" after her son was born, and told her: "*Look, you can't argue it both ways. Either you finished what you expected to finish or you have an excuse for not finishing.*"

123.    Professor Braham's conduct and statements evidence his resentment and animosity against Professor Veikos because of her efforts to combine her caregiving responsibilities as a parent with her efforts to achieve tenure at Penn.

124.    In an effort to hide his biases, Professor Braham told Professor Veikos that there was a "split vote" on her case within the Faculty, and never acknowledged that he had advocated against her candidacy to the Personnel Committee.

Penn's Willful Abdication Of Its Responsibility To Address Braham's Discriminatory Actions Resulted In The Discriminatory Denial Of Professor Veikos' Tenure Application

The Perfunctory Reconsideration By The Personnel Committee

125.    On April 18, 2011, Dean Taylor and Professor Leatherbarrow met with Professor Veikos to advise her that the Personnel Committee had voted against her promotion to Associate Professor with tenure.

21

126.    Dean Taylor was clearly surprised at the outcome, and agreed to give Professor

Veikos an opportunity to bring additional information to the attention of the Personnel

Committee for reconsideration.

127.    At that time, Professor Veikos was unaware of the many ways in which Professor

Braham had intentionally sabotaged her tenure case.

128.    Despite the unexpected outcome of the initial Personnel Committee vote, Dean

Taylor took no steps to review Professor Braham's conduct with respect to Professor Veikos'

tenure case for evidence of mishandling or bias.

129.    In addition, Dean Taylor took no steps to ensure that the reconsideration of

Professor Veikos' tenure case at the Personnel Committee was anything more than perfunctory.

130.    On Thursday, April 21, 2011, Professor Braham asked Professor Veikos to submit

any additional materials for consideration by the Personnel Committee no later than the next day,

April 22, 2011 (Good Friday), with the expectation that another vote would be taken at the

Personnel Committee's next scheduled meeting on Monday, April 25, 2011, the day after Easter.

131.    The next day, April 22, 2011, Professor Veikos was advised that the Department's

offices were closing at 1:30 pm, and all new materials had to be submitted by that time.

132.    Despite the short deadline, Professor Veikos submitted a letter to the Personnel

Committee in which she highlighted her concern that the external reviewers may not have been

aware that her manuscript for *Lina Bo Bardi: The Theory of Architectural Practice* had been

accepted for publication. Among other accomplishments, Professor Veikos also confirmed that

the proposal for her second book, *The Sense of Surface: Lina Bo Bardi's Drawings and*

*Buildings*, was favorably evaluated by Ashgate Publishing Company's Commissioning Editor,

Visual Studies, and was being circulated to reviewers for publication.

133.     In the meantime, Professor Fierro became aware that Professor Braham had changed how his vote at the Faculty meeting was reflected in his initial letter to the Personnel Committee. At Professor Fierro's insistence, Professor Braham revised his April 6, 2011 letter to show the Faculty vote as five (5) in favor and one (1) against.

134.     When the Personnel Committee met again on April 25, 2011, Professor Braham again attended the meeting and again advocated against the promotion, even though he told Professor Veikos that he would have no role in the reconsideration process.

135.     In refusing to approve Professor Veikos' application for tenure with a vote of two (2) for and three (3) against, the Personnel Committee again referenced the "concerns" of the external reviewers about the *quantity* of her published work.

136.     Despite their focus on *quantity* of production, the Personnel Committee took <u>no steps</u> to investigate Professor Veikos' concerns that the external reviewers were not aware of the publication contract for her book.

<u>Penn Administration's Failure to Investigate And Rectify Braham's Discriminatory Bias</u>

137.     Soon after the Personnel Committee's second vote against her tenure case, Professor Veikos began to question Professor Braham's handling of the process. For example, Professor Veikos asked Dean Taylor whether it was possible that the external reviewers had not been informed of the publication contract for her first book. Dean Taylor did not have a response.

138.     On May 4, 2011, Professor Veikos met with Dean Taylor to appeal to her to bring her tenure application to the Provost with a positive recommendation in light of the strength of her qualifications, and the mishandling of the process.

139.    A few days later, Professor Veikos confirmed her request in writing, and referenced the section of the School of Design policies that expressly permits the Dean to forward recommendations for tenure to the Provost that did not receive a positive endorsement of the personnel committee.

140.    Professor Veikos also met with Penn's Ombudsman, Joan Goodman (female), to seek assistance to review the tenure process. At the suggestion of Professor Goodman, Professor Veikos requested to see a copy of Professor Braham's letter to the external reviewers and learned for the first time that it violated Penn's policy by excluding the required language about the extension of her probationary period.

141.    Unbeknownst to Professor Veikos, Penn sent e-mails to each of the nine external reviewers who opined on Professor Veikos' tenure case in early May 2011 to advise them that information about the Policy on the Extension of the Probationary Periods had been mistakenly excluded from her dossier.

142.    Penn asked that each of the external reviewers reply within less than a week to confirm whether the Policy's application to Professor Veikos' tenure case changed their opinions about her candidacy.

143.    The process of asking the external reviewers to confirm whether this new information impacted their opinions within less than one week, at the busiest time of the academic year, was completely inadequate to remedy the significant policy violation.

144.    By the required deadline, one external reviewer confirmed that the new information improved her impression of Professor Veikos' productivity. .

145.    By that point, Professor Goodman had suggested that Professor Veikos consult with Bethany Wiggin, a candidate for tenure in the School of Arts & Sciences, Department of

Germanic Languages and Literatures. As with Professor Veikos, Penn had also violated the Policy on the Extension of the Probationary Periods in Professor Wiggin's tenure process..

146.    As was the case with Professor Veikos, Professor Wiggin received a positive vote for tenure from the Faculty in her Department, but the Personnel Committee vote was against and contained negative references to her pace of production.

147.    On May 12, 2011, with support from Professor Goodman, Professor Veikos wrote to Lynn Hollen Lees, Vice Provost for Faculty, about the inadequacy of Penn's efforts to rectify its violation of the Policy on the Extension of Probationary Periods. Professor Veikos specifically requested a new tenure review in the next academic year, and an extension of her employment during the period of review.

148.    At that time, Professor Veikos was still not yet aware of the other significant ways in which Professor Braham had intentionally sabotaged her tenure candidacy because Penn restricted her access to her tenure file.

149.    On May 13, 2011, the Personnel Committee met to consider the responses from the external reviewers about whether information about Penn's Policy on the Extension of Probationary Periods would change their opinions.

150.    In her letter confirming the substance of that meeting addressed to Dean Taylor, the Chair of the Personnel Committee stated that eight (8) of the external reviewers said the additional information did not affect their previous opinions. However, she made no mention of the reviewer who confirmed the information positively impacted her view of Professor Veikos' *productivity*.

25

151.    The Personnel Committee Chair's May 13, 2011 letter also inaccurately asserted that Professor Veikos' probationary period had been extended to nine (9) years, when it had been extended only once to eight (8) years.

152.    On May 17, 2011, Vice Provost Lees responded to Professor Veikos' complaint about the processing of her tenure case. In that letter, Vice Provost Lees claimed that sending follow up letters to the external reviewers about the failure to include the provisions required by Penn's Policy was a "sufficient remedy for the omission in the original letters."

153.    Vice Provost Lees also asserted that Penn requires tenured faculty to be "thought leaders in their field," and that issues of "quantity of production are secondary to judgments of quality and intellectual eminence."

154.    Vice Provost Lee's comments about the supposed reason for the Personnel Committee's negative vote directly contradicted Professor Braham's explanations that it was Professor Veikos' *quantity of production*, and not the quality of her scholarship, that precluded tenure.

155.    Professor Veikos also confided in Professor Fierro about what had transpired. In those communications, Professor Veikos learned of Professor Braham's mishandling of how the Faculty vote was reported to the Personnel Committee.

156.    During the time she was consulting with Penn's Ombudsman about her case, Professor Veikos also contacted David Brownlee (male), the Chair of the Faculty Grievance Committee, about her options.

157.    Both Professor Veikos and Professor Fierro appealed to Professor Brownlee to support a Grievance Committee review of the situation, and to consider continuing Professor

Veikos' employment to allow for the tenure review process to be conducted again in a fair and unbiased way.

158.     By letter dated May 27, 2011, Dean Taylor acknowledged Professor Veikos' requests for a re-review of her tenure case, confirmed that conversations were continuing, and also reminded Professor Veikos that her employment at Penn was scheduled to end effective June 30, 2011.

159.     In the Spring 2011, soon after learning of the negative Personnel Committee vote, Professor Wesley asked to meet with Professor Veikos. During their discussion, Professor Wesley told Professor Veikos that she should feel "lucky" because she had a "good run." Professor Wesley discouraged her from advocating to Dean Taylor to take her tenure case to the Provost in order to avoid a formal denial. That way, according to Professor Wesley, Professor Veikos could leave "gracefully" and no one would ever know she had been denied tenure.

160.     On June 8, 2011, Professor Veikos met with Professor Brownlee to talk about the grievance process. During that discussion, Professor Brownlee attempted to talk Professor Veikos out of filing a grievance, and instead to take advantage of the "good will" she had in order to find some resolution short of a re-review of her tenure case. Professor Brownlee indicated that Penn was considering an offer for Professor Veikos to stay in some capacity to stabilize her financially.

161.     Professor Brownlee also told Professor Veikos that he had not yet decided whether he would find adequate grounds for a grievance in her case, even though her situation fit squarely into the grievance requirements, which includes actions that are: (1) arbitrary and capricious; (2) discriminatory with regard to gender; and/or (3) not in compliance with University procedures or regulations.

162.     During the same conversation, Professor Brownlee questioned whether Penn's Policy on the Extension of Probationary Periods was even helpful to working mothers. According to Professor Brownlee, all of the men who had taken advantage of the policy obtained tenure, but only a small percentage of women who had taken the extension obtained tenure.

163.     Later the same day, Professor Veikos met with Dean Taylor about her options. Professor Veikos communicated to Dean Taylor that the only way to remedy the significant procedural errors was to allow a re-review in the normal cycle the following year, which would include her continued employment during the re-review period. At that point, Professor Veikos' employment was scheduled to terminate on June 30, 2011.

164.     Professor Veikos also made Dean Taylor aware that she was considering filing a formal grievance. In response, Dean Taylor asked her to consider how she wanted to spend her next year at Penn – productively, or in a long and drawn out grievance procedure.

165.     Dean Taylor advised Professor Veikos during the same discussion that she, Professor Braham, and Professor Brownlee had all communicated together and decided that the missing paragraph in the external review letters did not have any negative impact on her tenure candidacy.

166.     In their discussion, Dean Taylor repeatedly told Professor Veikos that she had gotten an "extra" year to compile her tenure dossier, which was not only false but represented a complete distortion of Penn's policies.

167.     Dean Taylor offered to "remedy" the situation by extending Professor Veikos' employment for one year with the title of "Distinguished Fellow," so that she would have time to look for another job. When Professor Veikos asked her to confirm the offer in writing, Dean Taylor said she was giving "her word."

28

168.     At that point, no one from Penn had taken any steps to reasonably investigate Professor Veikos' concerns about Professor Braham's misconduct in connection with her tenure process.

169.     Instead, Professor Wesley again sought out Professor Veikos, and while purporting to empathize with her situation, discouraged her from pursuing a grievance. Professor Wesley told Professor Veikos there was no one to blame with respect to her tenure denial, and "things just happen."

Professor Veikos' Complaint of Discrimination and Penn's Retaliatory Response

170.     By letter dated June 15, 2011, Professor Veikos thanked the Dean for her offer to continue her employment for one year so that she could conduct a job search, but reiterated her request to move her application for promotion to Associate Professor with tenure to the Provost despite the Personnel Committee's negative vote.

171.     In the same letter, Professor Veikos conveyed her intent to file a grievance with the Faculty Grievance Committee, outlined the reasons for her complaint at length, and asked for a written explanation of the reasons her tenure application was denied.

172.     Professor Veikos expressly asserted her concerns that Professor Braham had treated her differently than male candidates in the tenure process because of her gender and/or because she had requested an extension of her probationary period when her son was born. She also outlined a series of other incidents suggesting that Professor Braham and other male leaders in the Department of Architecture were biased against women.

173.     On the same date, Professor Veikos' attorney wrote to Penn's President, Amy Gutmann, seeking a full review of the situation before her client's employment terminated at the end of the month.

174.    On the evening of June 30, 2011, Dean Taylor sent Professor Veikos a letter to set forth the reasons her tenure case was not approved. Specifically, Dean Taylor claimed that Penn denied tenure to Professor Veikos because: (1) the quality of her work was seen as "weak" by several reviewers and faculty members; (2) her productivity did not meet expectations for promotion, making the assessment in full awareness of the extension of her probationary period for one year; and (3) there was little evidence presented that she was a thought leader in her field and discipline.

175.    In her June 30, 2011 letter, Dean Taylor also advised Professor Veikos that her employment at Penn terminated effective that day, and she made no mention of her prior offer to continue her employment for the upcoming academic year.

176.    Professor Veikos was as qualified, if not more qualified, than the male professors with and without caregiving responsibilities who were granted tenure in the Department of Architecture.

177.    The reasons stated by Penn in Dean Taylor's letter for denying tenure to Professor Veikos were false and just pretext for gender and familial status discrimination and retaliation.

178.    Despite taking the position that Penn's School of Design had done nothing wrong with the processing of Professor Veikos' tenure case, Dean Taylor advised Professor Veikos that they had decided to conduct a "re-evaluation" of her case for tenure and promotion. Dean Taylor stated that the re-evaluation process would begin "immediately," but provided no other details of the process.

179.    The next day, July 1, 2011, Professor Veikos met with Professor Leatherbarrow at length about her status. Professor Leatherbarrow confirmed that the Dean had chosen not to move her tenure case forward to the Provost, so the re-evaluation was the only path to tenure.

30

180.    As the new interim Chair of the Department, Professor Leatherbarrow would be responsible for the re-evaluation process. In his meeting with Professor Veikos on July 1, 2011, Professor Leatherbarrow said he could not predict the outcome, but assured his colleague that he would handle it fairly, and he would argue in favor of tenure.

181.    Later that day (July 1, 2011), Professor Veikos contacted Dean Taylor to discuss the procedures for the re-evaluation, and to find out whether her offer of continued employment was still available. Dean Taylor was very upset, and advised Professor Veikos that her actions had "changed the tone of the conversation," that they were where they were because of her letter, that the conversation had really changed since she had "gotten a lawyer," and the re-review would "remove any hint of bias" from the case.

182.    Upon information and belief, and in contrast to Professor Veikos' situation, Penn approved Professor Bethany Wiggin's application for tenure after the Ombudsman, Joan Goodman, became aware that the Personnel Committee's negative decision in her case was likely impacted by her Department's violation of the Policy on the Extension of Probationary Periods.

183.    Upon information and belief, Professor Wiggin did not submit a complaint of discrimination to Rebecca Bushnell, Dean of the School of Arts & Sciences, and Dean Bushnell supported her case for tenure.

184.    In Professor Veikos' case, Dean Taylor refused to take her tenure case forward to the Provost, and Penn refused to approve her promotion, in retaliation for her complaint of discrimination.

185.    Penn and Dean Taylor withdrew the prior offer to continue Professor Veikos' employment for one year in retaliation for her complaint of discrimination.

31

Penn's Discriminatory and Retaliatory Re-Review of Professor Veikos' Tenure Case

186.    Penn's offer to conduct a "re-evaluation" of Professor Veikos' tenure application was nothing more than a misguided attempt to insulate itself from her legitimate claims of discrimination arising out of the initial tenure review process.

187.    Penn's handling of the re-evaluation process was tainted by blatant retaliation from the start.

188.    In her initial communication about the "re-evaluation" of Professor Veikos' tenure case, Dean Taylor suggested that the only thing that needed to be completed to move forward was for Professor Veikos to submit three new names for external reviewers.

189.    At that time, Penn made no attempts to correct the numerous mistakes made during the first tenure review process, as outlined in Professor Veikos' June 15, 2011 letter to Dean Taylor.

190.    By letter dated July 22, 2011, Dean Taylor provided Professor Veikos "clarification" of the procedures relating to the re-evaluation, supposedly so that Penn could move forward with the process in a "timely" manner.  The letter identified deadlines for Professor Veikos to submit updated dossier materials based on a target date of August 15, 2011 to send the tenure file to the external reviewers. Dean Taylor also advised Professor Veikos that she was expected to vacate her office by August 22, 2011.

191.    Dean Taylor demanded that Professor Veikos meet these deadlines with respect to her tenure dossier with knowledge that Professor Veikos' book publication deadline was also August 15, 2011. Dean Taylor's purposeful interference with Professor Veikos' publishing obligations was motivated by retaliatory bias.

192.    In response, Professor Veikos requested additional time to have the dossier materials updated to address the prior errors and omissions, as well as to have them professionally bound and printed. She also asked if she could continue to have access to her office and the University's resources during the re-evaluation process, which was critical to her ability to meet her publication deadlines. Finally, Professor Veikos asked Dean Taylor to reconsider her prior offer to extend her employment, if not for the full year, then during the re-evaluation process.

193.    Despite being faced with unreasonable and retaliatory demands and deadlines, Professor Veikos met all requirements imposed by Penn with respect to the re-evaluation of her tenure case.

194.    By letter dated August 8, 2011, at Dean Taylor's request, Professor Veikos identified the errors and omissions contained in the package of her dossier materials when they were presented to the external reviewers during the initial tenure application process.

195.    Professor Veikos submitted the corrected versions of her dossier on August 15, 2011 (the digital dossier to be printed and bound), and on August 18, 2011 (in three hard copy volumes).

196.    Despite the rushed deadline for submission, and Dean Taylor's representation that the dossier would be sent to external reviewers in August, Professor Leatherbarrow contacted Professor Veikos in mid-September to request additional changes to her Curriculum Vitae, confirming that the deadlines imposed by Penn were both arbitrary and retaliatory.

197.    Specifically, Penn asked Professor Veikos to:  (1) change her dates of employment at Penn to reflect that her employment ended; (2) change her role with regard to Ph.D. Dissertations from "Supervision" to "Advising"; (3) change the references from "External

33

Examiner" to "Visiting Critic" at other Universities; (4) divide the list of her publications to identify "Manuscripts" (to be published) separately from "Books" (already published); and (5) list "Articles in Peer-Reviewed Journals- Manuscripts" and "Articles in Peer-Reviewed Journals" separately.

198.    Professor Veikos made the requested changes to her Curriculum Vitae, even though the prior version was consistent with the Curriculum Vitae that Professor Rahim (male) had submitted in support of his application for his further promotion to Full Professor (for example, listing his manuscripts approved for publication under the "Books" heading with a notation that they were "forthcoming," not separately under a separate heading for "Manuscripts").

199.    Penn did not send Professor Veikos' dossier to the external reviewers until October 31, 2011, and requested that responses be submitted by December 5, 2011.  This time, at least, the letter contained the language about the extension of Professor Veikos' probationary period as required by Penn Policy.

200.    Upon information and belief, the letters solicited from external reviewers during the re-evaluation process were primarily "neutral" with respect to Professor Veikos' candidacy for tenure. Such an outcome was expected in light of Penn's insistence that Professor Veikos highlight on her Curriculum Vitae that she was no longer working at Penn. Few external consultants would risk their reputation by strongly advocating for tenure in such a situation regardless of how impressed they were by the candidate's credentials.

201.    Despite Professor Veikos' objection to the prior selection of Professors Rahim and Weiss to serve on the Ad Hoc Committee for her tenure review, Professor Leatherbarrow asked them to serve in the same role for the re-evaluation process.

202.    In the "new" letter from this Ad Hoc Committee, which was almost identical to the letter they submitted in connection with the first review, Professors Rahim and Weiss failed to correct even the most obvious errors that were identified by Professor Veikos in her letter to Dean Taylor on June 15, 2011, including their inaccurate identification of the start of her probationary period as 2002, rather than 2003.

203.    By letter dated January 20, 2012, Professor Fierro, submitted a letter in unqualified support of Professor Veikos' tenure case as she had in the first review.

204.    On February 1, 2012, Frank Matero (male), one of the Full Professors in the Department, sent an e-mail to Professor Leatherbarrow opposing Professor Veikos' application for tenure, although he would not be available to participate in the Department vote.

205.    Upon information and belief, it is against the School of Design's tenure procedures for a Professor to vote or opine on a tenure file if he or she is not present for the Department discussion and formal vote.

206.    Professor Matero had previously voted in favor of Professor Veikos' tenure case, and his strong opposition to her application in the re-review process was motivated by retaliatory bias.

207.    On February 1, 2012, seven of the eight members of the tenured Faculty of the Department of Architecture met to discuss and vote on the re-evaluation of Professor Veikos' case for tenure.  The Faculty voted:  two (2) in favor of tenure, and five (5) against.

208.    Professor Leatherbarrow, who had unequivocally supported Professor Veikos' tenure case the first time, changed his vote, and recommended against promotion.

209.    In addition to Professors Braham, Matero and Leatherbarrow, at least one other Professor changed his or her vote to against promotion. Since nothing else had changed with

respect to Professor Veikos' tenure file that would warrant a negative vote, other than her filing of discrimination complaints, the new negative Faculty votes were clearly motivated by retaliation.

210. The Personnel Committee met on February 29, 2012, to reconsider Professor Veikos' case for tenure, and voted two (2) in favor of tenure and three (3) against.

211. The Personnel Committee's decision was significantly influenced by the Department's negative vote and retaliatory bias, including that of the interim Chair, David Leatherbarrow, and Frank Matero, who also served on the Personnel Committee.

212. At the time of the re-evaluation for tenure, Professor Veikos was as qualified, if not more qualified, than male Professors with and without caregiving responsibilities whose applications for tenure were granted.

213. Penn denied Professor Veikos' tenure application following the re-evaluation process because of her gender (female), familial status (mother), and in retaliation for her complaints of discrimination.

214. Penn did not advise Professor Veikos of the tenure denial following the re-evaluation until May 7, 2012, almost <u>two months</u> after the Personnel Committee's letter was delivered to the Dean, even though the Guidelines issued by the American Association of University Professors (AAUP) advise against such communications beyond March 15, or April 15 at the latest, of any academic year.

215. On Monday, May 21, 2012, Professor Veikos went to Penn to collect some of her personal belongings, which she understood had been placed in storage when the Dean insisted that she vacate her office due to the limited availability of office space. When she arrived on

campus, Professor Veikos was led to her former office, which was set up exactly how she had left it the prior August, and had never been used.

216.    While on campus, Professor Veikos ran into Professor Matero, who disingenuously claimed, despite his advocacy against her tenure application: "I am sorry Cathrine, I did everything I could.  It's a tragedy."

The Devastating Impact of Penn's Illegal Actions On Professor Veikos' Career and Well-Being

217.    Following Penn's notice dated June 30, 2011 that it had denied her tenure application, and her employment was terminated effective that day, Professor Veikos' world was turned upside down.

218.    As a result of Penn's discriminatory and retaliatory conduct, Professor Veikos experienced devastating upheaval to her life and the emotional distress that went with it.

219.    As the primary financial support for her family, Professor Veikos knew she had to quickly find new employment. At the time, her son was about to turn five (5) years old.

220.    Professor Veikos was also facing the deadlines for her book, which needed to be met by August 15, 2011, and additional deadlines thereafter, if she wanted to keep on the publishing schedule. Yet, she had no longer had financial or administrative support or even space to continue her work.

221.    As a result of Penn's discriminatory and retaliatory conduct, the publication of Professor Veikos' first book was delayed, and she was forced to abandon her goal of publishing her second book.

222.    Professor Veikos was able to secure employment at California College of the Arts (CCA) as a Visiting Architect for the 2011/2012 academic year. Although it was a relief to find

employment, the new position required Professor Veikos to uproot her son from a stable community environment and move across the country.

223.    As a result of Penn's discriminatory and retaliatory conduct, Professor Veikos was forced to live apart from her aging parents who lived on the East Coast in order to provide financial support for her family.

224.    As a result of Penn's discriminatory and retaliatory conduct, Professor Veikos suffered embarrassment, humiliation, mental anguish, and a complete derailment of her career in academia.

225.    As a result of Penn's discriminatory and retaliatory conduct, Professor Veikos has suffered, and continues to suffer, a loss of earnings and/or earning capacity, and significant reputational harm.

226.    Penn's discriminatory and retaliatory actions were willful and implemented with malice and/or a reckless disregard for Professor Veikos' civil rights and warrant the imposition of punitive damages.

Plaintiff's Administrative Filings and The PCHR's Cause Findings

227.    The PCHR, the administrative agency in Philadelphia authorized to enforce the Philadelphia Fair Practices Ordinance, conducted an extensive investigation of Professor Veikos' complaints of discrimination and retaliation, including interviews of multiple witnesses and a review of thousands of pages of documents.

228.    The PCHR issued its Findings of the Investigation on December 31, 2019, in which it concluded: (1) The evidence shows [Penn's] denial of tenure to [Professor Veikos] in the instant matters more than likely occurred because of [her] gender (female) and her familial status (mother); and (2) The evidence shows [Penn's] denial of an extension of [Professor

Veikos'] employment more than likely occurred because of her involvement in a legally

protected anti-discrimination activity. A true and correct copy of the PCHR Findings of the

Investigation are attached as Exhibit A.

COUNT I<br>
Gender Discrimination in violation of<br>
<u>Title VII of the Civil Rights Act of 1964</u>

229.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though

fully set forth herein.

230.    Defendant violated Title VII by denying Professor Veikos' applications for

promotion to Associate Professor with tenure because of her gender.

COUNT II<br>
Gender Discrimination in violation of the<br>
<u>Pennsylvania Human Relations Act</u>

231.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though

fully set forth herein.

232.    Defendant violated the PHRA by denying Professor Veikos' applications for

promotion to Associate Professor with tenure because of her gender.

COUNT III<br>
Gender Discrimination in violation of the<br>
<u>Philadelphia Fair Practices Ordinance</u>

233.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though

fully set forth herein.

234.    Defendant violated the PFPO by denying Professor Veikos' applications for

promotion to Associate Professor with tenure because of her gender.

## COUNT IV
Familial Status Discrimination in violation of the
Philadelphia Fair Practices Ordinance

235.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

236.    Defendant violated the PFPO by denying Professor Veikos' applications for promotion to Associate Professor with tenure because of her familial status (mother).

## COUNT V
Retaliation in violation of
Title VII of the Civil Rights Act of 1964

237.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

238.    Defendant violated Title VII by denying Professor Veikos' applications for promotion to Associate Professor with tenure and by withdrawing the offer of continued employment as a Distinguished Fellow in retaliation for her good faith complaints of discrimination.

## COUNT VI
Retaliation in violation of the
Pennsylvania Human Relations Act

239.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

240.    Defendant violated the PHRA by denying Professor Veikos' applications for promotion to Associate Professor with tenure and by withdrawing the offer of continued employment as a Distinguished Fellow in retaliation for her good faith complaints of discrimination.

40

COUNT VII
Retaliation in violation of the
Philadelphia Fair Practices Ordinance

241.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

242.    Defendant violated the PFPO by denying Professor Veikos' applications for promotion to Associate Professor with tenure and by withdrawing the offer of continued employment as a Distinguished Fellow in retaliation for her good faith complaints of discrimination.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Cathrine Veikos, respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant as follows:

A.      Declaring the acts and practices complained of herein to be a violation of the Title VII of the Civil Rights Act of 1964;

B.      Declaring the acts and practices complained of herein to be a violation of the Pennsylvania Human Relations Act;

C.      Declaring the acts and practices complained of herein to be a violation of the Philadelphia Fair Practices Ordinance;

D.      Awarding to Plaintiff injunctive relief by ordering Penn to reinstate her to  the position of Associate Professor of Architecture and grant her tenure as soon as practicable;

E.      Awarding to Plaintiff compensation for all past and future pecuniary losses resulting from Defendant's illegal actions, including but not limited to lost earnings, lost earnings growth potential, all compensation and benefits lost due to the actions of Defendant, all

41

out-of-pocket losses, as well as an award of front pay if employment with Defendant in the position of Associate Professor of Architecture with tenure is not possible;

F.       Awarding to Plaintiff compensatory damages for all past and future non-pecuniary damages resulting from Defendant's illegal actions, including emotional distress, mental anguish, humiliation, and reputational harm;

G.       Awarding to Plaintiff punitive damages for Defendant's malicious and reckless conduct as described herein;

H.       Awarding to Plaintiff all costs of this action, together with reasonable attorneys' fees;

I.       Awarding to Plaintiff prejudgment interest;

J.       Awarding to Plaintiff the sum necessary to make up for any adverse tax consequences incurred by her as result of any judgment entered in this matter; and

K.       Awarding to Plaintiff such additional relief as the Court deems just and proper under the circumstances.

<u>JURY TRIAL DEMANDED</u>

Plaintiff hereby requests a jury trial on each of the Counts in this Complaint.

CONSOLE MATTIACCI LAW, LLC


s/ *Julie A. Uebler*
Julie A. Uebler, Esquire (ID No. 71297)
1525 Locust Street, 9th Floor
Philadelphia, PA 19102
(215) 545-7676 (Voice)
(215) 501-5957 (Fax)
uebler@consolelaw.com

Attorneys for Plaintiff
Cathrine Veikos

42

# EXHIBIT A

CITY OF PHILADELPHIA
COMMISSION ON HUMAN RELATIONS

Cathrine Veikos,
    Complainant

           v.

Trustees of the University of Pennsylvania,
    Respondent

PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

## FINDINGS OF THE INVESTIGATION

### SUMMARY OF THE COMPLAINT

On November 30, 2011[1], Complainant, Cathrine Veikos, filed an employment discrimination complaint against Trustees of the University of Pennsylvania, Respondent. Complainant was appointed as Full-Time Lecturer at Respondent in 1999. In July 2003 she was promoted to Assistant Professor Tenure Track. During the 2010-11 academic year Complainant was reviewed for the position of Assistant Professor with Tenure. Complainant believes she met all qualifications for the position. She alleges:

1. Denial of tenure and termination on June 30, 2011 based on gender and familial status. (Female, single mother who used Respondent's policies for tenure candidates who have children during their seven-year tenure period). William Braham, Interim Chair, Marilyn Taylor, Dean and members of the Personnel Committee denied Complainant tenure and thus had her terminated. Braham mishandled her application by overstating the amount of time Complainant had to publish work; failing to include required information about her using its Family Friendly Policy in the letters requesting outside opinions about Complainant (the External Letters); not using the External Reviewers she proposed; and speaking negatively about Complainant's qualifications to the Personnel Committee. Dean Marilyn Taylor and the Personnel Committee were dismissive of Complainant's concerns about Braham's improper actions and took no effective steps to remedy them.

2. Failure to appoint Complainant to a one-year position of Distinguished Fellow based on gender, familial status and retaliation. On June 8, 2011, Complainant asked Taylor to extend her employment with Respondent so there would not be a break in her employment history. She also asked Respondent to do a second evaluation of her application for tenure with a corrected dossier. Taylor verbally offered Complainant a one-year appointment but refused to approve a reevaluation of Complainant's application. Taylor withdrew the offer on June 30, 2011 because complaints were raised over Respondent's discriminatory behavior in writing on June 15, 2011. Taylor stated Complainant's actions "changed the tone of the conversation", that they were "where we were" because of Complainant's letter; that the conversation "had really changed" since

---

[1] Complainant's attorney initially filed a complaint with the EEOC, which she sent to PCHR on October 14, 2011. Complainant signed a PCHR Charge form on January 30, 2012, which was revised on May 30, 2012 because Complainant Attorney put the wrong docket number on the first one.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR Charge No. E12026008
EEOC Charge No. 17G-2012-00083C

she had "gotten a lawyer;" and that a second review of Complainant's tenure application
would "remove any hint of bias."[2]

## SUMMARY OF THE RESPONSE

In response to Complainant's concerns, Respondent completed four reviews of Complainant's
application for tenure: On April 6, 2011 the Faculty Committee voted in favor of Complainant,
with Braham voting against her because some of the External Letters thought Complainant's
work was not "substantial" enough. The Personnel Committee voted unanimously against
Complainant. On April 18, Complainant raised concerns about her tenure review with Taylor
and David Leatherbarrow, her tenure mentor. Taylor allowed Complainant to submit additional
information and the Personnel Committee reconsidered her application on April 25, 2012. They
voted 3-2 against Complainant. Complainant then reviewed her tenure file and saw that
Braham's letters to the external reviewers did not include the language about Complainant using
Respondent's Family Friendly policy. In May 2011, Respondent advised the external reviewers
of this omission and requested that they advise Respondent if that changed their opinion of
Complainant. The Personnel Committee met again, reviewed these responses and voted
unanimously to stand by their previous decision.

Complainant signed an acknowledgement that she waived her one-year terminal[3] notice by
having her tenure review deferred from her sixth to seventh year. After Complainant met with
Taylor, Taylor sent Complainant an email that she would meet with the Provost about the
possibility of giving Complainant a temporary position, but "As things now stand, your
employment at the University will end at the end of your current term, on June 30, 2011." The
Provost's Office told Taylor that she should not make such an offer to Complainant.

## SUMMARY OF THE REBUTTAL

Complainant was clearly qualified for tenure: she was recognized in publications and exhibitions
when she was a practicing architect, then moved into teaching at four major universities prior to
Respondent. She specialized in Visual Studies, where her "thought leadership" was demonstrated
by her writing, invited lectures and workshops, and her many students who have gone on to
teaching positions. Leatherbarrow praised her book about Bo Bardi. Her proposal for a second
book, also about Bo Bardi's work, was favorably evaluated by another publisher.

---

[2] Complainant subsequently filed another complaint, Docket Number E12116127, based on Respondent's refusal to
grant Complainant tenure after the second review her application.

[3] The period in which she would have been permitted to search for new employment.

2

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

As her mentor, Leatherbarrow supported Complainant's decision to split her work into two books and concentrate on finishing the translation of a theoretical treatise with a lengthy introductory essay by Complainant. Taylor told Complainant she had "nothing to worry about" when Complainant asked her about her tenure review in 2010 and asked Complainant to serve on a search committee for a new Department Chair prior to her making complaint.

Braham subverted Complainant's application. He did not include information about all of Complainant's publications, including the acceptance of her first Bo Bardi book for publication. He allowed Complainant to nominate only two External Reviewers, when Respondent's rules allowed her to pick three, then picked Judith Sheine to be Complainant's third one, although Complainant told him that she was "ideologically opposed" to Complainant's work. Complainant specifically asked to Braham to have Michael Hays write a letter and that he not ask Caroline Conant. Braham picked two of Complainant's coworkers, Ali Rahim and Marion Weiss, to be Complainant's Internal Reviewers. Although Respondent's rules said such persons were to be experts in Complainant's specialization, they admitted being unable to comment on the core of Complainant's scholarly work. Braham's bias was shown by his insistence in focusing on the quantity, not quality, of her work; failing to include information about the Family Friendly Policy in his Solicitation Letters and him mischaracterizing her use of it as "granting her an additional year in her tenure-probation period because of the birth of her son." Braham voted with the 5 – 1 majority for Complainant at the Faculty Committee meeting, but then reported the vote as 4 – 2 in his draft letter to the Personnel Committee, in which he personally lobbied against her candidacy in spite of the vote of the Faculty Committee. Prior to this, Braham's dismissive attitude possible gender bias in promotions was shown in his minutes of a December 2010 Faculty Committee meeting after a training on unconscious bias: "The concept of Objective Bias was raised but discounted by the committee, especially in terms of gender, because [we] did not have this information to be biased by." One member of the committee, Witold Rybczynski, called the concept "bullshit" at the meeting.

Respondent's efforts to mitigate the damage done by Braham were ineffective because Respondent rushed through the reconsideration by the Personnel Committee and allowed Braham to campaign against Complainant in that meeting. Taylor's comments when she made the June 8, 2011 offer of a one-year appointment as a "Distinguished Fellow" indicated that Taylor was trying to dissuade Complainant from making a complaint. She said Complainant could either move on with her career or become involved in a "drawn out grievance process," and encouraged Complainant to take a "forward looking path." After Complainant and her attorney lodged written complaints of discrimination with Respondent, Taylor told Complainant in a letter that she was denied tenure because of negative comments about the quality of her written work in the External Letters.

3

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR Charge No. E12026008
EEOC Charge No. 17G-2012-00083C

# INVESTIGATIVE ANALYSIS

## **Disparate Treatment**

The Commission investigated Complainant's claim that she was denied tenure based on gender (female) and familial status (single mother).  In order for the Commission to find Respondent responsible for discrimination because of these actions, the facts must prove that if not for Complainant's gender (female) and familial status (single mother), the denial of tenure would not have occurred.  This means:

FIRST, Complainant must state facts that, if true, could prove that Respondent intentionally treated Complainant differently based on gender (female) and familial status (single mother). Complainant must state, and the evidence must show, each of the following:

1. Complainant is a member of a protected class, in this case gender (female) and familial status (single mother);

2. Complainant was denied of tenure by Respondent;

3. Complainant's denial of tenure is not explained by Complainant's qualifications and/or performance;

AND

4. Facts suggest that Complainant's gender (female) and familial status (single mother) was a factor in Complainant's denial of tenure.

SECOND, Respondent fails to provide an argument against Complainant's claim of discrimination.  This could happen in one of the following ways:

1. Respondent fails to offer a reason other than gender (female) and familial status (single mother) for Complainant's denial of tenure;

OR

2. Respondent offers a reason other than gender (female) and familial status (single mother) for the harm BUT the evidence shows Respondent's reason is an excuse or cover-up for discrimination.

If the evidence shows that the denial of tenure more than likely occurred due to Complainant's gender (female) and familial status (single mother) and Respondent fails to show otherwise, the Commission must find probable cause to believe that discrimination occurred.  If the evidence shows that the denial of tenure more than likely occurred for reasons other than Complainant's gender (female) and familial status (single mother), the Commission must close its investigation as a Charge Not Substantiated.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

## **Retaliation**

The Commission investigated Complainant's claim that she was denied an extension of her employment because she a complained of discrimination. In order for the Commission to find Respondent responsible for discrimination because of these actions, the facts must prove that if not for Complainant's making a complaint of discrimination, the denial of an extension of her employment would not have occurred. This means:

FIRST, Complainant must state facts that, if true, could prove that Respondent intentionally treated Complainant differently because she complained of discrimination. Complainant must state, and the evidence must show, each of the following:

1. Complainant opposed what she reasonably and in good faith believed to be an illegal discriminatory practice or participated in anti-discrimination enforcement process;

2. Complainant was harmed in a manner serious enough to discourage a reasonable worker from making or supporting a charge of discrimination;

AND

3. Complaining of discrimination caused the harm Complainant experienced.

SECOND, Respondent must support an argument against Complainant's claim of discrimination. This could happen in one of the following ways:

1. Respondent fails to offer a reason other than her complaints of discrimination for the harm Complainant experienced;

OR

2. Respondent offers a reason other than the complaints of discrimination BUT the evidence shows Respondent's reason is an excuse or cover-up for discrimination.

If the evidence shows Complainant's denial of an extension of employment by Respondent more than likely occurred because of her involvement in a legally protected anti-discrimination activity and Respondent fails to show otherwise, the Commission must find probable cause to believe that discrimination occurred. If the evidence shows Respondent's denial of an extension of Complainant's employment more than likely occurred for reasons other than Complainant's involvement in a legally protected anti-discrimination activity, the Commission must close its investigation as a Charge Not Substantiated.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

## SUMMARY OF INVESTIGATIVE FINDINGS

The Commission is not weighing in on the Respondent's substantive requirements or procedures for the tenure process used by the Respondent. Rather, over the course of the investigation, the Commission investigated whether the established process for the granting of tenure in place by the University was carried forth in a non-discriminatory manner. Specifically, whether it is more likely than not that Complainant was denied tenure based on her gender, familial status and/or retaliation.

The evidence shows Respondent's denial of tenure to Complainant in the instant matter more than likely occurred because of Complainant's gender (female) and her familial status (single mother).

The evidence shows Respondent's denial of an extension of Complainant's employment more than likely occurred because of her involvement in a legally protected anti-discrimination activity.

The investigation determined:

### *Denial of Tenure*

- Complainant was a candidate for a position as a Tenured Associate Professor in Respondent's School of Design.

- Respondent had a Family Friendly Policy which was designed to allow tenure candidates to take a break from the seven year period to build up their tenure dossier to care for newborn children. Complainant took advantage of this policy on the birth of her son, so in her CV it appeared she had an "extra" year to add to her achievements.

- Braham omitted information about Respondent's Family Friendly Policy in the Solicitation Letters to the External Reviewers and did not notify them that Complainant got a contract for her book before asking them to evaluate Complainant's work.

- Braham maintains he corrected this omission after he was told to do so but did not understand how omitting that crucial information could create any bias.

- The Faculty Committee of the School of Design voted 5-1 in favor of granting Complainant tenure. William Braham, Interim Chair lobbied against her with the Personnel Committee, who voted unanimously against Complainant. Dean Taylor refused to forward Complainant to the next step, thus ending her employment.

- Braham intended to report that the Faculty Committee vote was 4-2 against Complainant, but was called on this by another member of the Faculty Committee when she saw his draft report. Braham said he changed his vote between the Faculty Committee meeting

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

and when he drafted his report, but none the less, he reported the vote as 5-1 in the letter he sent. In that letter, he strongly advocated against Complainant, without mentioning his initial vote for her.

- David Leatherbarrow, Professor, who was Complainant's mentor, wrote a letter supporting Complainant for tenure, and served as a positive referee for Complainant's book, voted against giving her tenure. He said he was "sitting on the fence" when considering her application. Ali Rahim and Marion Weiss also claimed to have been the sole member of the Faculty Committee who voted against Complainant.

- The decision makers gave widely varying descriptions on how they interpreted Respondent's criteria for granting tenure and how they applied those criteria. They agreed that the External Letters (ELs) were a major factor in making tenure decisions but differed in how they evaluated and utilized them. There was also inconsistency between the decision makers who did not support Complainant as to whether the quality or quantity of her published work was deficient.

- Respondent's tenure process allowed the candidate to select three of the people who were to write ELs. Braham disregarded Complainant's suggestions for her External Reviewers in favor his own choices. Complainant expressed her concerns about this to Leatherbarrow.

- Most of Complainant's ELs were similar to those of candidates who were granted tenure except for one strongly negative letter. One other tenure candidate (female), was also denied tenure. She had one strongly negative letter. One of the males succeeded in spite of split votes from the Faculty and Personnel Committees, but with the strong support of Dean. Another was allowed to withdraw his application after a set of External Letters was assembled, left for a year, reapplied and was approved by the dean with the strong support of the Chair but split votes by the committees.

- Complainant's strongly negative letter was written by an External Reviewer who, in Respondent's paperwork, was identified as selected by Complainant. The reviewer, was, in fact, suggested by Braham and included as an External Reviewer, instead of the several other reviewers suggested by the Complainant.

- Braham also recruited two of Complainant's peers to write Internal Letters about Complainant's dossier, who, although they were supposed to be experts in her field, admitted being unable to judge most of her work.

- One of Respondent's principle criteria for granting tenure was the concept of "Thought Leadership." The decision makers' divergence of opinion as to the meaning and application of the term rendered it meaningless as an objective decision making standard.

- Braham thought Complainant did not publish enough to get tenure, but Taylor told Complainant that it was the quality of her work which was deficient.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

### *Withdrawal of the Extension of Employment*

- On May 27, 2011, Taylor wrote Complainant about the Personnel Committee turning Complainant down a third time and Complainant exploring her options to grieve the decision. She closed with "I am available to work with you to make your departure smooth and forward looking and I look forward to seeing you on June 7, 2011."

- On June 8, 2011, Complainant met with Taylor to discuss her future at Respondent. At that meeting, Complainant alleged that Taylor offered her a one year position as a Distinguished Fellow. Taylor denied making this offer. In her invitation, Taylor said that she, Braham and Leatherbarrow came up with "a few ideas we could explore."

- On June 15, 2011, Complainant wrote to Taylor, advising her that she intended to file a grievance about discrimination in her rejection for tenure. That same day, Complainant's attorney wrote the President of Respondent, outlining her concerns about discrimination regarding Complainant at Respondent.

- On June 30, 2011, Complainant met with Taylor. Complainant alleged that Taylor made comments that Complainant's actions "changed the tone of the conversation", that they were "where we were" because of Complainant's letter; that the conversation "had really changed" since she "had gotten a lawyer." Taylor denied making these comments but acknowledged that "her tone changed."

- Taylor wrote to Complainant on June 30, 2011, advising Complainant that it would be her last day and asking her to remove her things from Respondent's facilities.


## CONCLUSIONS

The evidence gathered during the investigation established that the actions Complainant alleged more than likely occurred due to discrimination based on the Complainant's protected class.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE No. E12026008
EEOC CHARGE No. 17G-2012-00083C

# APPENDIX

The investigation gathered and considered the following evidence:

*Denial of Tenure*:

- **Respondent's Procedures for Academic Appointments and Promotions from its Handbook for Faculty, established in 1973**. Faculty members in tenure track positions have seven years to develop materials to support their tenure application. Each of Respondent's 12 schools establishes a procedure for granting tenure which would create a "distinguished faculty" with strength in teaching, service and a "high degree of excellence" in research. Persons granted tenure were to be "Thought Leaders" in their field; create "new knowledge" in their area of specialization and the school must consider the candidate's specialty to be "important for the future." "The publication of books, chapters and articles in refereed (peer reviewed) publications is most important." The Department Chair would solicit confidential letters evaluating the candidate's case from peers at Respondent (Internal Letters) and scholars at similar institutions in Complainant's field (External Letters). Those letters, along with the candidate's publications, CV and any other relevant materials would make up the candidate's tenure dossier. Tenure applications would be reviewed first by the Faculty Committee of the applicant's department. The Department Chair reports the decision to the school's Personnel Committee. The Personnel Committee then reports its vote to the Dean, approves the recommendation of the Personnel Committee at his or her discretion. If approved by the Dean, it must also be approved by the Provost's Staff Conference, the Provost, University President and finally Respondent's Trustees.

- **Respondent's Faculty Policies and Procedures for the School of Design, dated September 1, 2004.** Tenure is to be granted based principally on research or professional accomplishments. Successful candidates "are expected to be "Thought Leaders" in their fields, and will have an identifiable area of work in which they are creating new knowledge." Their work should be considered "groundbreaking" by "leaders of the field." The most important criteria for candidates is "the publication of books, chapters and articles in refereed publications." Tenure review dossiers include at least 6 External Letters from scholars selected by Respondent and as many as possible from the three External Reviewers nominated by Complainant.

- **Respondent's Policies relating to Junior Faculty Member Career-Family Balance (the Family Friendly Policy), effective February 24, 2006**. The letters to External Reviewers "should explicitly state that the candidate has taken an extension pursuant to this policy" and it is Respondent's policy to evaluate "the productivity of each candidate who has been granted an extension as if he or she had been in probationary status for the normal duration, so that the candidate is not penalized for having received the extension."

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

- **Copy of Complainant's tenure dossier.** Contains her CV, lists her academic and employment histories, 14 peer reviewed publications, 43 invited lectures, and six invited projects in Visual Studies, five prizes, eight built and 15 other projects while she was a practicing Architect), the manuscripts for her two books, course descriptions, External Letters, and Internal Evaluations by coworkers and students.

- **William Braham's notes on External Reviewers.** Under the date 1/2/2011 are listed Mark Cottle, Peter MacKeith and Sanda Iliescu. (In an interview Braham stated that those were the persons Complainant told him that she wanted to be ERs.) Ten others are listed on the other side of the page, with the name "Judith Scheine" listed separately.

- **Emails between Complainant, Braham and Leatherbarrow dated January 3, 2011 through January 7, 2011:**

  o Monday, January 3, Complainant asked him to add Mark Cottle and Peter MacKeith to her list of External Reviewers. Braham said he needed her final list by the end of the week.

  o January 6, Braham wrote Complainant "From the list we discussed, I would suggest you nominate the following" and then listed Judith Sheine, Ila Berman and Renee Chang.

  o January 7, Braham told Complainant he would proceed with those three as her external reviewers. Complainant asked him to confirm that he got the names she sent on January 3 and asked that he hold off until she could talk about this with Leatherbarrow on Monday.

  o Complainant wrote to Leatherbarrow that day that Braham suggested a set of reviewers and planned to proceed with those names, although "I had other names in mind" and wanted to discuss this with him. Leatherbarrow said he did not know "what list he settled on."

  o Braham acknowledged getting the names Complainant sent, then told her that she was not allowed to play any further role in the selection process, concluding with "we have an excellent list."

- **Routledge (publisher of Complainant's Bo Bardi Book) referee questionnaire, completed by Referee 'B' (David Leatherbarrow).** He highly recommends Complainant's book based on its scholarly merit and the strong market there would be for this first English language text about an important, but until recently underappreciated female architect from Brazil.

- **Complainant's External Letters.** Staff evaluated these letters based on the criteria most frequently mentioned by members of the Faculty Committee and Personnel Committee (degree of support, equivocations or conditional praise, detail of reasons, and length of letter) on a scale of **PPP, PP, P, 0, N, NN, NNN**, with **PPP** being the most supportive and **NNN** adamantly opposed to Complainant's case).

  o *Christine Boyer* of Princeton praised Complainant's work on Bo Bardi and Visual Studies but found it difficult to rate her because she is a designer working in academia. This combination "intrigues" her. **(0)**

10

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

- *Caroline Constant* of the University of Michigan initially offered "cautious support" before she got a copy of Complainant's book. She praised Complainant's academic work done by "trained architect." In a follow up letter after she got the book, she was, "pleased to offer my support" **(PP)**

- *Enrique Vivoni- Farage* of the University of Puerto Rico stated, "Off-hand, I support her promotion." He noted that the Bo Bardi book complemented her Visual Studies work. He was "impressed with her work and the care with which it has been presented." **(PP)**

- *Anthony Vidler* of Cooper Union did not directly comment on promoting Complainant. He noted that Complainant was good at teaching Visual Studies and integrated it into her scholarship. He praised Complainant for her effort to learn Portuguese, understand and explain Bo Bardi in theory and history. Complainant did not fall neatly into either scholarship or design. He thought Complainant was light on publication. **(0)**

- *Illa Berman* of California College of the Arts "without reservation . . . strongly supported" Complainant's candidacy. She praised Complainant for her Visual Studies and digital teaching as "both forward thinking and practical" and her combined design and scholarly work: "one of the small number of people that has excelled equally in areas." **(PPP)**

- *Rene Cheng* of the University of Minnesota recommended C "without reservation." She praised Complainant's "mature and high level" of teaching. In glowing comments about Complainant's book, she described it as an "extraordinary insight" into Bo Bardi, with "solid" scholarship. She favorably compared Complainant to two peers. **(PPP)**

- *Judith Scheine* of California Polytechnical Institute, Pamona, thought Complainant's "work and reputation . . . Do not appear to be at the level expected by leading institutions in order to tenure." Her dossier was short on work, and her arguments about Bo Bardi were unclear. Scheine believed Complainant's book needed more editing to be publishable. **(NNN)**

- *Ulrika Karlsson* of KHT Royal Institute of Technology (Stockholm) offered no comment on tenure. She noted that Complainant was good at moving between design, research and academic work, had a "vigorous understanding of" Visual Studies and how it fit into training architects. The Bo Bardi book was "of great importance." Karlsson thought the quantity of her work was less than peers who concentrated in one area, noting Complainant included no current design work in her dossier. **(0)**

- *Ruth Zein* of Universidad Presbiteriana McKenzie (Brazil) thought Complainant's work currently "adequate" for tenure but saw potential for growth. She was familiar with Complainant's work on Bo Bardi. She called it "original and very interesting," especially Complainant's book, which was a "truly original contribution to field." **(P)**

- **Letter from Annette Fierro to Braham, dated March 24, 2011**. She "enthusiastically and without hesitation" gives Complainant the "strongest possible recommendation for tenure." She specifically questioned the accuracy of Scheine's criticisms of Complainant.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR Charge No. E12026008
EEOC Charge No. 17G-2012-00083C

- **Letter by David Leatherbarrow to Braham, dated March 25, 2011.** He supported Complainant for tenure. He complimented her on her publication record and said her work was an "important contribution to our field," her scholarship is "original and significant," and her specialization is "decisive in contemporary architecture."

- **Letter to Braham from Marion Weiss and Ali Rahim, dated April 5, 2011.** They praised her design work generally but felt it was "challenging to evaluate her impact" to them because it was not often reviewed in publications. They had difficulty relating Complainant's work in Visual Studies with her work on Bo Bardi because there was so little external comment about it. They offer no opinion on her tenure application.

- **Braham's handwritten notes, dated April 6, 2011.** He noted her chronology at Respondent, including that she got an extension of her tenure review period because of the birth of her child in 2006. He noted that Leatherbarrow had concerns about 3 External Letters with comments about Complainant's production; Fierro thought Scheine's letter was inaccurate and thought Complainant's work was brilliant; Matero wondered why her case was not considered strong enough; Rybczynski noted the shift in Complainant's work (from design to academic) and thought she was better than average. He initially tallied 5 "yes" responses and 1 "no" response, then crossed that notation out and replaced it with 4 "yes" responses and 2 "no" responses.

- **Letter from William Braham to Eugenie Birch, Personnel Committee Chair, dated April 6, 2011.** He reports the Faculty Committee vote as being "four for and two against", but he advocates against Complainant in first and last paragraphs. "Must agree with the minority position and advocate against promotion." Braham describes her history at Respondent, noting that she took extra year for birth of child. He praises her teaching and service, noting that she started as practitioner and moved into scholarship on Bo Bardi. He described the publisher as "well regarded press in field." He states the External Letters "repeatedly recognized" "the quality and importance of the book" and quotes praise from them: "intellectual consistency" and "design thinking advanced the scholarship." Many on the Faculty Committee praised Complainant for combining scholarship and design work, but some expressed concerns about the quantity of scholarship. He quotes four External Letters who had similar concerns.

- **Letter from Birch to Taylor, dated April 8, 2011.** She reported that the Personnel Committee reviewed Complainant's dossier, the Internal and External Letters, Braham's report and interviewed Braham prior a discussion that centered on Complainant's contributions and recognition in her field, the quality of her publications and trajectory of her career: was she a "thought leader." She offered no supporting information from the dossier. They voted four to zero against Complainant.

- **Letter from Braham to Birch, dated April 25, 2011.** Braham changed vote to five to one for Complainant.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

- **Letter from Birch to Taylor, dated April 25, 2011.** She reported that the Personnel Committee reviewed Complainant's case again, including new material from Complainant and Braham, the most significant was a letter from "commercial publisher expressing interest (but no commitment) in her book proposal" (Complainant's 2nd book). Birch quoted Respondent's handbook, Complainant's CV and the External Letters. She noted some of the letters questioned the quality of C's work, others quantity, and quotes them at length. Birch described the committee as "mixed" on the issue of Complainant being a Thought Leader. They voted 3-2 against Complainant.

- **Emails from Braham to the External Reviewers, dated May 6, 2011.** He advised them that the language about Complainant's use of the Family Friendly Policy was omitted from the original Solicitation Letters. He asked them to respond with any changes that information made in their review. All nine replied, eight stating the information did not change their opinion about Complainant's candidacy. Rene Chang, stated that knowing this improved her impression of Complainant's productivity.

- **Email from Annette Fierro, member of the Faculty Committee, to Complainant, dated June 3, 2011.** Fierro said that Braham changed his vote after the committee meeting and had the vote as 4-2 in his draft report until Fierro objected.

- **External Letters for seven other promotion reviews in the Architecture Department (five males, two females).** All but one (female) were granted tenure or promoted to Full Professor. All the successful candidates had only neutral or positive letters, while the one rejected candidate had one strongly negative letter. One male, Comparator A, had split votes in the Faculty Committee (5 pro-2 con and Personnel Committee (3 pro -2 con) with disputes about the merits of his specialization. The Dean gave him the "Highest" recommendation to the Provost. Another male, Comparator D, had a set of supportive letters without a vote (Respondent's Attorney stated this candidate withdrew his application, taught for a year at Harvard, then reapplied). There was a second set of letters that led to a 6 pro-3 con vote for in the Faculty Committee but the strong support of the Chair. Despite the split opinion of the Personnel Committee (3 pro -2 con), the Dean enthusiastically sent the candidate to the Provost. The letters are summarized and evaluated in the attached spreadsheet.

- **Braham's minutes from an Architecture Department Faculty Meeting on December 1, 2010.** The search committee for a new member of the faculty reported that the concept of objective bias was brought up in their proceedings, but "discounted by the committee, especially in terms of gender, because did not have this information to be biased by."

Staff interviews:

- On October 5, 2012 *Complainant* stated that Leatherbarrow told her that Detlef Mertens (male, deceased), the former Department Chair, was granted tenure based on a publication history similar to Complainant's: one book that was a translation with a lengthy introduction written by the candidate and that thought she would get tenure.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

- On n June 26, 2013, *Complainant* stated she did not want Scheine because she and Complainant took opposite positions on how to define "Modernism." She did not challenge Braham on this because she did not want to alienate him at the start of the process. She asked Braham to not include Caroline Constant as one of her External Reviewers because Complainant feared Constant would retaliate against Complainant for previously criticizing Constant's teaching.

- *William Braham, Chair*, stated he and Leatherbarrow served as her mentors for her tenure review. It never occurred to him to include the language about the Family Friendly Policy Solicitation Letters. He copied a letter from another file. <u>He acted to correct this omission when he was told to do so, but did not understand how the omission could create a bias.</u> (Emphasis Added) He went into the Faculty Committee meeting on the fence. He initially voted for Complainant and wrote down 5-1, then changed his mind and recorded the result as 4-2. The biggest problem he had was that she shifted from doing designs to academic work. He thought Complainant did not know Scheine, but picked her because she had a career path similar to Complainant's. Although he expressed his own opinion to the Personnel Committee, he "bent over backwards" to present the strongest case he could at that meeting.

- *Annette Fierro, Faculty Committee Member*, stated that Complainant told her that Braham pushed Scheine on her. Braham announced the vote as being 5-1 for Complainant at the end of the meeting, then circulated his draft report letter full of negative comments and saying the vote was 4-2. Fierro called Braham on that and he corrected the vote in the letter. Respondent started the Family Friendly Policy because of the high attrition rate of female faculty members after they had children. Fierro got many complaints from her female colleagues because she sat on Respondent's Women's Issues committee. When Fierro gave a presentation on unconscious bias, Witold Rybczynski (male) said it was "total bullshit."

- *David Leatherbarrow, Faculty Committee Member*, said that he was Complainant's tenure mentor and as such, wrote an "introductory" letter to the Faculty Committee recommending Complainant for tenure. Complainant came to Respondent because she wanted to do more research. She was working on a large project called "Sense of Surface" which would address Visual Studies in terms of classwork, theory and history. Leatherbarrow told her she had to get a book published for her tenure dossier, so she changed her focus to translating Bo Bardi with an introduction, which he supported as being a more manageable project. He was "Referee B" for the publisher of Complainant's book. He voted against Complainant because he came to doubt his confidence in her case based on what was in her dossier and what his colleagues said. Braham changing his vote was "atypical." He said that Rybczynski was dismissive of the concept of unconscious bias at a faculty meeting.

- *Marion Weiss, Faculty and Personnel Committee Member*, did not participate in the first Faculty Committee meeting, but wrote one of the Internal Letters assessing Complainant's candidacy for Complainant's dossier. She used "nuanced language" and "equivocated in her endorsement" to communicate her lack of enthusiasm for Complainant. Complainant shifting her focus from practice to academic work was not a problem in itself, but it made it more difficult to find people with whom Complainant could be compared and "inflected the

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

scope and momentum of critical output." She participated in the Personnel Committee meetings about Complainant in the spring of 2012, but could not recall what Braham said or any position that he argued. She vaguely recalled voting against Complainant.

- *Witold Rybczynski, Faculty Committee Member*, thought Complainant's work was lacking because she published in history when her specialty was Visual Studies. Successful candidates do not have to have an international reputation, but they have to either have things published or built. Rybczynski would not say how he voted in the Faculty Committee, but later said he did not recall his vote. He thought the vote was closer than 5-1 for Complainant. He recalled a training on unconscious bias before the review of Complainant's dossier.

- *Frank Matero, Faculty and Personnel Committees Member*, recalled the Faculty Committee talking about defining Visual Studies. There was disagreement about the quality and quantity of Complainant's work, which reflected in the 4-2 Faculty Committee vote (he gave that tally three times in the interview). He did not recall how he voted or any issue with the report of the vote. The Personnel Committee "prayed" for a unanimous Faculty Committee vote. He was unable to attend the first meeting Personnel Committee, but was at the April 25 meeting, where they voted 2-3 against Complainant. He could not recall his vote.

- *Ali Rahim, Faculty Committee Member*, made up his mind not to support Complainant before the first meeting. He wrote a letter with Weiss evaluating Complainant's dossier. At the meeting, he pointed out the discrepancies between the comments in the meeting and the materials in Complainant's dossier, which he believed to be weak. Rahim did not know of anyone who transitioned from design practice to academic theory and was successful. He did not recall the outcome of the vote, but Braham told him immediately after the meeting that he was changing his vote.

- *Eugenie Birch, Chair of the Personnel Committee* said she chaired the Personnel Committee meetings on Complainant's application. The Personnel Committee assessed candidates based on their "Thought Leadership," trajectory of their growth and how their work fit into the department's goals. There was one person from each department in on the committee, Marion Weiss represented Architecture. Significantly, Weiss did not support Complainant. At the April 8, 2011 meeting they voted 4-0 against Complainant. Birch did not think it unusual that Braham did not support Complainant although she knew he voted for her. The committee did a complete reevaluation of Complainant's case in the April 25, 2011 meeting. Most of the comments about Complainant's dossier were that her publishing record was "weak." She wrote both report letters to Taylor.

- *Dana Tomlin, Personnel Committee member*, stated that the Personnel Committee would usually ask the Chair to explain the motivations of the comments in the Faculty Committee report letter. Marion Weiss provided a second perspective on Complainant. Braham's presentation on April 8, 2011 was unusual because the Faculty Committee had a split vote for Complainant, but he was not supportive. Tomlin voted against Complainant. Tomlin reviewed Complainant's additional material for the April 25, 2011 meeting. Braham explained that the combination between history, theory and Visual Studies in Complainant's

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR CHARGE NO. E12026008
EEOC CHARGE NO. 17G-2012-00083C

work could be strong enough to grant tenure, but he did not think so. Tomlin voted for Complainant because he felt at that time that she was "on the fence" and deserved a chance to prove herself. Tomlin did not recall the May 13, 2011 vote.

- *Marilyn Taylor, Dean*, stated that Respondent had a form letter to solicit External Reviewers, but Braham must have used an older version, so she told him to send out follow up letters to the External Reviewers. The Department Chair would usually subtly express their degree of enthusiasm for a candidate. Braham told Taylor that he did not support Complainant. She told him to put it in his letter. A 5-1 vote versus a 4-2 vote makes a big difference to the Provost's Committee. Taylor had to feel confident the Provost's Committee would approve the candidate to send the case to them. She did not feel that way about Complainant.

Interviews of decision makers on the role of External Letters in evaluating candidates:

- *Braham* said that one phrase in a letter can condemn a case and evaluators would often "damn with faint praise."
- *Leatherbarrow* said that one strongly negative letter was not a "kiss of death."
- *Marion Weiss* thought External Letters were very important to judge the accomplishments of a candidate because collectively they presented best academic and professional judgment. She expected the External Letters to "unequivocally" endorse a candidate.
- *Rybczynski* expected the External Letters to be positive, but that was not entirely necessary. Negative letters were unexpected and got closer looks. The worst would be an expert in the field who said they never heard of the candidate.
- *Matero* depends on External Reviewers to gauge their recognition in their field. One outlier would not damage a case, but he looked for conditional language and discussing the candidate's future prospects as possible red flags.
- *Rahim* said that External Reviewers never say no and that it is up the Faculty Committee to "read between the lines." A single negative letter could be ignored. A successful candidates were "well known in the field" and have strong support.
- *Birch* stated that External Letters were central to measuring a candidate's "Thought Leadership." She saw anything less than enthusiastic support as a concern.
- *Tomlin* said the Personnel Committee meetings focused on the External Letters. One blemish could kill a case and even "lukewarm" praise caused problems. He ignored people who did not make a recommendation, but thought non-enthusiastic support was negative.
- *Taylor* said she tried to exclude negative "outliers" but expected a body of very favorable recommendations: "without a doubt would get tenure at our school." She rated letters on a 1-5 scale, from very positive to very negative. She is leery of any comments of qualified support. Successful candidates "walk on water."

Interviews of decision makers on "Thought Leadership" in evaluating candidates:

- *Braham* said the common conception was of "being one of the best around" but he thought it meant having an influential point of view.
- *Leatherbarrow* thought that qualifications in External Letters were expressions of doubt about being a "Thought Leader". Leatherbarrow did not like that term.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR Charge No. E12026008
EEOC Charge No. 17G-2012-00083C

- *Weiss* believed a "Thought Leader" would articulate and lead the trajectory in national and international discourse on an insight in theory or practice.
- *Rybczynski* could not define the term, except to describe it as "genius expression"
- *Matero* thought the term was "stupid" because emphasized comparisons rather than individual work.
- *Rahim* said a "Thought Leader" was someone who had an international reputation for a significant contribution to his or her field. Recognition by External Reviewers would be a strong indicator of it.
- *Birch* described a "Thought Leader" as someone who presented an "original and new perspective" on a topic that is noted by current reviewers.
- *Tomlin* thought the term described someone who made an "impactful contribution to the field" which could in part be measured by how aware the External Reviewers were of the candidate's reputation.
- *Taylor* said that "Thought Leaders" influenced people outside their specialty.

Interviews of decision makers on the role of publications in evaluating tenure candidates:

- *Braham* thought Complainant did not publish enough work because she shifted her focus from design to academics.
- *Leatherbarrow* expected a successful candidate to have at least one book published and the second nearly there or 12-20 scholarly articles. Leatherbarrow got tenure based on published articles and two unpublished books under contract.
- *Fierro* stated that candidates with PhD's were expected to have two books published, while those who worked in design would have less. Complainant published more than Fierro when she was up for tenure.
- *Weiss* did not think the type of publisher was a significant factor. She thought it was a problem if someone only published in academic journals because those people were "preaching to the choir" rather than reaching a broader forum.
- *Rybczynski* ranked candidates on a scale between a book published and reviewed to a proposal for a contract. He did not think a serious candidate would have anything less than a finished manuscript. Complainant's book was a translation, which he did not think was academically valid.
- *Matero* described Complainant's publication output as being "on the margins" for a successful candidate. He liked to see one book published and a second written.
- *Rahim* thought that Complainant's dossier lacked both the quality and quantity of published work to vote for her.
- *Birch* emphasized the importance of who published the candidate's materials: anything peer reviewed met the "gold standard." Complainant's Bo Bardi book and many of her articles were not peer reviewed.
- *Taylor* said most candidates with PhD's have their first book published earlier in the tenure period and the second book ready for publication in the 6th year. People who concentrate on design are rated on the projects they get built, project reviews and what awards they win.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR Charge No. E12026008
EEOC Charge No. 17G-2012-00083C

- In response to a query from Staff about Comparator D, Respondent's attorney stated that, based on redacted information, it appeared that Comparator D withdrew his application after the first set of letters were collected, taught at Harvard for the next year, then reapplied and was successful.

- Staff letters and emails to Ali Malkawi, who sat on the Faculty Committee for both of Complainant's tenure reviews, requesting that he participate in an interview. Malkawi left Respondent for Harvard shortly after Complainant's 2nd tenure review. He did not respond to the requests for interview.

### *Withdrawal of the Extension of Employment*:

- **Letter from Complainant to Lynn Lees, Vice Provost, dated May 12, 2011** complaining about Braham's omission of the Family Friendly Policy language in her Solicitation Letters and his ineffective attempts to address it. She asked to have her employment extended for a year. Lees responded on May 17, 2011 that Respondent expected persons granted tenure to be "Thought Leaders" and that the quantity of publications was secondary. Lees believed Respondent adequately addressed the omission and would not extend Complainant's employment.

- **Letter dated May 27, 2011, from Taylor to Complainant.** Dean Taylor advised her that the Personnel Committee did not see anything in the responses of the External Reviewers to change their vote. She referred to Complainant's efforts to explore disputing this decision with the caveat that as things stood, June 30, 2011 would be her last day. She closed with "I am available to work with you to make your departure smooth and forward looking."

- **Email from Taylor to Complainant on June 8, 2011.** Taylor that she spoke with Braham and Leatherbarrow at length about Complainant's situation. They came up with "a few ideas we could explore" when Complainant met with her later that day.

- **Letter from Complainant to Taylor, dated June 15, 2011.** About Complainant's "intent to file grievance." Complainant thanked Taylor for meeting the week before and offering Complainant a "chance to continue my employment at the University for one year" and she outlined in detail over 10 pages the problems with the tenure review. Complainant connected these problems to discrimination by Braham on the basis of familial status and gender.

- **Letter from Complainant's Attorney to Amy Gutman, President of Respondent, dated June 15, 2011.** She asserts that Braham injured her client by failing to include the Family Friendly Policy language in the Solicitation Letters, that he presented a biased description of the Faculty meeting to the Personnel Committee; that Respondent's attempts to remedy the situation were weak and that there is evidence of gender bias. Complainant's attorney asked Respondent to engage in settlement negotiations prior to Complainant filing a complaint with the EEOC.

Cathrine Veikos v. Trustees of the University of Pennsylvania
PCHR Charge No. E12026008
EEOC Charge No. 17G-2012-00083C

- **Letter from Taylor to Complainant, dated June 30, 2011**. Taylor declined to address the particulars of Complainant's letter of June 15, 2011, but stated Complainant was denied tenure because several reviewers and faculty members thought her work was "weak"; her productivity was insufficient; and she was not a "Thought Leader." Complainant's employment would end on June 30, 2011, but Respondent would have a second, new evaluation of her tenure application and Respondent would need her to nominate three new External Reviewers. (Taylor did not address Complainant's assertion that Taylor offered her another year at Respondent.)

- **Email from Complainant to Taylor, dated July 15, 2011**. Complainant repeats that Taylor offered her a one-year appointment on June 8th and that she would put the offer in writing, was giving Complainant "her word" and that the offer had "no strings attached." Complainant noted that when she called Taylor after getting the June 30, 2011 letter, Taylor told her that 'my actions had "changed the tone of the conversation"'; '"we are where we are because of" my letter'; and 'the conversation "had really changed since I had gotten a lawyer."'

- **Interview with Taylor**. Complainant went to the grievance committee and that committee told Taylor that they wanted Taylor to find the Complainant a job. Complainant asked Taylor if she could stay another year. Taylor told Complainant that the handbook did not allow that, but that she would ask the Provost. The Provost denied this request.. After Taylor told Complainant, Complainant wrote her letter. Taylor did not offer the Complainant a Visiting Fellowship or any job for the next year. She thought Complainant may have misinterpreted what Taylor told her. Taylor saw Complainant's letter but had no recollection of saying "this changes things" or any of the other comments Complainant alleged. Taylor admitted that her tone changed with the Complainant after the Provost told her she could not keep Complainant on at the Respondent.