IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CATHRINE VEIKOS,**<br><br>*Plaintiff,*<br><br>v.<br><br>**TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,**<br><br>*Defendant.* | **Case No. 2:20-cv-04408-JDW** |

## ORDER

**AND NOW**, this 11th day of January, 2022, upon consideration of Defendant Trustees Of The University Of Pennsylvania's Motion For Summary Judgment (ECF No. 44), the Court notes as follows.

1. Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a summary judgment motion, a court must "view

the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). The movant is entitled to judgment as a matter of law when the non-moving party fails to make such a showing. *See Celotex*, 477 U.S. at 323.

**Presumptions Based On Membership In A Protected Class**

2.     Penn asks the Court to conclude that certain faculty members did not discriminate against Ms. Veikos during the tenure process because they themselves are mothers with children. (*See* ECF No. 44-1 at 9–10.) As the Supreme Court has said, the "way to stop discrimination . . . is to stop discriminating." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). Therefore, "[a]rguments suggesting that people act in a certain way based on their membership in a protected class are not welcome in the judicial system. Attorneys should not make them, and the Court will not consider them." *Jazayeri v. Avaya, Inc.*, No. 2:19-CV-06003-JDW, 2021 WL 2186367, at *6 (E.D. Pa. May 28, 2021).

3.     Penn knows all of this and that the Court has ruled this way before. But it doubles down and asserts that "an inference of unlawful discrimination cannot be drawn

without at least recognizing that multiple women were opposed to a grant of tenure." (ECF No. 53 at 5.) But no one has to "recognize" that women opposed a grant of tenure to Ms. Veikos because that fact is irrelevant. It sheds no light on whether anyone involved in the tenure process—man or woman—acted on the basis of gender, rather than on the basis of the merits of Ms. Veikos's tenure application.

**Application Of *McDonnell-Douglas* Standard**

4.  All of Ms. Veikos's discrimination and retaliation claims, whether arising under Title VII, the PHRA, or the PFPO, are disparate treatment claims subject to the *McDonnell-Douglas* framework. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) (Title VII and PHRA); *Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 592 n.8 (E.D. Pa. 2020) (PFPO).

5.  Under this framework, an employee must first establish a *prima facie* case of discrimination or retaliation. *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (per curiam). If the employee makes out a *prima facie* case of discrimination or retaliation, the employer then has a burden of production (but not persuasion) to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *Id.* If the employer articulates a legitimate reason, the employee must then proffer evidence to allow a reasonable factfinder to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual. *See id.*

6. To establish a *prima facie* case of discrimination, the claimant must demonstrate, by a preponderance of the evidence, that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated persons who are not members of the protected class more favorably, or that the circumstances of her termination give rise to an inference of discrimination. *See Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 327 (3d Cir. 2015).

7. To establish a *prima facie* case of retaliation the claimant must demonstrate that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse action. *See Nelson v. Upsala College*, 51 F.3d 383, 386 (3d Cir. 1995). As part of this analysis, a plaintiff must show that decisionmakers had knowledge of the protected activity at the time of the adverse action. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015).

8. To show causation where temporal proximity, standing alone, is not unusually suggestive of retaliation, "courts may [also] look to the intervening period for other evidence of retaliatory animus." *Holt v. Pennsylvania*, 683 F. App'x 151, 157 (3d Cir. 2017) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (internal citations omitted)). "Circumstantial evidence of retaliatory animus may include a pattern of ongoing antagonism, inconsistencies in the employer's justifications, or any other

4

evidence gleaned from the record as a whole that is sufficient to support an inference of retaliatory animus." *Id.* (internal quotation omitted).

9. The pretext stage of the analysis is the same for discrimination and retaliation claims. To survive summary judgment, a plaintiff must offer evidence from which a factfinder could reasonably "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Under the first prong of the *Fuentes* test, a plaintiff cannot "simply show that the decision was wrong or mistaken, but must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the employer was not actually motivated by its proffered nondiscriminatory reason." *Parker v. Verizon Pennsylvania, Inc.*, 309 Fed. App'x. 551, 556–57 (3d Cir. 2009) (citing *Fuentes*, 32 F.3d at 765).

**Decisionmaker**

10. Under a cat's paw theory of liability, a plaintiff seeks to hold her employer liable for the animus of a subordinate, non-decisionmaker. *See McKenna v. City of Phila.*, 649 F.3d 171, 177–78 (3d Cir. 2011). To prove a cat's paw theory, a plaintiff must prove that animus motivated the conduct of the subordinate and the act was the proximate

cause of the ultimate employment action. See *Macknet v. Univ. of Pennsylvania*, 738 F. App'x 52, 57 (3d Cir. 2018) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)).

11. The briefing does not make the exact decisionmaker clear. For these purposes, the Court focuses on the entire process, including the decisions of the Dean and the Personnel Committee. The Department Chair and the departmental faculty vote informed those decisions. To the extent the Provost or Dean was the ultimate decisionmaker, the Court understands that the decision was informed by the recommendations from the Personnel Committee, the Chair, and the faculty's vote, and therefore, the cat's paw theory would apply.

**2011—Denial Of Tenure**

12. Penn does not dispute that Ms. Veikos has established a *prima facie* case of discrimination. The Court therefore assumes she has made the requisite showing. Instead it will focus on the third step: Whether Ms. Veikos can show that Penn's reason for denying Ms. Veikos tenure was pretextual.

13. Penn explains that it denied Ms. Veikos tenure because "faculty members and external reviewers questioned Professor Veikos's qualification for tenure, particularly the quantity and quality of her scholarship." (ECF No. 44-1 at 3.) That qualifies as a legitimate, non-discriminatory reason to deny Ms. Veikos tenure.

14. Viewing the facts and drawing reasonable inferences in the light most favorable to Ms. Veikos, the Court concludes that Penn's conduct before, during, and after

Ms. Veikos's tenure denial reveal inconsistencies in its explanation for her denial. As a result, the record presents enough evidence that, taken together, demonstrates pretext. *See Fasold v. Justice*, 409 F.3d 178, 186 (3d Cir. 2005) ("if the aggrieved employee can raise evidence sufficient to discredit the employer's proffered reasons . . . the [employee] need not also come forward with additional evidence of discrimination beyond his . . . *prima facie* case in order to survive summary judgment") (internal quotations omitted).

15. *First*, Penn offered inconsistent reasons for denying tenure to Ms. Veikos. *See Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 284 (3d Cir. 2001) ("[i]f a plaintiff demonstrates that the reasons given for her termination did not remain consistent, beginning at the time they were proffered and continuing throughout the proceedings, this may be viewed as evidence tending to show pretext"). Faculty at Penn initially pointed to external reviewers' criticisms that Ms. Veikos produced an insufficient body of work. However, when Penn realized Professor Braham had not told external reviewers that Ms. Veikos extended her probationary period under Penn's child-care policies—a fact that could weigh on the amount of work she should produce—Penn began to emphasize quality, telling Ms. Veikos that "issues of quantity . . . are secondary to judgments of quality and of intellectual eminence." (ECF No. 44-65 at 4; ECF No. 44-67; ECF No. 53-2 ¶¶ 225, 246.) Yet only one external reviewer raised quality concerns, and Professor Braham focused on quantity, not quality, concerns in his letter to the Personnel

Committee. A reasonable juror could infer from the shift, and the timing of the shift, that Penn's stated justifications were pretextual.

16. *Second*, Ms. Veikos has shown there were divergent assessments of her qualifications for tenure that could create an issue of fact as to whether the non-discriminatory rationale Penn gave for its denial of tenure was pretextual. *See Yongsheng Chen v. Pennsylvania State Univ.*, No. 4:15-CV-01136, 2018 WL 2766607, at *3–5 (M.D. Pa. June 8, 2018) ("diametrically opposed reviews given by different levels of reviewers" contributed to genuine issues of fact at the pretext stage); *Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 257 (S.D.N.Y. 2020) (same). During the faculty meeting, all but one faculty member voted to grant Ms. Veikos tenure. (Professor Braham later changed his vote and reported the vote as two voting against tenure.) Yet the Personnel Committee voted unanimously against tenure. And while the Personnel Committee ultimately re-voted twice because of irregularities in the process, its members again voted against the weight of the faculty. A reasonable jury could find these opposing opinions inconsistent.

17. Not only were there divergent views among faculty during the process, Ms. Veikos has pointed to evidence in the record that could suggest the critical views of her dossier were not "consistent over a significant period of time." *See Maras v. Curators of Univ. of Missouri*, 983 F.3d 1023, 1028 (8th Cir. 2020) (citing *Qamhiyah v. Iowa St. Univ. of Sci. & Tech.*, 566 F.3d 733, 747 (8th Cir. 2009)). For example, faculty supported Ms. Veikos for positions in 2003 and 2006, and many decisionmakers praised her work and

productivity. (ECF No. 53-2 ¶¶ 9, 15, 16.) Before her tenure review year began, Dean Taylor told Ms. Veikos that her prospects for tenure were "great." (ECF No. 53-2 ¶ 39.)

18. *Third*, there were procedural irregularities in the tenure process. Procedural irregularities may lend evidence that improper purposes, like discrimination, played a role in the decision. See *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 433–34 (3d Cir. 1997); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984) ("Departures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the decision."); see also *Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 263 (S.D.N.Y. 2020) (citing *Whaley v. City Univ. of New York*, 555 F. Supp. 2d 381, 407 (S.D.N.Y. 2008)).

19. Instead of informing external reviewers at the outset of the review process that Ms. Veikos had been granted an additional year of probation after the birth of her son, Penn only informed external reviewers of that fact after they had completed their letters. External reviewers were also not told that a publisher accepted Ms. Veikos's book for publication. Penn disputes whether it was required to do so because the book was accepted after reviewers began reviewing her materials. This dispute is beside the point. A reasonable juror could find that these discrepancies impacted external reviewers' assessments of the quantity of Ms. Veikos's work and affected Penn's final tenure decision.

20. There were also irregularities during the voting process. Despite a faculty vote of five in favor of tenure and one against, Professor Braham switched his vote

anonymously after the meeting and reported the vote to the Personnel Committee as four in favor of tenure and two against. And Professor Braham's letter to the Personnel Committee, which was supposed to summarize the faculty meeting, advocated against Ms. Veikos's tenure even though a majority had voted for tenure. When the Personnel Committee decided to re-vote (due to irregularities in the process), Professor Braham told Ms. Veikos he would not be involved in the process. Instead, he again presented to the Personnel Committee and reiterated his position.

21. These procedural irregularities are distinct from those that courts have found insufficient to suggest pretext. See *E.E.O.C. v. Muhlenberg Coll.*, 131 F. App'x 807, 811–12 (3d Cir. 2005). In *Muhlenberg* there were only two procedural violations and ample evidence that the tenure candidate failed to meet the standards for tenure. Here the procedural violations were far more numerous, and Ms. Veikos has identified inconsistencies in Penn's bases for denying her tenure. As such, these procedural violations more closely resemble those in *Stewart*, where divergent opinions of a tenure candidates' qualifications coupled with procedural irregularities precluded summary judgment. See *Stewart*, 120 F.3d at 429–31, 433–34.

22. *Fifth*, Penn's reliance on candidates' "promise" both before and after Ms. Veikos's denial of tenure calls into question Penn's explanation for denying her tenure, albeit just barely. Although Penn says that it denied Ms. Veikos tenure in part because external reviewers focused on her "promise" rather than her actual accomplishments,

10

"promise" weighed in favor of tenure for other candidates. For example, when the Chair drafted a letter to the Personnel Committee advocating for Professor Kim's tenure—despite a vote of four in favor of tenure and three against—the Chair emphasized that "[a]ll of the external reviewers took the time to explain why they believed Mr. Kim showed great promise to continue to develop into a leader in his field." (*See* ECF No. 52-45 at 58–59.) So sometimes, promise not only weighed in favor of tenure, but was a reason to grant tenure. This Court will not, and cannot, question the wisdom of a tenure denial. But a reasonable juror could decide that Penn's reliance on "promise" suggests pretext. *See Kunda v. Muhlenberg Coll.,* 621 F.2d 532, 544–45 (3d Cir. 1980) (denying a position for a candidate because she lacked a master's degree raised a triable issue of fact as to pretext where other individuals were not penalized for the same factor); *see also Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.,* 470 F.3d 535, 541 (3d Cir. 2006) (discussing a *prima facie* case and explaining "Title VII demands that employers apply the same standards [to protected classes] that they apply to all other applicants").

23. While it is possible that none of these inconsistencies, standing alone, could rebut Penn's proffered reason for denying tenure to Ms. Veikos, the Court must consider "the totality of the evidence," and not "the strength of each argument" in conducting a pretext analysis. *Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir. 1997); *see also Oliver v. Clinical Practices of the Univ. of Pa.,* 921 F. Supp. 2d 434, 449 (E.D. Pa. 2013). The Court recognizes that Penn might have legitimate, nondiscriminatory reasons for all of its

11

conduct at issue in this case. However, at this juncture the Court must view the evidence in the light most favorable to Ms. Veikos. Through that lens, there is enough circumstantial evidence that, taken together, allows Ms. Veikos to meet her burden.

**2011—Revocation of Teaching Position**

24. Ms. Veikos has identified evidence supporting both her *prima facie* case of retaliation and pretext in connection with the revocation of a teaching offer in 2011.

25. The timeline of events suggests causation. Dean Taylor offered, or suggested Penn would offer, a one-year teaching position to Ms. Veikos on June 8, 2011. Ms. Veikos sent Professor Leatherbarrow and Dean Taylor a letter complaining that the 2011 tenure review was discriminatory on June 15, 2011. On June 30, 2011, Dean Taylor revoked the offer and told Ms. Veikos that Penn could not offer the position. This timeline suggests a link between the revocation of the offer and Ms. Veikos's complaint. In addition, on July 1, 2011, Dean Taylor chastised Ms. Veikos and told her that complaining about discrimination had "changed everything." (ECF No. 52-6 at 292.) These facts provide enough evidence for a jury to find causation.

26. Penn offers a legitimate and non-discriminatory reason for revoking the job offer: Dean Taylor could not offer the year's position under Penn's rules.

27. The same evidence that establishes the causation element of Ms. Veikos's retaliation claim supports a finding that Penn had a retaliatory animus when it revoked the position. Many cases note this common overlap of proof. *See, e.g., Larochelle v.*

*Wilmac Corp.*, 210 F. Supp. 3d 658, 702 (E.D. Pa. 2016), clarified on denial of reconsideration, No. 12-CV-5567, 2016 WL 6135577 (E.D. Pa. Oct. 21, 2016), aff'd, 769 F. App'x 57 (3d Cir. 2019), and aff'd, 769 F. App'x 57 (3d Cir. 2019) (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 709 n. 6 (3d Cir. 1989) ("Although this fact is important in establishing plaintiff's *prima facie* case, there is nothing preventing it from also being used to rebut the defendant's proffered explanation.") and *Farrell*, 206 F.3d at 286 (noting same)).

28.  As discussed, Ms. Veikos has put forward evidence that Dean Taylor was angry Ms. Veikos made a complaint and took away the offer because of it. Dean Taylor's statement that Ms. Veikos's complaint changed things is a fact from which the jury could conclude retaliation was the real reason for Penn's decision.

**2012—Denial of Tenure**

29.  Penn disputes whether Ms. Veikos has established a *prima facie* case of retaliation and pretext for the denial of her tenure in 2012. With respect to the *prima facie* case, it challenges whether decisionmakers were aware of the protected activity and whether Ms. Veikos has shown a causal connection.

30.  Professor Leatherbarrow and Dean Taylor were aware of the protected activity. Protected activity includes "informal protests of discriminatory employment practices such as making complaints to management." See *Moore v. Sec'y U.S. Dep't of Homeland Sec.*, 718 F. App'x 164, 166 (3d Cir. 2017). As referenced above, Ms. Veikos engaged in protected activity when she sent Professor Leatherbarrow and Dean Taylor

13

the letter on June 15, 2011 complaining of discrimination. Regardless of whether other faculty were aware of Ms. Veikos' complaints, Penn may be held responsible for the animus of Dean Taylor and Professor Leatherbarrow.

31. Ms. Veikos also points to evidence to suggest that Penn denied her tenure in retaliation for complaining of discrimination. While several months passed between the time that Ms. Veikos complained and Penn denied her tenure, she has identified evidence of intervening retaliatory acts:

a. Dean Taylor's call chastising Ms. Veikos for getting a lawyer and raising complaints;

b. Professor Leatherbarrow changed his vote to oppose tenure and advocated against it, even though the substance of Ms. Veikos's dossier changed little, if at all, between the two reviews;

c. The tone of the faculty meeting during the vote on Ms. Veikos's tenure was "angry" with little discussion of the content of her case; and

d. Professor Leatherbarrow complained to everyone at the outset of the faculty meeting about having to "do it all over again" because Ms. Veikos thought "there was something wrong with the process." *See Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 371 (3d Cir. 2004) (considering remarks of decisionmakers in the context of the decision-making process).

32. A reasonable juror could conclude from Dean Taylor and Professor Leatherbarrow's behavior, and the cursory review of the materials at the faculty meeting, that she was denied tenure because she complained of discrimination.

33. Penn has met its burden by articulating a legitimate, non-discriminatory reason for denying Ms. Veikos tenure: the quality and quantity of her work.

34. The same evidence that establishes the causation element of Ms. Veikos's retaliation claim supports a finding that the District had a retaliatory animus when it denied her tenure. So do irregularities in the process that could cause a reasonable factfinder to call into question the independence of the review. In 2011, Ms. Veikos complained that Professor Braham subverted her attempts to select external reviewers. In this round, even though Penn policy permitted Ms. Veikos to request three reviewers, Professor Leatherbarrow asked two of her requested reviewers, Professor Hays and Professor Alberto-Gomez, to review a different tenure candidate, Ms. Furjan. Doing so meant they were unlikely to agree to review another candidate during the same cycle. Sure enough, Professor Alberto-Gomez declined to review Ms. Veikos because he was already reviewing Ms. Furjan. Professor Leatherbarrow may not have contacted Professor Hays at all. (*Id.* ¶ 264.) This left Ms. Veikos with only one selected reviewer.

35. Penn explains that it asked these external reviewers to review Ms. Veikos before it asked them to review Ms. Furjan, but Ms. Veikos has provided evidence indicating that this may not have been the case. There is no other evidence in the record

to explain why Professor Leatherbarrow selected these reviewers for Ms. Furjan. "[I]mplausibilities . . . in the employer's proffered legitimate reasons for its action" could permit a factfinder to conclude that Professor Leatherbarrow was trying to disadvantage Ms. Veikos. *See Parker*, 309 Fed. App'x at 556–57 (citing *Fuentes*, 32 F.3d at 765).

36. A reasonable juror could also conclude that Professor Braham's continued involvement in the process was irregular. Penn held the re-review in 2012 to remove any evidence of bias, and Professor Leatherbarrow, rather than Professor Braham, acted as Chair. Yet the day before Professor Leatherbarrow presided over the 2012 faculty vote on Ms. Veikos's case, Professor Braham sent his 2011 letter advocating against Ms. Veikos's tenure to Professor Leatherbarrow. Professor Braham may have also had a hand in selecting her external reviewers. In conjunction with the intervening acts, a reasonable juror could conclude the 2012 review was not independent from the 2011 review.

37. Penn has provided evidence that its faculty reviewed new external review letters and found Ms. Veikos unqualified for tenure. If the Court was a jury, it might find that evidence persuasive. But the Court is not a jury. Viewed in the light most favorable to Ms. Veikos, the Court finds that Ms. Veikos has presented sufficient evidence to permit a factfinder to believe that a retaliatory reason was more likely than not a motivating factor in her tenure denial. Therefore, there is a genuine issue of material fact as to whether Defendants' articulated reason for denying her tenure was really pretext for retaliation.

In light of the foregoing, it is **ORDERED** that Defendant Trustees Of The University Of Pennsylvania's Motion For Summary Judgment (ECF No. 44) is **DENIED**.

**BY THE COURT**:

*/s/ Joshua D. Wolson*
HON. JOSHUA D. WOLSON
United States District Judge