IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CATHRINE VEIKOS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 20-4408-JDW |
| | : | |
| TRUSTEES OF THE UNIVERSITY | : | |
| OF PENNSYLVANIA, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW RELATING TO ECONOMIC DAMAGES

I.      INTRODUCTION

On February 10, 2023, the jury returned a verdict in favor of Plaintiff in the above matter, finding that Defendant, Trustees of the University of Pennsylvania ("Penn"), denied her re-review application for tenure in 2012 in retaliation for her complaints of discrimination. ECF No. 101. The jury also awarded Plaintiff $1,000,000.00 in compensatory damages for the harm Penn caused by its illegal violation of her civil rights. Id.

On March 14, 2023, this Court held a hearing to consider Plaintiff's economic loss damages. At the conclusion of the hearing, the Court instructed the parties to submit proposed Findings of Fact and Conclusions of Law with respect to the following categories of Plaintiff's damages: back pay; pre-judgment interest; front pay; and the gross up for excess taxes.

For the reasons set forth herein, Plaintiff respectfully asks this Court to adopt her proposed Findings of Fact and proposed Conclusions of Law, and to award her a total of

$1,046,879.00 in economic damages arising from Defendant's illegal decision to deny her tenure application in 2012 in retaliation for her prior complaints of discrimination.

II.     PROPOSED FINDINGS OF FACT

1. Plaintiff has proven by a preponderance of the evidence that she is entitled to $206,188 in back pay.

2. Plaintiff has proven by a preponderance of the evidence that she is entitled to $532,596 in front pay.

3. Plaintiff has established, by a preponderance of the evidence, that she met her duty to mitigate her economic loss damages by making reasonable efforts under the circumstances to reduce her damages.

4. Defendant has not proven by a preponderance of the evidence that Plaintiff failed to obtain substantially equivalent job opportunities that were reasonably available to her.

III.    PROPOSED CONCLUSIONS OF LAW

1. Plaintiff is entitled to $41,474.00 in pre-judgment interest.

2. Plaintiff is entitled to a payment of $266,621.00 to compensate her for the excess taxes she is reasonably expected to incur on her back pay and front pay awards that she would not have paid but for Defendant's illegal actions.

IV.     ARGUMENT

A.     This Court Should Award Plaintiff $206,188 In Back Pay Damages.

Plaintiff is entitled to an award of "back pay," which is the amount that reasonably compensates her for the lost salary and benefits she would have received from Defendant had she not been subjected to illegal retaliation up to the present. See Third Circuit Model Jury Instructions

5.4.3. In this case, back pay is calculated by comparing the amount Professor Veikos reasonably would have earned had Penn granted her tenure, effective July 1, 2012, to the amount she has obtained in mitigation earnings. Id.

At the damages hearing on March 14, 2023, Kristin K. Kucsma, M.A., Plaintiff's economic loss expert, testified that she calculated Plaintiff's back pay in this case of $206,188. Exhibit A (Hearing Transcript) at 10:19-20; Exhibit 349A at 10. Ms. Kucsma is a highly trained and experienced economist whose credentials have not been, and could not be, challenged by Defendant. Ms. Kucsma's testimony about her methodology in calculating the back pay award was clear and persuasive. Exhibit A at 6:9-10:20. Defendant presented no competing expert testimony.

On cross examination, Defendant failed to create any reasonable challenges to Ms. Kucsma's expert opinion about her back pay calculations. For example, Defendant took issue with the fact that Ms. Kucsma did not factor the possibility of summer employment into her pay loss calculations. Exhibit A at 29:17-35:16. In fact, Defendant's counsel sarcastically asked: "By not looking for work or by not working in the summers, does your model have Penn subsidizing her choice to take the summers off?" Id. at 34:16-35:11. However, there is no evidence in the record about whether, when, and to what extent any of the Associate Professors in Penn's Department of Architecture worked during the summer. Id. at 109:1-110:1. As a result, adjustments to the economic damages awards based on speculation that Plaintiff could have (should have?) earned income during the summers at any level is completely inappropriate.

Similarly, Defendant's questions suggested that the number identified for Plaintiff's post-incident earnings at CCA for the second half of the year 2012 ($36,551) was underrepresented because (among other reasons that were hard to follow) it did not take into account the fact that Plaintiff received a pay increase as of late August 2012 when she was promoted to Chair. Exhibit

A at 25:3-11; 26:10-28:6. In response to cross examination, Ms. Kucsma confirmed that she relied on Plaintiff's W-2 earnings to make her calculations and did not specifically "weight" the higher pay rate to the second half of the year. Id. at 28:3-6. However, Plaintiff's Form W-2 for 2012 (which counsel did not show the witness) reflects that earnings from CCA for 2012 totaled only $62,401.68. Exhibit 348 at 228 of 315.[1] Thus, taking 50% of the CCA earnings would result in a total of only $31,200.84, not $36,551 See Exhibit 349A at 9. However, Ms. Kucsma's assumption for 2012 earnings starting on July 1, 2012 inadvertently included 50% of her wages from teaching a summer class at Berkeley. Exhibit 348 at 228 of 315. Thus, the CCA earnings reflected in the expert calculations for 2012 were actually more than 50% of her annual earnings from CCA, essentially offsetting Defendant's concerns about weighting. Defendant has provided no alternative and reliable calculation for this aspect of the backpay award.

Similarly, Defendant's suggestion that Ms. Kucsma's reliance on Plaintiff's W-2 earnings for Post-Incident earnings as a comparison to the salaries earned by Associate Professors at Penn is misplaced. Although Defendant's counsel identified certain years where Plaintiff's year end pay statements were greater than her Form W-2 earnings during the damages hearing, it is clear that in other years, Plaintiff's Form W-2 earnings were greater than her year end pay statements, including for 2016 and 2019. Exhibit 348 at 231, 232, 241, and 243 of 315.

In addition, Defendant had every opportunity to produce the Form W-2s and/or year end pay statements for the Penn Associate Professors, but elected not to do so. In her Interrogatories directed to Penn, Plaintiff sought discovery of all "compensation" paid to the tenured professors in the Department of Architecture. Exhibit 348 at 302 and 312 of 315. In its Answers to Plaintiff's Interrogatories, Penn made numerous objections and limited its answer to data relating only to the

---

[1] In the absence of consecutive Bates numbers to identify the pages within Exhibits, Plaintiff references the page number of the PDF out of the total pages in the Exhibit for pinpoint cites.

4

salaries of Associate Professors with tenure. Id. Defendant had the first version of Plaintiff's damages expert report in January 2020, before the case was even filed. If Penn took issue with the allegedly inadequate method of comparing streams of earnings, the ability to remedy it was solely in its power to change. Plaintiff's expert reasonably relied on the information available to her.

Defendant also took issue with the way in which Ms. Kucsma analyzed and relied on the salaries Penn paid to the other Associate Professors in the Department of Architecture to estimate what Plaintiff would have earned if she had been granted tenure in 2012. Exhibit A at 62:24-73:6; 76:19-98:8. Ms. Kucsma (repeatedly) confirmed that she prepared her calculations by assuming that Plaintiff would have been paid an average of what Penn paid its other Associate Professors. See, e.g., Exhibit A at 86:23-87:11. Such an assumption is entirely reasonable, and there is no evidence in the record to refute it. Through questioning, it appears that Penn's counsel thinks it would be preferable if the lost pay calculations were based on cherry picking the salaries of certain professors, rather than the average, but Defendant identified no basis to justify such a self-serving alternative.

Based on counsel's questions on cross, it also appears that Penn objects to the fact that Ms. Kucsma's assumptions result in increases to Plaintiff's projected Penn compensation over time that are larger than the year-to-year increases that the other Associate Professors received. However, Penn's objection is misplaced because it fails to take into account the anticipated increase in pay when a professor achieves tenure and is promoted from Assistant to Associate Professor. Exhibit A at 110:2-20; Exhibit 348 at 302 and 312 of 315. As a result, Penn's observation of the larger increases for Plaintiff do nothing to undermine Ms. Kucsma's reasonable analysis. As a result, this Court should adopt the backpay calculation presented by Plaintiff's expert.

B.     This Court Should Award Plaintiff $ 41,474 In Prejudgment Interest.

As courts in this jurisdiction have confirmed, the purpose of prejudgment interest on a backpay award is to "compensate a plaintiff for loss of the use of money that the plaintiff otherwise would have earned" had she not been subjected to illegal retaliation. Billman v. Easton Area Sch. Dist., Civ. A. No. 20-2730, *8-9 (E.D. Pa. Aug. 5, 2022) (citing Booker v. Taylor Milk Co., 64 F.3d 860, 868 (3d Cir. 1995) (citations omitted)). In fact, there is a "strong presumption" in favor of awarding prejudgment interest on a back pay award absent "unusual inequities." Id.

Following the damages hearing, Ms. Kucsma calculated the prejudgment interest due on the backpay damages she identified for Plaintiff using the IRS-adjusted prime rate and methodology that the court approved in the Billman case. See Exhibit D. Based on a backpay award of $206,188, Ms. Kucsma calculated Plaintiff's prejudgment interest to be $41,474.00. Id. Plaintiff respectfully asks this Court to conclude that she is entitled to prejudgment interest as set forth in her expert's calculations in order to make her whole for her economic losses.

C.     This Court Should Award Plaintiff $532,596 In Front Pay Damages.

Plaintiff is entitled to an award of "front pay," which is the monetary amount equal to the present value of any future salary and benefits she would have received from Defendant had she not been subjected to illegal retaliation from the date of the verdict through a reasonable time period into the future. See Third Circuit Model Jury Instructions 5.4.4. In this case, front pay is calculated by taking the present value of the difference between the amount Professor Veikos reasonably would have earned had Penn granted her tenure following the date of the verdict to the amount she can reasonably be expected to obtain in mitigation earnings through her projected retirement date.

At the damages hearing on March 14, 2023, Ms. Kucsma testified that she calculated Plaintiff's front pay in this case to be $532,596.00. Exhibit A at 14:11-12; Exhibit 349A at 12. Ms.

6

Kucsma's testimony about her methodology in calculating the front pay award was clear and persuasive. Exhibit A at 10:21-14:21. Defendant presented no competing expert testimony.

Defendant failed on cross examination to undermine the reasonableness of Ms. Kucsma's calculations of front pay damages. For example, Defendant's counsel questioned Ms. Kucsma about Plaintiff's 2023 pay rate, suggesting that Plaintiff may have "chosen" to teach fewer classes (and therefore earn less money) and/or that it was inappropriate for some reason for the expert to rely on the most recent data about Plaintiff's compensation to estimate front pay. Exhibit A at 46:12-51:14. However, Plaintiff testified clearly at trial that her pay decreased by 20% because enrollment at CCA was negatively impacted by COVID. Exhibit B (Trial Transcript Day 2) at 131:25-132:12.

As the testimony at the hearing shows, Ms. Kucsma reasonably relied on Plaintiff's most updated actual earnings to estimate her front pay damages. Exhibit A at 49:9-51:14. Presumably, if Plaintiff's compensation had <u>increased</u> in 2023 by 20%, Penn would have no objection to relying on her <u>actual</u> compensation to project future earnings. Since there is no evidence in the record to refute Ms. Kucsma's reasonable assumptions, Penn's attempt to challenge the amount of front pay damages on this basis must be rejected.

Similarly, this Court must reject any argument from Penn that Plaintiff's front pay award should not extend through her projected retirement age of 67. Since the adverse action at issue was the denial of tenure, which Penn repeatedly recognized at trial as a "lifetime appointment," there is no basis to cut off the front pay damages at an earlier date. Certainly, Penn has presented no evidence that other Penn professors routinely retire at earlier ages. As a result, Plaintiff has proven by a preponderance of the evidence that she is entitled to a full front pay award.

> D. Plaintiff Reasonably Mitigated Her Economic Damages And There Is No Evidence In The Record Upon Which This Court Could Find Otherwise.

Plaintiff recognizes that she has a duty to mitigate her economic damages. Billman v. Easton Area Sch. Dist., Civ. A. No. 20-2730, *3-4 (E.D. Pa. Aug. 5, 2022) (citing Booker v. Taylor Milk Co., 64 F.3d 860, 864-5 (3d Cir. 1995) (citations omitted)). Plaintiff's testimony at trial and the documents submitted as Exhibit 346 confirm that she took reasonable steps to mitigate her damages. Specifically, the correspondence that chronicles Plaintiff's job search clearly shows that she engaged in a thorough job search in 2011 to secure employment upon her termination by Penn. See generally Exhibit 346. Although she tried to find comparable employment in the Philadelphia area, Plaintiff was unsuccessful in finding any employment that came close to her Penn salary. Id. at 127-128, 133-134 of 165. Outside of Philadelphia, Plaintiff pursued a variety of roles, including an opportunity as Chair of the Interior Design program at the California College of the Arts (CCA), where she had a good relationship with the Director of the Architecture program. Id. at 27-61, 114, 119-124, 129-130 of 165.

Although the Chair position did not materialize in 2011, Plaintiff took a position as a Visiting Professor at CCA with the chance that she would obtain the Chair position in the following year, which would increase her salary. Exhibit 348 at 216-217 of 315; Exhibit C (Trial Transcript Day 3) at 78:22-79:03. In April 2012, CCA offered Plaintiff the position of Chair of Interior Design, where she had a chance to work full-time in a related discipline and provide for her family at a salary that was reasonably close to her earnings at Penn. Exhibit 348 at 221-224 of 315.

Plaintiff also applied for tenure track positions at McGill and Pratt before she received an employment offer for the Chair position at CCA. Exhibit 346 at 132, 140, 163, 165 of 165. Both McGill and Pratt rejected Plaintiff for the positions to which she applied. Id. However, Plaintiff

8

confirmed that she would not have accepted such positions after April 2012 when she accepted the Chair role at CCA because she reasonably perceived a positive career path at CCA. In addition, Plaintiff did not want to uproot her son again after he had difficulty adjusting to the move to California. Exhibit C at 78:12-21. As she confirmed at trial, Plaintiff did not seek any other tenure track positions because she had a full-time job, she had completely lost trust in the tenure process, and she did not want to put her family through another career transition. Exhibit B at 129:14-130:07.

While at CCA, after working very hard to shift her career focus and pivot to learning and excelling in an administrative position, Plaintiff served two 3-year terms as Chair of Interior Design, served as the President of the Faculty Senate, and obtained a promotion to full professor. Exhibit B at 131:25-132:12; Exhibit C at 72:06-73:21. By any measure, including as conceded by Penn's counsel at trial, Plaintiff "landed on her feet and did well." Exhibit C at 74:10-12. Unfortunately, since CCA is a private teaching institution and was badly hit with low enrollments due to COVID, Plaintiff has experienced a reduction in her annualized compensation from CCA. Exhibit B at 131:25-132:12. To the extent Plaintiff has experienced diminished labor market expectations, they arise from Penn's unlawful conduct and not from Plaintiff's failure to mitigate. See, e.g., Billman v. Easton Area Sch. Dist., Civ. A. No. 20-2730, *7-8.

The burden to prove that a plaintiff has failed to mitigate her damages rests with the defendant. Billman v. Easton Area Sch. Dist., Civ. A. No. 20-2730, at *4 (E.D. Pa. Aug. 5, 2022) (citing Booker v. Taylor Milk Co., 64 F.3d 860, 864-5 (3d Cir. 1995) (citations omitted)). Specifically, to meet its burden, an employer must show that: (1) substantially equivalent work was available; and (2) the plaintiff did not exercise reasonable diligence to obtain the employment. Id. (citations omitted). Here, Penn has not introduced any evidence to meet this burden of proof.

As Penn's counsel conceded at the damages hearing, the only way the Court could find that Plaintiff failed to mitigate her damages in this case is to find that she "withdrew entirely from the employment market." Exhibit A at 116:9-118:4; see, e.g., Caufield v. Center Area School District, 133 F. App'x 4, 10-11 (3d Cir. 2005) (where plaintiff withdrew from labor market, employer need not provide evidence that substantially equivalent employment actually existed). Penn argues that Plaintiff must be found to have withdrawn from the labor market because she did not seek alternative employment, particularly tenure track positions, after becoming Chair of Interior Design at CCA. Id. at 112:15-113:1.

Such an argument, however, has been rejected as an "inherently flawed" application of the law. In Briggs v. Temple Univ., 339 F. Supp. 3d 466, 507-510 (E.D. Pa. 2018). In Briggs, the employer argued that the plaintiff had withdrawn from the labor market because she did not continue to search for higher paying jobs after she accepted employment in a different field at a lower salary. The court rejected the employer's argument as transforming the "duty to mitigate" into a "duty to absolve." Id. 509-510. As the court in Briggs noted, a plaintiff who accepts employment, even at a lower wage, has no continuing duty to search for a more lucrative job. Id. 508.

Similarly, in Giedgowd v. Cafaro Group, Civ. A. No. 20-6184, at *15-19 (E.D. Pa. Oct. 26, 2021), the court rejected an employer's argument that the plaintiff had removed himself from the labor market by failing to look for any other jobs after accepting less lucrative position in another field as an independent contractor for 25 hours per week. In that case, the jury determined that the plaintiff had adequately mitigated his damages, and the court found ample evidence to support such a finding even where the plaintiff testified that he did not look for other employment. Id.

Here, Penn has not and cannot argue that Plaintiff's decision to accept the Chair position at CCA was unreasonable. After accepting that job, as with the plaintiff in Briggs and Giedgowd, Plaintiff continued to mitigate her damages by working at CCA and has not, at any time, "withdrawn" from the labor market. Penn claims that compensating Plaintiff for her actual past and projected future economic losses would be a "windfall." However, back pay and front pay damages are designed to make victims of discrimination and retaliation whole by restoring them to the position they would have been absent the employer's illegal conduct. This Court should make full back pay and front pay awards in this case because they are necessary to make Plaintiff whole for the harms caused by Penn's violation of her civil rights. Based on the evidence presented, any reductions in the damages Plaintiff seeks for her alleged failure to mitigate would do nothing more than insulate Penn from being held accountable for the harm caused by its own illegal conduct.

E. This Court Should Award Plaintiff A Gross Up For Excess Taxes In The Amount Of $266,621.

In appropriate cases, a prevailing plaintiff in a civil rights case who is awarded back pay and/or front pay damages is entitled to an additional sum to offset the negative tax consequences of the pay loss awards. Eshelman v. Agere Sys., Inc., 554 F.3d 426, 441-42 (3d Cir. 2009) (district court may award additional sum to prevailing plaintiff to compensate for increased tax burden of lump sum award). "Without this type of equitable relief in appropriate cases, it would not be possible to restore the employee to the economic status quo that would exist but for the employer's conduct." Id. at 442 (citations omitted). A gross up is warranted for the negative tax consequences of both a back pay and front pay award. Kissinger v. The Mennonite Home, Civ. A. No. 20-3000 (E.D. Pa. Feb. 28, 2022) (citations omitted).

At the damages hearing, Ms. Kucsma testified that Plaintiff cannot be made whole for her economic losses arising out of Defendant's illegal retaliation without taking into account her tax liability on the lump sum payments for back pay and front pay as compared to the tax liability she would have incurred if she received her earnings year over year. Exhibit A at 18:13-24. Based on Professor Veikos' specific tax situation, and her back pay and front pay calculations, Ms. Kucsma testified at the damages hearing that Defendant would need to make a payment of an additional $316,621 to account for the excess tax burden of receiving a lump sum award. Id. at 20:21-23. However, as the Court correctly noted, Ms. Kucsma's calculation at that time did not account for the Philadelphia City Wage Tax. Subsequently, Ms. Kucsma adjusted her calculations to take the Philadelphia local tax into consideration, and has updated her opinion that a payment of $266,621 would be needed to make up for Plaintiff's excess taxes. See Exhibit E. Ms. Kucsma's testimony about her methodology in calculating the excess tax gross up was clear and persuasive. Exhibit A at 18:25-21:2. Defendant presented no competing expert testimony.

As with the other categories of economic loss damages, Defendant's efforts to undermine the reasonableness of Ms. Kucsma's expert opinions were unpersuasive. For example, Defendant's counsel suggested that Penn should not have to compensate Plaintiff for her all of the excess taxes she has to pay as a result of its illegal retaliation against her because "she chose to live in California for the past decade" and California's income tax rate may be higher than in Pennsylvania. Exhibit A at 106:15-107:5. Since Plaintiff's decision to relocate to California for employment after Penn's illegal decision to deny her application was reasonable, Penn's argument has no merit. As a result, Plaintiff has proven by a preponderance of the evidence that she is entitled to a gross up for excess taxes to make her whole for her economic losses.

V.  CONCLUSION

For the reasons set forth herein, Plaintiff respectfully asks this Court to adopt her proposed Findings of Fact and proposed Conclusions of Law, and to award her a total of $1,046,879.00 in economic damages arising from Defendant's illegal decision to deny her tenure application in 2012 in retaliation for her prior complaints of discrimination.

Respectfully submitted,

UEBLER LAW LLC

s/ *Julie A. Uebler*
Julie A. Uebler, Esquire
Attorney ID No. 71297
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Tel. No.: (484) 875-3186
Email: uebler@ueblerlaw.com

*Attorney for Plaintiff,
Cathrine Veikos*

CERTIFICATE OF SERVICE

I, Julie A. Uebler, hereby certify that true and correct copies of Plaintiff's Proposed Findings of Fact and Conclusions of Law and Exhibits were filed with the court's ECF system on April 17, 2023 and served upon counsel of record below:

Michael L. Banks, Esquire
A. Klair Fitzpatrick, Esquire
Max O. Bernstein, Esquire
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
michael.banks@morganlewis.com
klair.fitzpatrick@morganlewis.com
max.bernstein@morganlewis.com

*Attorneys for Defendant*

                                                    _s/Julie A. Uebler_
                                                    Julie A. Uebler