**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| CATHRINE VEIKOS<br><br>Plaintiff,<br><br>v.<br><br>TRUSTEES OF THE<br>UNIVERSITY OF PENNSYLVANIA<br><br>Defendant. | Civil Action No. 2:20-cv-04408 |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
RELATING TO PLAINTIFF'S CLAIM FOR ECONOMIC DAMAGES**

# TABLE OF CONTENTS

**Page**

I.    PROPOSED FINDINGS OF FACT ................................................................. 2

   A.    Plaintiff's Employment with Penn and Job Search Efforts ................... 2

   B.    Plaintiff's Employment with CCA............................................................. 3

   C.    Plaintiff's Expert Report and Testimony ................................................ 11

      1.    Kucsma's Several Report Versions and Hearing Testimony.................. 11

      2.    Kucsma's Calculations Are Based on Arbitrary and Speculative
         Assumptions........................................................................................... 14

         a.    Kucsma's Back Pay Calculations Are Based on Selective
           Data That Artificially Boost Plaintiff's Hypothetical Penn
           Salary While Suppressing Her Actual Earnings ........................ 14

           (i)    Kucsma Understates Plaintiff's Actual Earnings............. 14

           (ii)   Kucsma Overstates Plaintiff's Potential Penn
               Earnings .......................................................................... 17

         b.    Kucsma's Front Pay Calculations and Assumptions Are
           Also Speculative and Inflated ...................................................... 24

           (i)    Kucsma's Starting Point for Plaintiff's CCA 2023
               Salary Is Unsupported by the Record ............................. 24

           (ii)   The Evidence Belies Kucsma's Assumption That
               Plaintiff's CCA Pay Would Only Grow at 3.9%
               from Her Allegedly Reduced 2023 Salary....................... 26

           (iii)  Kucsma's Assumptions About Plaintiff's Potential
               Future Penn Income Are Speculative and Employ
               an Inconsistent Methodology Designed to Inflate
               Compensation ................................................................. 30

           (iv)   Kucsma Provides No Support for an Eight-Year
               Front-Pay Award............................................................. 31

           (v)    Kucsma's Revisions to Her Report Artificially
               Inflate Her Front-Pay Calculations ................................. 31

II.   PROPOSED CONCLUSIONS OF LAW ....................................................... 32

   A.    Plaintiff Is Not Entitled to Economic Damages.................................... 35

      1.    Plaintiff Engaged in a Willful Loss of Earnings and Took Herself
         out of the Tenure-Track Labor Market for Alternative Faculty
         Positions Beginning in April 2012, Before She Was Denied Tenure
         in Her Re-Review at Penn.................................................................. 38

         a.    Plaintiff Engaged in a Willful Loss of Earnings.......................... 39

# TABLE OF CONTENTS
(continued)

Page

b. Penn Should Not Be Required to Subsize Plaintiff's Personal Decision to Change Her Career Trajectory .................. 45

c. Plaintiff's Personal Reasons for Changing Her Career Cannot Justify Her Lack of Reasonable Diligence in Seeking a Comparable Position .................................. 47

    (i) Plaintiff's Expressed Unwillingness to Relocate Does Not Justify Her Lack of Reasonable Diligence ...... 48

    (ii) Plaintiff's Reasons Related to Lack of Mental Fortitude Do Not Justify Lack of Reasonable Diligence ......................................... 52

2. Plaintiff Initially Mitigated her Damages While at CCA, And Had the Opportunity to Do So in Later Years .................................. 53

3. Plaintiff Is Not Entitled to Front Pay ....................................... 56

B. Even if the Court Awards Plaintiff Economic Damages, Such Damages Should Be Less Than Those Proposed in Kucsma's Expert Report .................. 58

1. Kucsma's Calculations and Methodologies Are Neither Reliable nor Helpful ..................................................... 58

2. Kucsma's Opinions Have Been Disregarded in Prior Cases .................. 61

3. If Awarding Backpay, the Court Awards Such Damages Based on Reasonable Assumptions ......................................... 63

4. Plaintiff Is Not Entitled to Eight Years of Front Pay ............................. 69

C. Plaintiff Has Not Met Her Burden of Proving That She Is Entitled to Compensation for Excess Taxes on a Lump-Sum Award .................. 70

1. Kucsma's Tax Differential Estimate is Speculative and Unreliable ........ 71

2. Kucsma's Use of California's Tax Rate to Calculate the Offset for Excess Taxes is Speculative and Unhelpful ............................... 74

3. Kucsma Wrongly Included Damages for the Tax Rate Differential between California and Pennsylvania ..................................... 75

D. If the Court Decides to Award Prejudgment Interest, It Will Be Based on an Appropriate Interest Rate and the Court Will Decline to Award Prejudgment Interest on Compensatory Damages, any Front Pay Award, or Compensation for Excess Taxes ..................................... 76

III. CONCLUSION .................................................................. 80

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
  No. 12-CV-00064, 2013 WL 6328263 (W.D. La. Dec. 3, 2013) ...........................................63

*Anastasio v. Schering Corp.*,
  838 F.2d 701 (3d Cir. 1988)............................................................................................69

*Argue v. David Davis Enterprises, Inc.*,
  No. CIV A 02-9521, 2009 WL 750197 (E.D. Pa. Mar. 20, 2009).............................71, 72, 73

*Baker v. John Morrell & Co.*,
  263 F. Supp. 2d 1161 (N.D. Iowa 2003), *aff'd*, 382 F.3d 816 (8th Cir. 2004) ......................49

*Bates v. Bd. of Educ. of the Capital Sch. Dist.*,
  No. 97-394-SLR, 2000 WL 376405 (D. Del. Mar. 31, 2000) .........................................33, 36

*Bessler v. City of Tempe*,
  No. CV-19-04610-PHX-MTL, 2021 WL 3089104 (D. Ariz. July 22, 2021),
  *amended on reconsideration in part and on other grounds*, No. 19-04610,
  2021 WL 4122247 (D. Ariz. Sept. 9, 2021)......................................................................49

*Billman v. Easton Area Sch. Dist.*,
  No. CV 20-2730, 2022 WL 3139748 (E.D. Pa. Aug. 5, 2022)......................................*passim*

*Bing v. Roadway Exp., Inc.*,
  485 F.2d 441 (5th Cir. 1973) ...........................................................................................15

*Blum v. Witco Chem. Corp.*,
  829 F. 2d 367 (3d Cir. 1987)........................................................................................38, 53

*Booker v. Taylor Milk Co.*,
  64 F.3d 860 (3d Cir. 1995)........................................................................................*passim*

*Branch v. Temple Univ.*,
  No. 20-2323, 2021 WL 2823071 (E.D. Pa. Jul. 7, 2021) .....................................................58

*Briggs v. Temple Univ.*,
  339 F. Supp. 3d 466 (E.D. Pa. 2018) ......................................................................39, 40, 41

*Brown v. Nutrition Mgmt. Servs. Co.*,
  Civ. A. No. 06-2034, 2010 WL 2902557 (E.D. Pa. Jul. 22, 2010).........................................69

*Buffington v. PEC Mgmt. II, LLP*,
  Civ. No. 1:11-cv-229, 2014 WL 2567181 (W.D. Pa. June 6, 2014) .................................56, 57

*Carden v. Westinghouse Elec. Corp.*,
    850 F.2d 996 (3d Cir. 1988)...............................................................33, 35, 38

*Caufield v. Ctr. Area Sch. Dist.*,
    133 F. App'x 4 (3d Cir. 2005) ...........................................................36, 39, 40

*Chesser v. State of Ill.*,
    895 F.2d 330 (7th Cir. 1990) ............................................................................15

*City of Long Branch v. W. of Pier Assocs., LLC*,
    No. A-4495-11T3, 2014 WL 563812 (N.J. Super. Ct. App. Div. Feb. 13,
    2014) ..............................................................................................................62

*Cosimano v. Twp. of Union*,
    No. CV 10-5710, 2017 WL 1395493 (D.N.J. Apr. 17, 2017) .................................53

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...........................................................................................58

*Davis v. Integrated Sys. Sols. Corp.*,
    No. 97 C 3774, 2003 WL 1733111 (N.D. Ill. March 31, 2003) ........................46, 47

*Davis v. Rutgers Cas. Ins. Co.*,
    964 F. Supp. 560 (D.N.J. 1997) ..........................................................................43

*Davis v. Yisrael*,
    No. 16-1574, 2019 WL 2098151 (S.D.N.Y. May 14, 2019) ...................................62

*Donlin v. Philips Lighting N. Am. Corp.*,
    581 F.3d 73 (3d Cir. 2009)................................................................32, 33, 56, 57

*E.E.O.C. v. Com. of Pa.*,
    772 F. Supp. 217 (M.D. Pa. 1991), *aff'd sub nom. Binker v. Com. of Pa.*, 977
    F.2d 738 (3d Cir. 1992).....................................................................................50

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)................................................................................58

*Ellis v. Ethicon, Inc.*,
    No. CV 05-726 (FLW), 2009 WL 10641983 (D.N.J. Nov. 13, 2009)....................72

*Ellis v. Ringgold Sch. Dist.*,
    832 F.2d 27 (3d Cir. 1987)..................................................................................40

*England v. Mack Trucks, Inc.*,
    No. C07-5169-RBL, 2008 WL 168689 (W.D. Wash. Jan. 16, 2008)....................50

*Eshelman v. Agere Sys., Inc.*,
   554 F.3d 426 (3d Cir. 2009)................................................................32, 56, 71, 76

*Est. of Tanaka by Rosello v. Kazary*,
   No. A-2072-20, 2023 WL 382310 (N.J. Super. Ct. App. Div. Jan. 25, 2023) .................61, 62

*Fillman v. Valley Pain Specialists, P.C.*,
   No. 13-CV-01609, 2016 WL 192656 (E.D. Pa. Jan. 15, 2016).............................70

*Ford Motor Co. v. E. E. O. C.*,
   458 U.S. 219 (1982)......................................................................... *passim*

*Ford v. Nicks*,
   866 F.2d 865 (6th Cir. 1989) .............................................................45, 47, 52, 55

*Giedgowd v. Cafaro Grp., LLC*,
   No. CV 20-6184, 2021 WL 4963533 (E.D. Pa. Oct. 26, 2021)....................38, 41, 49

*Goss v. Exxon Off. Sys. Co.*,
   747 F.2d 885 (3d Cir. 1984)................................................................69, 70

*Green v. USX Corp.*,
   843 F.2d 1511 (3d Cir. 1988), *cert. granted, judgment vacated*, 490 U.S. 1103
   (1989), *opinion reinstated in part*, 896 F.2d 801 (3d Cir. 1990)......................57, 77

*Henderson v. Camden Cty. Mun. Util. Auth.*,
   826 A.2d 615 (N.J. 2003)...................................................................79

*Hogan v. Bangor & Aroostook R. Co.*,
   61 F.3d 1034 (1st Cir. 1995)...............................................................78

*Holocheck v. Luzerne Cnty. Head Start, Inc*.,
   No. 3CV-04-2082, 2007 WL 954308 (M.D. Pa. Mar. 28, 2007) .........................36, 39, 42, 55

*Hurley v. Atl. City Police Dep't.*,
   933 F. Supp. 396 (D.N.J. 1996), *aff'd*, 174 F.3d 95 (3d Cir. 1999).......................77

*Hurst v. Beck*,
   771 F. Supp. 118 (E.D. Pa. 1991) .........................................................57, 69

*Int'l Transp. Mgmt. Corp. v. Brooks Fitch Apparel Grp., LLC*,
   No. CV111921ESJAD, 2020 WL 5525510 (D.N.J. Sept. 14, 2020)......................79

*Jefferson v. Milvets Sys. Tech., Inc.*,
   986 F. Supp. 6 (D.D.C. 1997)...............................................................40, 52

*JMJ Enters v. Via Veneto Italian Ice*,
   No. 97-CV-0652, 1998 WL 175888 (E.D. Pa. Apr. 15, 1998)..............................58

*Joffe v. King & Spalding LLP*,
  No. 17-CV-3392, 2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019)......................................59, 62

*Johnson v. Dependability Co.*,
  Civ. A. No. 15-3355, 2016 WL 852038 (E.D. Pa. Mar. 3, 2016)............................................70

*Kairys v. S. Pines Trucking, Inc.*,
  595 F. Supp. 3d 376 (W.D. Pa. 2022).....................................................................................70

*Loeffler v. Frank*,
  486 U.S. 549 (1988).................................................................................................................76

*Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*,
  158 F. Supp. 2d 510 (E.D. Pa. 2001) .......................................................................................58

*Marthers v. Gonzales*,
  No. 05-CV-03778, 2008 WL 3539961 (E.D. Pa. Aug. 13, 2008) ....................................77, 80

*McKenna v. City of Philadelphia*,
  636 F. Supp. 2d 446 (E.D. Pa. 2009) ................................................................................32, 36

*McKenna v. City of Philadelphia*,
  No. 98-5835, 2009 WL 2230771 (E.D. Pa. July 24, 2009) .....................................................79

*Meyer v. United Air Lines, Inc.*,
  950 F. Supp. 874 (N.D. Ill. 1997) ...............................................................................42, 47, 48

*Miller v. AT&T*,
  83 F. Supp. 2d 700 (S.D.W. Va. 2000), *aff'd sub nom, Miller v. AT&T Corp.*,
  250 F.3d 820 (4th Cir. 2001) .............................................................................................46, 47

*Moffitt v. Tunkhannock Area Sch. Dist.*,
  No. CV 3:13-1519, 2017 WL 319154 (M.D. Pa. Jan. 20, 2017) ................................71, 72, 73

*N.L.R.B. v. Madison Courier Inc.*,
  472 F.2d 1307 (D.C. Cir. 1972) ...............................................................................................42

*Ngai v. Urb. Outfitters, Inc.*,
  No. CV 19-1480, 2021 WL 1175155 (E.D. Pa. Mar. 29, 2021)..................................38, 39, 49

*O'Neill v. Sears, Roebuck & Co.*,
  108 F. Supp. 2d 443 (E.D. Pa. 2000) .......................................................................................78

*Phelps Dodge Corp. v. N.L.R.B.*,
  313 U.S. 177 (1941)...........................................................................................................39, 42

*Robinson v. Fetterman*,
  387 F. Supp. 2d 483 (E.D. Pa. 2005) .......................................................................................79

*Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div.*,
    982 F.2d 892 (3d Cir. 1993).........................................................................76

*Rush v. Scott Specialty Gases, Inc.*,
    940 F. Supp. 814 (E.D. Pa. 1996) ...............................................................80

*Samuels v. Albert Einstein Med. Ctr.*,
    No. Civ. A. 97- 3448, 1998 WL 690107 (E.D. Pa. Sept. 16, 1998) ............42

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................................59

*Sears v. Atchison, Topeka & Santa Fe Ry., Co.*,
    749 F.2d 1451 (10th Cir. 1984) ...................................................................71

*Smith v. Int'l Servs., Inc.*,
    No. CIV. A. 95-2038, 1997 WL 667872 (E.D. Pa. Oct. 9, 1997)..................77

*Spagnuolo v. Whirlpool Corp.*,
    717 F.2d 114 (4th Cir. 1983) .......................................................................49

*Supinski v. United Parcel Service., Inc.*,
    No. 3:06-CV-00793, 2012 WL 2905458 (M.D. Pa. July 16, 2012) ..............72

*Taxman v. Bd. of Educ. of Twp. of Piscataway*,
    91 F.3d 1547 (3d Cir. 1996).........................................................33, 36, 52, 78

*Tubari, Ltd., Inc. v. N.L.R.B.*,
    959 F.2d 451 (3d Cir. 1992)................................................................ *passim*

*Tuszynski v. Innovative Servs., Inc.*,
    No. 01-CV-6302, 2005 WL 221234 (W.D.N.Y. Jan. 29, 2005).............45, 47

*United States v. 80,794 Square Feet of Land*,
    No. 18-532, 2021 WL 2154847 (M.D. Pa. May 27, 2001)...........................58

*United States v. City of Chicago*,
    853 F.2d 572 (7th Cir. 1988) ..................................................................47, 48

*United States v. Miner*,
    No. 1:14-CR-33 MAD, 2014 WL 4816230 (N.D.N.Y. Sept. 25, 2014),
    *vacated in part on other grounds*, 617 F. App'x 102 (2d Cir. 2015)...........59

*United States v. State of N.J.*,
    530 F. Supp. 328 (D.N.J. 1981) ...................................................................15

*Williams v. Imperial Eastman Acquisition Corp.*,
    994 F. Supp. 926 (N.D. Ill. 1998) ...................................................45, 47, 52

*Wooten v. BNSF Ry. Co.*,
No. 16-139, 2018 WL 2417858 (D. Mont. May 29, 2018), *report and recommendation adopted*, No. 16-139, 2018 WL 4462506 (D. Mont. Sept. 18, 2018) ...................................................................................................................50

**Statutes**

42 U.S.C. 2000e-5(g) ...........................................................................................15, 36, 42

**Other Authorities**

Merriam-Webster's Online Dictionary, 11th ed. 2005, https://www.merriam-webster.com/ .........................................................................................................23

Michael Rustad and Thomas Koenig, *The Supreme Court and Junk Social Science: Selective Distortion in Amicus Briefs*, 72 N.C. Law Review 91, 146 (1993)....................................................................................................................59

*Policy, Data, Oversight*,
Office of Personnel Management, https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/interest-rates-used-for-computation-of-back-pay/ .......................................................................................78

Since she was denied tenure by the Defendant, the University of Pennsylvania ("Penn") in 2012, Plaintiff Cathrine Veikos ("Plaintiff") has enjoyed a successful career:  she immediately secured a position at another university in California, became the head of her department, was elected president of the school's faculty senate, published a manuscript, and has been invited to lecture as an expert in her field across the world.  At the outset of her career in California, Plaintiff's earnings even surpassed what she had made at Penn.  Once she was promoted to a Department Chair position at California College of the Arts, which came with a significant pay raise and a longer term contract, she stopped looking for additional or alternative work, all before she learned she had been denied tenure at Penn in 2012.  At no point in the last ***eleven years*** did Plaintiff make any effort to look for another position.

Nevertheless, Plaintiff requests that Penn pay her almost ***twenty years*** of economic damages—eleven years of back pay and eight years of front pay.  Plaintiff is not entitled to any economic damages as a matter of law.  She failed to satisfy her legal duty to mitigate her damages by choosing not to search for another, comparable position after her tenure denial, and after 2012, declined to avail herself of opportunities to perform a full year of work that would have enabled her to earn more than her expert projects she would have earned had she remained at Penn.

Even if the Court determines that Plaintiff is entitled to *some* damages, the amount should be far more modest than the inflated numbers Plaintiff's economic expert suggests.  Plaintiff's expert's methodologies are demonstrably flawed, her assumptions are rife with unsupported speculation, and for many of the same reasons, her opinions have been rejected by other courts.  Similarly, Plaintiff has failed to meet her burden to claim an award for the negative tax consequences of any lump sum award, as the calculations and evidence on which she relies lack essential information and are wholly speculative.  Moreover, given the amount of damages at issue

and the substantial compensatory damages Plaintiff has already been awarded, the Court finds that even a modest amount of economic damages renders Plaintiff "whole," and thus an award of prejudgment interest would be inequitable.

Therefore, in order to avoid a windfall and fulfill the aims of ***equitable*** relief, the Court should exercise its considerable discretion and decline to award the grossly inflated and speculative damages that Plaintiff has demanded.  These points are discussed further below in Penn's Proposed Findings of Fact and Conclusions of Law.

## I.   PROPOSED FINDINGS OF FACT

### A.   <u>Plaintiff's Employment with Penn and Job Search Efforts</u>

1.     In 1999, Penn hired Plaintiff as a full-time lecturer in the Department of Architecture.  Trial Tr. 1/31/2023 12:3-5.

2.     Effective July 2003, Plaintiff was appointed an Assistant Professor in the Department of Architecture, on the tenure track.  Trial Tr. 1/31/2023 12:8-10.

3.     While Plaintiff's tenure candidacy was being evaluated by Penn in 2010, 2011, and early 2012, Plaintiff submitted applications or sent emails regarding teaching positions at nineteen other colleges and universities.  Trial Tr. 2/1/2023 75:1-25; *see, e.g.*, Ex. 346, at VEIKOS000665, VEIKOS000771-72, VEIKOS001089, VEIKOS001363, VEIKOS001592, VEIKOS001632, VEIKOS001882, VEIKOS002039, VEIKOS001973, VEIKOS002224, PCHR 0319, PCHR 0339, PCHR 0881, PCHR 0299.

4.     These other institutions were located around the United States and Canada and included Smith College, University of California at Berkeley ("Berkeley"), University of Minnesota, Pennsylvania State University, McGill University, University of North Carolina, Cornell University, Drexel University ("Drexel"), Temple University, Mississippi State University, Rhode Island School of Design, California College of the Arts ("CCA"), and Pratt

Institute ("Pratt").  *See, e.g.*, Ex. 346, at VEIKOS000665, VEIKOS000771-72,  VEIKOS001089, VEIKOS001363,     VEIKOS001592,     VEIKOS001632,     VEIKOS001882,     VEIKOS002039, VEIKOS001973, VEIKOS002224, PCHR 0319, PCHR 0339, PCHR 0881, PCHR 0299.

5.      Plaintiff's job search began shortly before she was considered for tenure at Penn. Penn denied Plaintiff tenure in 2011, and her employment with Penn ended on June 30, 2011.  Ex. 231, at VEIKOS001852.

6.      Plaintiff was reevaluated for tenure in 2012 and was advised in May 2012 that she would not be granted tenure.  Ex. 250, at PCHR 1333-34, Ex. 294, at VEIKOS002271-72; Trial Tr. 2/1/2023 218:11-25.

7.      Had she been granted tenure on the re-evaluation, she would have become an Associate Professor in Penn's Weitzman's School of Design effective as of July 1, 2012.  Trial Tr. 2/1/23 166-5.

8.      The jury found that the tenure denial decisions in 2011 and 2012 were not discriminatory, but it concluded that the 2012 re-evaluation was retaliatory based on prior complaints of discrimination by Plaintiff.  ECF. No. 101.  That finding has not yet been reviewed on post-trial motions, which are not due until after a final judgment is entered by the Court.  In the meantime, for the purpose of considering what economic damages (back pay and front pay), if any, are to be awarded, the Court uses July 1, 2012 as the starting point for its analysis.[1]

    **B.      Plaintiff's Employment with CCA**

9.      In July 2011, a few weeks after her employment with Penn ended, Plaintiff secured a position teaching architecture at CCA.  Trial Tr. 2/1/2023 72:11-24; Ex. 348, at VEIKOS002350.

---

[1] The parties stipulated that economic damages are equitable in nature and for the Court to determine.  *See* ECF. No. 65, at p. 11; ECF. No. 73, at p. 12.

10.     Beginning in August 2011, Plaintiff advised other universities and colleges to which she had previously applied that she was no longer considering those positions. *See, e.g.*, Ex. 346, at VEIKOS002154, VEIKOS002167-68, VEIKOS002170.

11.      For example, on August 18, 2011, Plaintiff replied to an email from the Chair of the Architecture Department at Temple University in Philadelphia, declining an offer to teach at Temple that fall and noting that she would be moving to San Francisco.   Ex. 346, at VEIKOS002154.

12.     Similarly, in August 2011, Plaintiff exchanged emails with the Head of the Department of Architecture at Drexel, who told her that he could not offer her a studio position for the fall but invited her to teach elective courses.  Ex. 346, at VEIKOS002167-68.  He also informed Plaintiff that the Dean had approved two full-time teaching positions for the following year, which he stated he "hopes [she] will consider."  *Id.*  On August 22, Plaintiff replied that she could not teach at Drexel in the fall because she had accepted a position at CCA.  *Id.*  However, she noted that her position at CCA was only temporary, and she remained interested in a full-time teaching position at Drexel.  *Id.*  There is no evidence that Plaintiff ever followed up regarding these full-time positions at Drexel.

13.     On August 23, 2011, Plaintiff declined an offer to teach at the Rhode Island School of Design in the fall, stating that she had already accepted a position at CCA.   Ex. 346, at VEIKOS002170.

14.     In September 2011, Plaintiff commenced employment at CCA.  Trial Tr. 1/31/2023 114:1-4.  Her initial contract was for an appointment teaching in the fall and spring semesters of 2011 and 2012 and expired on May 12, 2012.  Ex. 348, at VEIKOS002350.  Her base compensation during this eight-month period was $51,000, including a $1,000 "team-teaching stipend."  *Id.*

15.     Several weeks after Plaintiff began her employment at CCA, in November 2011, her salary for the eight-month initial period was increased to $54,150.  Ex. 348, at VEIKOS002351.

16.     Plaintiff was not hired for a tenure track position at CCA.  Trial Tr. 1/31/2023 7:1-6.  Therefore, she did not have the kind of research and writing responsibilities that took up much of her time when she was an Assistant Professor seeking tenure at Penn.  Trial Tr. 1/31/2023 132:5-7.

17.     In addition to her regular course load at CCA in the fall of 2011 and spring of 2012, Plaintiff applied for summer teaching positions at CCA, Berkeley, and the University of California at Los Angeles ("UCLA").   Ex. 348, at VEIKOS002357, VEIKOS002274; Ex. 346, at VEIKOS002270.

18.     She was paid $3,150 to teach at CCA in the summer of 2012 and an additional $10,700 to teach at Berkeley that summer.  Ex. 348, at VEIKOS002354, VEIKOS002274.

19.     During her first few months at CCA, when her prospects for long-term employment were less certain, Plaintiff continued to seek alternative employment at other colleges and universities.  Ex. 346, at VEIKOS002224, VEIKOS002227.

20.      In November 2011, Plaintiff received an email from her former colleague at Penn, Annette Fierro, about a possible opening at the University of Virginia ("UVA").  Ex. 346, at PENN 05054.  Fierro had been requested to nominate candidates for a UVA faculty search for "tenure track types" and offered to nominate Plaintiff if she was interested.  *Id.*  Fierro emphasized that the person seeking recommendations for UVA was a "very dear friend and mentor" who regarded Fierro's advice highly.  *Id.*  Plaintiff did not reply to that email.  *Id.*

21.     Thereafter, Plaintiff applied for only two additional faculty positions: a tenure-track position at Pratt and another one at Cornell University.   Ex. 346, at VEIKOS002224,

VEIKOS002227.  Both applications were submitted in January 2012, when her prospects at CCA were unclear and before her tenure re-review was complete.  *Id.*

22.     On April 6, 2012, Plaintiff received an email from the Assistant to the Dean at Pratt, a prestigious design college in Brooklyn, New York.  Ex. 346, at VEIKOS002266; Trial Tr. 2/1/2023 76:20-77:1-3.  The email noted that its search committee was inviting Plaintiff to interview via Skype for a tenure track position.  Ex. 346, at VEIKOS002266.

23.     On April 9, 2012, before she had replied to the invitation from Pratt, Plaintiff was offered the position of Chair of Interior Design at CCA beginning in the 2012-2013 academic year.  Her salary in the new position was increased to $77,500 per year, and she was entitled to an additional $3,000 grant and $5,000 relocation bonus.  Ex. 348, at VEIKOS002355.  As the Department Chair, Plaintiff was required to teach courses at CCA in the fall and spring semesters, but not in the summers.  *Id.*

24.     On April 18, 2012, Plaintiff signed her offer letter, accepting the position as Chair of Interior Design at CCA.  Ex. 348, at VEIKOS002355-56.

25.     On April 22, 2012, having accepted the offer to be a Department Chair at CCA, Plaintiff declined the Pratt opportunity.  Ex. 346, at VEIKOS002266.  Her response noted that her "situation has changed . . . and [she] must withdraw at this time."  *Id.*  Several months later, in June 2012, Plaintiff received a generic email from Pratt informing her that the position had been filled.  Ex. 346, at VEIKOS002283.

26.     At trial, Plaintiff testified that she declined the Pratt opportunity because she "had already accepted the position of chair in interior design" and that her "son had just adjusted to kindergarten and had some difficulty, and it would have been very hard to uproot him again."  Trial Tr. 2/1/2023 78:16-21.  She conceded, however, that Pratt was in a desirable location—the school

is in Brooklyn, near where her parents lived.  Trial Tr. 2/1/2023 78:1-11.  Plaintiff had previously testified about the hardship that she and her son faced by moving away from her family, especially given her father's cancer diagnosis, and that she felt "lost in California."  Trial Tr. 1/31/2023 128:16-25; Trial Tr. 2/1/2023 78:6-10.

27.    Moreover, as of April 2012, Plaintiff did not yet know whether she would be granted tenure at Penn.  It was still her goal at that time to return to the East Coast, and in particular, to Philadelphia.  Trial. Tr. 1/31/2012 114:5-9.  It was not until May 7, 2012, that she learned from Dean Taylor that she had been denied tenure a second time at Penn.  Ex. 432, at VEIKOS002272-73.

28.    Plaintiff admits that after she learned of her second tenure denial in May 2012, she did not take any steps to seek alternative full-time employment.  Trial Tr. 1/31/2023 129:14-16; Trial Tr. 2/1/2023 74:14-16.  Instead, once she was given the Department Chair position and a contract extension at CCA, she abandoned her efforts to find a higher-paying faculty position or a tenure-track position at another college or university.  Trial Tr. 1/31/2023 129:14-16.

29.    As noted above, the period in which economic damages are to be calculated began on July 1, 2012, when Plaintiff would have returned to Penn had she been granted tenure in the re-review.  From July 1, 2012 to December 31, 2012, Plaintiff actually earned more compensation than she would have received at Penn, at least according to her expert witness.

30.    During the six-month period from July 1 to December 31, Plaintiff earned $53,708.33.[2]  Ex. 348, at VEIKOS002351, VEIKOS002354-55, VEIKOS002357-58.  Her average

---

[2] This figure reflects six months of Plaintiff's earnings from July 2012 through December 2012. *See infra* Findings of Fact ¶ 41.  From July through August 2012, she earned a base salary of $54,150.12, and she earned an additional $3,150 from CCA for teaching a summer course and $10,700 for teaching at Berkeley that summer.  Ex. 348, at VEIKOS002351, VEIKOS002357-58, VEIKOS002273-75.  From September through December 2012, her annual salary increased to $77,500.  Ex. 348, at VEIKOS002355-56.  This figure also reflects several bonuses she received, including a $3,000 faculty enrichment grant and a $5,000 relocation bonus.  Ex. 348, at VEIKOS002355.  Such

monthly earnings during that period, considering both her CCA and her Berkeley earnings, was $8,951.39. This is higher than her $6,397.80 of monthly earnings at Penn before her employment ended, and also higher than the $6,976.30 per month that her expert witness assumes she would have earned in 2012 had tenure been granted at Penn.

31.     In total, Plaintiff earned $17,153 more in the first six months of the damages period than her expert assumes she would have earned had she remained at Penn as a tenured Associate Professor. Ex. 348, at VEIKOS002351, VEIKOS002354-55, VEIKOS002357-58; Ex. 349A, at pp. 9-11; *see infra* Findings of Fact ¶ 41.

32.     Plaintiff's actual earnings declined somewhat after 2012, primarily because Plaintiff did not teach summer courses after she began to serve as a Department Chair. Plaintiff did not explain why she chose not to teach in any of the summers after 2012. Perhaps she no longer considered it necessary after receiving a salary increase and a longer-term contract, but it appears to have been a personal decision. Her 2012 contract with CCA did not require her to teach in the summers, and her non-tenure track position would not have entailed the kind of research and writing responsibilities that she had at Penn. Ex. 348, at VEIKOS002502, VEIKOS002355; Trial Tr. 1/31/2023 132:5-7.

33.     Whatever the motivation, there is no evidence that Plaintiff sought any employment or income-producing teaching opportunities after 2012 for the periods between the end of classes in May and the resumption of the academic schedule in September.

---

amounts are properly considered income, as they were taxable and reflect compensation for amounts she would have otherwise been required to pay.

34.     Plaintiff has been employed continuously as a full-time member of the faculty at CCA from the commencement of her employment in September 2011 through the completion of the trial of her case in February 2023.  Trial Tr. 1/31/2023 7:1-5.

35.     Her accomplishments in that position reflect a long-term and successful relationship that she has not suggested will end.  Trial. Tr. 1/31/2023 132:1-5.  Plaintiff served as the Chair of Interior Design at CCA for six years, from 2012 to 2018.  Trial Tr. 2/1/203 73:1-3.  She was elected President of CCA's Faculty Senate.  Trial Tr. 1/31/2023 131:22-24.  She published her manuscript, *Lina Bo Bardi: The Theory of Architecture Practice* in 2013, as well as several additional works, including chapters in books, essays, and articles in peer-reviewed journals.  Ex. 348, at VEIKOS002503-07; Trial Tr. 2/1/2023 74:3-9.  Additionally, she has been invited to lecture as an expert in her field across the country and even internationally, including at prestigious institutions such as Princeton University.  Ex. 348, at VEIKOS002507-08; Trial Tr. 1/31/2023 131:9-16.

36.     At various times while at CCA, Plaintiff also undertook administrative responsibilities, such as facilitating a pre-college program in 2014 and 2015.  Ex. 348, at VEIKOS002502.  She received additional compensation for these duties.  Ex. 348, at VEIKOS002383.

37.     Plaintiff's CCA Earnings Statements reflect the various components of her pay, including the additional compensation she received in most years for administrative responsibilities, honorarium, and stipends, as reflected in the chart below.  *See infra* Findings of Fact ¶ 41.

38.     Although Plaintiff produced these Earnings Statements for several years, her expert disregarded them and instead relied exclusively on the lower taxable wage amounts reflected in her W-2 statements.  Hearing Tr. 27:21-22.

39.     As Plaintiff's Earning Statements explicitly state, portions of her compensation were "excluded from federal taxable wages."   Ex. 348, VEIKOS002359, VEIKOS002360, VEIKOS002361, VEIKOS002383, VEIKOS002414.   Those amounts are accordingly excluded from her W-2 compensation.

40.     Comparing her annual gross earnings to her W-2 wages shows that Plaintiff's expert reduced Plaintiff's actual CCA gross earnings by approximately 5%, but she did not include a similar 5% deduction to account for non-taxable benefits at Penn.  Hearing Tr. 45:3-6.  To the contrary, her report specifically states that she intended to exclude the value of benefits (other than retirement benefits).  *See* Ex. 347, at pp. 8-9 (explaining that she assumed benefits offered by Penn and CCA were roughly equivalent and therefore only included the value of the 403(b) match in as fringe benefits).

41.     The chart below demonstrates how Plaintiff's actual pay, as depicted on her 2012-2015 CCA Earnings Statements which reflect categories of reportable income, compared to her W-2 forms:

| Year | CCA Earnings Statements[3] | | W-2 Wages[4] |
|------|------------------|----------|-------------|
|      | Earning Type | Total |  |
| 2012 | Regular: | 65,783.36 | $73,101.68[5] |
|      | Honorarium: | $100.00 |  |
|      | **Gross Total:** | **$65,883.36** |  |

---

[3] *See* Ex. 348, VEIKOS002359, VEIKOS002360, VEIKOS002361, VEIKOS002383; VEIKOS002384.
[4] *See* Ex. 349A, at 3; Ex. 348, at VEIKOS002362, VEIKOS002381.
[5] *See* 348, at VEIKOS002362, VEIKOS002354.

| 2013 | Regular: | $78,016.72 | $74,339.86 |
| | **Gross Total:** | **78,016.72** | |
| 2014 | Regular: | $79,576.32 | $82,332.22 |
| | Honorarium: | $600.00 | |
| | Add Ctrt Reg | $1,000.00 | |
| | Precollege | $5,160.00 | |
| | **Gross Total:** | **$86,336.32** | |
| 2015 | Ranked Faculty | $53752.60 | $93,938.20 |
| | Regular: | $32583.36 | |
| | Honorarium | $200.00 | |
| | Stipend | $6,500.00 | |
| | Pre-college | $5400.00 | |
| | **Gross Total:** | **$98,435.96** | |
| 2016 | Regular through 11/16/2016 | $84,239.62 | $91,010.00 |
| | **Total through year end** | **$95,683.36** | |

## C.   **Plaintiff's Expert Report and Testimony**

### 1.   **Kucsma's Several Report Versions and Hearing Testimony**

42.   Plaintiff retained an economic expert, Kristin Kucsma ("Kucsma"), to offer an opinion on Plaintiff's alleged economic losses.  Ex. 347, at pp. 1-5.  Kucsma provided an initial opinion, which she then updated on July 23, 2021.  *Id.*at 2.  The purpose of Kucsma's report was to evaluate "lost earnings through the present time, lost earnings in future years through plaintiff's retirement, and related losses suffered by Catherine Veikos arising from her denial of her tenure application, which she alleges was the result of discrimination and retaliation."  Ex. 347, at p. 2. Kucsma relied on documents and information provided by Plaintiff and her counsel.   Hearing Tr. 6:19-25, 54:9-25.

43.     Kucsma accepted the assumptions provided to her and confirmed at the Hearing that she was not offering an opinion on the sufficiency of Plaintiff's search for alternative or additional employment.  Hearing Tr. 48:8-9.  Accordingly, she did not consider whether Plaintiff could have fared better economically had she not abandoned her job search in April 2012 or had she continued to teach summer courses after 2012.  *Id.*  Kucsma is not a vocational expert and did not opine on the reasonableness of Plaintiff's attempts to mitigate her damages or the availability of other opportunities.  Hearing Tr. 22:9-18.

44.     In her original July 2021 report, Kucsma opined that "within a reasonable degree of economic certainty" it was her professional opinion that the total present value of the economic losses sustained by Plaintiff amounted to $914,852.  Ex. 347, at p. 2.

45.     Kucsma's calculation included $174,960 of back pay.  *Id.* at 11-16.  Kucsma opined that had Plaintiff remained at Penn from 2011 to 2021, she would have earned $1,046,379.  *Id.* at 16.  She then subtracted from that amount the $871,419 that she believed Plaintiff had earned at CCA.  *Id.*

46.     Kucsma's damages estimate also included a component of "adjusted earnings in future years"—front pay—totaling $269,499.  *Id.* at 20.  She calculated this by subtracting from the earnings Plaintiff allegedly could have earned had she stayed at Penn through retirement, which Kucsma calculated to be $1,115,142, the earnings she would receive if she stayed at CCA through retirement, which Kucsma calculated to be $845,643.  *Id.* at 18-21.

47.     Kucsma's 2021 calculations also included $184,501 in damages related to tuition reimbursement benefits for Plaintiff's son.  *Id.* at 26.

48.     Finally, the 2021 report also included a sum to compensate Plaintiff for "excess taxation," totaling $285,892.  *Id.* at 25.  Kucsma analyzed Plaintiff's excess tax compensation,

assuming the award would be taxed at the state level in California, where Plaintiff currently resides. *Id.* at 23.

49.     On January 9, 2023, this Court granted Penn's Motion in Limine to preclude evidence related to tuition benefits damages, finding that any damages related to tuition benefits were speculative.  ECF. No. 83, at p. 6.

50.     After the jury verdict in this case, the Court scheduled a hearing on Plaintiff's claim for economic damages (the "Hearing").  ECF. No. 111.  In anticipation of the Hearing, Kucsma provided a new report on Plaintiff's economic losses.  Ex. 349A.  This new report modified the back pay period to begin in 2012, rather than 2011, since the jury found in favor of Penn on the 2011 tenure denial.  Kucsma also excluded tuition reimbursement damages pursuant to the Court's ruling on Penn's motion in limine.  *Id.*

51.     Kucsma stated that she used the same analysis as in her 2021 report but incorporated new salary information provided by Plaintiff.  Ex. 348A; Hearing Tr. 6:4-11.

52.     In the final version of her report, Kucsma determined the total amount of back pay to be $206,188.  Ex. 349A, at 8-10.

53.     Kucsma's updated analysis also included a front pay component, which she calculated to be $532,596—more than twice the 2021 calculation that she had offered with a "reasonable degree of certainty."  *Id.* at 12; Ex. 347, p. 2.

54.     Finally, based on those figures, Kucsma's updated calculations for compensation for excess taxes totaled $316,621.  Ex. 349A, at 14-16.

55.     Therefore, despite Kucsma removing nearly $200,000 in tuition fees and reflecting one less year of damages, Kucsma's updated report calculated Plaintiff's economic damages as $1,055,405—over $140,000 higher than the total damages amount reported in her original report:

|  | **Initial Report** | **Revised Report** |
|---|---|---|
| Years | 2011-2031 | 2012-2031 |
| Back Pay | $174,960 | $206,188 |
| Front Pay | $269,499 | $532,596 |
| Tuition Benefits | $184,501 | $0 |
| Excess Taxes | $285,892 | $316,621 |
| **Total** | **$914,852** | **$1,055,405** |

Ex. 347, p. 28; Ex. 349A, p. 16; Hearing Tr. 59:11-12.

### 2. Kucsma's Calculations Are Based on Arbitrary and Speculative Assumptions

56.     Each component of Kucsma's economic damages assessment is rife with flawed methodologies and speculation, as demonstrated below.

        a.    <u>Kucsma's Back Pay Calculations Are Based on Selective Data That Artificially Boost Plaintiff's Hypothetical Penn Salary While Suppressing Her Actual Earnings</u>

        *(i)*    *Kucsma Understates Plaintiff's Actual Earnings*

57.     Kucsma's assumptions regarding Plaintiff's pay at CCA between 2012 and 2023 are inaccurate and resulted in artificially lower amounts than Plaintiff actually earned, in at least two respects.

58.     *First*, Kucsma did not include all components of pay received by Plaintiff throughout these years—specifically all pay earned outside of CCA.

59.     As an example, Plaintiff taught at Berkeley during the summer in 2012 to supplement her income with CCA, both at CCA and at other institutions.  *See* Ex. 348, at VEIKOS002354.

60.     Kucsma admitted at trial that she did not take into account this additional compensation when calculating the amount of money Plaintiff earned between 2012 and 2023. Hearing Tr. 29:23-24 ("A. . . . I did not consider any earnings other than her CCA earnings for purposes of my analysis.").

61.     Kucsma provided no legitimate reason for the exclusion of such earnings from her back pay calculations, where courts require plaintiffs to mitigate their economic losses and include all forms of income in economic damages calculations. Her decision was completely arbitrary and inconsistent with well-accepted principles of determining economic damages in employment discrimination cases. *See Chesser v. State of Ill.*, 895 F.2d 330, 337 (7th Cir. 1990) (finding that a district court erred in refusing to deduct alternative income from a plaintiff's back pay award and noting that, under Title VII, such income could be considered "interim earnings") (citing 42 U.S.C. § 2000e–5(g)); *Bing v. Roadway Exp., Inc.*, 485 F.2d 441, 454 (5th Cir. 1973) (affirming a trial court's decision to deduct a plaintiff's "moonlighting" earnings from his back pay award); *United States v. State of N.J.*, 530 F. Supp. 328, 336 (D.N.J. 1981) (noting that a plaintiff's supplemental earnings could offset back pay when the plaintiff would not have been able to earn those funds with his or her original employer).

62.     *Second*, Kucsma also incorrectly accounted for the pay Plaintiff earned at CCA.

63.     Kucsma admitted that she referred only to Plaintiff's W-2 forms for those years. Hearing Tr. 27:21-22. However, it was determined at the Hearing (and it is borne out by the documentary evidence) that the boxes referenced by Kucsma on Plaintiff's W-2 forms did not reflect the full pay that Plaintiff earned at CCA during the years in question. *See supra* Findings of Fact ¶ 41.

64.     For example, Kucsma reported Plaintiff's CCA pay as $74,340 in 2013.  Ex. 349A,

at p. 9.  However, Plaintiff's year-end wage statement from CCA indicates full-year earnings of

$78,016.72.  Ex. 348, VEIKOS002360.  As noted above, the expert relied only on the lower taxable

wage amounts, disregarding the portions of her Earning Statements that were deducted for non-

taxable benefits.  *See supra* Findings of Fact ¶ 41.

65.     Kucsma, however, could not provide an explanation as to why there would be a

$4,000 difference in those numbers.  Hearing Tr. 42:4-5, 44:11-16.

66.     Likewise, Kucsma reported Plaintiff's CCA pay as $82,332 in 2014.  Ex. 349A, p.

9.  However, Plaintiff's year-end wage statement from CCA indicates that she was paid $86,336.32

in 2014 by CCA.  Ex. 348, VEIKOS002361; *see supra* Findings of Fact ¶ 41.

67.     Kucsma could not explain why there were differences between the income reported

on Plaintiff's W-2 and her contemporaneous Earnings Statement.  Hearing Tr. 39:10-16.  Indeed,

she conceded that Plaintiff's W-2 form included only "most . . . of her compensation" at CCA.

Hearing Tr. 39:12-18.

68.     Similarly, Kucsma reported Plaintiff's CCA pay as $93,398 in 2015.  Ex. 349A, p.

9.  However, Plaintiff's year-end wage statement from CCA indicates that she was paid $98,435.96

in that year.  Ex. 348, at VEIKOS002383; *see supra* Findings of Fact ¶ 41.

69.     Kucsma admitted that it appeared to be the case that Plaintiff's W-2 did not reflect

all components of Plaintiff's CCA earnings in that year.  Hearing Tr. 40:9-12.

70.     That strategic "misstep" is exacerbated by the fact that, when calculating earnings

at Penn, Kucsma stated that she "used the salary amounts," ***not*** W-2s.[6]  Hearing Tr. 43:1-8, 44:2-

---

[6] To the extent that Plaintiff tries to argue that her expert was not provided with tax information depicting Penn salary information, such information was never even requested by Plaintiff.  *See* Ex. 348, at p. 299 (Defendant Penn's Answers and Objections to Plaintiff's Interrogatories).

4.  Accordingly, by relying on W-2 amounts, Kucsma reduced Plaintiff's CCA gross earnings by approximately 5% per year, but she did not include a similar 5% deduction to account for non-taxable benefits paid to those at Penn.  Hearing Tr. 45:3-6.  Kucsma used total compensation, as that was what Plaintiff requested, and Penn produced, in discovery.

71.     Kucsma failed to adequately report Plaintiff's actual pay received between 2012 and 2023, which resulted in an inflated back pay estimate.  Whether that was by choice or neglect, it reflects a fundamental flaw in the opinion and would leave this Court to speculate about back pay.

*(ii)     Kucsma Overstates Plaintiff's Potential Penn Earnings*

72.     Likewise, Kucsma's assumptions about what Plaintiff's pay at Penn would have been from 2012 through 2023 further inflated her back pay calculations.

73.     As a starting point for her backward-looking estimates, Kucsma used Plaintiff's 2010 Penn salary of $75,688.  Ex. 349A, at p. 5.

74.     Even this starting point is incorrect, given that Plaintiff's salary had been increased to $76,579 for the 2010-2011 academic year.  Ex. 348, at VEIKOS002426.

75.     The question then was how to estimate Plaintiff's Penn pay going forward from there.  Kucsma could have taken the median or the average merit increase received year-over-year by other tenured professors in Penn's Architecture Department—information to which Kucsma had admittedly had access—and applied those raises to Plaintiff's 2010 pay each year.  Ex. 349A, at p. 4; Ex. 347, at p. 9; Hearing Tr. 65:24-66:5.

76.     Instead, Kucsma assumed that Plaintiff would have been earning the average, or mean, pay of tenured Associate Professors in the Department of Architecture in 2020—including professors with much greater seniority and potentially different responsibilities—and then retroactively calculated what the average annual raise Plaintiff would have had to receive to get

her from her pay in 2010 ($75,688) to the Department's average salary in 2020 ($125,294).  Ex. 349A, at p. 5; Hearing Tr. 68:9-18.  There are several problems with this methodology.

77.    Kucsma offered no rational basis for selecting 2020 as the year by which she assumed Plaintiff would earn the average Department salary.  She could have chosen any other year for which she had Department data.  Kucsma testified that she chose 2020 because that was the most recent year for which she had a full year of data when she prepared her initial report.  Hearing Tr. 70:12-14.  But Kucsma prepared subsequent revised reports since then.  *See* Ex. 349; Ex. 349A.  Choosing 2020 as the lookback date was arbitrary.

78.    In fact, using the "average salary" of tenured Associate Professors in the Department of Architecture as the estimate of Plaintiff's future salary at all is problematic.  In any given year, the "average salary" of those professors can be—and indeed was in years between 2012 and 2020 and thereafter—skewed by unforeseen variables, like highly compensated professors joining the Department, low-earning professors leaving the Department, or individual professors receiving abnormally large raises for unknown reasons.

79.    For example, in 2019, Andrew Saunders became a tenured Associate Professor in the Department.  Ex. 349A, at p. 4.  He became the highest-paid tenured Associate Professor in the Department, earning more than professors who had been tenured for Penn for years, and the inclusion of his salary artificially raised the "average salary" of the relevant group of professors.  *Id.*  Similarly, in 2022, Rashida Ng was hired laterally into a Chair-level position and became the highest-paid tenured Associate Professor, earning approximately $20,000 a year more than others in the Department.  *Id.*  Obviously, Professor Ng raised the "average salary" of tenured Associate Professors in the Department, even though no other individual professor's salary changed as a result of her hire.  *Id.*  On the other hand, when Professor Saunders left the Department in 2021,

the tenured Associate Professors' "average salary" decreased (until Professor Ng was hired the next year), even though every other such professor's pay remained constant.  *Id.*

80.     Kucsma offered no explanation or evidence as to why Professors Saunders and Ng were hired or promoted at higher salary levels than other Associate Professors in the Department, but there is no logical basis to include them in the mix, as there is no reason to believe that their obviously unique circumstances would have led to a sudden increase in Plaintiff's salary had she been at Penn between 2019 and 2022.

81.     The Department's tenured Associate Professors' "average salary" in individual years were likewise skewed by professors receiving irregular raises.  For example, in 2022, Simon Kim received a raise of over 20%, while everyone else in the Department received exactly 3% raises.  Ex. 349A, at p. 4.  There is no evidence on the record why Professor Kim received such an outsized raise in 2022.  Hearing Tr. 80:17-20.  The same problem arose in 2023, when Franca Trubiano received an 8.53% raise, while the other three professors received, on average, a little over 4% raises.  Ex. 349A, at p. 4.

82.     Picking any "average salary" of the Department's tenured Associate Professors as a starting point for Plaintiff's estimated salary, rather than simply projecting forward using the average annual raise per year, would necessarily be impacted by any of these outlier professors joining or leaving the Department or receiving relatively large raises for unknown reasons.  Using the median, as described *infra*, rather than the average or mean, would have remediated any such impact.

83.     Moreover, the Court cannot accept Kucsma's determination, as reflected in the chart she included in her report that Plaintiff would have received salary increases of 5.17% per year beginning in 2011, reaching an annual salary of $125,294 in 2020.  Ex. 349A, p. 5; Hearing Tr. 68:13-21.   The typical annual raise given to Associate Professors in the Department of Architecture from 2010 to 2020 was approximately 3%.  For example, between 2013 and 2020, as reflected in the chart below, the average annual raises received by tenured Associate Professors in the Architecture Department were: 2.7% (2013), 4.2% (2014), 3.5% (2015), 3% (2016), 3% (2017), 3% (2018), 3% (2019), and 3% (2020).  Ex. 349A, at p. 4.

| Associate Professor | Year and Salary | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | 2013 | 2013 increase | 2014 | 2014 increase | 2015 | 2015 increase | 2016 | 2016 increase | 2017 | 2017 increase |
| William Braham | $ 113,929.00 | $ 117,232.00 | 2.90% | $ 120,163.00 | 2.50% | $ 122,566.00 | 2.00% | | | $ 122,014.00 | 3.00% |
| Annette Fiero | $ 100,907.00 | $ 103,431.00 | 2.50% | $ 109,534.00 | 5.90% | $ 115,010.00 | 5.00% | $ 118,460.00 | 3.00% | | |
| Andrew Saunders | | | | | | | | | | | |
| Franca Trubiano | | | | | | | | | | $ 109,381.00 | |
| Simon Kim | | | | | | | | | | | |
| Daniel Barber | | | | | | | | | | | |
| Rashida Ng | | | | | | | | | | | |
| Average Salary | $ 107,418.00 | $ 110,331.50 | 2.70% | $ 114,848.50 | 4.20% | $ 118,788.00 | 3.50% | $ 118,460.00 | 3.00% | $ 115,697.50 | 3.00% |
| Median increase | | | 2.70% | | 4.20% | | 3.50% | | 3.00% | | 3.00% |

| Associate Professor | Year and Salary | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2018 | 2018 increase | 2019 | 2019 increase | 2020 | 2020 increase | 2021 | 2021 increase | 2022 | 2022 increase | 2023 | 2023 increase |
| William Braham | | | | | | | | | | | | |
| Annette Fiero | $ 125,674.00 | 3.00% | $ 129,400.00 | 2.96% | $ 133,328.00 | 3.04% | $ 133,326.00 | 0.00% | $ 137,326.00 | 3.00% | $ 144,192.00 | 5.00% |
| Andrew Saunders | | | $ 138,306.00 | | $ 142,455.00 | 3.00% | | | | | | |
| Franca Trubiano | $ 112,662.00 | 3.0% | $ 116,042.00 | 3.0% | $ 120,524.00 | 3.86% | $ 120,524.00 | 0.00% | $ 124,140.00 | 3.00% | $ 134,726.00 | 8.53% |
| Simon Kim | $ 107,500.00 | | $ 110,725.00 | 3.0% | $ 114,047.00 | 3.00% | $ 114,047.00 | 0.00% | $ 137,000.00 | 20.13% | $ 143,850.00 | 5.00% |
| Daniel Barber | | | $ 113,408.00 | | $ 116,118.00 | 2.39% | $ 116,118.00 | 0.00% | $ 119,602.00 | 3.00% | | |
| Rashida Ng | | | | | | | | | $ 157,000.00 | | $ 160,533.00 | 2.25% |
| Average Salary | $ 115,278.67 | 3.00% | $ 121,576.20 | 2.99% | $ 125,294.40 | 3.06% | $ 121,003.75 | 0.00% | $ 135,013.60 | 7.28% | $ 145,825.25 | 5.19% |
| Median Increase | | 3.00% | | 3.00% | | 3.00% | | 0.00% | | 3.00% | | 5.00% |

Data from Ex. 348, at p. 299 (Defendant Penn's Answers and Objections to Plaintiff's Interrogatories).

84.     There is no reason to believe that Plaintiff would have received a raise of 5.17% in any given year—let alone on average—between 2010 and 2020.  Kucsma has provided no rational explanation for her assumption.

85.     Kucsma's projected salary calculations for the last three years are equally problematic.

| Associate Professor | 2021 | 2021 increase | 2022 | 2022 increase | 2023 | 2023 increase |
|---|---|---|---|---|---|---|
| William Braham | | | | | | |
| Annette Fiero | $ 133,326.00 | 0.00% | $ 137,326.00 | 3.00% | $ 144,192.00 | 5.00% |
| Andrew Saunders | | | | | | |
| Franca Trubiano | $ 120,524.00 | 0.00% | $ 124,140.00 | 3.00% | $ 134,726.00 | 8.53% |
| Simon Kim | $ 114,047.00 | 0.00% | $ 137,000.00 | 20.13% | $ 143,850.00 | 5.00% |
| Daniel Barber | $ 116,118.00 | 0.00% | $ 119,602.00 | 3.00% | | |
| Rashida Ng | | | $ 157,000.00 | | $ 160,533.00 | 2.25% |
| Average Salary | $ 121,003.75 | 0.00% | $ 135,013.60 | 7.28% | $ 145,825.25 | 5.19% |
| Median Increase | | 0.00% | | 3.00% | | 5.00% |
| Kucsma Increase | | 0.00% | | 11.58% | | 8.01% |

86.     To estimate Plaintiff's Penn salaries in 2022 and 2023, Kucsma assumed that Plaintiff would have received even larger annual raises, of 11.58% and 8.01%, respectively.  To calculate those figures, she used the percentage difference between the average salary of tenured Associate Professors in the Department of Architecture year-over-year rather than looking at the average salary increase actually received by the professors.  Hearing Tr. 80:7-8; Ex. 349A, p. 5. But because this methodology would have resulted in a salary *reduction* in 2021, Kucsma abandoned her proposed methodology in that year only and instead looked at the actual salary increase received by each assistant professor that year.  Hearing Tr. 85:1-25.

87.     In other words, Kucsma selectively deviated from her approach when it would have yielded a result that was less favorable to Plaintiff.  From 2020 to 2021, the average salary of tenured Associate Professors in the Department decreased, from $125,294 to $121,004, as the highly paid Professor Saunders left the Department. Ex. 349, at p. 4.  But Kucsma hypothesized that Plaintiff's salary would have been unaffected even though the average decreased.  Ex. 349A, at p. 5.  That may have been a logical assumption had Kucsma been tracking actual percentage salary increases rather than Departmental averages, but it is inconsistent with the methodology she

used and reflects an all-too convenient attempt to utilize an assumption only when it is favorable for Plaintiff.

88. But then in 2022 and 2023, Kucsma changed course, reverting to an analysis of year-over-year differences in the Department's tenured Associate Professors' "average salary". In 2022, Kucsma assumed that Plaintiff would have received an 11.58% raise, as that was the difference between the "average salary" of Associate Professors in 2021 and 2022. Ex. 349A, at p. 5; Hearing Tr. 84:1-10. But looking at the individual professors' raises, everyone other than Professor Kim received raises of exactly 3%. Ex. 349A, at p. 4. Even including Professor Kim's aforementioned outsized 20% raise, the professors who received raises in 2022 received, on average, a 7% raise—not the 11.58% that Kucsma uses. *Id.* The "average salary" of the Department's tenure Associate Professors only increased by 11.58% because Professor Ng joined the Department, earning roughly $20,000 more per year than the previously highest-paid tenured Associate Professor. *Id.* Kucsma selectively and conveniently used this "average salary increase" methodology because it yielded a higher raise for her client, rather than focusing on the kinds of salary increases that Associate Professors actually received.

89. By the same token, in 2023, Kucsma assumed an 8.01% increase in Plaintiff's salary, based on the difference in the Department's tenured Associate Professors' "average salary" in 2022 to 2023. Ex. 349A, at p. 5; Hearing Tr. 84:1-10. Examining the individual professors' raises, though, only one professor, Professor Trubiano, received a raise even approaching the 8.01% assumed for Plaintiff. Ex. 349A, at p. 4. Indeed, the average raise actually received by the professors in 2023 was only 5.2%. *Id.* The only reason the 2023 "average salary" of the Department's tenured Associate Professors increased by over 8% was that the lowest-paid

professor, Professor Daniel Barber, left the Department. *Id.* Yet again, Kucsma arbitrarily selected a methodology that yielded an artificially inflated result for Plaintiff. *Id.*

90.     By using a method that was tied to the hiring or departure of individual, outlier professors, Kucsma has failed offer a useful method to project the kinds of increases that Plaintiff, or any other longstanding Associate Professor, would have received on a year-to-year basis had she remained a tenured member of the faculty between 2012 and 2023.

91.     Looking instead at the median salary increase in each year, which eliminates the impact of individual outliers, the yearly salary increase was 3% in most years.[7] *See supra* Findings of Fact ¶ 83.

92.     The flaws in Kucsma's approach are illustrated by focusing on the salary paid to Fierro between 2012 and the present. Fierro is the only Associate Professor in the Department currently who was also in that position in 2012, and her historical compensation and annual increases provide a useful comparison point.

93.     Kucsma projected that in 2023, Plaintiff would be earning an annual salary of $150,995, which is based on an average annual increase of 5.5% from the $83,716 salary that she projected for Plaintiff in 2012. Ex. 349, at p. 5. That projected 2023 salary for Plaintiff, however, is higher than the salary currently paid to Fierro. *Id* at 4.

94.     Notably, Fierro is more senior and received tenure in 2002. Fierro Trial Dep. 186:23-187:04. Fierro was already earning $100,907 per year in 2012, the starting year for these

---

[7] The median is the "value in an ordered set of values below and above which there is an equal number of values or which is the arithmetic mean of the two middle values if there is no one middle number." *See* Merriam-Webster's Online Dictionary, 11th ed. 2005, https://www.merriam-webster.com/. Kucsma herself admitted that using the median was an appropriate method to ensure outliers did not overly impact calculations. When calculating retirement age, Kucsma noted that "the median was the most appropriate [methodology] absent any additional information," particularly because using the average would have been skewed higher by outliers in the field. Hearing Tr. 100:17-15, 101:1-7.

calculations, which was roughly $17,000 a year more than the projected starting point for Plaintiff in the Kucsma analysis.  Ex. 347, at p. 7.

95.     Yet by 2023, Kucsma suggests that Fierro would be earning $6,000 per year more than Plaintiff, without any evidentiary support for such an assertion.  Ex. 349A, p. 4.  Kucsma achieves this anomalous and factually unsupported result by suggesting that Plaintiff's salary would have grown by an average of 5.5% per year from 2012 to the present, while Fierro's salary actually grew by just 3.29% per year over the same period.  *Id.*

96.     There is simply no evidence on the record that Plaintiff would have received, ***on average***, a 5.5% raise in salary at Penn over the last eleven years, or that she would have begun the period earning $17,000 per year less than Fierro and ended it earning $6,000 per year more. This obvious disparity alone should have suggested to Kucsma that there was a serious flaw in her methodology.

        b.    <u>Kucsma's Front Pay Calculations and Assumptions Are Also Speculative and Inflated</u>

        (i)    *Kucsma's Starting Point for Plaintiff's CCA 2023 Salary Is Unsupported by the Record*

97.     In calculating Plaintiff's future expected earnings at CCA, Kucsma starts with Plaintiff's 2023 salary with CCA and grows it by 3.9% per year through the projected retirement age.  Ex. 349A, at p. 12.  The growth assumption seems reasonable, but the starting point—the salary Kucsma attributes to Plaintiff in 2023—is based on a flawed assumption.

98.     Kucsma assumes that Plaintiff's CCA 2023 salary of $75,268 is an accurate reflection of what Plaintiff could be earning with reasonable diligence and that this particular year is a reasonable starting point for a nine-year projection of maximum assumed earnings.  Ex. 349A, at p. 12.  Critically, that 2023 salary is $30,000 (and 32.1%) ***less*** than Plaintiff earned from CCA

in 2022 just one year prior.  Ex. 349A, at p. 9.  Indeed, this salary would be almost the same as what Plaintiff earned when she first started at CCA in 2012, more than ten years before.  *Id.*

99.     Kucsma wrote in her report and testified at the Hearing that she assumed Plaintiff's 2023 salary would be $75,268 due to "CCA course limitations as presented in [P]laintiff's faculty contract effective August 16, 2022."  Hearing Tr. 46:12-16; Ex. 349A, at p. 6.  But she makes no effort to determine whether this one-year decrease was due to a decision by Plaintiff to teach fewer courses, a temporary change in circumstances, or some other short-term blip that bears no relationship to Plaintiff's eleven-year trajectory at CCA or her realistic earning potential over the next nine years.

100.    The contract referred to by Kucsma does indeed indicate a salary of $75,268, but it attributes that reduced salary to the fact that she is only working an 80% schedule, compared with the 100% she had worked the year before.  Ex. 348A, at VEIKOS003179; Hearing Tr. 45:9-11, 46:12-15.

101.    The only evidence that Plaintiff was precluded from having a full workload in 2021-—either because of COVID or for any other reason—is her own vague testimony.[8]  Moreover, it is undisputed that Kucsma, *at the time she drafted her report*, did not know about such testimony.  Kucsma admitted that under oath at the Hearing.  Hearing Tr. 47:2-11.

102.    Kucsma could not say whether or not it was Plaintiff's own choice not to teach a full courseload and testified that she did not know whether Plaintiff will be afforded the opportunity to pick up any additional coursework or administrative duties at CCA that will supplement her allegedly reduced income for her regular courses.  Hearing Tr. 47:12-48:9.

---

[8] At trial, Plaintiff stated that she lost "20 percent of [her] salary this year because of low enrollment."  Trial Tr. 1/31/2023 132:9-12.

103.     As explained above, however, there is abundant evidence that, in prior years, Plaintiff received additional compensation beyond that paid to her for teaching courses in the fall and spring semesters.

104.     For example, in 2014 and 2015, Plaintiff was paid $5,160 and $5,400, respectively, for running the pre-college program at CCA.  Ex. 348, at VEIKOS002361, VEIKOS002383; Hearing Tr. 36:1-8.  Similarly, in 2014, she received an additional $1,500 collectively for activities labeled on her pay statement "Honorarium" and "Add Ctrt Reg" and in 2015, she earned an additional $6,500 stipend.  Ex. 348, at VEIKOS002361; VEIKOS002383.  Kucsma took none of this into account when assuming Plaintiff's 2023 pay.

105.     Moreover, Kucsma disregarded the fact that Plaintiff earned substantially more than $75,268 in each of the last eight years, and essentially admitted as much, stating that the "most up-to-date information about her current compensation . . . is the most reasonable figure for me to use to determine what she[] . . . likely will continue to earn going forward."  Hearing Tr. 49:16-50:3; Ex. 349A, p. 9.

106.     There is simply no evidence that $75,268—more than 32% less than her salary the year before and ***almost the same as her salary when she started at CCA over ten years ago***—is an appropriate starting point for Plaintiff's expert's front pay calculations.

> (ii)     *The Evidence Belies Kucsma's Assumption That Plaintiff's CCA Pay Would Only Grow at 3.9% from Her Allegedly Reduced 2023 Salary*

107.     Assuming that CCA did decrease Plaintiff's salary by 20% in 2023 due to COVID-related enrollment limitations or some other temporary circumstance, there is no reason to assume either that (1) her salary would remain artificially depressed for the next eight years or (2) that her salary would only increase by 3.9% per year.

108.     Yet Kucsma did just that.  Kucsma testified that she used the reduced $75,268 salary for Plaintiff as her 2023 starting point, and then projected future earnings based on consistent annual raises of 3.9%.  Hearing Tr. 48:22-25.

109.     In so doing, Kucsma made the unwarranted assumption that Plaintiff's course load, and therefore her salary, at CCA would remain at 80% of its previous level for the next eight years until her retirement.  Ex. 349A, at p. 12; Hearing Tr. 50:4-8, 55:15-18 ("Q. Okay.  But still you are assuming that whatever course load reduction will continue until she retires in 2031?  A. . . . That's correct.").

110.     She also assumed that Plaintiff would not earn any additional income from administrative activities or additional teaching (i.e., summer school either at CCA or elsewhere) in any of those additional years.  Hearing Tr. 31:1-15.

111.     But those assumptions are not based on facts and are entirely unreasonable. Kucsma admitted at the Hearing that she had no evidence that the alleged 80% schedule would continue indefinitely.  Hearing Tr. 51:6-14.  She also admitted that the only thing she based her information on with respect to the COVID-related cuts was a statement from Plaintiff's counsel. Hearing Tr. 54:4-12.

112.     Even if true, there is no reason to believe that a reduction due to COVID-related enrollment limitations would even continue past 2023, let alone for *eight more years*.  In fact, the only evidence on the record related to COVID-based cuts at CCA concerns CCA's decision to suspend its contributions to its employees' 403(b) plans—*which it has already reinstated*. Hearing Tr. 55:12-14.

113.     Kucsma also admitted that she had no idea whether Plaintiff could or would assume additional teaching or administrative duties to supplement her income in future years.  Hearing Tr.

50:21-51:3 ("Q.  Anything like teaching summer school, running the precollege programming, receiving a grant or an honorarium or a stipend, all of those additional pieces of compensable earnings that we saw on previous pay statements, you don't know if she's going to receive them in 2023 or in 2024 or in 2025 or any year; is that right?  A. . . . [T]hat's correct.").

114.    Therefore, Kucsma's method of using Plaintiff's allegedly temporarily reduced 2023 salary to project out the following eight years is purely speculative and unreasonable.

115.    Furthermore, the annual 3.9% increase Kucsma applied to her faulty 2023 starting point is similarly flawed.

116.    In applying such an annual increase, Kucsma ignored the historical pay raises Plaintiff actually received during her employment at CCA.  Using Kucsma's analysis of Plaintiff's CCA pay alone, there were several years in which Plaintiff's salary increased by much more than 3.9%—for example, in 2014, she received a raise of almost 11%; in 2015, she received a raise of over 13%; and in 2022, she received a raise of *almost 20%*.  Ex. 349A, at p. 9.

117.    Overall, taking all of Plaintiff's annual raises while at CCA into account, Plaintiff's average annual compensation between 2012 and 2022 increased by approximately 4.49%.  Ex. 349A, at p. 9.  Yet when projecting Plaintiff's raises from 2023 to 2031, Kucsma used an annual raise of only 3.9%.  *Id.* at 12.

118.    This assumption also completely neglects the possibility (or, likely, probability) that in 2024, or some other future year, when the alleged COVID-related course limitations are lifted, Plaintiff's teaching responsibilities and salary will be restored to historical levels.

119.    Despite her testimony that she "didn't kind of assume [the 3.9% annual increase] out of the air" (Hearing Tr. 93:16-21), Plaintiff's expert could provide no concrete formula for

how she calculated that figure—indeed, she testified explicitly that "there's no formula." Hearing Tr. 94:17-20.

120.   Instead, she testified vaguely to various sources she looked at, like "projections that are published by the Congressional Budget Office . . . projections that are published by the Social Security Administration . . . historical data published by the U.S. Department of Labor[9] . . . current economic conditions . . . rates of inflation, the tight labor market, the retiring of baby boomers, the declining population" and stated that "all of those things have an impact on the relative supply and demand for labor and are going to have continuing effects on how wages increase going forward." Hearing Tr. 94:6-95:1-6.

121.   But Kucsma could not explain *how* those sources were utilized to arrive at the annual 3.9% increase she supposedly calculated.

122.   This is illustrated by examining the end point in Kucsma's projected front pay period. Using her assumed 3.9% annual increase from 2023 through Plaintiff's estimated retirement, Kucsma estimates that in 2031, Plaintiff will be earning no more than $102,220 from CCA—*this is $8,000 a year less than Plaintiff earned in 2022, and barely more than Plaintiff earned in total in her first full year at CCA in 2012*. Ex. 349A, at pp. 3-12

123.   There is no reason to assume that Plaintiff's CCA salary will remain depressed at the 2023 level, or that if it does, that Plaintiff would not seek additional/different employment, or perhaps return to summer teaching as she did in 2012, to bring her compensation more in line with her historical earnings.

---

[9] The expert considered this historical data even though just minutes prior to this testimony, she stated "[i]n [her] professional opinion as an economist, it is never appropriate to consider historical data." Hearing Tr. 57:4-5.

>           (iii)    *Kucsma's Assumptions About Plaintiff's Potential Future*
>                    *Penn Income Are Speculative and Employ an Inconsistent*
>                    *Methodology Designed to Inflate Compensation*

124.    Kucsma's estimates of what Plaintiff would have earned between 2023 and 2031 at Penn are similarly premised on both (1) a flawed starting point for what Plaintiff's Penn salary would be in 2023 and (2) a speculative annual increase building on that flawed starting point. Each of these faulty assumptions is independently sufficiently speculative to render Kucsma's front pay calculations unreliable and unhelpful.

125.    As described *supra* in Section I(C)(2)(a)(ii), Kucsma overestimates what Plaintiff would have earned from 2012 to 2023 at Penn.

126.    Consequently, Kucsma's starting point for Plaintiff's future potential Penn salary is grossly overstated.

127.    Regardless of the 2023 starting point, Kucsma's forward-looking estimates of Plaintiff's potential Penn salary are based on pure conjecture.

128.    Kucsma assumes that Plaintiff would receive, on average, annual raises of 3.9% between 2023 and 2031. Ex. 349A, at p. 11.

129.    As described above, however, Kucsma admits that that percentage is not based on any verifiable or known formula (Hearing Tr. 94:17-20), but rather an amorphous amalgamation of her observations of various trends and market conditions. Hearing Tr. 93:16-22.

130.    Such trends and market conditions, however, are not focused on the Department of Architecture specifically, or even Penn generally. Hearing Tr. 97:7-9.

131.    Indeed, Penn's guidelines provided for raises between 0 and 3.5% and the typical raise received by tenured Associate Professors in the Department of Architecture was closer to 3%. Ex. 348, at VEIKOS002426; Ex. 349A, at p. 4.

132.    Kucsma's use of 3.9% is arbitrary and untethered to the actual raises received by tenured Associate Professors in the Department.

*(iv)    Kucsma Provides No Support for an Eight-Year Front-Pay Award*

133.    Even if the Court determines that front pay is necessary to make Plaintiff whole, there is no evidence on the record supporting an award of eight years of front pay.

134.    Kucsma assumes that Plaintiff would not have retired from her tenured position at Penn until she was 67.5 years old, indicating a retirement year of 2031.  Ex. 347, p. 5.

135.    However, she provides no explanation for such an estimate, basing it solely on the "median statistical retirement age" of females with master's degrees.  Ex. 347, p. 5; Hearing Tr. 99:16-22.

136.    There has been absolutely no testimony about when Plaintiff planned to retire or what other career, life, or health goals she has before retirement.  The expert's estimate of the duration of front pay to which Plaintiff is entitled is based on pure conjecture about when Plaintiff would retire, and the Court should not simply accept such conjecture if crafting a front pay award.

*(v)    Kucsma's Revisions to Her Report Artificially Inflate Her Front-Pay Calculations*

137.    The wide variations in front pay calculations between Kucsma's initial report and her most recently prepared revised report underscore the speculative nature of her calculations.

138.    Indeed, Kucsma now estimates that by 2031, Plaintiff would be earning $205,062 per year at Penn—***this is $25,000 more*** than the $180,385 she estimated in her initial report. *Compare* Ex. 349A, at p. 11 *with* Ex. 347, at p. 21.

139.    Similarly, Kucsma now estimates that by 2031, Plaintiff will only be earning $102,220 at CCA—***which is more than $35,000 less*** per year than the $135,144 she estimated in her initial report.  *Compare* Ex. 349A, at p. 12 *with* Ex. 347, at p. 22.

31

140.    All told, based on all the above faulty calculations, assumptions, and methodologies, applied to each year of salary at both Penn and CCA, Kucsma surmises that, in *front pay alone*, Plaintiff is entitled to $532,596 in present value, which is ***almost double*** and ***almost $300,000 more*** than the $269,499 she calculated in her initial report. *Compare* Ex. 349A, at p. 12 *with* Ex. 347, at p. 22.

141.    These kinds of fluctuations in Kucsma's assumptions and calculations undermine any confidence in her analysis, as well as the assertion in her report that her opinions are offered with a reasonable degree of economic certainty.

## II.    PROPOSED CONCLUSIONS OF LAW

1.    In Title VII cases, economic damages are equitable in nature and are to be "left to the judgment of the court." *McKenna v. City of Philadelphia*, 636 F. Supp. 2d 446, 455 (E.D. Pa. 2009).

2.    The purpose of equitable damages under Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 440 (3d Cir. 2009).

3.    In exercising their discretion to award equitable damages, district courts should endeavor only to restore plaintiffs to the economic status quo that would exist but for the defendant's conduct. *Id.* at 441. Such damages are to be awarded only to make plaintiffs "whole" and to allow them "to reestablish [their] rightful place in the job market." *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 84 (3d Cir. 2009).

4.    Consequently, Title VII plaintiffs do not simply receive as equitable damages the wages they would have earned had they remained in their positions with their former employers. Rather, the court imposes on plaintiffs a duty to mitigate their damages and to take into account what the plaintiffs actually earned or could have earned with reasonable diligence after the end of

their employment with defendants. *Bates v. Bd. of Educ. of the Capital Sch. Dist.*, No. 97-394-SLR, 2000 WL 376405, at \*18 (D. Del. Mar. 31, 2000).

5.      These concepts inform the courts' responsibilities to both "locate a just result," *Taxman v. Bd. of Educ. of Twp. of Piscataway*, 91 F.3d 1547, 1565 (3d Cir. 1996), and prevent plaintiffs from "obtaining a windfall." *Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1005 (3d Cir. 1988).

6.      Here, Plaintiff seeks almost ***twenty years*** of economic damages—more than ten years of back pay and eight years of front pay—even though (a) she readily admitted that she never tried to find a higher-paying job after accepting a role almost immediately after her employment with Penn ended, and (b) she has "reestablished her rightful place in the job market" through her employment with CCA. *Donlin*, 581 F.3d at 84.

7.      Since her employment ended at Penn, Plaintiff has had a successful career at CCA, where she has taught consistently, served as a Department Chair and the President of the school's Faculty Senate, published books, and given lectures regularly in her field.   She has not demonstrated any desire to change her career trajectory since her employment with CCA began.

8.      Moreover, since becoming a Department Chair in the fall of 2012, Plaintiff has apparently elected not to teach or work between the end of the CCA school year in May and the resumption of classes in September.   Presumably, that is because her compensation at CCA increased to a level that was higher than she was earning at Penn before her employment ended, and her job security at CCA improved with the offering of a three-year contract.   Alternatively, she may have found it desirable on a personal level to have free time in the summer months. Whatever the reason for her decision, Plaintiff has chosen not to teach in the summer months between 2013 and the present.

9.      Whatever motivated Plaintiff to abandon her job search and stop teaching in the summers, her compensation in her first year after she left Penn establishes that with reasonable diligence, she could have fully mitigated any economic harm she claims to have suffered as a result of the 2012 denial of tenure.  It would be unfair and inequitable for this Court to require Penn to compensate Plaintiff for her personal decision to take time off from work during a quarter of each year from 2013 to the present.

10.     Even if the Court were to award Plaintiff some amount of economic damages, it would be inappropriate to award the amount of damages proposed by Plaintiff's expert, as her methodologies and conclusions are based on speculation and inconsistent application.

11.     Most striking is the expert's front pay calculations—the most recent of which *double* her initial estimate— based on a one-time 20% decrease in Plaintiff's CCA salary in 2023, which Kucsma then projects as a perpetual diminution of Plaintiff's earning opportunity for the remainder of her career.  Kucsma believes that the decrease is related to the impact of COVID, but she did not explore whether it was attributable to a decision by Plaintiff to teach fewer courses or whether it will continue into the future as the effects of the pandemic fade.

12.     Her projection of that one-year salary reduction as an inevitable and recurring compensation factor in each of the next nine years represents a level of speculation that this Court cannot accept.

13.     Equally speculative and unfounded is Kucsma's attempt to build sharp increases into the rate of compensation that she says Plaintiff would have enjoyed had she remained at Penn. While tenured Associate Professors in the Penn's Department of Architecture typically received 3% annual increases over the last eleven years, Kucsma projects that Plaintiff would have received an 11.6% increase in 2022 and an 8% increase in 2023.  She then builds those inflated salary

calculations into her front pay calculations, as the 2023 assumed rate of compensation becomes the foundation for future damages. Those rather grandiose assumptions for 2022 and 2023, however, are not based on compensation increases for longstanding faculty members, but rather the inclusion in Kucsma's calculations of newly hired faculty with different roles who skewed the averages for the department. This makes the front pay calculations both speculative and deeply flawed.

14.     Furthermore, Plaintiff has not proven that she is entitled to compensation for the excess taxes associated with receiving damages in a lump sum, and, even if she had, Kucsma erred in using the California tax rate in calculating such compensation. *See infra* Conclusions of Law ¶¶ 133-157.

15.     Finally, prejudgment interest is not warranted, but would be limited to back pay only.

### A.     Plaintiff Is Not Entitled to Economic Damages

16.     Plaintiff is not entitled to an award of economic damages that would be inequitable or a windfall. Additionally, she is not entitled to be compensated by Penn for personal decisions which may have diminished her actual earnings over the last eleven years, but which reflect choices she made about where she decided to live and work and whether she would work on a full time or seasonal basis.

17.     The Third Circuit has held that in the employment law context, a plaintiff has the duty to mitigate her losses. *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995).

18.     The purpose of "the doctrine of mitigation of damages . . . is to prevent the wage earner . . . from obtaining a windfall, i.e., a double recovery." *Carden,* 850 F.2d at 1005.

19.     In the employment context, equitable damages serve a remedial purpose, and should not be used to punish a defendant or to *compensate* a plaintiff for the consequences of

personal decisions. *See McKenna,* 636 F. Supp. 2d at 455 ("The award of equitable damages is left to the judgment of the court, which must exercise this power in light of the remedial purposes of Title VII.").

20.     Moreover, in deciding issues related to economic damages, a district court has wide latitude to "locate a just result." *Taxman*, 91 F.3d at 1565; *Billman v. Easton Area Sch. Dist.*, No. CV 20-2730, 2022 WL 3139748, at *6 (E.D. Pa. Aug. 5, 2022).

21.     Under the principle of mitigation, "[i]nterim earnings or *amounts earnable with reasonable diligence* by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." *Bates*, 2000 WL 376405, at *18 (quoting 42 U.S.C. 2000e-5(g)(1)) (emphasis added).

22.     A plaintiff has fully mitigated, and damages liability should be foreclosed, when she earned, or could have earned with reasonable diligence, substantially the same amount as she did with her prior employer. *See Ford Motor Co. v. E. E. O. C.*, 458 U.S. 219, 232 (1982).

23.     A defendant can satisfy its burden to demonstrate a failure to mitigate by proving that either (1) other substantially equivalent positions were available to the employee and she failed to use reasonable diligence in attempting to secure those positions, or (2) the employee has engaged in a "willful loss of earnings." *See Holocheck v. Luzerne Cnty. Head Start, Inc.*, No. 3CV-04-2082, 2007 WL 954308, at *5 (M.D. Pa. Mar. 28, 2007); *see also Caufield v. Ctr. Area Sch. Dist.*, 133 F. App'x 4, 11 (3d Cir. 2005); *Tubari, Ltd., Inc. v. N.L.R.B.*, 959 F.2d 451, 452-53 (3d Cir. 1992).

24.     Here, the period in which damages calculations are to be made began on July 1, 2012, the date when Plaintiff would have received tenure at Penn had she not been subjected to retaliation as found by the jury.

25.     Plaintiff seeks nearly two decades of back pay and front pay.  Yet she concedes that from the time she learned of the denial of tenure in the 2012 re-review, she did not apply for a single tenure or tenure-track position, nor did she seek any alternative teaching or faculty positions at other schools.

26.     Plaintiff was obviously prepared to leave California and return to Philadelphia had tenure been granted, so she cannot credibly contend that she was constrained by family or personal reasons to remain in California.  On the contrary, she lamented the lost opportunity to be closer to her family in New York, including her father, who was in the last years of his life.  Yet within days after she learned that she would be a Department Chair at CCA, she declined an offer of an interview for a tenure-track position at Pratt Institute in New York, stating that her circumstances had changed.

27.      It is undisputed that Plaintiff took herself out of the job market for tenure track or other higher-paid faculty positions.

28.     Penn is not required to subsidize Plaintiff's personal decision to remain at CCA for over a decade.  Indeed, to award the nearly two-decades of damages she seeks would amount to an unwarranted windfall.  The reasoning is threefold.  *First*, by taking herself out of the tenure-track labor market entirely, Plaintiff engaged in a willful loss of earnings.  *Second*, even assuming Plaintiff did not engage in a willful loss of earnings, she fully mitigated her damages in 2012 and has offered no evidence as to why, with reasonable diligence, she could not have maintained that level of income in future years had she simply chosen to continue to work throughout the year rather than having summers with no teaching responsibilities.  *Third*, Plaintiff is not entitled to front pay because she has already been "made whole" and has been restored to the economic

position that she would have enjoyed but for the 2012 re-review denial.  Therefore, an award of economic damages would be tantamount to an improper windfall to Plaintiff.

> 1. **Plaintiff Engaged in a Willful Loss of Earnings and Took Herself out of the Tenure-Track Labor Market for Alternative Faculty Positions Beginning in April 2012, Before She Was Denied Tenure in Her Re-Review at Penn.**

29.     Plaintiff diligently conducted a national job search in 2010 and 2011 but stopped in April 2012 after she accepted a job as chair of CCA.  Critically, these job-search efforts occurred *before* Penn denied her tenure in 2012 (the only decision for which Penn has been held liable).  On the other hand, Plaintiff unequivocally testified that she did not apply for a single job after she accepted the role as Chair of CCA.

30.     In so doing, she engaged in a willful loss of earnings and therefore is not entitled to economic damages.

31.     Ultimately, whether a plaintiff has satisfied her duty to mitigate damages is a question of fact, properly reserved for the factfinder.  *Giedgowd v. Cafaro Grp., LLC*, No. CV 20-6184, 2021 WL 4963533, at *12 (E.D. Pa. Oct. 26, 2021) (holding that whether a plaintiff had removed himself from the job market was a question reserved for the trier of fact); *Ngai v. Urb. Outfitters, Inc.,* No. CV 19-1480, 2021 WL 1175155, at *20 (E.D. Pa. Mar. 29, 2021) (same).  The factfinder here is the Court.

32.     In making its factual determinations, this Court has the discretion to reach an equitable, fair result that avoids granting Plaintiff an undue windfall.  *Carden*, 850 F.2d at 1005; *Blum v. Witco Chem. Corp.*, 829 F. 2d 367, 367 (3d Cir. 1987).

33.     Relying on its equitable power and based on the consideration of all of the evidence, the Court finds that Plaintiff failed to mitigate her damages and that it would be unjust to award her economic damages given the choices that she made.

38

a.   Plaintiff Engaged in a Willful Loss of Earnings

34.     It is contrary to the remedial, equitable purpose of employment discrimination statutes to hold an employer liable for damages that are not the result of discrimination or retaliation, but instead are the result of losses willfully incurred by the plaintiff. *See Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 198 (1941).

35.     As such, numerous courts within the Third Circuit have recognized that when a plaintiff has engaged in a willful loss of earnings, such as by removing oneself from the job market, the employer need not put forward evidence of substantially equivalent employment. *Caufield*, 133 F. App'x 4 at 12; *Tubari Ltd., Inc.*, 959 F.2d at 454; *Ngai*, 2021 WL 1175155, at *20; *Briggs v. Temple Univ.*, 339 F. Supp. 3d 466, 507 (E.D. Pa. 2018) ("In a case where the plaintiff withdrew from the employment market, the employer need not provide evidence that substantially equivalent employment actually existed.").

36.     A willful loss of earnings has been found where the alleged victim has failed to stay in the labor market, refused to accept comparable employment, failed to search diligently for other work, or voluntarily quit alternative employment without cause. *Holocheck*, 2007 WL 954308, at *15.

37.     In *Billman*, Judge Pratter explicitly referenced this standard, noting that courts in the Third Circuit have held that, as an alternative to proving that substantially similar employment existed, the defendant can show that the plaintiff failed to mitigate because he or she withdrew from the job market. *Billman*, 2022 WL 3139748, at *3.  As Judge Pratter stated, in the scenario where a "plaintiff does not seek any other employment," it is up to the court to "consider[] whether this decision is justified." *Id.*

38.     Moreover, a plaintiff may take a position that might pay less money or have fewer responsibilities than her prior position but **only after** the plaintiff has made reasonable and diligent efforts to find substantially equivalent employment.  *Ford Motor Co.,* 458 U.S. at 231 n.14.

39.     As such, an underemployed plaintiff has the same responsibilities to mitigate damages and may not entirely abandon the search for a fully comparable position.  *Caufield*, 133 F. App'x 4 at 10; *Tubari Ltd., Inc.*, 959 F.2d at 456–57; *Jefferson v. Milvets Sys. Tech., Inc.*, 986 F. Supp. 6, 8 (D.D.C. 1997) ("This duty to mitigate also applies to 'underemployed' Title VII claimants.") (citing *Ford Motor Co.,* 458 U.S. at 231); *Ellis v. Ringgold Sch. Dist.*, 832 F.2d 27, 30 (3d Cir. 1987) ("The duty of mitigation may require that a plaintiff accept a lower paying position if one equivalent to that from which she was barred is unavailable.").

40.      Indeed, as the court in *Briggs* noted, it can sometimes be reasonable for a plaintiff to accept a lower paying position, **but only after** she has engaged in a reasonable search effort to find comparable employment.  In *Briggs*, a plaintiff was wrongfully terminated from her position as an executive assistant at Temple University ("Temple") in April 2014.  *Briggs*, 339 F. Supp. 3d at 484.  The plaintiff had searched for a position for over **two years** until finally, in August 2016, she accepted a lower-paying position as a home health aide and then ceased to continue to look for other work.  *Id.* at 507-08.  The court rejected Temple's argument that the plaintiff failed to mitigate because she did not continue to search for work after becoming a home health aide.  *Id.* The court noted that "[I]n order to adequately mitigate damages, an employee may need to lower her sights following a ***reasonable period*** of unsuccessfully searching for equivalent employment." *Id.* at 509 (emphasis added).

41.     However, this case is different because, unlike the plaintiff in *Briggs*, who diligently searched for a comparable position for over ***twenty eight months***, Plaintiff admitted she

did not apply for a **single** comparable position after being denied tenure in 2012.  The court in *Briggs* specifically found that the plaintiff there had presented "sufficient evidence that, **after an extensive job search,** she was unable to secure an equivalent position." *Id.*  Here, on the other hand, Plaintiff did not engage in **any** job-search efforts after 2012, much less an "extensive one."

42.     Furthermore, as the court in *Briggs* noted, the very question of whether a plaintiff is justified in accepting a lower paying position is a factual consideration reserved for the factfinder.  *Id.* at 509; *see also Tubari Ltd., Inc.*, 959 F.2d at 454 (noting that courts determine the reasonableness of an employee's search efforts by factors such as the economic climate and the employee's skills, qualifications and age).

43.     This principle was also recognized by the court in *Giedgowd*.  There, the court considered whether a plaintiff had mitigated his damages when, after being unemployed for several months, he accepted a lower paying commission-based position and then ceased job hunting.  *Giedgowd*, 2021 WL 4963533, at *11-12.   However, the court cautioned that the question of whether the plaintiff had mitigated his damages was a consideration for the fact finder—in that case, the jury.  *Id.*  There, considering all circumstances, including the fact that the plaintiff had **actively sought** employment following his termination and that the Covid-19 pandemic limited his ability to search for other work, the jury found that the plaintiff had not failed to mitigate.  Here, just as in *Giedgowd*, the question of whether Plaintiff was reasonable in failing to apply for any comparable work is reserved for the factfinder, in this case the Court.  Moreover, the facts are clearly distinct.  Unlike the plaintiff in *Giedgowd*, who sought work for **months** during a global pandemic, here, Plaintiff never even inquired about a single, comparable position for over **eleven years**.

44.     A plaintiff who accepts work that is temporary, lower-paying, or in a different field without first making a reasonable and diligent effort to find substantially equivalent employment has engaged in a willful loss of earnings.  *Holocheck*, 2007 WL 954308, at *15 (finding a former teacher had failed to mitigate her damages and had engaged in a willful loss of earnings even though she had subsequently worked as a waitress because she had made **"no inquiries within her field**.");  *Tubari Ltd., Inc.*, 959 F.2d at 454 (finding that plaintiffs had willfully incurred their earnings losses when they immediately accepted employment that paid 66% of their former wage level and thereafter stopped searching for other fully comparable work);  *see also Meyer v. United Air Lines, Inc.*, 950 F. Supp. 874, 877 (N.D. Ill. 1997) (finding that a lawyer at United Airlines who, after being constructively discharged from her position, immediately accepted a part-time position at the State Attorney's Office had failed to mitigate her damages because (1) even though she continued to practice law her position at the State Attorney's office was not substantially equivalent and (2) she made no further attempts to secure a comparable position, which amounted to a "willful loss of earnings, thereby reducing the amount of any award [she] might receive");  *see also N.L.R.B. v. Madison Courier Inc.,* 472 F.2d 1307, 1321 (D.C. Cir. 1972) (holding that "[i]f the discriminatee accepts significantly lower-paying work too soon after the discrimination in question, he may be subject to a reduction in back pay on the ground that he willfully incurred a loss by accepting an 'unsuitably' low paying position").[10]  *Cf. Samuels v. Albert Einstein Med. Ctr.,* No. Civ. A. 97- 3448, 1998 WL 690107 (E.D. Pa. Sept. 16, 1998) (declining to issue partial summary judgement on the issue of mitigation because, although a plaintiff initially accepted a non-comparable position, the plaintiff **never completely stopped**

---

[10] Although *Tubari, Phelps Dodge* and *Madison Courier* all involved cases based on National Labor Relations Act (NLRA), they may be applied with equal force to a Title VII action.  In *Ford Motor*, the Supreme Court explained that 42 U.S.C. § 2000e–5(g) was "'expressly modeled'" on the analogous remedial provision of the *Ford Motor Co.*, 458 U.S. at 226 n.8.

looking for comparable employment); *Davis v. Rutgers Cas. Ins. Co.*, 964 F. Supp. 560, 571 (D.N.J. 1997) (finding that a plaintiff who had worked in the insurance industry had mitigated damages even though he took a job selling gymnastics equipment because he ***at all times*** continued diligent efforts to find a job in the insurance field that was suited to his education, skills and experience).

45.     Here, Plaintiff admitted that, after she learned of the denial of her tenure, she made no efforts whatsoever to find a single higher-paying job, much less a tenured or tenure-track position.  Trial Tr. 1/31/2023 129:14-16; Trial Tr. 2/1/2023 74:14-16.

46.     In fact, the evidence indicates that, after accepting the position as Chair at CCA, she turned down an opportunity to interview for a substantially similar, tenure-track position at the prestigious Pratt Institute. Ex. 346, at VEIKOS002266; Trial Tr. 2/1/2023 77:24-78:3.  There was no burden associated with the interview, as it was to be fully remote.  Had she been selected for that tenure-track position in Brooklyn, where her parents lived, this presumably would have been ideal given that she had testified that being away from her parents was emotionally harmful for her and her son, and she was willing to move back to Philadelphia had she received tenure at Penn.

47.     Moreover, the argument put forth by Plaintiff that the June 2012 follow-up email from Pratt is proof that she would not have gotten the job is unpersuasive.  The June Pratt email is merely a pro forma communication that appears to have been sent to inform candidates that the position had already been filled.  Ex. 346, at VEIKOS002283.  Regardless, the record is clear that, months before the June email, Plaintiff had unequivocally removed herself from consideration for the position, which certainly would explain why she received a form email several months later.  Ex. 346, at VEIKOS002266.  There is simply no evidence to support Plaintiff's strained assertion

that despite her express withdrawal from the position, Pratt considered her anyway and then rejected her for the position.

48.     Furthermore, Plaintiff was clearly knowledgeable of the process and capable of applying for tenured and tenure-track positions.  In 2011, she had contacted at least nineteen different academic institutions during her initial job search, and in the process, she demonstrated that she had numerous connections with decision-makers at these colleges and universities and a willingness to relocate to virtually any part of the country.  Trial Tr. 2/1/2023 75:1-25.

49.     In fact, during and after her 2011 search, Plaintiff was made aware that several positions would be becoming available at these institutions in the future.  For example, in an August 2011 email, the Head of the Department of Architecture at Drexel personally emailed Plaintiff to let her know that the department had been approved to search for two new full time positions in 2012.  Ex. 346, at VEIKOS002168.  In fact, he specifically noted that he ***hoped Plaintiff would consider*** the positions.  *Id.*  Despite her 2011 reply that she was interested, Plaintiff did not follow-up or apply to those positions when they became available.  Ex. 346, at VEIKOS002167-68.

50.      In addition, in November 2011, Plaintiff's former colleague Fierro forwarded her an email from the University of Virginia ("UVA") seeking Fierro's recommendations for candidates for ***tenure-track*** positions.  Ex. 346, at PENN 05054.  In her email to Plaintiff, Fierro suggested not only that she would recommend Plaintiff for the positions at UVA, but also that she had very strong connections with the faculty decision-makers there.  Ex. 346, at PENN05054.  Yet Plaintiff did not even reply to Fierro, let alone apply for a position at UVA.

51.     Additionally, Plaintiff declined to pursue these, or any other tenure or tenure-track positions even though her subsequent professional achievements presumably burnished her

resume.  Plaintiff served as the Chair of Interior Design at CCA for six years, was elected President of CCA's Faculty Senate, published a manuscript and other works, and had been invited to lecture as an expert in her field at numerous prestigious institutions.   These accolades undoubtably increased her qualifications, making it more likely that she would have been a competitive candidate for an alternative position at another college or university.

> b.   Penn Should Not Be Required to Subsize Plaintiff's Personal Decision to Change Her Career Trajectory

52.   A plaintiff is "not free to impose the costs" of a personal decision to leave the relevant labor market on her former employer, and courts routinely decline to award economic damages when plaintiffs chose to change careers after putting forth minimal effort into finding substantially similar employment within their original career.  *See Ford v. Nicks*, 866 F.2d 865, 875 (6th Cir. 1989) (holding that a district court's analysis that an assistant professor plaintiff had mitigated her damages was clearly erroneous when there was evidence that she had unreasonably turned down a substantially similar position and had failed to exercise reasonable diligence in applying for other substantially equivalent positions at other universities, and noting that instead plaintiff had "simply left the labor market for entry level professors . . . and made no further effort to obtain work in that field"); *Tuszynski v. Innovative Servs., Inc.*, No. 01-CV-6302, 2005 WL 221234, at *6 (W.D.N.Y. Jan. 29, 2005) ("[P]laintiff's decision to abandon his former line of work and embark on a career as a barber was made shortly after his termination and, once made, plaintiff did not try to find other suitable and higher paying positions to replace or supplement his relatively meager income as a barber.  Plaintiff is not entitled to have defendant subsidize his reduced barber income for years after he decided to change careers."); *Williams v. Imperial Eastman Acquisition Corp.*, 994 F. Supp. 926, 932 (N.D. Ill. 1998) (finding that a plaintiff's decision to abandon the insurance industry and become a cattle farmer was unreasonable given that he had only made two

inquiries into alternative employment in the insurance field and therefore had not diligently sought a position similar to the one he had previously held); *Davis v. Integrated Sys. Sols. Corp.,* No. 97 C 3774, 2003 WL 1733111, *2 (N.D. Ill. March 31, 2003) (noting a backpay award should be cut-off when plaintiff chose to change her career and voluntarily elected to leave the computer industry and began working in an entirely different field, where she remained employed); *Miller v. AT&T*, 83 F. Supp. 2d 700, 708-09 (S.D.W. Va. 2000), *aff'd sub nom, Miller v. AT&T Corp.*, 250 F.3d 820 (4th Cir. 2001) ("Miller is certainly entitled to a change of career.  However, her new career . . . should not be subsidized by AT&T.  A successful . . . plaintiff cannot simply reevaluate her career goals, accept a lesser paying job, and receive the same amount of compensation as before through front pay.  The possibilities for abuse are patent and the Court finds that front pay is not appropriate in such circumstances.").

53.     Here, Plaintiff made a conscious, personal decision to switch her career trajectory from that of a tenure-track professor into a teaching role with administrative duties, and Penn should not be required to subsidize this choice.  While Plaintiff had applied for at least ***nineteen*** jobs between 2010 and early 2012, she ceased ***all job***-search activities as soon as she became Chair of CCA in April 2012.  Trial Tr. 2/1/2023 74;14-25.

54.     Plaintiff knew that the position at CCA was not comparable to a tenured professor role, as it was temporary and not on the tenure track.  Despite this knowledge, she chose to "pivot" her career and remain in an administrative and non-tenure-track role for ***over a decade***.  Trial Tr. Day 1/31/2013 129:24-130:1 (testifying that she decided to "pivot to being an administrator, to being a chair of a discipline that, you know, I felt close to ***but wasn't my field***") (emphasis added).

55.     As such, because any losses sustained by a reduction in earnings were the result of Plaintiff's "personal choice" made "freely," to award damages based on such losses "would subvert the reasons supporting [the Title VII] remedy." *Meyer*, 950 F. Supp. at 877.

56.     Penn should not be required to subsidize Plaintiff's personal choice and pay Plaintiff for the difference between her salary at CCA and what she would have earned in a tenured position at Penn from 2012 forward. *Ford*, 866 F.2d at 875; *Tuszynski*, 2005 WL 221234, at *6; *Davis*, 2003 WL 1733111, *2; *Miller v. AT&T*, 83 F. Supp. 2d at 708-09.

> c.     <u>Plaintiff's Personal Reasons for Changing Her Career Cannot Justify Her Lack of Reasonable Diligence in Seeking a Comparable Position</u>

57.     A plaintiff's purely personal reasons for changing careers, even if admirable, selfless, or sympathetic cannot excuse a lack of reasonable diligence in seeking comparable employment. *See United States v. City of Chicago*, 853 F.2d 572, 579 (7th Cir. 1988) (noting that "personal reasons unrelated to the job" would not provide sufficient justification to change positions); *Meyer*, 950 F. Supp. at 877 (finding that a plaintiff's decision to accept a part-time position was based on considerations relating to child-care, and not poor economic conditions or a tight labor market, and therefore could not justify her lack of reasonable diligence in pursuing comparable employment); *Williams*, 994 F. Supp. at 932 (finding that plaintiff made a "personal decision" to abandon his white collar career and run a family cattle farm and noting that "[p]ersonal decisions cannot be used as a justification for lack of reasonable diligence").

58.     The evidence elicited at trial demonstrates that it was not poor economic conditions or a tight labor market that prevented Plaintiff from securing another tenure-track position; rather, Plaintiff declined to pursue tenure opportunities for purely personal reasons including not wanting to relocate and a lack of mental fortitude to withstand going through the tenure review process again.  Trial. Tr. 1/31/2023 129:14-25; Trial Tr. 2/1/2023 78:1-25.

        (i)     *Plaintiff's Expressed Unwillingness to Relocate Does Not Justify Her Lack of Reasonable Diligence*

59.     Plaintiff testified that by the spring of 2012, she did not want to relocate. But this self-serving assertion is inherently contradicted by the fact that Plaintiff was apparently willing to relocate from California to Philadelphia had she been granted tenure during her 2012 re-review. Indeed, if Plaintiff is contending that she would not have returned to Philadelphia in the spring or summer of 2012 even had tenure been granted by Penn, then she has no entitlement to economic damages, as she would have suffered no harm from the very decision she is challenging in this case.

60.     However, even accepting Plaintiff's testimony, the Court finds that reasons related to not wanting to "uproot" her son, even if sympathetic, also cannot justify a lack of diligence in seeking comparable employment. *See Meyer*, 950 F. Supp. at 877.

61.     In *Meyer*, for example, the court found that a plaintiff had not fulfilled her statutory duty to mitigate damages when she ***immediately*** accepted a non-comparable part-time position. *Id.* at 866. The court noted that, by choosing the non-comparable position, the plaintiff had voluntarily cut her salary in half and "dimmed" her prospects for promotion. *Id.* Moreover, the plaintiff had accepted this part-time position because of child-care concerns, and without first attempting to find ***any*** suitably comparable employment. *Id.* at 877. The court held that plaintiff's "choice to pursue part-time work was not based upon poor economic conditions or a tight labor market. Rather, [plaintiff's] decision was based on personal considerations relating to child-care [and] . . . [a]s valid as these concerns may be, they still are 'personal reasons unrelated to the job.' Consequently, [plaintiff's] personal reasons for seeking only part-time work cannot be used as a justification for her lack of reasonable diligence." *Id.* at 877 (quoting *City of Chicago,* 853 F.3d at 579).

62.     Similarly, in *Baker,* the court found that a plaintiff failed to mitigate her damages after she voluntarily resigned from a comparable interim position due to personal reasons. *Baker v. John Morrell & Co.*, 263 F. Supp. 2d 1161, 1181-82 (N.D. Iowa 2003), *aff'd*, 382 F.3d 816 (8th Cir. 2004). The court noted that plaintiff's reason for resigning from that position, to care for her ailing brother, was a "strictly personal, albert admirable and selfless reason." *Id.* at 1182. However, while the court was "sympathetic and admired [plaintiff's] dedication to her family," it ultimately held that the "defendant should not be penalized for her choice." *Id.*

63.     Furthermore, even in the instances where courts have held that certain plaintiffs were not required to relocate to mitigate their damages, the question of the reasonableness of an employee's efforts to mitigate is a question of fact for the fact finder. *See, e.g.*, *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114 (4th Cir. 1983) (noting an instance where a plaintiff was not required to relocate); *Giedgowd*, 2021 WL 4963533, at *12 (noting that the reasonableness of an employee's efforts to mitigate is a question of fact for the fact finder); *Ngai*, 2021 WL 1175155, at *20 (same).

64.     The reasonableness of an employee's diligence in seeking new employment must be evaluated based on the particular circumstances of the employee. *Booker*, 64 F.3d 860.

65.     Together, these principles suggest that an employee's duty to look for out-of-state employment to mitigate damages is a question of fact based on the particular circumstances and characteristics of the employee. This is in accord with conclusions reached by other courts. *See Bessler v. City of Tempe*, No. CV-19-04610-PHX-MTL, 2021 WL 3089104, at *15 (D. Ariz. July 22, 2021), *amended on reconsideration in part and on other grounds*, No. 19-04610, 2021 WL 4122247 (D. Ariz. Sept. 9, 2021) (finding that there is no per se rule that an employee is not required to look for employment out of state in order to mitigate damages and instead adopting the

position that whether an employee is required to relocate is a question of fact based on the particular circumstances and characteristics of the employee); *Wooten v. BNSF Ry. Co.*, No. 16-139, 2018 WL 2417858, at *5 (D. Mont. May 29, 2018), *report and recommendation adopted*, No. 16-139, 2018 WL 4462506 (D. Mont. Sept. 18, 2018) (holding that whether it was reasonable for an employee to relocate to another state to mitigate damages under the circumstances was a question for the trier of fact); *England v. Mack Trucks, Inc.*, No. C07-5169-RBL, 2008 WL 168689, at *3 (W.D. Wash. Jan. 16, 2008) (explaining that the duty to mitigate requires the employee to act reasonably and whether there was a duty to relocate was a question of fact that precluded summary judgment); *see also E.E.O.C. v. Com. of Pa.*, 772 F. Supp. 217, 222 (M.D. Pa. 1991), *aff'd sub nom. Binker v. Com. of Pa.*, 977 F.2d 738 (3d Cir. 1992) (finding that an ADEA plaintiff was not required to relocate in order to mitigate damages, but only after evaluating the plaintiff's particular circumstances and employment situation).

66.     Here, it is not unreasonable to require that Plaintiff consider relocation given the national job market for Plaintiff's specialized role and the fact that Plaintiff demonstrated a desire and willingness to relocate even after she was settled in California.

67.     The record indicates that Plaintiff undertook a nationwide job search in 2011, in which she demonstrated a willingness to consider tenure-track and suitable academic positions all around the United States and even in Canada.  *See, e.g.*, Ex. 346. at, PCHR 0339.  She never testified or indicated that she had any geographic limitations, which was reasonable given the specialized and unique nature of her profession and the role she sought.

68.     In fact, Plaintiff demonstrated a willingness to relocate *even after* she had settled her family in Northern California.  First and foremost, as noted above, Plaintiff was clearly open to relocating back to the East Coast given that she solicited the re-review of her tenure case.  Had

she been granted tenure after the 2012 re-review, which she desired, there is every indication she would have eagerly relocated her family back to Philadelphia.  Trial. Tr. 1/31/2023 128:16-17 (testifying that she was "lost in California.").  She also testified at length about the hardship that being in California had caused her family and her son.  Trial. Tr. 1/31/2023 128:19-25.

69.     Moreover, in May of 2012 Plaintiff reached out to a contact at UCLA to inquire about a summer teaching position in Los Angeles, more than 350 miles from her home in Northern California.  Ex. 346, at VEIKOS002270.  Plaintiff thereby demonstrated that she was willing to work outside of the Bay Area.

70.     Finally, even if the court were to find that it was unreasonable to require Plaintiff to relocate in order to mitigate her damages, it was certainly not reasonable for her to fail to apply to ***any positions*** in the Bay Area that would not have required her to move.

71.     In fact, the record shows that Plaintiff had connections at Berkeley, a prestigious university with a Department of Architecture, and where Plaintiff had previously taught summer courses.  Ex. 348, at VEIKOS002274-75.  Indeed, prior to 2012, Plaintiff previously applied to positions at Berkeley and indicated that she "remain[ed] very interested in the school and research center."  Ex. 346, at VEIKOS000771, VEIKOS000772.

72.     Despite Berkeley being located even closer than CCA to Plaintiff's home in Oakland, Plaintiff never even inquired about, much less applied for, any tenure or tenure-track positions that may have been available at Berkeley or any other university in the Bay Area after accepting the Chair position.  Trial. Tr. 1/31/2023 129:14-16.

       (ii)     *Plaintiff's Reasons Related to Lack of Mental Fortitude Do Not Justify Her Lack of Reasonable Diligence*

73.    Other than relocation, the only other reason Plaintiff provided for not applying to tenured roles was her lack of mental fortitude to re-start the tenure process. This reason can also not excuse her lack of diligence in securing comparable employment.

74.    Plaintiff testified that she "just lost motivation" after she was denied tenure for a second time in 2012. Trial Tr. 1/31/2023; 129:4-6. She also testified that she "lost faith in the process" and did not "want to put [her] family through that again." Trial Tr. 1/31/2023 129:14-21.

75.    Her excuse related to lack of mental fortitude is inherently unreasonable as a basis to excuse mitigation because, if accepted, it could be invoked by every plaintiff who fails to mitigate. *See Jefferson*, 986 F. Supp. at 8 ("Without more, the plaintiff's mere assertion that he has not felt and does not feel he can work at his current job on a full-time basis is far too speculative to justify an award of back pay and front pay for so many years. Thus, the plaintiff has failed to mitigate his economic damages."); *Williams*, 994 F. Supp. at 932; *see also Ford*, 866 F.2d at 874 (noting that a plaintiff was "perfectly free" to make a choice to leave the labor market for entry level professors, but she was not free to impose the cost of that choice on her former employer).

76.    Therefore, enlisting the wide latitude granted to district courts to "locate a just result," the Court finds that Plaintiff's failure to seek comparable employment for ***over a decade*** was an unreasonable, willful loss of earnings. *Taxman*, 91 F.3d at 1565. Plaintiff's failure to exercise reasonable diligence is a failure to mitigate that precludes her from receiving economic damages.

### 2. Plaintiff Initially Mitigated her Damages While at CCA, And Had the Opportunity to Do So in Later Years

77.     Even assuming that Plaintiff did not engage in a willful loss of earnings, she does not qualify for economic damages after 2012.  Plaintiff fully mitigated her damages within months of arriving at CCA, and she has not shown why, with reasonable diligence, she could not have maintained that level of income in future years.

78.     The duty to mitigate damages is intended to ensure that a damages award does not amount to a windfall to the plaintiff.  *Blum*, 829 F. 2d 367.  Without such a duty, "an employer may find itself on the hook for damages…to a plaintiff who could very likely be making an even greater salary with a different employer." *Cosimano v. Twp. of Union*, No. CV 10-5710, 2017 WL 1395493, at *2 (D.N.J. Apr. 17, 2017).

79.     A plaintiff has fully mitigated, and damages liability should be foreclosed, when she earned, or could have earned with reasonable diligence, substantially the same amount as she did with her prior employer.  *See Ford Motor Co.*, 458 U.S. at 232.

80.     By the time her tenure re-review was denied in May 2012, Plaintiff had accepted and was already employed in a prestigious position at another reputable educational institution, CCA.

81.     Including her CCA compensation and 2012 summer earnings, Plaintiff's earnings in the first six months of the damages period, from July 1, 2012 to December 31, 2012, were $53,708.33.[11]

---

[11] This figure reflects six months of Plaintiff's earnings from July 2012 through December 2012.  *See supra* Findings of Fact ¶ 41.  From July through August 2012, she earned a base salary of $54,150.12, and she earned an additional $3,150 from CCA for teaching a summer course and $10,700 for teaching at Berkeley that summer.  Ex. 348, at VEIKOS002351, VEIKOS002357-58, VEIKOS002273-75.  From September through December 2012, her annual salary increased to $77,500.  Ex. 348, at VEIKOS002355-56.  This figure also reflects several bonuses she received, including a $3,000 faculty enrichment grant and a $5,000 relocation bonus.  Ex. 348, at VEIKOS002355.  Such amounts are properly considered income, as they were taxable and reflect earnings she would have otherwise been required to pay.

82.     Therefore, during this period Plaintiff actually earned ***more*** than her damages expert assumes she would have earned had Plaintiff been granted tenure at Penn during the same six-month period.  Her average monthly earnings from CCA and Berkeley during that period were $8,951, as compared to the $6,976.3 per month her expert witness assumes she would have earned in 2012 had tenure been granted.

83.      In total, Plaintiff earned $17,153 more at CCA and Berkeley in the first six months of the damages period than her expert assumes she would have earned had she remained at Penn as a tenured Associate Professor.   Ex. 348, at VEIKOS002351, VEIKOS002354-55, VEIKOS002357-58; Ex. 349A, at pp. 9-11; *see supra* Findings of Fact ¶ 41.

84.     To the extent that Plaintiff earned less in subsequent years while at CCA, that appears to be a consequence of a decision to stop working in the summer after she received a salary increase and greater job security at CCA.  Plaintiff has offered ***no evidence*** to explain why, with reasonable diligence, she could not have duplicated her efforts to earn as high of a salary as she did in 2012.  *See Ford Motor Co.,* 458 U.S. at 231-39 (discussing that an unemployed or underemployed claimant forfeits his rights to economic damages if he forgoes opportunities to obtain substantially equivalent employment opportunities).

85.     Kucsma testified that she specifically excluded summer income from her damages estimates based on her assumption that had Plaintiff remained at Penn, she might also have had the opportunity to supplement her income teaching during the summer at an outside institution.  Hearing Tr. 30: 9-18.  She admitted that she did not actually know whether or how often any professors in the School of Design at Penn taught summer classes or received any other income outside the university.  Hearing Tr. 31:18-20.  Instead, Plaintiff's expert based her assumption only

on her own "experience," but admitted that she had not considered the specific obligations of Plaintiff or any other tenured professor at Penn.  Hearing Tr. 31:24-32:1-7.[12]

86.     Kucsma's assumption about summer earnings and opportunities seem to be wholly contrived, as Plaintiff did not provide any evidence about how she spent her summers when she was employed at Penn.  Perhaps she was fully engaged with research and writing responsibilities relating to her tenure track duties at Penn, unlike her situation at CCA.  Or perhaps Plaintiff had other Penn-related duties that occupied her in the summer months.  We do not know, because there was no evidence on these issues.  Kucsma may have been willing to speculate about what Plaintiff did in the summers before 2012 when she was at Penn, or why Plaintiff stopped teaching or working in the summers between 2013 and the present while at CCA, but the Court is not prepared to do the same.  All that can be said is that Plaintiff mitigated her damages fully in her first year at CCA, and then for some unexplained reason chose not to work in the summer months and experienced a reduction in actual earning.

87.     In essence, therefore, Plaintiff asks Penn to subsidize a voluntary, personal decision not to work during the summer months while she was at CCA.[13]  *See Ford*, 866 F.2d at 875 (noting that, after a plaintiff made a personal choice to forgo job opportunities in her field, the plaintiff was "perfectly free to make this choice but… she was not free to impose the costs of that decision on her former employer."); *Holocheck*, 2007 WL 954308, at *15 ("A willful loss of earnings has

---

[12]Kucsma argued that her assumption that tenured professors at Penn commonly worked at other institutions over the summer was reasonable based on her own "experience . . . as an economic expert having worked on a number of cases involving faculty members and economic damages in cases like this."  Hearing Tr.  31:24-25; 32:1-77.  However, Kucsma's resume, which provides a detailed description of her trial and deposition testimony, reflects only one other remotely similar case involving a plaintiff seeking economic damages from employment at a college or university.  Ex. 347, at p. 39.

[13] Similarly, there is no evidence in the record to suggest Plaintiff could not have taken advantage of additional administrative income-generating opportunities every year, such as the pre-college program she ran in 2014 and 2015.  Ex. 348, at VEIKOS002361; Hearing Tr. 36:1-25.

been found where the alleged victim has failed to stay in the labor market, refused to accept comparable employment, failed to search diligently for other work, or voluntarily quit alternative employment without cause."); *Billman*, 2022 WL 3139748, at *5 ("[A] former employee may not refuse to seek alternative employment to mount unjustified damages."). That is an unreasonable request.

88.     This Court finds that Plaintiff fully mitigated her damages in 2012 and has offered no evidence as to why, with reasonable diligence, she could not have maintained that level of income in future years. Plaintiff does not qualify for economic damages after that date.

### 3.     Plaintiff Is Not Entitled to Front Pay

89.     Both Plaintiff and her expert assume that front pay is appropriate in this case, and that it is a mere calculation exercise to compare what Plaintiff would have earned at Penn through her expert's suggested retirement date with projected earnings at CCA for the same time period. *See* Ex. 349A. That assumption is incorrect as a matter of law.

90.     The sole purpose of awarding equitable damages under Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Eshelman*, 554 F.3d at 440.

91.     To that end, front pay is an equitable alternative to reinstatement, which a court may award where a plaintiff cannot be placed back in the position sought. *Donlin*, 581 F.3d at 84.

92.     However, not every plaintiff is entitled to front pay—the Court has considerable discretion to determine whether future damages are equitable under the circumstances. *Id.*

93.     A court considering a front pay claim must always "avoid awarding a plaintiff a windfall." *Buffington v. PEC Mgmt. II, LLP*, Civ. No. 1:11-cv-229, 2014 WL 2567181, at *21 (W.D. Pa. June 6, 2014).

94.     Front pay is only intended to "make the victim . . . whole and restore the economic position that would have enjoyed but for the employer's unlawful conduct." *Hurst v. Beck*, 771 F. Supp. 118, 123 (E.D. Pa. 1991) (citing *Green v. USX Corp.*, 843, F.2d 1511, 1531 (3d Cir. 1988)).

95.     Front pay should only be awarded to allow plaintiff "to reestablish her rightful place in the job market." *Donlin*, 581 F.3d at 86.

96.     Therefore, "it is not an abuse of discretion for a court to deny front pay where a district court concludes that back pay was sufficient to make a plaintiff whole." *Buffington*, 2014 WL 2567181, at *21.

97.     Plaintiff is seeking **ten years** of back pay, in addition to front pay through her projected retirement date.  There is no evidence on the record that Plaintiff has not been "made whole" or that Plaintiff has not "reestablish[ed] her . . . place in the job market" as of today.  *Donlin*, 581 F.3d at 86.

98.     Indeed, as explained *supra*, Plaintiff has changed the course of her career and is no longer seeking to regain the status she allegedly lost.  Plaintiff became a Full Professor at CCA and the Chair of her department, and she has published multiple works since she established herself in an alternative career path.  Ex. 348, at VEIKOS002503-07.

99.     Moreover, as discussed above, it is quite clear that Plaintiff had the ability to earn—and, indeed, **did earn**—more after she left Penn than she earned there.  *See supra* Section II(A)(2).

100.    Therefore, Plaintiff has already been made whole.  An award of front pay would be tantamount to an improper windfall to Plaintiff.  Plaintiff is not entitled to front pay.

**B.** **Even if the Court Awards Plaintiff Economic Damages, Such Damages Should Be Less Than Those Proposed in Kucsma's Expert Report**

   **1.** **Kucsma's Calculations and Methodologies Are Neither Reliable nor Helpful**

101.    "District courts must ensure that evidence presented by expert witnesses is relevant, **reliable**, and **helpful** to the . . . evaluation of such evidence." *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 512 (E.D. Pa. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000)) (emphasis added).

102.    An expert's testimony is reliable and helpful "if it is grounded in 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Branch v. Temple Univ.*, No. 20-2323, 2021 WL 2823071, at *5 (E.D. Pa. Jul. 7, 2021) (quoting *Daubert*, 509 U.S. at 590); *JMJ Enters v. Via Veneto Italian Ice*, No. 97-CV-0652, 1998 WL 175888, at *17 (E.D. Pa. Apr. 15, 1998) ("Expert testimony that is based on speculation or unrealistic assumptions is not helpful.").

103.    Moreover, to be admissible, an expert's methodologies must be applied consistently. *See, e.g., United States v. 80,794 Square Feet of Land*, No. 18-532, 2021 WL 2154847, at *90-91 (M.D. Pa. May 27, 2001) ("In addition, in calculating his unit rate, Mr. Walters failed to make an apples-to-apples comparison rendering it unreliable.  Mr. Walters's valuation based on price per buildable area accordingly is flawed, not credible and deserves no weight.").

104.    Even if the Court awards Plaintiff any economic damages, it should not defer to Plaintiff's expert, Kucsma, when calculating such damages.

105.    As demonstrated at the Hearing, and by the evidence on record, the opinions and methods contained in Kucsma's report are neither reliable nor helpful, as they are based on

speculation and improper assumptions and are applied inconsistently across the several components of her economic damages reports.

106.    Indicative of that conclusion, when Kucsma revised her report to **deduct** a year of back pay and tuition benefits damages (which alone totaled almost $200,000), her total present-value damages calculated were almost ***$250,000 more than her original estimates***.  *Compare* Ex. 349A, at p. 16, *with* Ex. 347, at p. 28.

107.    In fact, upon closer examination, each of the components of Kucsma's calculations is seriously flawed.  Kucsma's faulty and speculative assumptions and methodologies include, but are not limited to, the following (as explained *supra*):

- Kucsma overestimated Plaintiff's potential earnings at Penn between 2012 and 2023 by using the "average salary"14 of tenured Associate Professors in Penn's Department of Architecture to estimate Plaintiff's salary, which ignored the fact that the average pay in the Department was skewed each year by high-earning professors joining the Department, low-earning professors leaving the Department, and professors receiving unexplained, atypically high raises in some years;

---

[14] Such a method is incorrect as a matter of law.  In fact, courts have noted that relying on the mean, as opposed to median, for economic calculations can be unreliable given that the mean does not exclude extreme outliers that can skew the outcome.  *See United States v. Miner*, No. 1:14-CR-33 MAD, 2014 WL 4816230, at *12 (N.D.N.Y. Sept. 25, 2014), *vacated in part on other grounds*, 617 F. App'x 102 (2d Cir. 2015) ("The Court recognizes the generally accepted principle that using the median in evaluating a data set, rather than the mean, avoids '[t]he mean's disadvantage [in] that a few unusually high or low figures in the data set can skew the result upward or downward.  The median . . ., on the other hand[,] is the middle figure in a sequence of awards listed from lowest to highest.  A handful of high or low numbers in the data will not influence the median.'" (quoting Michael Rustad and Thomas Koenig, *The Supreme Court and Junk Social Science: Selective Distortion in Amicus Briefs*, 72 N.C. Law Review 91, 146 (1993)); *see also Joffe v. King & Spalding LLP*, No. 17-CV-3392, 2019 WL 4673554, at *8 (S.D.N.Y. Sept. 24, 2019) (specifically discussing a time when Kucsma also used mean, rather than median, to calculate earnings, and noting that it was up to the factfinder to determine if such a methodology was unreliable should be rejected); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 51 (S.D.N.Y. 2016) ("Disputes regarding the proper variables to employ in statistical studies are more properly left for juries to consider and to decide.") (citation omitted).

- Kucsma arbitrarily assumed that Plaintiff would have received the average pay of tenured Associate Professors in the Department by 2020, rather than 2021 or any other year in which such average pay was lower;

- Kucsma assumed that Plaintiff would receive, on average, a 5.5% annual raise between 2012 and 2023, which no other tenured professor received, on average, over the same period (and when evidence on the record demonstrates that professors typically received raises of 3% or less);

- Kucsma understated Plaintiff's actual pay earned between 2012 and 2023 by (1) failing to include in her report any pay earned outside of CCA and (2) reporting Plaintiff's W-2 wages, when her Earnings Statements reflected higher pay (which she could not explain at the Hearing) and she used earnings information when reporting Penn pay;

- Kucsma provides no basis for assuming that Plaintiff's 2023 CCA salary will be roughly $30,000 less than her 2022 salary in perpetuity because of supposed COVID-related course limitations that she suggests were imposed in a single year (2023);

- Even if Plaintiff is indeed on a 20% reduced pay schedule in 2023, Kucsma assumed that such a reduction would continue for the next eight years, until 2031, but admitted that she had no evidence that would be the case—and that the only evidence connected to CCA's COVID-based cuts relates to its decision to suspend its 403(b) plan contributions, a decision that has already been reversed;

- Kucsma assumed that Plaintiff would receive a 3.9% annual raise at CCA between 2023 and 2031, when, on average, she received a 4.49% average annual raise between 2012 and 2022;

- Kucsma similarly assumed that Plaintiff would have received a 3.9% annual raise at Penn between 2023 and 2031, when, on average, Penn's guidelines prescribed raises in the 0%-3.5% range and the Department of Architecture's tenured Associate Professors typically received raises less than 3.5%; and

- At the Hearing, Kucsma could provide no concrete formula for her 3.9% annual raise assumption.

108.    Based on these, and other, inaccurate, arbitrary, and speculative decisions and methodologies, Kucsma's expert report is neither reliable nor helpful, and the Court should not credit on it when calculating Plaintiff's economic damages, if found to be appropriate.

### 2.    Kucsma's Opinions Have Been Disregarded in Prior Cases

109.    The reliability of Kucsma's methods, data, and assumptions have been repeatedly questioned in other cases as well.  Courts have excluded her opinions and reports on that basis on several occasions.

110.    For example, Kucsma testified in *Est. of Tanaka by Rosello v. Kazary* in New Jersey state court.  No. A-2072-20, 2023 WL 382310, at *1 (N.J. Super. Ct. App. Div. Jan. 25, 2023). That was a survival and wrongful death case involving a decedent who died in a car accident.  *Id.* at *3.  Kucsma opined that the total present value of the economic loss to the estate was between $455,102 and $731,179, based on a number of factors including estimates of the decedent's after-tax lifetime expected wages, the direct financial support and alternative levels of care the decedent could have provided to her parents, the amount of time the decedent could have spent with her, and the advice and counsel the decedent would have provided to her parents.  *Id.*

111.    After hearing Kucsma's testimony, the trial judge found "significant issues with [her] testimony."  *Id.* at *5.  The judge found her testimony "not to be credible" and "simply, not

tethered to the facts." *Id.* Specifically, the judge found certain numbers inflated, including the amount of time the decedent would have spent with her parents and the advice the decedent provided to her parents. *Id.* Consequently, the judge rejected Kucsma's opinions and instead relied on an alternative expert's calculations. *Id.*

112. Similarly, Kucsma testified as an expert in *Davis v. Yisrael* in federal court in New York. No. 16-1574, 2019 WL 2098151 (S.D.N.Y. May 14, 2019). That case was about a plaintiff's injuries under the New York Insurance Law. *Id.* at *1. Kucsma "opined that the total present value of the pecuniary losses resulting from injury to [p]laintiff amounted to $591,595." *Id.* She based that calculation on the assumption that the plaintiff would "not re-enter the active labor force due to . . . injury." *Id.*

113. The court there found Kucsma's "future lost earnings computation . . . flawed." 2019 WL 2098151, at *2. The court agreed with the opposing expert that the plaintiff "was able to sustain some kind of entry-level employment and was not unable to enter the workforce." *Id.* The court found that Kucsma "should have, but did not compute Plaintiff's future lost wages based on Plaintiff earning $19,822 per year, the entry-level earnings of an individual performing a sedentary job." *Id.* Because she "overstate[d] [the plaintiff's] future lost earnings," the court refused to rely on her future lost income computation and adopted the opposing expert's. *Id.*

114. Other examples abound. *See, e.g.*, *Joffe*, 2019 WL 4673554, at *10 (precluding Kucsma from including in her opinion a 4.8% adjustment for employer fringe benefits because that figure was calculated based on a nation-wide average of employer benefits, which was not an "appropriate estimate" given that the figure should have been based on a more comparable average of employers in the plaintiff's field); *City of Long Branch v. W. of Pier Assocs., LLC*, No. A-4495-11T3, 2014 WL 563812, at *4-5 (N.J. Super. Ct. App. Div. Feb. 13, 2014) (affirming the

conclusion of a trial judge that Kucsma's "testimony was not credible, because she changed her opinion without 'provid[ing] any basis for the turnaround . . . other than her reliance on the opinion of [the defendant's other expert], which had been provided after her report had been issued.'"); *In re Actos (Pioglitazone) Prod. Liab. Litig.*, No. 12-CV-00064, 2013 WL 6328263, at *4 (W.D. La. Dec. 3, 2013) (granting defendants' motion to exclude Kucsma's testimony regarding present value of future care costs associated with recurrence of plaintiff's cancer in same form he previously experienced).

115.    Kucsma's problematic assumptions, propensity for speculation, and dubious methods appear yet again in this case, and lead this Court to reject her conclusions.

### 3.    If Awarding Backpay, the Court Awards Such Damages Based on Reasonable Assumptions

116.    If the Court decides to award Plaintiff economic damages at all, it will apply rational and non-speculative calculations, and will only award backpay, and not front pay.

117.    Below are tables of calculations of Plaintiff's backpay based on reasonable assumptions and calculations, compared to what Plaintiff's expert calculated.

118.    Table 1 demonstrates adjusted calculations for Plaintiff's earnings between July 2012 and March 2023, showing the vast differences between (i) Kucsma's reporting of Plaintiff's W-2 earnings (columns (a) and (d)), (ii) the pay she actually received for work performed (columns (b) and (e)), and (iii) the pay Plaintiff could have earned had she continued teaching summer courses (columns (c) and (f)).

**TABLE 1**

Plaintiff's Mitigation from CCA/Berkeley

| | Actual Earnings since July 1, 2012 | | | Adjusted Earnings since July 1, 2012 | | |
|---|---|---|---|---|---|---|
| | Expert Reported Pay [1] | Actual Post-Penn Earnings | Actual Earnings w/ Summer School [9] | Adjusted Expert Reported Pay [10] | Adjusted Actual Post-Penn Earnings [10] | Adjusted Actual Earnings w/ Summer School [10] |
| | (a) | (b) | (c) | (d) | (e) | (f) |
| July-Dec 12 | $ 36,551.00 [2] | $ 53,708.33 [3] | $ 53,708.33 | $ 36,551.00 | $ 53,708.33 | $ 53,708.33 |
| 2013 | $ 74,340.00 | $ 78,016.72 [4] | $ 91,866.72 | $ 74,340.00 | $ 78,016.72 | $ 91,866.72 |
| 2014 | $ 82,332.00 | $ 86,338.00 [5] | $ 100,188.00 | $ 82,332.00 | $ 86,338.00 | $ 100,188.00 |
| 2015 | $ 93,398.00 | $ 98,435.00 [6] | $ 112,285.00 | $ 93,398.00 | $ 98,435.00 | $ 112,285.00 |
| 2016 | $ 91,010.00 | $ 95,683.36 [7] | $ 109,533.36 | $ 91,010.00 | $ 95,683.36 | $ 109,533.36 |
| 2017 | $ 91,763.00 | $ 96,351.15 [7] | $ 110,201.15 | $ 91,763.00 | $ 96,351.15 | $ 110,201.15 |
| 2018 | $ 95,276.00 | $ 100,039.80 [7] | $ 113,889.80 | $ 95,276.00 | $ 100,039.80 | $ 113,889.80 |
| 2019 | $ 93,280.00 | $ 93,280.00 | $ 107,130.00 | $ 93,280.00 | $ 93,280.00 | $ 107,130.00 |
| 2020 | $ 93,974.00 | $ 97,318.20 [7] | $ 111,168.20 | $ 91,624.65 | $ 94,885.25 | $ 108,389.00 |
| 2021 | $ 92,684.00 | $ 97,318.20 [7] | $ 111,168.20 | $ 89,115.67 | $ 93,571.45 | $ 106,888.22 |
| 2022 | $ 110,864.00 | $ 110,864.00 [7] | $ 124,714.00 | $ 108,092.40 | $ 108,092.40 | $ 121,596.15 |
| Jan-Mar 2023 | $ 18,817.00 [2] | $ 23,521.25 [8] | $ 37,371.25 | $ 18,346.58 | $ 22,933.22 | $ 36,436.97 |
| | $ 974,289.00 | $ 1,030,874.01 | $ 1,183,224.01 | $ 965,129.29 | $ 1,021,334.68 | $ 1,172,112.70 |

(1)   Expert Reported Pay from page 9 of Ex. 349A

(2)   2012 and 2023 earnings are adjusted with the percentages indicated by Plaintiff's expert in column 2 on page 9 of Ex. 349A

(3)   July-December 2012 actual earnings includes 2 months of pay for July and August at CCA 2011-2012 salary of $54,150.12 plus $3,150 for teaching summer classes at CCA and $10,700 for summer classes at Berkley (Ex. 348 at VEIKOS002358, VEIKOS002273-75) plus four months for September through December at her increased salary of $77,500 plus additional $3,000 faculty enrichment grant and a $5,000 relocation bonus (Ex. 348 at VEIKOS002355)

(4)   Actual gross earnings on Ex. 348 at VEIKOS002360 in lieu of W-2 amounts to allow apples to apples comparison to Penn pay

(5)   Actual gross earnings on Ex. 348 at VEIKOS002361 in lieu of W-2 amounts to allow apples to apples comparison to Penn pay

(6)   Actual gross earnings on Ex. 348 at VEIKOS002383 in lieu of W-2 amounts to allow apples to apples comparison to Penn pay

(7)   For 2016, actual gross earnings through November 16, 2016 listed on Ex. 348 at VEIKOS002384 as $84,239.62.  Bringing this to year end by adding the three remaining pay periods in the year of $3,814.58 results in total year compensation of $95,683.36 (approximately 5% greater than W2, as in earlier years).  Accordingly, Veikos's 2017-2021 W-2 income is increased by 5% to account for non-taxable benefits excluded from W-2 earnings to allow apples to apples comparison to Penn pay.

(8)   Adjusted 2023 compensation to 100% rather than 80% Plaintiff's expert used (Ex. 348A at VEIKOS003179)

(9)   Assumes Plaintiff could have taught summer school at Berkley and CCA every summer after 2012 so adds an additional $3,150 from CCA and $10,700 for Berkley each year from 2012-2022

(10)   Using adjustment factors from Plaintiff's expert on page 9 of Ex. 349A

119.   Table 2 demonstrates calculations for Plaintiff's potential Penn pay between 2012 and 2013, indicating the tremendous variances between the speculative and inconsistently applied methodologies used by Kucsma to calculate Penn salaries and the pay Plaintiff would have earned had she instead received the median raise received by tenured Associate Professors in the Department of Architecture each year.

## TABLE 2

**Penn Earnings**

| | Potential Earnings since July 1, 2012 | | | | Adjusted Earnings since July 1, 2012 [30] | |
|---|---|---|---|---|---|---|
| Year | Expert Reported Penn Earnings [11] | | Corrected Post-Penn Earnings [17] | | Adj. Expert Reported Penn Earnings [31] | Adj. Corrected Post-Penn Earnings |
| | *(g)* | | *(h)* | | *(i)* | *(j)* |
| July-Dec 12 | $ 41,858.00 [12] | | $ 41,858.00 [18] | | $ 41,355.70 | $ 41,355.70 |
| 2013 | $ 88,044.00 [13] | | $ 85,976.33 [19] | | $ 86,987.47 | $ 84,944.62 |
| 2014 | $ 92,595.00 [13] | | $ 89,587.34 [20] | | $ 91,483.86 | $ 88,512.29 |
| 2015 | $ 97,381.88 [13] | | $ 92,722.89 [21] | | $ 96,213.29 | $ 91,610.22 |
| 2016 | $ 102,416.13 [13] | | $ 95,504.58 [22] | | $ 101,187.14 | $ 94,358.53 |
| 2017 | $ 107,710.63 [13] | | $ 98,369.72 [23] | | $ 106,418.11 | $ 97,189.28 |
| 2018 | $ 113,278.84 [13] | | $ 101,320.81 [24] | | $ 111,919.50 | $ 100,104.96 |
| 2019 | $ 119,134.91 [13] | | $ 104,360.43 [25] | | $ 117,705.29 | $ 103,108.11 |
| 2020 | $ 125,293.70 [13] | | $ 107,491.25 [26] | | $ 120,908.43 | $ 103,729.05 |
| 2021 | $ 125,293.70 [14] | | $ 107,491.25 [27] | | $ 121,219.15 | $ 103,995.63 |
| 2022 | $ 139,800.34 [15] | | $ 110,715.99 [28] | | $ 138,122.73 | $ 109,387.39 |
| Jan-Mar 2023 | $ 37,748.75 [16] | | $ 29,062.95 [29] | | $ 37,295.77 | $ 28,714.19 |
| | $ 1,190,555.89 | | $ 1,064,461.54 | | $ 1,170,816.43 | $ 1,047,009.98 |

(11)   Expert reported "Pre-Incident Penn Earnings" from page 8 of Ex. 349A

(12)   2012 pay is adjusted by 50% in accordance with column 2 on page 9 of Ex. 349A

(13)   Plaintiff's expert assumes 5.1696% increase from prior year (page 5 of Ex. 349A)

(14)   Plaintiff's expert assumes no increase from prior year (page 5 of Ex. 349A)

(15)   Plaintiff's expert assumes 11.5781% increase from prior year (page 5 of Ex. 349A)

(16)   Plaintiff's expert assumes 25% of projected 2023 pay of $150,995 (Column 2 on page 9 of Ex. 349A), which
       represents a 8.0073% increase from 2022 (page 5 of Ex. 349A)

(17)   Earnings are increased by the median actual increase received by associate professors in Penn's Department
       of Architecture; median is used instead of average to eliminate unexplained outliers for which no explanato
       evidence exists; see Ex. 2 (chart showing increases); Ex. 348 at VEIKOS002426 (reflecting Veikos increase of
       2.5% in 2011 with range of up to 3.5%); Ex. 347 at page 6 (showing salary increases for all associate
       professors at Penn from 2012-2021 averaged 2.85% and had a median of 2.45%)

(18)   Penn earnings are calculated using expert's assumed 2012 starting salary of $83,716

(19)   2013 earnings reflect 2.7% increase (the median increase actually received by Penn Associate Professors
       in the Department of Architecture in 2013)

(20)   2014 earnings reflect 4.2% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2014)

(21)   2015 earnings reflect 3.5% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2015)

(22)   2016 earnings reflect 3.0% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2016)

(23)   2017 earnings reflect 3.0% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2017)

(24)   2018 earnings reflect 3.0% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2018)

(25)   2019 earnings reflect 3.0% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2019)

(26)   2020 earnings reflect 3.0% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2020)

(27)   2021 earnings reflect 0% increase because no Penn Associate Professors in the Department of Architecture received an increase in 2021

(28)   2022 earnings reflect 3% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2022)

(29)   2023 earnings reflect 5% increase (the median increase actually received by Penn Associate Professors in the Department of Architecture in 2023)

(30)   Using adjustment factors from Plaintiff's expert on page 8 of Ex. 349A

(31)   Expert Adjusted Earnings from Column 4 of page 8 of Ex. 349A

120.    Table 3 includes calculations for Plaintiff's backpay, highlighting the differences between the backpay calculated using Kucsma's methodologies (column (k)), the backpay estimate calculated by subtracting Plaintiff's actual earnings while at CCA from the pay she would have received at Penn using the Department's median pay raises (column (l)), and the backpay estimate calculated by subtracting what Plaintiff could have earned while at CCA had she continued teaching summer courses from the pay she would have received at Penn using the Department's median pay raises (column (m)).

### TABLE 3

**Total Backpay**

**Amount of Lost Wages Since July 1, 2012**

| Year | Expert Backpay Calculation (i) - (d) [32] | | Corrected Earnings Backpay Calculation (j) - (e) [33] | | Corrected Earnings Backpay Calculation w/ Summer School (j) - (f) [34] | |
|---|---|---|---|---|---|---|
| | *(k)* | | *(l)* | | *(m)* | |
| July-Dec 12 | $ | 4,804.70 | $ | (12,352.63) | $ | (12,352.63) |
| 2013 | $ | 12,647.47 | $ | 6,927.90 | $ | (6,922.10) |
| 2014 | $ | 9,151.86 | $ | 2,174.29 | $ | (11,675.71) |
| 2015 | $ | 2,815.29 | $ | (6,824.78) | $ | (20,674.78) |
| 2016 | $ | 10,177.14 | $ | (1,324.83) | $ | (15,174.83) |
| 2017 | $ | 14,655.11 | $ | 838.13 | $ | (13,011.87) |
| 2018 | $ | 16,643.50 | $ | 65.16 | $ | (13,784.84) |
| 2019 | $ | 24,425.29 | $ | 9,828.11 | $ | (4,021.89) |
| 2020 | $ | 29,283.78 | $ | 8,843.81 | $ | (4,659.94) |
| 2021 | $ | 32,103.49 | $ | 10,424.18 | $ | (2,892.59) |
| 2022 | $ | 30,030.33 | $ | 1,294.99 | $ | (12,208.76) |
| Jan-Mar 2023 | $ | 18,949.19 | $ | 5,780.97 | $ | (7,722.78) |
| | $ | **205,687.14** | $ | **25,675.30** | $ | **(125,102.72)** |

(32) Expert Backpay Calculation reflects Adjusted Expert Reported Penn Earnings (column (i)) - Adjusted Expert Reported Pay (column (d))

(33) Corrected Earnings Backpay Calculation reflects Adjusted Corrected Post-Penn Earnings (column (jj)) - Adjusted Actual Post-Penn Earnings (column (e))

(34) Corrected Earnings Backpay Calculation w/ Summer School reflects Adjusted Corrected Post-Penn Earnings (column (jj)) - Adjusted Actual Earnings with Summer School (column (f))

121.    The impact of Kucsma's arbitrary selection of 2020 is demonstrated by reference to Table 4. Table 4 accepts Kucsma's methodology but calculates what Plaintiff's backpay would have been using Kucsma's methodology but choosing 2021 as the year in which Plaintiff would earn the average salary in the Department rather than 2020 (column (p) shows the difference between her actual CCA earnings and what she would have earned using this methodology in each year).

**TABLE 4**

| | Using 2021 Average Salary | | | |
|---|---|---|---|---|
| | **Amount of Lost Wages Since July 1, 2012** | | | |
| Year | Corrected Post-Penn Earnings Using 2021 Salary Average [35] | Adj. Corrected Post-Penn Earnings Using 2021 Salary Average [36] | Corrected Earnings Backpay Calculation (o) - (e) [37] | Corrected Earnings Backpay Calculation w/ Summer School (o) - (f) [38] |
| | *(n)* | *(o)* | *(p)* | *(q)* |
| July-Dec 12 | $   20,040.96 | $   19,800.47 | $   (33,907.86) | $   (33,907.86) |
| 2013 | $   83,916.52 | $   82,909.53 | $   4,892.81 | $   (8,957.19) |
| 2014 | $   87,844.87 | $   86,790.73 | $   452.73 | $   (13,397.27) |
| 2015 | $   91,957.11 | $   90,853.62 | $   (7,581.38) | $   (21,431.38) |
| 2016 | $   96,261.85 | $   95,106.70 | $   (576.66) | $   (14,426.66) |
| 2017 | $   100,768.10 | $   99,558.89 | $   3,207.74 | $   (10,642.26) |
| 2018 | $   105,485.31 | $   104,219.49 | $   4,179.69 | $   (9,670.31) |
| 2019 | $   110,423.34 | $   109,098.26 | $   15,818.26 | $   1,968.26 |
| 2020 | $   115,592.54 | $   114,205.43 | $   19,320.18 | $   5,816.43 |
| 2021 | $   121,003.71 | $   119,551.67 | $   25,980.22 | $   12,663.44 |
| 2022 | $   124,633.82 | $   123,138.22 | $   15,045.82 | $   1,542.07 |
| Jan-Mar 2023 | $   32,716.38 | $   32,323.78 | $   9,390.56 | $   (4,113.19) |
| | $   1,090,644.51 | $   1,077,556.78 | $   56,222.10 | $   (94,555.92) |

(35) Using Plaintiff's expert's methodology and building off of Plaintiff's 2010-2011 salary of $76,579 (Ex. 348 at VEIKOS002426) but assuming that Plaintiff would have earned the average salary earned by an assistant professor in Penn's Department of Architecture in 2021, rather than 2020, of $121,004). 2021 is used because it eliminates the impact on the average of outliers Andrew Saunders and Rashida Ng. This requires an annual increase from 2012 to 2021 of 4.68125%, which though still higher than typical, is closer than Plaintiff's proposed 5.1813% increase.

(36) Using adjustment factors from Plaintiff's expert on page 8 of Ex. 349A.

(37) Corrected Earnings Backpay Calculation reflects Adjusted Corrected Post-Penn Earnings Using 2021 Salary Average (column (o)) - Adjusted Actual Post-Penn Earnings (column (e)).

(38) Corrected Earnings Backpay Calculation w/ Summer School reflects Adjusted Corrected Post-Penn Earnings Using 2021 Salary Average (column (o)) - Adjusted Actual Earnings with Summer School (column (f)).

122.    Plaintiff's backpay is $0 both because she failed to mitigate and because she would have fully mitigated had she simply taught summer school as she did in 2012. Even if this Court awarded back pay, that back pay would be limited to either $25,798 (Table 3) or $56,345 (Table 4) using these reasonable assumptions and methodologies—figures that stand in stark contrast to Kucsma's backpay estimate of $205,687.

### 4.   Plaintiff Is Not Entitled to Eight Years of Front Pay

123.   Plaintiff's claim for eight years of front pay, and Kucsma's assumption that she is entitled eight years of front pay, are not supported by the law.

124.   As noted above, front pay is intended only to "make the victim . . . whole and restore the economic position that would have enjoyed but for the employer's unlawful conduct." *Hurst*, 771 F. Supp. at 123.

125.   To that end, "[t]he time frame covered [by a proper front pay award] is only what is required to reestablish the wronged employee's place in the job market." *Brown v. Nutrition Mgmt. Servs. Co.*, Civ. A. No. 06-2034, 2010 WL 2902557, at *13 (E.D. Pa. Jul. 22, 2010).

126.   And in crafting a suitable front pay award, a court "should avoid unreasonable speculation regarding future conditions." *Id.*; *Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984) (affirming reduction of front pay where the trial court found the initial award "would require excessive speculation").

127.   Moreover, front pay awards "should account for expected future damages caused by the wrongful conduct, but not 'guarantee every claimant . . . an annuity to age 70.'" *Brown*, 2010 WL 2902557, at *6 (quoting *Anastasio v. Schering Corp.*, 838 F.2d 701, 709 (3d Cir. 1988)).

128.   An award of eight years of front pay is not reasonable under the circumstances and would unfairly result in a windfall to Plaintiff.

129.   The duration of front pay is only to last as long as would be necessary for Plaintiff to re-establish her status in the market. *Brown*, 2010 WL 2902557, at *13.  Plaintiff provides no basis upon which the Court can conclude that it would take her eight years to do so.

130.   In fact, it is clear that Plaintiff has ***already*** reestablished her place in the market—she changed her career and is no longer seeking to regain the status she allegedly lost.  Under such circumstances, eight years of front pay—in addition to ten of back pay—is far too long a period

of damages; in fact, courts in this circuit routinely award front pay over shorter time frames.  *See*

*Fillman v. Valley Pain Specialists, P.C.*, No. 13-CV-01609, 2016 WL 192656, at *5 (E.D. Pa. Jan.

15, 2016) (awarding two years and two months in front pay); *Goss*, 747 F.2d at 890 (affirming a

four-month front pay award); *Johnson v. Dependability Co.*, Civ. A. No. 15-3355,

2016 WL 852038, at *9 (E.D. Pa. Mar. 3, 2016) (awarding front pay for one year where the court

credited plaintiff's testimony that she could not find work); *Kairys v. S. Pines Trucking, Inc.*, 595

F. Supp. 3d 376, 390 (W.D. Pa. 2022) (five years).

131.   It bears mentioning that ***none*** of these cases involved a plaintiff who also sought

ten years of back pay.  An award of the duration sought by Plaintiff would be more of an annuity

than a remedy designed to compensate a discrimination plaintiff for the consequences of a

challenged decision.  As discussed above, Plaintiff must bear at least some responsibility for the

choices she has made about where to work, whether to work a full schedule, and whether to take

herself out of the market for alternative employment.

132.   To the extent the Court decides front pay is an appropriate remedy, the Court does

not grant Plaintiff eight years of front pay in addition to whatever back pay deemed just.  Doing

so would result in an inequitable windfall to Plaintiff.

C.   <u>**Plaintiff Has Not Met Her Burden of Proving That She Is Entitled to
Compensation for Excess Taxes on a Lump-Sum Award**</u>

133.   The Court declines to grant Plaintiff an award for excesses taxes because Plaintiff

has not met her burden to prove precisely her entitlement to such an award.

134.   Kucsma assumes Plaintiff is entitled to an award to offset the negative tax

consequences of receiving her damages as a one-time lump sum award rather than annually.  Ex.

349A, at pp. 14-15.

135.    However, in the Third Circuit, compensation for such tax burdens associated with lump sum recovery of damages awards is not presumed and is not appropriate in all cases. *Eshelman*, 554 F.3d at 440-43 ("We hasten to add that in so holding, we do not suggest that a prevailing plaintiff in discrimination cases is presumptively entitled to an additional award to offset tax consequences above the amount to which she would otherwise be entitled."); *see also Moffitt v. Tunkhannock Area Sch. Dist.*, No. CV 3:13-1519, 2017 WL 319154, at *21 (M.D. Pa. Jan. 20, 2017) (noting it is the plaintiff's burden to demonstrate the amount to offset the negative consequences of a lump sum award); *Sears v. Atchison, Topeka & Santa Fe Ry., Co.*, 749 F.2d 1451, 1456 (10th Cir. 1984) ("A tax component may not be appropriate in a typical Title VII case.").

136.    District courts are entrusted with the discretion to "locate a just result" regarding such awards and must consider the "circumstances peculiar to the case" when determining whether to grant additional tax relief. *Eshelman*, 554 F.3d at 443.  Determinations with respect to negative tax consequences must be grounded in the facts of the case.  *Argue v. David Davis Enterprises, Inc.*, No. CIV A 02-9521, 2009 WL 750197, at *27 (E.D. Pa. Mar. 20, 2009).

137.    It is the plaintiff's burden to prove entitlement to compensation for the increased tax burden associated with receiving a lump sum damages award.  *Moffitt*, 2017 WL 319154, at *21.

### 1.    Kucsma's Tax Differential Estimate is Speculative and Unreliable.

138.    Courts deny awards to compensate for excess tax burdens when a plaintiff submits insufficient or unreliable evidence such that the court cannot calculate a non-speculative negative tax award just as Plaintiff has done here.  *Moffitt*, 2017 WL 319154, at *21.

139.    For example, in *Moffit*, the court held that a plaintiff had not sustained his burden with respect to the amount of negative tax reimbursement owed because plaintiff's calculations

included incorrect data, included a projected tax rate based on an improper year, did not provide W-2 or other sufficient income verification, and did not note any tax deductions the plaintiff might take when filing his returns. *Moffitt*, 2017 WL 319154, at *21.

140. Similarly, in *Supinski v. United Parcel Service., Inc*., the court denied a plaintiff's motion for an additional monetary award to compensate him for the increased tax burden because the evidence plaintiff presented—a one page tax computation chart prepared by counsel—was inadequate to allow the court to make a non-speculative negative tax implication award. No. 3:06-CV-00793, 2012 WL 2905458, at *6 (M.D. Pa. July 16, 2012).

141. Likewise, in *Argue,* the court held that the plaintiff failed to provide a reliable estimate of the negative income tax consequences of a lump sum award because his calculations were speculative because he relied on only one year of tax returns and the incorrect tax year as the basis for his calculations. 2009 WL 750197, at *27.

142. Kucsma testified vaguely that she "reviewed part of a 2016 tax return" and "had some information from [Plaintiff's] 2020 tax return." Hearing Tr. 102:17-21. She admitted, however, that she never reviewed a complete tax return for Plaintiff and did not review Plaintiff's 2021 tax return. Hearing Tr. 103:7-11. There is no evidence on the record to show what taxes Plaintiff paid or would have paid in any given year.

143. Plaintiff did not produce or provide to Kucsma even a single year of tax returns, and in accord with the cases above, this alone precludes her recovery of an excess tax award. *See Argue*, 2009 WL 750197, at *27 (finding that the plaintiff's calculations were speculative in part because only one year of tax returns was used in the tax calculations); *Ellis v. Ethicon, Inc*., No. CV 05-726 (FLW), 2009 WL 10641983 (D.N.J. Nov. 13, 2009), at *20 ("Plaintiff must provide the court with financial analysis and evidence with regard to her tax burden for the relevant years

in order to avoid speculation."); *Moffitt*, 2017 WL 319154, at \*21 (noting that a plaintiff's tax calculations were speculative in part because he did not report any of his tax deductions).

144.    In addition, although Kucsma's revised report uses a combined effective tax rate of 44%, the report is silent on the basis for using such a rate. Ex. 349A, p. 15. Any calculations based on tax rates that are not applicable in 2023 are speculative. *See Argue*, 2009 WL 750197, at \*27 (noting that an expert's calculations were speculative because they relied on a 2007 tax year, despite the fact that the trial took place in 2008 and so 2008 would be the earliest year plaintiff would receive judgment); *Moffitt*, 2017 WL 319154, at \*21 ("In addition, the taxes due are calculated using the 2016 projected tax rate. It is now 2017. Thus, the tax brackets provided in the 2016 table are now inapplicable due to inflation.").

145.    And there is no reason to credit this rate. For example, Kucsma's original and revised report utilizes the Pennsylvania tax rate but fails to account for the Philadelphia city wage tax which Plaintiff would have been required to pay. Hearing Tr. 104:21-22. Further, Kucsma mixes apples and oranges by adjusting the amounts using the Pennsylvania tax rate on one hand and California's on the other. Awarding damages on this basis would provide Plaintiff with yet another category of damages—compensation for the state tax differential between Pennsylvania and California, which, as discussed below, is unavailable. By mixing two different state tax rates, her proposed effective tax rate is rendered unreliable.

146.    Next, Kucsma's calculations are inadequate to allow the court to make a non-speculative negative tax implication award because she only offered a single negative tax consequences calculation based solely on a $738,784 lump sum award—the entire amount of her economic damages calculations. However, the Court has rejected Kucsma's front pay and back

73

pay calculations, and so it cannot rely on Kucsma's calculations because she has provided no guideposts as to how the Court might determine the tax consequences of a lesser award.

147.    At the Hearing, Kucsma offered to redo her calculation of the tax gross-up based on updated documentation.  Hearing Tr. 107:9-12.  But that offer highlights the insufficiency of Plaintiff's evidence supporting such an award—the time for conducting discovery in this case has long closed and Plaintiff did not provide sufficient documentation on which the Court may base a tax gross-up.  Moreover, Penn would not be able to probe, and would not have the opportunity to probe at the Hearing, any new calculations presented by Kucsma.  Plaintiff cannot now produce new evidence after the close of discovery and after the Court has held a hearing on the issue of economic damages.

148.    Plaintiff (and Kucsma) has failed to put forth sufficient evidence upon which the Court may base an award for the negative tax consequences of a lump sum award.  Consequently, an award for excess taxes would be based on Kucsma's speculation, which is improper under the law.

### 2.    Kucsma's Use of California's Tax Rate to Calculate the Offset for Excess Taxes is Speculative and Unhelpful

149.    Even if the Court were to grant Plaintiff damages for the negative federal tax consequence associated with receiving a lump sum award, it would not award Plaintiff damages based on state taxes, as proposed by Kucsma.

150.    Kucsma's calculations of the excess tax award includes compensation for California taxes, where Plaintiff moved after the denial of her tenure in 2011.  Ex. 349A, at p. 15.

151.    Kucsma testified that she did so because California is the state in which Plaintiff currently resides.  Hearing Tr. 105:2-4.  California's tax rate may be higher than the applicable rates in Pennsylvania (where she lived before moving cross-country).  Hearing Tr. 105:5-7.

152.     But Plaintiff's location in California was a consequence of a personal decision Plaintiff made about where to live and work.  After all, Plaintiff chose to move to California after Penn's lawful decision to deny her tenure in 2011; there is no evidence on the record that anyone forced her to do so and it cannot be argued that Penn is somehow responsible for Plaintiff's California residency, as Plaintiff moved ***prior*** to the only relevant adverse decision at issue here, the 2012 tenure re-review.  If Plaintiff moved to a state in which there is no income tax, like Texas or Florida or Virginia, would Penn be entitled to an offset for the taxes Plaintiff saved?  The variability of state tax rates should not be a factor in any obligation owed by Penn to Plaintiff.

153.     This is quite different from considering the federal tax implications of a lump sum damages award, which is permissible under the Court's discretion if a plaintiff's expert conducts the kind of analysis of relevant tax information that would lead to a non-speculative award (which Kucsma failed to do).  A higher federal tax burden on a lump-sum recovery is unavoidable, and a function of a uniform tax code that applies regardless of where the plaintiff chooses to live.

154.     Here, by way of contrast, a California tax enhancement would compensate Plaintiff for a personal decision she has made to live in that state.  The Court is aware of no authority suggesting that such a subsidy for living in California would be warranted in a damages award.

### 3.     Kucsma Wrongly Included Damages for the Tax Rate Differential between California and Pennsylvania

155.     Kucsma's tax gross-up calculation is also wrong because her calculation includes compensation for the difference between the tax rates in California and Pennsylvania.  Such award is different than a simple gross-up for the payment of backpay as a one-time lump sum and instead would represent a new, additional category of damages.  Kucsma explained that she did this on purpose to compensate Plaintiff for her increased tax burden in California compared to what she would have paid had she continued to live in Pennsylvania.  But Plaintiff has cited no cases where

a court has ordered an award of such damages.  Again, the point of the excess tax award, when ordered, is to compensate a plaintiff for the increased tax burden encountered by being lifted into a higher tax bracket due to the receipt of a one-time lump-sum backpay award.  *Eshelman*, 554 F.3d at 441.  Including the tax difference between states does not support that goal.

156.    Moreover, even if there were support for awarding the differences in taxes between two states, Plaintiff has not provided proper evidence of what the different tax burdens actually were in any given year.  Indeed, to do that properly, she would have had to have looked at total income earned from any source in each year (not just CCA W-2 amounts), what deductions Plaintiff took, what permissible write-offs existed in each state in each year, what the tax rates were each year since 2012 as rates have varied over time (particularly during COVID), and what her Philadelphia tax rate would be, which also would vary depending on if she lived in or out of the city.  Kucsma's calculations account for none of these variables and therefore, are unreliable.

157.    Because of these flaws, the Court would not incorporate state taxes for any lump sum tax excess calculations, if it decided to award such damages.

**D.    If the Court Decides to Award Prejudgment Interest, It Will Be Based on an Appropriate Interest Rate and the Court Will Decline to Award Prejudgment Interest on Compensatory Damages, any Front Pay Award, or Compensation for Excess Taxes.**

158.    Title VII and the PHRA allow for, but do not mandate, prejudgment interest as part of a back pay remedy.  *See Loeffler v. Frank*, 486 U.S. 549, 557 (1988).  Rather, the determination of whether to award prejudgment interest in a Title VII case is committed to the sound discretion of the District Court.  *See Booker*, 64 F.3d at 868; *see also Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 898 (3d Cir. 1993).

159.    The purpose of prejudgment interest is compensatory in nature; it is not intended to be punitive.  *See Booker*, 64 F.3d at 868; *Marthers v. Gonzales*, No. 05-CV-03778, 2008 WL 3539961, at *7 (E.D. Pa. Aug. 13, 2008).

160.    The Third Circuit has stated that prejudgment interest should be "given in response to considerations of fairness and denied when its exaction would be inequitable." *Booker*, 64 F.3d at 868 (quoting *Green v. USX Corp.*, 843 F.2d 1511, 1530 (3d Cir. 1988), *cert. granted, judgment vacated*, 490 U.S. 1103 (1989), and *opinion reinstated in part*, 896 F.2d 801 (3d Cir. 1990)).

161.    Although there is a presumption in favor of awarding prejudgment interest, this presumption is not absolute and can be overcome when the award would result in "unusual inequities." *Billman*, 2022 WL 3139748, at *3 (citing *Booker*, 64 F.3d at 868).

162.    Here, since the Court finds that no back pay is warranted, the Court declines to award prejudgment interest.

163.    Even if the Court were to award damages, the Court finds that an award of prejudgment interest would be inequitable and not serve a "make whole" purpose because even a modest award of economic damages, in combination with the substantial award of compensatory damages awarded by the jury, renders Plaintiff whole.

164.    Other courts have similarly declined to award prejudgment interest when the court finds that the Plaintiff has been otherwise fairly compensated.  *See Smith v. Int'l Servs., Inc.*, No. CIV. A. 95-2038, 1997 WL 667872 at *9 (E.D. Pa. Oct. 9, 1997) (finding that an award of prejudgment interest was "unwarranted" and would not serve a "make whole" purpose when the plaintiff had been adequately compensated by a jury award that included compensatory damages) (citing *Hurley v. Atl. City Police Dep't.*, 933 F. Supp. 396, 430-31 (D.N.J. 1996), *aff'd*, 174 F.3d 95 (3d Cir. 1999) (finding that a plaintiff had been appropriately compensated by a jury award and

declining to award prejudgment interest)); *see also Hogan v. Bangor and Aroostook R. Co.,* 61 F.3d 1034, 1038 (1st Cir. 1995) (affirming a lower court's decision not to award prejudgment interest on backpay where the damages awarded was nearly three times the amount of a back pay award).

165.    Furthermore, if awarded, the amount of prejudgment interest could be substantial because Plaintiff delayed in filing suit until 2020—***eight years*** after the adverse action occurred.

166.    However, should the Court determine that some amount of prejudgment interest is equitable, the Court will calculate interest using the IRS-adjusted prime rate, a method approved of by the Third Circuit. *Taxman*, 91 F.3d at 1566; *Billman*, 2022 WL 3139748, at *5 (utilizing the IRS-adjusted prime rate to calculate prejudgment interest in a Title VII and PHRA case); *see also O'Neill v. Sears, Roebuck & Co.*, 108 F. Supp. 2d 443, 445 (E.D. Pa. 2000) (noting that the amount of prejudgment interest awarded is within the trial court's discretion).

167.    Should any prejudgment interest be granted, the Court adopts the chart below, which reflects the applicable IRS-adjusted prime rates. *See Billman*, 2022 WL 3139748, at *5 (utilizing the IRS prime interest rate from the Office of Personnel Management website).

| Year | IRS Adjusted Prime Rate for Back Pay[15] |
|---|---|
| July-Dec 12 | 3% |
| 2013 | 3% |
| 2014 | 3% |
| 2015 | 3% |
| 2016 | 3% |
| 2017 | 4% |
| 2018 | 4% |
| 2019 | 6% |
| 2020 | 5% |

---

[15] *See Policy, Data, Oversight*, Office of Personnel Management, https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/interest-rates-used-for-computation-of-back-pay/.

| Year | IRS Adjusted Prime Rate for Back Pay[15] |
|---|---|
| 2021 | 3% |
| 2022 | 3% |
| Jan-Mar 2023 | 7% |

168.     Additionally, the Court recognizes that, as with all aspects of prejudgment interest, whether this rate should be compounded is within the discretion of the court.  *See Booker*, 64 F.3d at 868 (noting that an award of prejudgment interest is committed to the sound discretion of the district court).  Moreover, other courts have recognized that compounding interest is typically the exception to the general principle that interest should be computed on a simple basis and can often lead to harsh, inequitable consequences.  *See, e.g., Int'l Transp. Mgmt. Corp. v. Brooks Fitch Apparel Grp., LLC*, No. CV111921ESJAD, 2020 WL 5525510, at *4 (D.N.J. Sept. 14, 2020) (holding that it would be inequitable to compound interest and noting that "compounding prejudgment interest is 'harsh and oppressive' . . . particularly where, as here, the interest would compound over a long period of time (eight years) on a substantial sum") (quoting *Henderson v. Camden Cty. Mun. Util. Auth.*, 826 A.2d 615, 619 (N.J. 2003)).

169.     The Court declines any invitation to award prejudgment interest on any noneconomic or future damages awarded to Plaintiff.

170.     Courts in the Third Circuit "have consistently granted pre-judgment interest only on damage awards for economic losses, such as back pay, and have declined to award pre-judgment interest on awards compensating for non-pecuniary losses, such as awards for emotional distress."  *McKenna v. City of Philadelphia*, No. 98-5835, 2009 WL 2230771, at *2 (E.D. Pa. July 24, 2009) (citing *Booker*, 64 F.3d at 868) ("An award of pre-judgment interest generally 'serves to compensate a plaintiff for the loss of the use of money' that the plaintiff would otherwise have received absent the defendant's wrongdoing."); *see also Robinson v. Fetterma*n, 387 F. Supp. 2d

483, 485 (E.D. Pa. 2005) (finding that court's discretion to award pre-judgment interest nonetheless did not allow interest to be awarded on "that portion of the verdict or finding which compensates for pain and suffering or other non-economic loss."); *Rush v. Scott Specialty Gases, Inc.*, 940 F. Supp. 814, 817 (E.D. Pa. 1996) (finding pre-judgment interest could not be awarded for "punitive, pain and suffering, and future damages" in a Title VII case) (collecting cases).

171.    Indeed, "[i]f the purpose of an award of prejudgment interest is to compensate a plaintiff for the loss of use of money that he otherwise would have earned but for defendant's discrimination, that purpose is not served by awarding interest on compensatory damages." *Marthers*, 2008 WL 3539961, at *7 (declining to award prejudgment interest on a compensatory damages award under Title VII).

## III.    CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff is not entitled to economic damages as a matter of law and further finds that Plaintiff's expert report is a speculative and unreliable as a basis for the award of any damages.


Dated:  April 17, 2023                              Respectfully Submitted,

                                                    By:  *s/ Michael L. Banks*
                                                    Michael L. Banks
                                                    A. Klair Fitzpatrick
                                                    MORGAN, LEWIS & BOCKIUS LLP
                                                    1701 Market Street
                                                    Philadelphia, PA  19103-2921
                                                    Tel:    215.963.5387/4935
                                                    Fax:    215.963.5001
                                                    Email:    michael.banks@morganlewis.com
                                                              klair.fitzpatrick@morganlewis.com

                                                    *Attorneys for Defendant Penn*

## <u>CERTIFICATE OF SERVICE</u>

I, Michael L. Banks, hereby certify that a true and correct copy of the foregoing document was filed electronically and is available for viewing and downloading from the ECF system of the U.S. District Court for the Eastern District of Pennsylvania, and that I served the same via electronic filing on April 17, 2023 upon the following:

Julie A. Uebler
UEBLER LAW LLC
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
uebler@ueblerlaw.com

Attorneys for Plaintiff

*/s/ Michael L. Banks*
Michael L. Banks