IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CATHRINE VEIKOS,**<br><br>*Plaintiff,*<br><br>v.<br><br>**TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,**<br><br>*Defendant.* | **Case No. 2:20-cv-04408-JDW** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Following a trial in February 2023, a jury determined that the Trustees of the University of Pennsylvania ("Penn") retaliated against Cathrine Veikos after she complained of gender discrimination in her tenure review process. Pursuant to Federal Rule of Civil Procedure 52(a), I make the following findings of fact and conclusions of law. Ms. Veikos is entitled to $144,136 in back pay, $149,425 in front pay, $27,668 in prejudgment interest, and $61,555 in excess tax gross up.

**I.   FINDINGS OF FACT**

    **A.   Ms. Veikos's Tenure Reviews**

    1.   Tenure is a lifetime appointment.

    2.   Penn denied Ms. Veikos tenure in 2011.

3. Ms. Veikos complained to Penn that gender discrimination had impacted her tenure review process.

4. Because she was not granted tenure, Ms. Veikos's employment with Penn ended on June 30, 2011.

5. Penn agreed to perform a second tenure review during the 2011-2012 academic year to address Ms. Veikos's concerns of discrimination.

6. Penn denied Ms. Veikos tenure again in May 2012.

7. On February 10, 2023, after a 7-day jury trial, a jury concluded that Penn denied Ms. Veikos tenure in 2012 in retaliation for her complaints of gender discrimination.

8. Had Ms. Veikos been granted tenure on re-review, she would have become an Associate Professor with tenure at Penn's Weitzman School of Design as of July 1, 2012.

**B.  Ms. Veikos's Job Search and Employment After Penn**

9. Ms. Veikos submitted applications or sent emails regarding teaching positions to nineteen colleges and universities around the United States and Canada from 2010 to 2012.

10. After her employment contract ended in June 2011, Ms. Veikos accepted a position as a Visiting Professor at the California College of the Arts ("CCA"). She declined lower-paying teaching opportunities at colleges and universities, such as Temple, Drexel, and the Rhode Island School of Design, once she had accepted the CCA position.

11.     Ms. Veikos began teaching at CCA in September 2011.

12.     In April 2012, Professor Veikos accepted the position of Chair of Interior Design at CCA. As the Chair of Interior Design, Ms. Veikos took on a more administrative role while still teaching courses in the fall and spring semesters.

13.     Ms. Veikos did not seek any other tenure track positions after accepting the Chair of Interior Design position at CCA.

14.     Ms. Veikos has been employed as a full-time member of the faculty at CCA from September 2011 through the completion of the trial of her case in February 2023. While at CCA, Ms. Veikos was elected president of the school's faculty senate, published a manuscript, and was invited to lecture as an expert in her field around the world.

15.     Ms. Veikos elected to teach summer classes for CCA and the University of California, Berkeley in 2012, but has not done so in subsequent years.

C.      **Ms. Veikos's Compensation**

16.     During her last full year at Penn (2010), Ms. Veikos earned $75,688.

17.     Ms. Veikos earned the following amounts after Penn terminated her employment in June 2011:

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| W2 Earnings | $17,350 | $73,102 | $74,340 | $82,332 | $93,398 | $91,010 | $91,763 | $95,276 | $93,280 | $93,974 | $92,684 | $110,864 |

18.     Ms. Veikos's W2 earnings do not reflect nontaxable income, such as some grants that she earned at CCA.

### D.     Tenured Professor Compensation At Penn

19.    Penn paid associate professors in its Architecture Department the following amounts:

| Associate Professor | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| William Braham | $113,929 | $117,232 | $120,163 | $122,566 | - | - | - | - | - | - | - |
| Annette Fierro | $100,907 | $103,431 | $109,534 | $115,010 | $118,460 | $122,014 | $125,674 | $129,400 | $133,326 | $133,326 | $137,326 |
| Franca Trubiano | - | - | - | - | $109,381 | $112,662 | $116,042 | $120,524 | $120,524 | $124,140 | |
| Simon Kim | - | - | - | - | - | - | $107,500 | $110,725 | $114,047 | $114,047 | $137,000 |
| Andrew Saunders | - | - | - | - | - | - | - | $138,306 | $142,455 | | |
| Daniel Barber | - | - | - | - | - | - | - | $113,408 | $116,118 | $116,118 | $119,602 |
| Rashida Ng | - | - | - | - | - | - | - | - | - | - | $157,000 |
| AVERAGE | $107,418 | $110,332 | $114,849 | $118,788 | $118,460 | $115,698 | $115,279 | $121,576 | $125,294 | $121,004 | $135,014 |

## II.    CONCLUSIONS OF LAW

### A.     Duty To Mitigate

1.    Plaintiffs have a duty to mitigate economic damages by "demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment." *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864-65 (3d Cir. 1995).

2.    Under the backpay provision of Title VII, a court will not award back pay when the evidence shows a willful loss of earnings. *See Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (1980). The acts that constitute such willful conduct include a failure to remain in the labor market, refusal to accept substantially equivalent employment, failure diligently to search for alternative work, or voluntarily quitting alternative employment without good reason. *See id.* Employers bear the burden of proving failure to mitigate. *See Booker*, 64 F.3d at 864.

4

3. There is no evidence, and no one has argued, that Ms. Veikos voluntarily quit alternative employment without good reason.

4. There is no evidence that Ms. Veikos removed herself from the labor market. Ms. Veikos continued to work in her chosen career after she moved on from Penn. She remains in a professorship at an institution of higher learning. Still, Penn suggests that Ms. Veikos withdrew from the "tenure-track labor market." (ECF No. 117 at 38.) But Penn has not shown that there is a difference in the labor market for non-tenure positions at institutions of higher learning and tenure at institutions of higher learning. Certainly, tenure is a perk that many, if not most, market participants would like to have. But that doesn't make it a different market, as opposed to a different segment of the same labor market. As the party with the burden of proof, the burden was on Penn to offer evidence to prove the market definition that it now advances. Its failure to do so dooms this argument.

5. There is also no evidence that Ms. Veikos either failed to search for or failed to accept substantially similar employment. Penn's arguments to the contrary fail for at least three reasons.

6. *First*, Penn's arguments ignore the type of position that would qualify as "substantially similar." The position that Ms. Veikos lost at Penn was a tenured professorship, not just a tenure track position. Penn glosses over this and suggests that Ms. Veikos should have pursued a "tenured or tenure-track position." (*E.g.*, ECF No. 117

at 43 (¶ 45).) That's too broad, though. A substantially similar position in this case would have been a tenured position. For Ms. Veikos to take a tenure-track position, she would have had to take a step back. And, as she learned at Penn, there was no guarantee that she would get tenure at the end of a new tenure track. The law required Ms. Veikos to look for and accept substantially equivalent positions; it did not require that she seek out positions that offered her a chance to take a step backwards and a non-guaranteed possibility that she might obtain a substantially equivalent position. Penn has not shown that there were any tenured professorships available to Ms. Veikos. The most it has shown is that she did not pursue a tenure-**track** position at Pratt Institute, even though there was no guarantee that that position would have resulted in a tenured professorship.

7. *Second*, Penn's arguments ignore the scope of the search that Ms. Veikos conducted before accepting a position at CCA. Ms. Veikos contacted nineteen universities about teaching positions before accepting the visitor professorship at CCA. This satisfies the requirement for a diligent search for other work. And once Ms. Veikos had comparable employment at CCA, any subsequent search for other positions was not necessary for mitigation purposes. *See Briggs v. Temple Univ.*, 339 F.Supp.3d 466, 510 (E.D. Pa. 2018).

8. *Third*, Penn complains that Ms. Veikos did not try to find a "higher-paying job." (ECF No. 117 at 43 (¶ 45).) But there's no evidence to suggest that such jobs existed in the market. Ms. Veikos had a position in which she was advancing, and her salary was increasing. Keep that job was "reasonable diligence in finding other suitable

employment," which is all that the law requires to satisfy her duty to mitigate. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982); *see also Booker*, 64 F.3d at 865. She didn't have to change jobs to chase every last dollar to avoid a failure-to-mitigate argument.

9. On a related note, Penn argues that the compensation Ms. Veikos could have earned working summers should be used to reduce an award of economic damages. *See Booker*, 64 F.3d at 864 ("amounts earnable with reasonable diligence by the person [sic] discriminated against shall operate to reduce the back pay otherwise allowable."). However, as Penn acknowledges, neither Party presented evidence on what Ms. Veikos did with her summers at Penn or CCA, other than the summer of 2012. I do not know if she was required to work on research her summers at Penn or got that time off. Nor do I know if her summers at CCA were occupied by administrative duties as the Department Chair. Without more evidence on this, I cannot hold that Ms. Veikos's failure to seek out summer employment was a lack reasonable diligence that should be held against her.

10. Because Penn has not satisfied its burden of showing that Ms. Veikos accepted a willful loss of wages, I do not have to determine whether any of Ms. Veikos's personal justifications, such as her desire not to uproot her son or her frustration with the tenure process, justifies her actions.

**B. Back Pay**

11. "[B]ack pay and front pay are equitable remedies to be determined by the court." *Donlin*, 581 F.3d at 78 n.1.

12. "Back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination." *Id.* at 84. As a result, back pay is calculated "from the time of discrimination until trial[.]" *Id.* at 86.

13. In this case, an award of back pay begins to run as of July 1, 2012, because that is the day that Ms. Veikos would have started as a tenured Professor at Penn. For simplicity of calculations, back pay will run through December 31, 2022, shortly before the trial in this case.

14. Ms. Veikos is entitled to an additional $144,136 in back pay, based on the difference between the amount she earned since Penn's retaliation and the approximate amount she would have earned had she remained at Penn. I used a modified version of the methodology of Ms. Veikos's damages expert, Kristin Kucsma, to determine Ms. Veikos's projected Penn earnings.

15. To determine Ms. Veikos's projected Penn earnings, Ms. Kucsma increased Ms. Veikos's 2010 Penn earnings ($75,688) to the average earnings of Associate Professors in 2020 ($125,294) over the course of ten years using a consistent growth rate (5.1696%) and then increased her projected 2020 earnings for 2021, 2022, and 2023 by the average rate of increase between professors' salaries during those years (0%, 11.5781%, and 8.0073% respectively). Ms. Kucsma then adjusted both the projected Penn earnings and Ms. Veikos's W2 earnings downward by an "adjusted earnings factor" to account for fringe

benefits and job maintenance expenses. To calculate back pay, Ms. Kucsma reduced the adjusted projected Penn earnings by Ms. Veikos's adjusted W2 earnings from July 1, 2012, through March 30, 2023 (Q1 of 2023).

16. I performed similar calculations, but I removed outliers[1] when calculating the average earnings of associate professors and scaled Ms. Veikos's 2010 Penn earnings ($75,688) up to the average associate professor pay in 2022 ($129,516) using a consistent growth rate (4.578%). These adjustments address many issues that Penn noted in Ms. Kucsma's methodology:

- It avoids fluctuations in average pay due to highly compensated professors joining and leaving the Department;
- It eliminates the scenario that was present under Ms. Kucsma's methodology in which Ms. Veikos would earn more than Professor Annette Fierro, even though Ms. Fiero's time as a tenured professor at Penn was much longer than Ms. Veikos's time;
- It avoids the arbitrary change in methodology after 2020; and
- It avoids large pay raises between 2021 and 2023, for which Ms. Kucsma could offer no justification.

---

[1] Professors Andrew Saunders and Rashida Ng

| Projected Penn Earnings | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | TOTAL |
| Projected Earnings | $82,777 | $86,566 | $90,530 | $94,674 | $99,009 | $103,542 | $108,282 | $113,240 | $118,424 | $123,846 | $129,516 | $1,150,407 |
| Adjusted Projected Earnings | $40,892 | $85,528 | $89,443 | $93,538 | $97,821 | $102,299 | $106,983 | $111,881 | $114,753 | $119,819 | $127,962 | $1,090,919 |

| CCA Earnings | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | TOTAL |
| W2 Earnings | $73,102 | $74,340 | $82,332 | $93,398 | $91,010 | $91,763 | $95,276 | $93,280 | $93,974 | $92,684 | $110,864 | $992,023 |
| Adjusted W2 Earnings | $36,551 | $74,340 | $82,332 | $93,398 | $91,010 | $91,763 | $95,276 | $93,280 | $91,625 | $89,116 | $108,092 | $946,783 |

17. My calculation is the difference between Ms. Veikos's Adjusted Projected Earnings at Penn and her Adjusted W2 Earnings at CCA. My modified version of Ms. Kucsma's methodology does not address Penn's concern that Ms. Veikos's W2 earnings do not reflect her full earnings because they excluded nontaxable income. However, neither Party has provided year-end wage statements from CCA for the full period on which I could base my calculations. Therefore, W2 earnings were the only complete data set on which to base any award.

**C.     Front Pay**

18. "[C]ourts may award front pay where a victim of employment discrimination will experience a loss of future earnings because she cannot be placed in the position she was unlawfully denied." *Donlin*, 581 F.3d at 86.

19. In this case, an award of front pay starts to run as of January 1, 2023, until Ms. Veikos's projected retirement in June 2031. Ms. Veikos is entitled to economic damages through her retirement because tenure is a lifetime appointment.

20. Ms. Veikos is entitled to an additional $149,425 in front pay, based on the difference between the amount I project she will earn at CCA and the amount I project

she would have earned at Penn. To make this determination, I use a modified version of Ms. Kucsma's methodology.

21.     To determine Ms. Veikos's projected future Penn earnings as a tenured professor, Ms. Kucsma increased her projected 2023 Penn earnings ($150,995) over the course of Ms. Veikos's remaining working years by a consistent growth rate (3.9%). Ms. Kucsma used similar methodology to project Ms. Veikos's CCA earnings, increasing her projected 2023 CCA earnings ($75,268) over the course of Ms. Veikos's remaining working years by the same growth rate (3.9%). Ms. Kucsma then adjusted both projections downward to account for the probability of death or inability to work and discounted the projections to present value. To calculate front pay, Ms. Kucsma reduced the adjusted projected Penn earnings by Ms. Veikos's adjusted projected CCA earnings from April 1, 2023 (Q2 of 2023) through June 30, 2031.

22.     I performed similar calculations, but I used my 2022 Projected Penn Earnings ($129,516) and Ms. Veikos's 2022 CCA W2 Earnings ($110,864), both increased for 2023 by Ms. Kucsma's 3.9% growth rate, as the base pay for projections until Ms. Veikos's retirement in 2031. These adjustments address Penn's concerns about Ms. Kucsma's base pay amounts coming to illogical conclusions, such as Ms. Veikos earning $8,000 less in the 2031 CCA projection than her 2022 earnings.

| Projected Penn Earnings | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | TOTAL |
| Projected Earnings | $134,567 | $139,815 | $145,268 | $150,934 | $156,820 | $162,936 | $169,291 | $175,893 | $182,753 | $1,418,278 |
| Adjusted Projected Earnings | $112,606 | $116,998 | $121,560 | $126,301 | $131,227 | $136,345 | $141,662 | $147,187 | $76,464 | $1,110,351 |
| Present Value of Adjusted Projected Earnings | $112,606 | $112,769 | $112,932 | $113,095 | $113,259 | $113,422 | $113,586 | $113,751 | $56,957 | **$962,377** |

| Projected CCA Earnings | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | TOTAL |
| Projected Earnings | $115,188 | $119,680 | $124,348 | $129,197 | $134,236 | $139,471 | $144,910 | $150,562 | $156,434 | $1,214,025 |
| Adjusted Projected Earnings | $95,122 | $98,832 | $102,686 | $106,691 | $110,852 | $115,175 | $119,667 | $124,334 | $64,591 | $937,950 |
| Present Value of Adjusted Projected Earnings | $95,122 | $95,260 | $95,397 | $95,535 | $95,673 | $95,812 | $95,950 | $96,089 | $48,114 | **$812,952** |

23. My modified version of Ms. Kucsma's methodology does not address Penn's concern that Ms. Kucsma's 3.9% annual increase is not sufficiently tied to the facts of this case. Penn argues that the 3.9% underrepresents Ms. Veikos's raises at CCA and overstates the increases Penn professors can expect. While Penn is correct that in some years Ms. Veikos had higher raises at CCA and some Penn professors had lower raises, there were also years where Ms. Veikos's CCA raise was lower and Penn professors' raises were larger. Given that projecting future earnings will always require some estimation, I find Ms. Kucsma's 3.9% growth rate reasonable and sufficiently tied to the facts of this case. She based this rate on Ms. Veikos's historical pay raises, data published by the U.S. Department of Labor, salary increases in the education field generally, present market conditions, and projections of future wage growth published by the Congressional Budget Office and the Social Security Administration, which are all appropriate sources.

24. Penn also argues that Ms. Veikos is not entitled to any front pay because awarding eight years of front pay in addition to the ten years of back pay would be a windfall. However, Penn ignores the fact that tenure is a lifetime appointment. Although

the period for the award is long, it reflects the place that Ms. Veikos lost in the job market. *See Donlin*, 581 F.3d at 86.

### D. Prejudgment Interest

25. "Title VII authorizes prejudgment interest as part of the back pay remedy in actions against private employers." *Booker*, 64 F.3d at 868 (citations omitted). There is a strong presumption in favor of awarding prejudgment interest. *Id.*

26. Prejudgment interest is awarded only for back pay. *See McKenna v. City of Philadelphia*, No. 98-5835, 2009 WL 2230771, at *2 (E.D. Pa. July 24, 2009) ("Courts in this circuit have [sic] consistently granted pre-judgment interest only on damage awards for economic losses, such as back pay, and have declined to award pre-judgment interest on awards compensating for non-pecuniary losses, such as awards for pain and suffering and emotional distress.").

27. Ms. Veikos is entitled to an additional $27,668 in interest on her back pay. I determined this using the same methodology as Ms. Kucsma.

28. Ms. Kuscma calculated the prejudgment interest due on the back pay damages she determined using the IRS-adjusted prime rate and a standard methodology applied in other cases. *See, e.g.*, *Billman v. Easton Area Sch. Dist.*, No. 20-2730, 2022 WL 3139748, at *4 (E.D. Pa. Aug. 5, 2022).

29. I performed the same calculations as Ms. Kucsma using the back pay amounts that I determined using my modified version of Ms. Kucsma's methodology.

| Yearly Interest Calculation | | | | | | |
|---|---|---|---|---|---|---|
| Year | Portion of Year | Award at start of Period | Annual Interest | Effective Interest Rate | Yearly Loss | Compound Interest Value |
| 2012 | 50% | $ - | 3.00% | 1.50% | $ 4,340.65 | $ 65.11 |
| 2013 | 100% | $ 4,405.76 | 3.00% | 3.00% | $ 11,187.60 | $ 467.80 |
| 2014 | 100% | $ 16,061.16 | 3.00% | 3.00% | $ 7,111.32 | $ 695.17 |
| 2015 | 100% | $ 23,867.66 | 3.00% | 3.00% | $ 140.32 | $ 720.24 |
| 2016 | 100% | $ 24,728.22 | 3.75% | 3.75% | $ 6,810.80 | $ 1,182.71 |
| 2017 | 100% | $ 32,721.73 | 4.00% | 4.00% | $ 10,536.35 | $ 1,730.32 |
| 2018 | 100% | $ 44,988.40 | 4.75% | 4.75% | $ 11,706.93 | $ 2,693.03 |
| 2019 | 100% | $ 59,388.36 | 5.50% | 5.50% | $ 18,600.95 | $ 4,289.41 |
| 2020 | 100% | $ 82,278.73 | 4.00% | 4.00% | $ 23,128.50 | $ 4,216.29 |
| 2021 | 100% | $ 109,623.52 | 3.00% | 3.00% | $ 30,703.00 | $ 4,209.80 |
| 2022 | 100% | $ 144,536.32 | 4.50% | 4.50% | $ 19,869.62 | $ 7,398.27 |
| | | | | | Interest To Be Paid | $ 27,668 |

30. Penn provides no reason for me to depart from the presumption in favor of prejudgment interest. *See Booker*, 64 F.3d at 868. It states only that "prejudgment interest would be inequitable and not serve a 'make whole' purpose because even a modest award of economic damages, in combination with the substantial award of compensatory damages awarded by the jury, renders Plaintiff whole." (ECF No. 117 at 77). I am not persuaded that Ms. Veikos is whole just because the Jury awarded her substantial compensatory damages. If she should have received this back pay in the past, then the way to make her whole is to give her the present value of that money.

E. **Excess Tax**

31. District courts may "award a prevailing employee an additional sum of money to compensate for the increased tax burden [an economic damages] award may create." *Eshelman v. Agere Systems, Inc.*, 554 F.3d 426, 441-42 (3d Cir. 2009). "Without this type of equitable relief in appropriate cases, it would not be possible 'to restore the

14

employee to the economic status quo that would exist but for the employer's conduct.'" *Id.* at 442 (quoting *In re Continental Airlines*, 125 F.3d 120, 135 (3d Cir. 1997)).

32. Ms. Veikos is entitled to an additional $61,555 gross up for the excess taxes on her lump sum award of front and back pay. I determined this using the same methodology as Ms. Kucsma.

33. Ms. Kucsma calculated the excess tax gross up by determining Ms. Veikos's after-tax award, based on the amounts she calculated for front and back pay, had Ms. Veikos been able to pay taxes on those projected earnings annually. Then Ms. Kucsma calculated the pre-tax award Ms. Veikos must receive to end up with that same after-tax award, given that Ms. Veikos will receive the award in a lump sum and pay a higher effective tax rate on that award. She then subtracted the back and front pay award from the lump sum pre-tax award to obtain the excess tax gross up.

34. I performed the same calculations as Ms. Kucsma, using the back and front pay amounts I determined above. I also adjusted the federal and California state effective tax rate to reflect the appropriate rate for the award size.

| Calculation Excess Tax | | | | | |
|---|---|---|---|---|---|
| Pretax Back and Front Pay | Annual Effective Tax Rate | After-tax Award | Effective Tax Rate on Lump Sum | Pre-tax Lump Sum Award | Excess Tax Gross Up |
| $293,561 | 23.79% | $223,722.95 | 37% | $355,115.80 | $61,554.65 |

35. Penn argues that Ms. Veikos has not proven that she is entitled to any tax gross up because Ms. Kucsma's excess tax calculation is speculative and unhelpful. The

nonbinding cases Penn cites in support of its argument are not persuasive. Ms. Kucsma based her tax rates on reviews of Ms. Veikos' earnings as well as the various federal and state tax schedules. This is the type of information on which I would expect an expert to base tax estimates. And while Ms. Kucsma's omission of the Philadelphia city tax was an issue, she corrected it in her updated calculations, which I used in my calculations above. (*See* ECF No. 116-5.)

36. Penn also argues that the use of Pennsylvania's lower tax rate for the front and back pay compared to the use of California's higher tax rate for the lump sum award is an apples-to-oranges-comparison. But the use of these rates reflects the tax burden that Ms. Veikos would have faced had Penn not retaliated against her and the tax burden she will face now as a California resident. Penn says it should not have to subsidize her choice to live in California, but this rings as disingenuous. If Ms. Veikos had moved to a state with a lower tax burden than Pennsylvania, Penn would be arguing that state's tax rate should apply, rather than give her a windfall of tax value she wouldn't pay. The just outcome cannot be "heads I win, tails you lose."

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

May 2, 2023