# Annette Fierro Final Designations

Designation List Report



**Fierro, Annette**                                    **2022-08-11**

| | |
|---|---|
| Full Final Designations | 03:02:13 |
| **TOTAL RUN TIME** | **03:02:13** |



**ID: AF_FINAL**

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 5:10 - 20:19 | **Fierro, Annette 2022-08-11** | 00:16:13 | AF_FINAL.1 |

| | | |
|---|---|---|
| 5:10 | Q. | Good morning, Professor Fierro. |
| 5:11 | A. | Good morning. |
| 5:12 | Q. | As you know, we are here to take your |
| 5:13 | | video deposition which will be presented to the |
| 5:14 | | jury in Cathrine Veikos's civil rights trial in |
| 5:15 | | January. |
| 5:16 | | It is my understanding that you |
| 5:17 | | will be out of the Philadelphia region at that |
| 5:18 | | time.  Can you please tell us where you will be? |
| 5:19 | A. | Yes.  I'm on academic sabbatical as of |
| 5:20 | | July 1, so right now.  And I have a year-long |
| 5:21 | | sabbatical.  I will be in Paris for most of that |
| 5:22 | | time where I will be completing a book. |
| 5:23 | Q. | What is your current position at Penn? |
| 5:24 | A. | I am an associate professor of |
| 6:01 | | architecture.  I have been at Penn since 1993. |
| 6:02 | | Since -- before last year, I was the associate |
| 6:03 | | chair for eight years.  I'm the director of |
| 6:04 | | admissions and of advising.  I'm the chair of |
| 6:05 | | the master's thesis program.  I'm the chair of |
| 6:06 | | the first year curriculum.  And I'm the chair of |
| 6:07 | | the study abroad program. |
| 6:08 | Q. | Thank you. |
| 6:09 | | When you said you were associate |
| 6:10 | | professor of architecture, is that with tenure? |
| 6:11 | A. | Yes, that is with tenure.  I'm fully |
| 6:12 | | tenured on the standing faculty. |
| 6:13 | Q. | Okay.  And the department of |
| 6:14 | | architecture is in what school within the |
| 6:15 | | university? |
| 6:16 | A. | The department of architecture is in the |
| 6:17 | | Graduate School of Design, now known as the |
| 6:18 | | Weitzman School of Design.  It has four |
| 6:19 | | departments:  Landscape architecture, fine arts, |
| 6:20 | | city planning.  It has a program in preservation |
| 6:21 | | and a program in visual studies. |
| 6:22 | Q. | Thank you. |
| 6:23 | | When you came to Penn, did you come |
| 6:24 | | as an assistant professor on a tenure-track? |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

7:01   A.   I did.

7:02   Q.   And were you promoted to associate

7:03        professor with tenure --

7:04   A.   Yes, I was.

7:05   Q.   -- in the department?

7:06   A.   Uh-huh.

7:07   Q.   Can you describe your area of focus?

7:08        And keep in mind throughout your testimony

7:09        today, I think that the audience for your

7:10        testimony are people who are not college

7:11        professors or architects.

7:12   A.   It is challenging.

7:13   Q.   Yes.

7:14   A.   Architecture is a synthetic discipline.

7:15        Okay?  We are a professional school of

7:16        architecture, which means that most of our

7:17        students are going to receive a master's degree

7:18        in architecture, and after internships they will

7:19        be licensed architects.

7:20        Architecture is a field that

7:21        combines technology.  Right, you have to know

7:22        how to build buildings.  It combines history and

7:23        theory.  You need to know how to think about

7:24        buildings.  You need to know about the history

8:01        of architecture.  We are a very old academic

8:02        discipline.  And we have to be able to think

8:03        about how we make drawings.  So visual studies.

8:04        And a large part of our curriculum

8:05        is dedicated to design studios.  So a very kind

8:06        of hands on, one-on-one intensive teaching, yes.

8:07   Q.   And do you have a particular focus

8:08        within that?

8:09   A.   Well, I lead design studios, certainly.

8:10        I've been the coordinator of design studios for

8:11        the entire time I've been at Penn.  So I'm a

8:12        leader in design.  But my writing, I would say

8:13        that my professional work, I work as a scholar

8:14        and/or writer on technology and culture.

8:15        So it migrates between how people

8:16        use technology, how architects use technology,

8:17        how it is received in the cultural sphere.  How

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|

| | 8:18 | | the design and building of materials in |
|---|---|---|---|
| | 8:19 | | particular, and structure affect how architects |
| | 8:20 | | think about buildings and how they react in a |
| | 8:21 | | political context. |
| | 8:22 | Q. | Thank you. |
| | 8:23 | | You mentioned a couple of different |
| | 8:24 | | specialties or areas of focus, and I just want |
| | 9:01 | | to make sure the jury understands what they each |
| | 9:02 | | are. |
| | 9:03 | | So when you say technology within |
| | 9:04 | | architecture, can you help us understand what |
| | 9:05 | | that means? |
| | 9:06 | A. | Sure.  That's complicated.  Right? |
| | 9:07 | Q. | Okay. |
| | 9:08 | A. | Because that's really where I sort of |
| | 9:09 | | probe and I actually ask myself what is |
| | 9:10 | | technology in architecture. |
| | 9:11 | | I mean technology for a |
| | 9:12 | | professional architect means that you know about |
| | 9:13 | | structures, you know about how materials go |
| | 9:14 | | together.  You know especially not how to build |
| | 9:15 | | yourself, but how to instruct other people how |
| | 9:16 | | to build and you know about the economies of |
| | 9:17 | | that. |
| | 9:18 | | I work in areas of how culture |
| | 9:19 | | receives technology.  So, for example, right now |
| | 9:20 | | I just finished a book on buildings that were |
| | 9:21 | | done in London by a group of architects known as |
| | 9:22 | | the high tech architects where the built product |
| | 9:23 | | looked like a machine. |
| | 9:24 | | So it both employs technology, but |
| | 10:01 | | it is also culturally read as a technological |
| | 10:02 | | piece. |
| | 10:03 | | Does that make sense?  Yes, I hope |
| | 10:04 | | so. |
| | 10:05 | Q. | Yes.  At a high level. |
| | 10:06 | A. | It is very nuanced.  I know, I know. |
| | 10:07 | Q. | I appreciate that.  I think it is very |
| | 10:08 | | helpful. |
| | 10:09 | A. | Yeah. |
| | 10:10 | Q. | And the other thing I think you |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

10:11   mentioned was visual studies?

10:12   A.   Right.

10:13   Q.   Can you describe what you mean when you

10:14   refer to visual studies?

10:15   A.   Right.  Well, architecture has, as a

10:16   discipline, has a body of work, because we don't

10:17   build, we only draw what we are going to build,

10:18   and those kinds of drawings, I mean there are

10:19   technical drawings, like working drawings,

10:20   construction drawings.  That's one form of

10:21   drawing.

10:22   But communicative drawings like

10:23   what a building will look like, like

10:24   representational drawings also has a history of

11:01   its own.

11:02   Penn especially is based in the old

11:03   French Beaux-Arts program where they were known

11:04   for their magnificent water color drawings.  And

11:05   so you could say that the building that they

11:06   drew was about how it would be built and what it

11:07   would look like, but the history of that drawing

11:08   was on its own very important to us.

11:09   Q.   And the other things I think you

11:10   mentioned, you mentioned preservation.  Is that

11:11   a separate --

11:12   A.   Right.

11:13   Q.   -- area of focus?

11:14   A.   It is a separate area.  That's actually

11:15   quite a large program.  It's a very prestigious

11:16   program for us.

11:17   Preservation is basically, you

11:18   know, historic preservation of important

11:19   buildings.  So it has a lot of history to it.

11:20   It also has a drawing component to it.  It has a

11:21   lot of technology, which is surprising.

11:22   But yeah, you have to know about,

11:23   you know, how grout works in historical

11:24   buildings and the kind of chemical decomposition

12:01   of surfaces and, you know, it has its own body

12:02   itself, yeah.

12:03   Q.   And I think you mentioned also history

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

12:04      and theory.

12:05  A.  Yes.

12:06  Q.  I don't know whether they go together.

12:07      Can you describe what you are referring to when

12:08      you make reference to that?

12:09  A.  Yeah.  This is a kind of an academic,

12:10      it's the most academic of the work that we do,

12:11      meaning that it is centered on writing.  And

12:12      there is a capacity of history, right, you know,

12:13      facts and figures and who did this, who did

12:14      that, when they did this, how it followed.

12:15      Certain movements in architecture.

12:16      Theory is most, is more about

12:17      challenging perceived notions of that history.

12:18      Debating, speculating about the role of this or

12:19      that in the profession or in drawing or in the

12:20      history itself.

12:21      And it sort of varies right now.

12:22      Gender studies is actually very important in

12:23      history theory as is, I mean the whole Black

12:24      Lives Matter took its role in history theory.

13:01      And so we're looking at how race plays a role in

13:02      the built environment, certainly in an urban

13:03      dimension, but also, you know, in different

13:04      capacities of what we do, how we interact with

13:05      the public.

13:06  Q.  And what about design, when I think of

13:07      architects I think of their designing.

13:08  A.  Right.

13:09  Q.  But is design its own specialty within a

13:10      school of architecture?

13:11  A.  Well, the design studios are where it

13:12      all comes together.  You know, it is where you

13:13      synthesize technology, you synthesize history,

13:14      theory, and you actually, you know -- a design

13:15      studio meets three times a week.  They say for

13:16      four hours.  It is more like six hours.  And you

13:17      basically give a hypothetical problem and the

13:18      students make hypothetical solutions to that.

13:19      And so, you know, it is not always

13:20      buildable, but it is always, it always

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|

| | 13:21 | | speculates about something fascinating.  It is a |
| | 13:22 | | really -- it's a wonderful discipline, |
| | 13:23 | | especially in the university. |
| | 13:24 | Q. | Thank you. |
| | 14:01 | | So I want to talk about tenure. |
| | 14:02 | A. | Okay. |
| | 14:03 | Q. | So in addition to going through the |
| | 14:04 | | tenure review process yourself at Penn within |
| | 14:05 | | the department of architecture, have you |
| | 14:06 | | participated in the tenure review process for |
| | 14:07 | | other candidates? |
| | 14:08 | A. | I have. |
| | 14:09 | Q. | Okay. |
| | 14:10 | A. | All of them since I was tenured I have |
| | 14:11 | | participated in.  In different capacities.  I |
| | 14:12 | | have been a mentor.  I have written letters for |
| | 14:13 | | many people.  I have always been in meetings.  I |
| | 14:14 | | think it is a very primary role of an |
| | 14:15 | | academician. |
| | 14:16 | Q. | Again, for those of us who aren't |
| | 14:17 | | academic professors, can you describe what |
| | 14:18 | | tenure means? |
| | 14:19 | A. | Tenure, it has a kind of mythology of |
| | 14:20 | | its own, doesn't it?  Okay. |
| | 14:21 | | Historically tenure was an idea |
| | 14:22 | | that came up in the 60s, and it was to safeguard |
| | 14:23 | | people in the academy, safeguard their freedom |
| | 14:24 | | of speech.  So that they could say anything that |
| | 15:01 | | was contentious politically that was not agreed |
| | 15:02 | | to by, you know, the upper levels of the |
| | 15:03 | | faculty.  People were given a lifetime contract. |
| | 15:04 | | Right? |
| | 15:05 | | And so to get that lifetime |
| | 15:06 | | contract, they thought it wise that there be a |
| | 15:07 | | probationary period to see who the person was, |
| | 15:08 | | how they taught, what they could do before |
| | 15:09 | | giving them that lifetime contract. |
| | 15:10 | | As it has migrated, it has become |
| | 15:11 | | more of a right of passage, and now there's a |
| | 15:12 | | certain body of work that you are expected to |
| | 15:13 | | present for tenure review.  People want to see |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

15:14    that you are going to be a good teacher, that

15:15    you are going to be a good colleague, that you

15:16    are going to produce some kind of work, be it

15:17    writing or you are going to design buildings, or

15:18    even now you are going to do drawings.  So that

15:19    production varies that you are engaged by.

15:20  Q.  All right.  And you mentioned the

15:21    probationary period.

15:22  A.  Yes.

15:23  Q.  So is that the period during which you

15:24    are considered for tenure, I mean the

16:01    probationary period?

16:02  A.  Yes.

16:03  Q.  And is that a set number of years?

16:04  A.  Yes.  It varies from individual to

16:05    individual.  Typically it is six years where you

16:06    are evaluated for tenure.  I mean the way the

16:07    contract is set up, you are evaluated after your

16:08    fifth year.  Well, actually, no, you are

16:09    evaluated at the midpoint.  Then you are

16:10    evaluated at the fifth year.  And then you have

16:11    a year's grace where if you are turned down you

16:12    have a year to find another contract somewhere.

16:13    There are people who decide not to

16:14    go up through fifth year, but to go up through

16:15    six year for a number of reasons.

16:16    I did that because my book wasn't

16:17    out yet and I wanted it to be further along

16:18    before I was reviewed.

16:19  Q.  You mentioned the midpoint.

16:20  A.  Yes.

16:21  Q.  Is that the time where there is

16:22    consideration for reappointment?

16:23  A.  Yes, that's called reappointment and all

16:24    of the above is evaluated and you are, you are

17:01    counseled after that on what the faculty, and it

17:02    is mostly an internal review.  So you are

17:03    counseled on the things that you need to focus

17:04    on, what you need to do more of.  If you need to

17:05    improve your teaching, you know, you are told.

17:06    We have assessment forms that the students fill

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| | 17:07 | out and that's, you know, very concrete. |
| | 17:08 | Basically, you know, what you need |
| | 17:09 | to be ready to be tenurable by our standards |
| | 17:10 | within the department, but as well as |
| | 17:11 | university. |
| | 17:12 | Q.  Is it correct that the tenure review and |
| | 17:13 | probationary process is an up or out process? |
| | 17:14 | In other words, if you don't get tenured, do you |
| | 17:15 | have to leave? |
| | 17:16 | A.  Yes.  By university regulations, you |
| | 17:17 | have to leave. |
| | 17:18 | Q.  Okay.  During your probationary period |
| | 17:19 | at Penn, did you ask that that period, that |
| | 17:20 | probationary period be extended? |
| | 17:21 | A.  Yes. |
| | 17:22 | When I was going up for tenure, I |
| | 17:23 | had -- okay, my first child was born in 1994 and |
| | 17:24 | my second child was born in 1996.  At that time, |
| | 18:01 | there was no policy to have your clock extended, |
| | 18:02 | have that probationary period extended.  And for |
| | 18:03 | me, my first child had health problems.  He was |
| | 18:04 | in the ICU for three weeks and the care required |
| | 18:05 | at home was extensive.  And I had been given a |
| | 18:06 | leave by the department from teaching, but my |
| | 18:07 | tenure clock was essentially running.  So I was |
| | 18:08 | expected to be producing work while I was under |
| | 18:09 | this kind of duress. |
| | 18:10 | And so I asked that the clock be |
| | 18:11 | stopped because it just didn't seem possible. |
| | 18:12 | And I was told then by the department that this |
| | 18:13 | was a university regulation and I would have to |
| | 18:14 | petition the university. |
| | 18:15 | I did, and I was told that I should |
| | 18:16 | produce a body of research that compared pure |
| | 18:17 | institutions.  And I tried, but that was also |
| | 18:18 | impossible.  I was the only woman, I mean there |
| | 18:19 | are very few women in architecture schools |
| | 18:20 | across the country where -- certainly there are |
| | 18:21 | a few women, but there are even fewer women |
| | 18:22 | where they were pregnant. |
| | 18:23 | And so it was very hard even to get |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 18:24 | names and to find out what the schools were | | |
| | 19:01 | doing because that, you know, required a kind of | | |
| | 19:02 | research effort. | | |
| | 19:03 | Finally the university took it up | | |
| | 19:04 | and they embraced it and they came out with a | | |
| | 19:05 | policy that would grant a full year extension of | | |
| | 19:06 | the probationary period, understanding that this | | |
| | 19:07 | was extremely difficult, and trying to put us on | | |
| | 19:08 | an equal footing with the rest of our | | |
| | 19:09 | colleagues.  They wanted to make it fair for us | | |
| | 19:10 | that chose parenthood to become equal with our | | |
| | 19:11 | other colleagues who hadn't. | | |
| | 19:12 | So in fact they gave me the two | | |
| | 19:13 | years -- I'm not quite sure what year it was, | | |
| | 19:14 | when the policy came out -- but I was given two | | |
| | 19:15 | years after like, I think 1999, 2000, so before | | |
| | 19:16 | I went up for tenure, they added two years to my | | |
| | 19:17 | contract. | | |
| | 19:18 | Q.  We will look at, we are going to look at | | |
| | 19:19 | the policy and that might refresh your | | |
| | 19:20 | recollection about the timing, but you mentioned | | |
| | 19:21 | that you were, in order to advocate for this | | |
| | 19:22 | policy, you were told to do some research among | | |
| | 19:23 | peer institutions. | | |
| | 19:24 | A.  Right. | | |
| | 20:01 | Q.  Who was it that directed you to do that? | | |
| | 20:02 | A.  David Leatherbarrow asked me to do that. | | |
| | 20:03 | Q.  What was his role at the time? | | |
| | 20:04 | A.  He was the chair of the department at | | |
| | 20:05 | the time. | | |
| | 20:06 | Q.  All right, we are going to look at an | | |
| | 20:07 | exhibit. | | |
| | 20:08 | I am going to hand you what has | | |
| | 20:09 | already been marked as P-1.  I will hand that | | |
| | 20:10 | down there. | | |
| | 20:11 | This document has a title "Penn | | |
| | 20:12 | Policies Relating to Junior Faculty Members' | | |
| | 20:13 | Career-Family Balance." | | |
| | 20:14 | Do you recognize that as something | | |
| | 20:15 | that was published at Penn? | | |
| | 20:16 | A.  Yes.  This is published in the Almanac, | | |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 20:17 | which is our faculty publication.  This becomes | | |
| | 20:18 | a kind of record of policies as they are | | |
| | 20:19 | activated currently. | | |
| 20:23 - 30:20 | **Fierro, Annette 2022-08-11** | | 00:09:52 | AF_FINAL.2 |
| | 20:23 | BY MS. UEBLER: | | |
| | 20:24 | Q. Okay, so the date on this particular | | |
| | 21:01 | publication is February 28th, 2006. | | |
| | 21:02 | When you look at this, can you take | | |
| | 21:03 | a look at the second page, which talks about an | | |
| | 21:04 | "Approved Revision" at the top there on the | | |
| | 21:05 | right-hand column. | | |
| | 21:06 | A. Yes. | | |
| | 21:07 | Q. To the "Policy on Extension of the | | |
| | 21:08 | Probationary Periods that Apply to Granting of | | |
| | 21:09 | Tenure or Promotion to Associate Professor." | | |
| | 21:10 | I don't necessarily need you to | | |
| | 21:11 | read it for us, Professor, but can you tell us | | |
| | 21:12 | the circumstances when the extension is | | |
| | 21:13 | available to a tenure candidate? | | |
| | 21:14 | A. It is available before the tenure | | |
| | 21:15 | review, and it is -- I am trying to be | | |
| | 21:16 | absolutely correct here. | | |
| | 21:17 | Q. Sure. | | |
| | 21:18 | A. So the language is very careful.  I'm | | |
| | 21:19 | not quite sure if it -- I think it happens at | | |
| | 21:20 | the point of the child's birth now, or very soon | | |
| | 21:21 | after.  And where that falls relative to | | |
| | 21:22 | reappointment I'm not entirely sure about. | | |
| | 21:23 | Q. And I was asking an easier question. | | |
| | 21:24 | A. Okay. | | |
| | 22:01 | Q. Which is so the extension applies -- you | | |
| | 22:02 | talked about it in the context of having your | | |
| | 22:03 | own child. | | |
| | 22:04 | A. Right. | | |
| | 22:05 | Q. And so if we look at this exhibit in | | |
| | 22:06 | P-1, the second page, A(1) talks about the | | |
| | 22:07 | situation where a child is adopted or born -- | | |
| | 22:08 | A. Right. | | |
| | 22:09 | Q. -- and placed into the caregiver's | | |
| | 22:10 | family? | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

22:11   A.   Right.

22:12   Q.   And then there are other reasons.

22:13   A.   Right.

22:14   Q.   Are you familiar with what they are?

22:15   A.   Yes, uh-huh.  Yes.

22:16   Q.   And is it that in the event of a serious

22:17        health condition either for the candidate or a

22:18        family member?

22:19   A.   Right, exactly.

22:20   Q.   Okay.

22:21   A.   Uh-huh.

22:22   Q.   So in addition to extending the years of

22:23        the probationary period, are there other

22:24        elements of the policy that are important to the

23:01        tenure review process?

23:02   A.   I believe this came after the notice

23:03        that this should be made very clear in the

23:04        letters to external reviewers.  But, you know,

23:05        given that letters would be sent out with the

23:06        kind of -- with the candidate's term of

23:07        appointment, that it wouldn't look like

23:08        additional years had been added.  That in fact

23:09        the probationary period simply had been

23:10        extended, but technically it was still the same,

23:11        yeah.

23:12   Q.   So let's look at, on this exhibit on

23:13        Page 2 there is a Section D, which we can look

23:14        at.  I am just going to take a moment because it

23:15        is a little artificial here, but we will be

23:16        showing this to the jury as well at the time.

23:17   A.   Right.

23:18   Q.   That section, is that the section of the

23:19        policy that addresses the question you just were

23:20        talking about?

23:21   A.   Yes, yes.

23:22   Q.   Okay.  And we will talk in a little bit

23:23        about external reviewers, but is it fair to say

23:24        that those people who are notified are people

24:01        who are giving feedback about a candidate's

24:02        tenure case?

24:03   A.   Yes, uh-huh.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

24:04  Q.  Okay.

24:05      All right, let's talk about

24:06      Cathrine Veikos.

24:07  A.  Okay.

24:08  Q.  This case is about her and we should

24:09      talk about her.

24:10  A.  Okay.

24:11  Q.  Did you know Cathrine before she came to

24:12      work at Penn?

24:13  A.  I had met her a couple of times in

24:14      Paris, in fact.  She was working there and I was

24:15      teaching studios for Georgia Tech and my

24:16      colleague knew of her.  I don't know how.  But

24:17      he invited her to sit in on student reviews.

24:18      And this is at the end of the semester, the

24:19      student presents a final project and usually

24:20      four or five people are invited to talk about

24:21      the work.  So when I say a student review,

24:22      that's what I'm talking about.

24:23  Q.  Okay.

24:24  A.  So I think she sat on one or maybe two.

25:01      I'm not sure.

25:02  Q.  Okay.

25:03  A.  Yeah.

25:04  Q.  Did you participate in the faculty

25:05      discussions when Professor Veikos was originally

25:06      appointed to a tenure-track position?

25:07  A.  Yes, I did.

25:08  Q.  Okay.  In what field was she appointed?

25:09  A.  She was appointed, and I remember the

25:10      discussion very clearly because this was -- it

25:11      was, what, '98?  No.

25:12  Q.  2003.

25:13  A.  2003, okay.  See, I am very shaky.  This

25:14      was a long time ago.

25:15      We had been hit by the introduction

25:16      of computers and digital drawing and we realized

25:17      that we really needed to focus on that.  We were

25:18      largely still hand drawing, and it became very

25:19      clear that given now the advent of digital

25:20      medias that everything had changed.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| | 25:21 | So we knew we had to focus on that |
| | 25:22 | and we knew we had to hire faculty that could |
| | 25:23 | focus on that. So she was hired in answer to |
| | 25:24 | that in visual studies. |
| | 26:01 | Q. To your knowledge, prior to coming to |
| | 26:02 | Penn, did Professor Veikos work as a practicing |
| | 26:03 | architect? |
| | 26:04 | A. Yes. She had a very successful |
| | 26:05 | practice, and in fact she had taught a couple of |
| | 26:06 | studios at a higher level as a visiting critic. |
| | 26:07 | And that's how we first became aware of her, |
| | 26:08 | yes. |
| | 26:09 | Q. Was it your understanding that Professor |
| | 26:10 | Veikos stopped her private architecture practice |
| | 26:11 | when she came to Penn? |
| | 26:12 | A. Certainly. |
| | 26:13 | Q. What was, if you recall, what was her |
| | 26:14 | expected focus of her work for her tenure |
| | 26:15 | probationary period at the time of her |
| | 26:16 | tenure-track appointment? |
| | 26:17 | A. Well, because she was appointed in |
| | 26:18 | visual studies, there could have been several |
| | 26:19 | different routes to take. I think her focus |
| | 26:20 | from the beginning was academic. And having |
| | 26:21 | taught with her, because we both taught |
| | 26:22 | beginning students, and so we were teaching |
| | 26:23 | alongside each other, you know, me and beginning |
| | 26:24 | studio curriculum and she in beginning visual |
| | 27:01 | studies curriculum. But we wanted to |
| | 27:02 | cross-fertilize. So we worked together on the |
| | 27:03 | curriculum, the drawing types, how the drawing |
| | 27:04 | types would feed into the studio. |
| | 27:05 | And her focus was always that it |
| | 27:06 | wasn't just about the techniques of drawing, |
| | 27:07 | like how you draw, what you draw, what line |
| | 27:08 | wave, what color, you know. Her focus was on |
| | 27:09 | the history of drawing and how that, you know, |
| | 27:10 | made you think differently about buildings and |
| | 27:11 | how that made you think differently about what |
| | 27:12 | you were doing. |
| | 27:13 | Q. Okay. |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

27:14   A.   And that has its own kind of historical

27:15   trajectory, some kind of theoretical trajectory.

27:16   I mean visual studies is -- I mean

27:17   it's an official program in the university

27:18   because I think, you know, certainly the kind of

27:19   advent of digital medias has prompted that we

27:20   all think about very carefully how images affect

27:21   all of the things that we do, all of the things

27:22   that we think about.

27:23   So visual studies at Penn has its

27:24   own different cross-disciplinary program where

28:01   you get -- I know that five of our fine arts

28:02   faculty is in that program.  I also know that

28:03   there is a neuro biologist that looks at vision.

28:04   I also know that there is a few history of

28:05   science people.

28:06   So it has always been

28:07   cross-disciplinary.  It is a kind of fertile

28:08   field of kind of growing speculations about how

28:09   this works.

28:10   Q.   Okay, but it was your understanding that

28:11   that was her focus from the beginning of her

28:12   tenure-track and that she wouldn't continue as a

28:13   practicing architect?

28:14   A.   No.

28:15   Q.   Okay.

28:16   A.   Yeah.

28:17   Q.   How would you describe your relationship

28:18   with Cathrine Veikos?

28:19   A.   Well, we were, you know, the only women

28:20   faculty.  I mean with Marion Weiss, but Marion

28:21   Weiss is a practitioner.  She had her -- she is

28:22   a very successful practitioner.  She has an

28:23   office in New York.  She was actually really

28:24   never there except to teach her courses.  So we

29:01   were some of the only women on the faculty.

29:02   So, you know, we naturally became

29:03   close, especially because we were teaching

29:04   together the same group of students.  And I had

29:05   a great deal of respect for her orientation so

29:06   it made it, it made it a productive

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 29:07 | | relationship. | | |
| | 29:08 | Q. | We talked about reappointment a little | | |
| | 29:09 | | while ago. | | |
| | 29:10 | | Did you participate in the faculty | | |
| | 29:11 | | discussion when Professor Veikos was considered | | |
| | 29:12 | | for reappointment -- | | |
| | 29:13 | A. | Yes. | | |
| | 29:14 | Q. | -- during tenure? Okay. | | |
| | 29:15 | | And were you a member of the | | |
| | 29:16 | | tenured faculty at that time? | | |
| | 29:17 | A. | Yes, I was, uh-huh. | | |
| | 29:18 | Q. | Who was the chair of the architecture | | |
| | 29:19 | | department at the time of reappointment, do you | | |
| | 29:20 | | recall? | | |
| | 29:21 | A. | Bill Braham, I believe, was acting | | |
| | 29:22 | | chair. | | |
| | 29:23 | Q. | Let's look at a document and maybe that | | |
| | 29:24 | | will help. | | |
| | 30:01 | A. | Okay, okay. I am sorry. | | |
| | 30:02 | Q. | No, that is okay. I want to talk about | | |
| | 30:03 | | this anyway. | | |
| | 30:04 | A. | This is now 20 years ago. | | |
| | 30:05 | Q. | I want to look at Exhibit P-2. | | |
| | 30:06 | A. | Okay. | | |
| | 30:07 | | So David was. Okay. So David was. | | |
| | 30:08 | | So Bill was the chair at the appointment, at the | | |
| | 30:09 | | tenure assessment, and Bill -- and David was the | | |
| | 30:10 | | chair at the reappointment. | | |
| | 30:11 | Q. | Let's look at the letter first. | | |
| | 30:12 | A. | Oh, Detlef was, I am sorry. | | |
| | 30:13 | Q. | So P-2, why don't you take a look at it | | |
| | 30:14 | | for a minute and tell us if you can identify | | |
| | 30:15 | | what this letter is? | | |
| | 30:16 | A. | This letter would have been the chair's | | |
| | 30:17 | | summation of the discussion of the faculty when | | |
| | 30:18 | | Cathrine was assessed at the midpoint. And this | | |
| | 30:19 | | letter, it goes in different stages. This | | |
| | 30:20 | | letter -- | | |
| **31:03 - 37:13** | **Fierro, Annette 2022-08-11** | | | **00:06:53** | **AF_FINAL.3** |
| | 31:03 | | BY MS. UEBLER: | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|
| 31:04 | Q. So I did want to talk about, so let's |
| 31:05 | just clarify one thing. So the person who was |
| 31:06 | the chair of the department at the time of |
| 31:07 | Cathrine's reappointment was who? |
| 31:08 | A. Detlef Mertins. |
| 31:09 | Q. Okay. |
| 31:10 | A. Yes. I am sorry for that mistake. |
| 31:11 | Q. That is okay. All these letters sort of |
| 31:12 | run together, so. |
| 31:13 | A. Yes, yes. |
| 31:14 | Q. So if we look at this letter, and again, |
| 31:15 | I am just going to take a moment because we are |
| 31:16 | going to be -- you are seeing it, but we are |
| 31:17 | going to want to make sure the jury sees it at |
| 31:18 | the time as well. |
| 31:19 | A. Okay. |
| 31:20 | Q. So this is a letter from February of |
| 31:21 | 2006; right? |
| 31:22 | A. Right. |
| 31:23 | Q. In the top paragraph it identifies who |
| 31:24 | was president at that meeting. Is that your |
| 32:01 | recollection? |
| 32:02 | A. Yes, uh-huh. |
| 32:03 | Q. Okay. |
| 32:04 | The letter is from the department |
| 32:05 | of architecture to who, what is the purpose of |
| 32:06 | the letter? |
| 32:07 | A. It might be helpful to describe the |
| 32:08 | tenure and the assessment procedures. |
| 32:09 | Q. We are going to talk about that. This |
| 32:10 | is just the reappointment. |
| 32:11 | A. Okay. |
| 32:12 | Q. So I think maybe just talk about the |
| 32:13 | reappointment itself and then definitely we are |
| 32:14 | going to talk about the tenure process. |
| 32:15 | A. Okay. |
| 32:16 | Q. So with the reappointment, after the |
| 32:17 | department reviews it, is it reviewed after |
| 32:18 | that? |
| 32:19 | A. Yes. |
| 32:20 | Q. Okay. |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

32:21  A.  The department discusses the candidate.

32:22      Both procedures, really.  The chair writes a

32:23      summary letter and records a vote.  And then

32:24      this letter gets put with the candidate's

33:01      material.

33:02      And it goes to the next stage of

33:03      assessment, is the personnel committee, which is

33:04      faculty from the other departments in the

33:05      school.  And then they look at it, they assess

33:06      it, they vote, and then it goes to the dean.

33:07  Q.  All right.  So with this, this meeting

33:08      that is the subject of Exhibit P-2, was the vote

33:09      for Professor Veikos's reappointment recorded

33:10      here?

33:11  A.  Yes, it was a unanimous vote.

33:12  Q.  Okay.  So all of the members of the

33:13      standing faculty voted in favor of her

33:14      reappointment?

33:15  A.  Yes, uh-huh.

33:16  Q.  There are some specific aspects of this

33:17      letter I wanted to ask about.  There is a

33:18      reference at the bottom of the third paragraph

33:19      here that says, "During the past few years,

33:20      Cathrine's teaching last broadened beyond

33:21      digital media and representation toward an

33:22      expanded range of interests in materials,

33:23      construction, art practices and exhibition

33:24      design.  This reflects a shift in her research."

34:01      Did you have an understanding at

34:02      the time of her reappointment discussions that

34:03      she was shifting her focus?

34:04  A.  No.  I would probably disagree with this

34:05      assessment.  I think Cathrine was drawing her

34:06      previous experience in to converge with her

34:07      visual studies observations.  So she was -- I

34:08      know this is really arcane and I apologize for

34:09      this.  It is difficult for anyone outside the

34:10      field to understand these nuances.  But I think

34:11      what she was doing is she was looking at

34:12      buildings, drawings of buildings, especially of

34:13      particular people, and talking about how the

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 34:14 | building itself could be thought of as a product | | |
| 34:15 | of a kind of visual study, a visual, a visual | | |
| 34:16 | artifact.  So she was looking at buildings as if | | |
| 34:17 | they were drawings. | | |
| 34:18 | Q.  What was Detlef Mertins background, what | | |
| 34:19 | was his area of focus? | | |
| 34:20 | A.  Detlef Mertins was a well-known | | |
| 34:21 | historian.  Detlef Mertins was a very well | | |
| 34:22 | respected historian, but he came from a rigorous | | |
| 34:23 | background that looked at history as his central | | |
| 34:24 | practice.  He is self-identified.  He describes | | |
| 35:01 | himself very proudly as a historian. | | |
| 35:02 | Q.  Let's take a look at a reference that | | |
| 35:03 | Professor Mertins made in the second page of | | |
| 35:04 | this letter, so that long middle paragraph about | | |
| 35:05 | halfway down there is a sentence that | | |
| 35:06 | reads, "However, many faculty expressed concerns | | |
| 35:07 | about their recent shift in her" -- meaning | | |
| 35:08 | Professor Veikos's -- research to a historical | | |
| 35:09 | monograph whose scholarly scope goes well beyond | | |
| 35:10 | the issues of representation that were her focus | | |
| 35:11 | previously." | | |
| 35:12 | Do you have a recollection of what | | |
| 35:13 | she was working on at the time? | | |
| 35:14 | A.  Yes.  She had begun to become very | | |
| 35:15 | interested in a Brazilian architect, a woman | | |
| 35:16 | architect named Lina Bo Bardi.  And I think her | | |
| 35:17 | reading of this architect's work was through | | |
| 35:18 | this kind of philosophy that she was developing | | |
| 35:19 | about buildings as visual artifacts where the | | |
| 35:20 | construction of the material and the surfaces | | |
| 35:21 | worked in a pictorial way so that the building | | |
| 35:22 | again would be read as image first. | | |
| 35:23 | Now I think as she started doing | | |
| 35:24 | the research, she found a piece of writing that | | |
| 36:01 | Lina Bo Bardi had written that she thought was | | |
| 36:02 | very important to understanding her work.  And | | |
| 36:03 | she was advised that this could be a very good | | |
| 36:04 | way to enter the work in a very deep way. | | |
| 36:05 | And I believe David Leatherbarrow | | |
| 36:06 | advised her to do that, to look at this piece of | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 36:07 | writing and translate it and then to draw her | | |
| | 36:08 | own observations and conclusions.  Because this | | |
| | 36:09 | was a piece of writing that had never been | | |
| | 36:10 | looked at or translated and was not well known. | | |
| | 36:11 | So that was her first foray into | | |
| | 36:12 | this architect's work.  So she went in to | | |
| | 36:13 | translate and tried to reevaluate what that | | |
| | 36:14 | meant. | | |
| | 36:15 | Q. Is it your understanding, was it at the | | |
| | 36:16 | time as well, that the work that Professor | | |
| | 36:17 | Mertins identified as a historical monograph was | | |
| | 36:18 | in fact that project that she was working on? | | |
| | 36:19 | A. Yes, it was. | | |
| | 36:20 | Q. And do you think it was accurate to call | | |
| | 36:21 | it a historical monograph? | | |
| | 36:22 | A. No, I don't think so.  I think that, | | |
| | 36:23 | first of all, she's a contemporary architect. | | |
| | 36:24 | She's not -- it is not like she had a long | | |
| | 37:01 | history, but it was in the past.  But I think | | |
| | 37:02 | what Cathrine was doing was trying to engage her | | |
| | 37:03 | way of thinking through this monograph and in | | |
| | 37:04 | talking about the monograph she had to | | |
| | 37:05 | contextualize it within what was going on | | |
| | 37:06 | politically, socially, culturally in Brazil and | | |
| | 37:07 | Italy where the work took place. | | |
| | 37:08 | So was she trying to be a | | |
| | 37:09 | historian?  No.  But she, and I think like I, | | |
| | 37:10 | something that we share in common and how we | | |
| | 37:11 | think about writing about these things, try to | | |
| | 37:12 | fully contextualize these pieces and what's | | |
| | 37:13 | going on at the moment. | | |
| 38:04 - 42:04 | **Fierro, Annette 2022-08-11** | | 00:04:29 | AF_FINAL.4 |
| | 38:04 | Q. We talked a little while ago about your | | |
| | 38:05 | own tenure probationary process and the fact | | |
| | 38:06 | that you took or were granted after the fact, in | | |
| | 38:07 | a sense, extensions of the probationary period. | | |
| | 38:08 | A. Right. | | |
| | 38:09 | Q. Do you know whether Professor Veikos | | |
| | 38:10 | also took an extension of the probationary | | |
| | 38:11 | period? | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

38:12  A.  Yes, she did.

38:13  Q.  For what purpose, did she have a

38:14     child or --

38:15  A.  For the same, she had a child.  She had

38:16     a child during her probationary period.

38:17  Q.  All right.  I want to switch gears a

38:18     little bit to go into more depth on the process

38:19     you were talking about --

38:20  A.  Okay.

38:21  Q.  -- in terms of the tenure review.

38:22     So you talked to us a little bit

38:23     about what the steps are in reappointment.

38:24  A.  Right.

39:01  Q.  Can you identify the levels of review

39:02     for tenure?

39:03  A.  Right.  Okay, the whole process is

39:04     telescoping.  Because it's assumed that people

39:05     outside of the discipline are not really going

39:06     to have the capacity to evaluate the work.  So

39:07     it begins at the most local of levels.  So when

39:08     the department meets to talk about the

39:09     candidate, the department will talk about the

39:10     colleague as a colleague.  You know, like

39:11     working relationships.  We talk about teaching a

39:12     lot.  We talk about teaching ability.  We talk

39:13     about the service that the candidate has given

39:14     to the school.  And we also talk about the

39:15     candidate's work.

39:16     And that work, you know, I think

39:17     the university correctly asks for a series of

39:18     objective evaluators.  And so the candidate will

39:19     ask for reviewers that they think are able to

39:20     respond to the work, are equipped to respond to

39:21     the work.  The chair suggests a number of

39:22     reviewers that are equipped to respond to the

39:23     work.  And then there are also internal

39:24     reviewers that talk about the work and the

40:01     candidate.

40:02     And so, so the first step is we sit

40:03     around a table very much like this one, and we

40:04     talk about the candidate and we talk about -- we

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 40:05 | look, usually there's like piles of work on the |
| | 40:06 | table and we pass them around.  And we assess |
| | 40:07 | everything all together.  And then the chair -- |
| | 40:08 | then we take a vote after -- it is usually a |
| | 40:09 | blind vote because it is a very delicate |
| | 40:10 | situation.  And then we take a vote. |
| | 40:11 | And after that, the chair |
| | 40:12 | summarizes the discussion of the faculty and |
| | 40:13 | reports the vote to the personnel committee. |
| | 40:14 | The personnel committee gets a |
| | 40:15 | little bit more distant.  Right?  Because now |
| | 40:16 | these are fine artists, these are landscape |
| | 40:17 | architects, and although they are still |
| | 40:18 | tangential to architecture, they can't be |
| | 40:19 | expected to really know, you know, the content |
| | 40:20 | of the work. |
| | 40:21 | But they talk, that's when the |
| | 40:22 | letters become much more important, because they |
| | 40:23 | are the readings of experts to the work itself |
| | 40:24 | that they can lean on. |
| | 41:01 | That becomes, that assessment is |
| | 41:02 | then voted on again, as I said, and then the |
| | 41:03 | chair of the personnel committee writes another |
| | 41:04 | letter.  And all of this goes into the |
| | 41:05 | candidate's file and you'll hear that described |
| | 41:06 | as a dossier.  And so the dossier is just kind |
| | 41:07 | of an accumulation of all of the work, of all of |
| | 41:08 | the letters from the reviewers, from the two |
| | 41:09 | chairs of the departments. |
| | 41:10 | That goes to the dean.  The dean |
| | 41:11 | decides then whether the case is going on.  If |
| | 41:12 | it goes on, he writes a letter and it goes to |
| | 41:13 | the provost committee. |
| | 41:14 | So now, now I think the kind of |
| | 41:15 | logic of this becomes even clearer because the |
| | 41:16 | provost committee is made up of people from all |
| | 41:17 | over the university and the deans.  So I mean |
| | 41:18 | the dean of the law school, for example, is not |
| | 41:19 | expected to know the nuances of architectural |
| | 41:20 | discourse.  That is impossible.  There is |
| | 41:21 | biologists, there's chemists, there's, you know, |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 41:22 | people from the nursing school. And so they | | |
| | 41:23 | have to rely on the letters more than the work | | |
| | 41:24 | itself. Right? | | |
| | 42:01 | And so after all of that, after all | | |
| | 42:02 | of those bodies vote and assess and talk, the | | |
| | 42:03 | provost committee takes the final vote and the | | |
| | 42:04 | candidate is either accepted or denied. | | |
| 42:07 - 49:18 | **Fierro, Annette 2022-08-11** | | 00:07:33 | AF_FINAL.5 |
| | 42:07 | And I want to break down a couple | | |
| | 42:08 | things. So you talked about certain people who | | |
| | 42:09 | were reviewing the work. | | |
| | 42:10 | A. Right. | | |
| | 42:11 | Q. And one of them, I think you talked | | |
| | 42:12 | about the external reviewers. | | |
| | 42:13 | A. Right. | | |
| | 42:14 | Q. Are they sometimes called extramural | | |
| | 42:15 | consultants? | | |
| | 42:16 | A. That's very technical, but I guess. | | |
| | 42:17 | Q. Okay. | | |
| | 42:18 | A. We always call them external reviewers. | | |
| | 42:19 | Q. Okay, great. | | |
| | 42:20 | So I think it is important to know | | |
| | 42:21 | who they are and kind of what role they play in | | |
| | 42:22 | the process, if you can address that. | | |
| | 42:23 | A. Yeah. They are expected to be people of | | |
| | 42:24 | very high profiles. They are expected to be | | |
| | 43:01 | people who know the subject matter that the | | |
| | 43:02 | candidate is writing on. They are people who | | |
| | 43:03 | are expected to have significant reputations, | | |
| | 43:04 | especially in our peer institutions. Because | | |
| | 43:05 | that becomes very important the higher you go. | | |
| | 43:06 | Right? | | |
| | 43:07 | Q. Okay. | | |
| | 43:08 | A. I think especially, you know, at an Ivy | | |
| | 43:09 | League school it is important to have Ivy League | | |
| | 43:10 | external reviewers. That's our conceit. | | |
| | 43:11 | Q. Sure. And the idea, let me make sure I | | |
| | 43:12 | understand it, is that these professors at other | | |
| | 43:13 | universities are reviewing the materials that is | | |
| | 43:14 | in the candidate's dossier? | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

43:15   A.   Right.

43:16   Q.   Okay.

43:17   A.   Right.  The candidate collects the

43:18        dossier and then the chair and the staff of the

43:19        school send that dossier out to all of the

43:20        external reviewers, and internal, yeah.

43:21   Q.   Okay.  Have you been an external

43:22        reviewer for candidates?

43:23   A.   I have.  I have been an external

43:24        reviewer.

44:01   Q.   Have you ever declined to review a

44:02        candidate?

44:03   A.   I have declined to review a candidate.

44:04   Q.   In what circumstance?

44:05   A.   I didn't feel qualified to remark on the

44:06        subject matter in a way.  I mean these are very

44:07        important documents, so I didn't, you know,

44:08        think I was qualified.

44:09   Q.   All right.  You talked also about the

44:10        concept of internal reviews.

44:11   A.   Uh-huh.

44:12   Q.   Can you describe who does an internal

44:13        review and what role they play?

44:14   A.   There are two kind of reviewers.

44:15        There's an ad hoc committee.  Right now we have

44:16        sort of changed that, it is personnel committee

44:17        within the department, but it is also like an

44:18        ad hoc committee.  And they objectively review

44:19        the number of publications, the body of work.

44:20        And then the internal reviewers

44:21        come from the faculty and we have to talk about

44:22        just about everything.  The teaching, the

44:23        colleagueship, the student reviewers, the

44:24        syllabi, and then the written work or the design

45:01        work.

45:02   Q.   Okay.

45:03        All right, and that information or

45:04        the assessments are put into written letters

45:05        that are added?

45:06   A.   Yes, uh-huh.

45:07   Q.   All right, so we talked a little bit

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| | 45:08 | about, then, the faculty meeting and the voting |
| | 45:09 | that happens. |
| | 45:10 | So at the end of a meeting, there |
| | 45:11 | is actually a vote amongst the faculty members |
| | 45:12 | about whether they approve or don't approve a |
| | 45:13 | candidate for tenure? |
| | 45:14 | A.  Yes, uh-huh. |
| | 45:15 | Q.  Okay. |
| | 45:16 | And then the faculty's assessment |
| | 45:17 | of that candidate, how is that then communicated |
| | 45:18 | up the chain, is it in a letter? |
| | 45:19 | A.  Yes, it's in a letter from the chair. |
| | 45:20 | So they are responsible for accurately |
| | 45:21 | summarizing the discussion of the faculty and |
| | 45:22 | then reporting on the vote. |
| | 45:23 | Q.  Is there a process in place for the |
| | 45:24 | members of the faculty to review that letter |
| | 46:01 | before it goes up to the next level of review? |
| | 46:02 | A.  Procedurally, I believe they are asked |
| | 46:03 | to circulate a draft.  Sometimes it happens. |
| | 46:04 | Sometimes it doesn't.  That letter does go into |
| | 46:05 | a folder that is then available for the faculty |
| | 46:06 | to look at. |
| | 46:07 | Q.  Okay. |
| | 46:08 | A.  Yeah. |
| | 46:09 | Q.  After the faculty meets and votes on a |
| | 46:10 | candidate's application for promotion to tenure, |
| | 46:11 | are the faculty members involved in the next |
| | 46:12 | steps? |
| | 46:13 | A.  No.  After that point, that's the last |
| | 46:14 | we know until the vote of the provost. |
| | 46:15 | Q.  Okay.  All right, with respect to the |
| | 46:16 | personnel committee -- |
| | 46:17 | A.  Right. |
| | 46:18 | Q.  -- who populates the personnel |
| | 46:19 | committee?  And is that a committee that is |
| | 46:20 | school wide -- |
| | 46:21 | A.  Yes. |
| | 46:22 | Q.  -- as opposed to -- okay. |
| | 46:23 | A.  It is school wide and it is full |
| | 46:24 | professors that sit on that committee. |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

47:01   Q.   Okay.  So it could be, if it is a tenure

47:02   candidate in architecture, it could be full

47:03   professors from architecture --

47:04   A.   Yes.

47:05   Q.   -- that serve?

47:06   A.   Yes.

47:07   Q.   Okay.  All right.

47:08   Let's focus again on the department

47:09   of architecture because that's where Cathrine

47:10   was considered.

47:11   What is your understanding of how

47:12   much in terms of publications a tenure candidate

47:13   must produce in order to be promoted with tenure

47:14   at Penn?

47:15   A.   This is not a, this is not a concrete

47:16   list.  In fact, I think Penn goes to an

47:17   extraordinary length not to have a concrete list

47:18   because they want to have leeway in subjectively

47:19   evaluating the candidate.

47:20   But I would say a typical package

47:21   would be a dozen or so peer-reviewed articles.

47:22   And at Penn for someone writing in an academic

47:23   field, you are expected to have a book which has

47:24   been accepted by a publisher for publication by

48:01   an academic press.  So a peer-reviewed press.

48:02   Q.   Okay.  Are there higher expectations for

48:03   people in certain areas of focus or people with

48:04   different educational backgrounds?

48:05   A.   Yes.  As time has gone by, if you have a

48:06   Ph.D., and so this would be, typically be

48:07   history theory or people who have doctorates in

48:08   technology of some kind, you are expected to

48:09   publish your dissertation and then also have a

48:10   second book accepted or almost ready to be

48:11   submitted, but almost totally produced, yes.

48:12   Q.   Okay.  And what is the basis for your

48:13   understanding of what that standard of

48:14   production is?

48:15   A.   That's a kind of funny thing.

48:16   Q.   Okay.

48:17   A.   I was taken aside by a full professor

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 48:18 | when I first arrived at Penn.  His name is Marco | | |
| | 48:19 | Frascari.  He is no longer there.  He was a | | |
| | 48:20 | very, you know, wonderful colleague who said, | | |
| | 48:21 | you know, that you have to have a book.  If you | | |
| | 48:22 | don't have a book, you will not get tenure. | | |
| | 48:23 | So that was, that way, anyway, the | | |
| | 48:24 | inside scoop, but it was just sort of well- | | |
| | 49:01 | acknowledged reality, yeah. | | |
| | 49:02 | Q.  At the time of your own tenure review, | | |
| | 49:03 | did you have a single-authored book published? | | |
| | 49:04 | A.  I had a book accepted by MIT Press which | | |
| | 49:05 | was then being -- it was going the last day to | | |
| | 49:06 | graphic design.  So I had a contract, I had | | |
| | 49:07 | reviewers.  I had the graphic design almost | | |
| | 49:08 | done.  And so it was done.  But even then I had | | |
| | 49:09 | to put the contract in and I had to prove all | | |
| | 49:10 | kinds of things, but yeah. | | |
| | 49:11 | Q.  And it had not yet been published? | | |
| | 49:12 | A.  It had not yet been published. | | |
| | 49:13 | Q.  Okay.  I want to talk a little bit about | | |
| | 49:14 | the records, publication records of the other | | |
| | 49:15 | tenured candidates where you participated in | | |
| | 49:16 | voting on their tenure reviews -- | | |
| | 49:17 | A.  Okay. | | |
| | 49:18 | Q.  -- in the department. | | |
| 60:09 - 68:08 | **Fierro, Annette 2022-08-11** | | 00:07:38 | AF_FINAL.6 |
| | 60:09 | All right, this is Exhibit P-5. | | |
| | 60:10 | Can you tell us whose department | | |
| | 60:11 | letter and CV at tenure review this exhibit | | |
| | 60:12 | relates to? | | |
| | 60:13 | A.  This relates to the promotion of Ali | | |
| | 60:14 | Rahim to associate professor with tenure, and | | |
| | 60:15 | that year was 2006. | | |
| | 60:16 | Q.  Did you participate in the facility | | |
| | 60:17 | vote? | | |
| | 60:18 | A.  Yes, I did. | | |
| | 60:19 | Q.  Who was the department chair at the | | |
| | 60:20 | time? | | |
| | 60:21 | A.  David Leatherbarrow was the | | |
| | 60:22 | department -- no, no.  I'm sorry.  Detlef | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 60:23 | Mertins was the department chair. | | |
| | 60:24 | Q.  Okay. | | |
| | 61:01 | A.  Right. | | |
| | 61:02 | I am sorry about that, but David | | |
| | 61:03 | has been chair for several times.  He has been | | |
| | 61:04 | interim chair.  It is a kind of an interwoven | | |
| | 61:05 | history. | | |
| | 61:06 | Q.  Sure, no problem. | | |
| | 61:07 | A.  So I am sorry to make a mistake. | | |
| | 61:08 | Q.  Thank you for clarifying. | | |
| | 61:09 | A.  Right. | | |
| | 61:10 | Q.  What is Ali Rahim's field or | | |
| | 61:11 | subspecialty? | | |
| | 61:12 | A.  Ali Rahim is a practitioner.  He has an | | |
| | 61:13 | office.  He is sort of known as an experimental | | |
| | 61:14 | practitioner.  For the first few years he didn't | | |
| | 61:15 | do any buildings.  He did drawings.  He did | | |
| | 61:16 | designs of things that might be built, would be | | |
| | 61:17 | built. | | |
| | 61:18 | It hasn't been until very recently | | |
| | 61:19 | that he started building quite a bit in China. | | |
| | 61:20 | Q.  Okay. | | |
| | 61:21 | A.  Yeah. | | |
| | 61:22 | Q.  And Professor Rahim's gender is? | | |
| | 61:23 | A.  Male. | | |
| | 61:24 | Q.  I want to look at the letter itself, | | |
| | 62:01 | which is, I guess it is the second page of P-5. | | |
| | 62:02 | The first paragraph. | | |
| | 62:03 | What was the vote of the faculty | | |
| | 62:04 | for Professor Rahim's tenure review? | | |
| | 62:05 | A.  Could you direct me to where? | | |
| | 62:06 | Q.  Sure. | | |
| | 62:07 | A.  Oh, yes.  Six in favor and three | | |
| | 62:08 | against. | | |
| | 62:09 | Q.  Okay.  And did you vote -- what was your | | |
| | 62:10 | vote in this case, if you recall? | | |
| | 62:11 | A.  I voted in favor. | | |
| | 62:12 | Q.  There is a reference in the middle of | | |
| | 62:13 | the second paragraph of that same letter.  It | | |
| | 62:14 | says, "He has authored a monograph on his work, | | |
| | 62:15 | Catalytic Formations. | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|
| 62:16 | Is it your understanding that that |
| 62:17 | was the single-authored publication that he had |
| 62:18 | as of the time of the tenure review? |
| 62:19 | A. Yes. |
| 62:20 | Q. And so when it says it is about his |
| 62:21 | work, help me understand how that is done. Was |
| 62:22 | he writing about his designs? |
| 62:23 | A. Yes. He was publishing his design work |
| 62:24 | and then he was also writing about it. |
| 63:01 | Sometimes a monograph will have |
| 63:02 | other people write about the work, but in this |
| 63:03 | particular case he wrote about his own work. I |
| 63:04 | think there was an introduction by someone else. |
| 63:05 | Q. Okay. |
| 63:06 | A. Yeah. |
| 63:07 | Q. All right, so the vote in this case was |
| 63:08 | six in favor and three against. |
| 63:09 | A. Right. |
| 63:10 | Q. If we can look at the end of Professor |
| 63:11 | Mertins' letter, the last paragraph he is |
| 63:12 | summarizing, I think, the faculty. |
| 63:13 | It says, "The majority of faculty |
| 63:14 | concluded that Ali Rahim has met all the |
| 63:15 | criteria for tenure as associate professor at |
| 63:16 | Penn." |
| 63:17 | And then Professor Mertins has |
| 63:18 | written at the end of that paragraph, "I support |
| 63:19 | this promotion without reservation." |
| 63:20 | A. Right. |
| 63:21 | Q. In your experience, is it important to |
| 63:22 | upper level review that the chair, the |
| 63:23 | department chair's letter support a candidate |
| 63:24 | without reservation in order to be successful? |
| 64:01 | A. It is essential. |
| 64:02 | Q. Let's look at another exhibit. |
| 64:03 | What we are showing you now is |
| 64:04 | Exhibit P-6. It is also a department letter and |
| 64:05 | a CV. |
| 64:06 | Can you tell us which tenure |
| 64:07 | candidate this relates to? |
| 64:08 | A. This was for Franca Trubiano for |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

64:09   promotion to associate professor with tenure.

64:10   Q.   And did you participate in the faculty

64:11   vote when Professor Trubiano was considered for

64:12   tenure?

64:13   A.   I did.

64:14   Q.   Who was the department chair at that

64:15   time?

64:16   A.   It was David Leatherbarrow at that time.

64:17   Q.   Can you take a look at the second page

64:18   of the department letter.

64:19   A.   Oh, no, I am sorry.  It was Winka

64:20   Dubbeldam.  I am so sorry.

64:21   Q.   That is okay.  Professor Leatherbarrow

64:22   had that role for a while.

64:23   A.   Yeah, I was actually in London, but I

64:24   participated remotely then.

65:01   Q.   Okay, I was going to ask if --

65:02   A.   Yes.

65:03   Q.   -- we take a look at the first paragraph

65:04   of that letter.

65:05   A.   Yes.

65:06   Q.   There is a listing there of the people

65:07   who are attending and it says you participated

65:08   remotely.

65:09   A.   And I also wrote an internal letter.  So

65:10   yes --

65:11   Q.   Okay.

65:12   A.   -- it was Winka Dubbeldam.

65:13   Q.   Okay.  And what is Professor Trubiano's

65:14   field?

65:15   A.   Professor Trubiano, her field now is in

65:16   technology, in building construction, and

65:17   particularly in the industry of building

65:18   construction.  So she writes about that.  She

65:19   writes books about that.

65:20   She didn't start in that.  She has

65:21   a Ph.D. that was all history theory.  She wrote

65:22   a huge dissertation on Piranesi, which is a very

65:23   historical Italian figure.

65:24   Q.   Did she change her focus to building

66:01   technology at the time of her tenure-track

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

66:02    appointment?

66:03  A.  No.  She changed it.  She applied in

66:04    building technologies and there was a lot of

66:05    discussion then about this also.  But she was

66:06    appointed in technology.

66:07  Q.  Professor Trubiano's gender is?

66:08  A.  Female.

66:09  Q.  Does she have children?

66:10  A.  No.

66:11  Q.  Let's look at her CV for a minute.  I

66:12    want to make sure I understand the publications.

66:13  A.  Okay.

66:14  Q.  I think we have to move to Page 4 of the

66:15    CV, which looks likes there is a little number

66:16    at the bottom of the page, it says "Penn 6247"

66:17    on it.

66:18  A.  Right, uh-uh.

66:19  Q.  At the top it says "Publications:

66:20    Books."

66:21  A.  Right.

66:22  Q.  There are three, so I wanted to make

66:23    sure I understood this.  So in 2012, is it

66:24    correct that that book, her role was as an

67:01    editor, not the author?

67:02  A.  Of building theories?

67:03  Q.  Design and Construction, the one in

67:04    2012?

67:05  A.  Yes, uh-huh, that was a series of essays

67:06    by other people.

67:07  Q.  Okay.

67:08  A.  Yes.

67:09  Q.  And that was published by?

67:10  A.  Routledge in 2012.

67:11  Q.  Okay.  And is that a press that meets

67:12    the criteria for tenure?

67:13  A.  Routledge is certainly academic, yes.

67:14  Q.  And then what is your understanding

67:15    about the 2014 entry for publication?

67:16  A.  I believe it was the same book that had

67:17    been translated into Korean.  So it would have

67:18    been the same book.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

|  | 67:19   Q.   So the same book where she was the | | |
|  | 67:20          editor? | | |
|  | 67:21   A.   Right, uh-huh, uh-huh. | | |
|  | 67:22   Q.   And then the one at the top, 2016. | | |
|  | 67:23   A.   Right. | | |
|  | 67:24   Q.   Building Theories.  There is a reference | | |
|  | 68:01          there, it says "Single Author Manuscript." | | |
|  | 68:02   A.   Right. | | |
|  | 68:03   Q.   Okay.  At what point is that in the | | |
|  | 68:04          process? | | |
|  | 68:05   A.   That was technically forthcoming.  It | | |
|  | 68:06          had been peer-reviewed.  She cites Routledge so | | |
|  | 68:07          I assume it had a contract and was forthcoming | | |
|  | 68:08          the same year that she went up. | | |

| 72:06 - 72:20 | **Fierro, Annette 2022-08-11** | 00:00:36 | AF_FINAL.7 |
|  | 72:06          At the time of a tenure review, is | | |
|  | 72:07          there a consideration of a candidate's career | | |
|  | 72:08          trajectory? | | |
|  | 72:09   A.   Yes, certainly. | | |
|  | 72:10   Q.   Okay. | | |
|  | 72:11   A.   Yes, certainly. | | |
|  | 72:12   Q.   And what is the expectation at the time | | |
|  | 72:13          of the tenure review? | | |
|  | 72:14   A.   Well, I think Penn, as a leading | | |
|  | 72:15          institution, wants to see people become very | | |
|  | 72:16          famous in whatever they are doing.  This helps | | |
|  | 72:17          the reputation of the university.  And so we are | | |
|  | 72:18          both evaluating on the work that's been done and | | |
|  | 72:19          does it look like this person is going to be an | | |
|  | 72:20          important person in the field. | | |

| 79:11 - 80:11 | **Fierro, Annette 2022-08-11** | 00:01:00 | AF_FINAL.8 |
|  | 79:11   Q.   Professor Fierro, when you were being | | |
|  | 79:12          considered for tenure at Penn, did you have | | |
|  | 79:13          doubts about whether you would be successful? | | |
|  | 79:14   A.   Well, I think everyone has doubts to a | | |
|  | 79:15          certain degree.  It is a very stressful time. | | |
|  | 79:16          Everybody is talking about you, whether you are | | |
|  | 79:17          good enough.  It is really, really stressful. | | |
|  | 79:18          But I had been accepted by MIT | | |
|  | 79:19          Press and that's sort of the gold standard for | | |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 79:20 | academic publications.  So I had hoped that that | | |
| | 79:21 | would be it, yes. | | |
| | 79:22 | Q.  In your experience at Penn with your | | |
| | 79:23 | colleagues, is it typical for tenure candidates | | |
| | 79:24 | to look for other jobs during the tenure review | | |
| | 80:01 | process? | | |
| | 80:02 | A.  That always happens, yeah.  I know | | |
| | 80:03 | Andrew Saunders already had a position lined up | | |
| | 80:04 | in case he didn't get tenure.  A lot of people | | |
| | 80:05 | do that. | | |
| | 80:06 | You know, because they will | | |
| | 80:07 | basically be without a job if they don't, if | | |
| | 80:08 | they don't have another position. | | |
| | 80:09 | Q.  All right, we are going to talk about | | |
| | 80:10 | Cathrine Veikos's tenure review process -- | | |
| | 80:11 | A.  Okay. | | |
| 80:17 - 80:20 | **Fierro, Annette 2022-08-11** | | 00:00:13 | AF_FINAL.9 |
| | 80:17 | Did you observe or experience any | | |
| | 80:18 | bias against women or bias against women with | | |
| | 80:19 | young children in the department before | | |
| | 80:20 | Professor Veikos was reviewed for tenure? | | |
| 82:11 - 84:19 | **Fierro, Annette 2022-08-11** | | 00:02:32 | AF_FINAL.10 |
| | 82:11 | I would say that my own case, you | | |
| | 82:12 | know, there are several times where it was just | | |
| | 82:13 | clear that, you know, they were clueless about | | |
| | 82:14 | what it meant to have a pregnant faculty member. | | |
| | 82:15 | I remember when I was pregnant with | | |
| | 82:16 | my first child -- no, it was my second child | | |
| | 82:17 | because it was December -- David, who was then | | |
| | 82:18 | acting chair, asked me -- it was December.  My | | |
| | 82:19 | child was born on New Years Eve, so I was eight | | |
| | 82:20 | months pregnant and I was enormous and I was | | |
| | 82:21 | sitting in his office.  And he advised me that I | | |
| | 82:22 | should really go to Japan over Christmas to | | |
| | 82:23 | further my research. | | |
| | 82:24 | And I remember joking saying, you | | |
| | 83:01 | know, David, I don't think anyone is going to | | |
| | 83:02 | sell me a ticket now, do you? | | |
| | 83:03 | BY MS. UEBLER: | | |
| | 83:04 | Q.  And when you make reference to "David," | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|---|
| | 83:05 | who are you referring to? |
| | 83:06 | A.  David Leatherbarrow, who was the |
| | 83:07 | chairman. |
| | 83:08 | He then also went on to ask me what |
| | 83:09 | I was going to be researching while I was on my |
| | 83:10 | maternity leave. |
| | 83:11 | And, you know, it just becomes very |
| | 83:12 | evident that they have no idea that if you are a |
| | 83:13 | young mother with a newborn, you are not going |
| | 83:14 | to be doing any research, right.  You are going |
| | 83:15 | to be trying to make yourself a sandwich.  There |
| | 83:16 | is no time or mind space for research. |
| | 83:17 | I remember coming in with a newborn |
| | 83:18 | who was colicky and I had her in a strap and she |
| | 83:19 | was screaming, and I was just there to check my |
| | 83:20 | mail.  And David started going on and on about, |
| | 83:21 | you know, his latest topic of his book.  And it |
| | 83:22 | was just, you know, another indication that he |
| | 83:23 | just didn't understand that I couldn't possibly |
| | 83:24 | be listening to this in a serious way.  I had a |
| | 84:01 | screaming infant. |
| | 84:02 | There was another time where I had |
| | 84:03 | to bring my baby in to a student review.  Again, |
| | 84:04 | there is a kind of informal review, student |
| | 84:05 | projects.  I had a lot of trouble breastfeeding. |
| | 84:06 | She wasn't taking a bottle. |
| | 84:07 | The professor of the review said |
| | 84:08 | just bring the baby in.  It is okay. |
| | 84:09 | So I ran home and I brought the |
| | 84:10 | baby and she was great.  She didn't cry, but she |
| | 84:11 | was tucked into a kind of swaddle.  And I |
| | 84:12 | remember he made a nasty remark about that and |
| | 84:13 | that how would the students be able to speak to |
| | 84:14 | me with a baby in the room. |
| | 84:15 | It was just a lot of really |
| | 84:16 | insensitive stuff.  It was just, it just showed |
| | 84:17 | that they were not familiar.  I mean I was the |
| | 84:18 | only faculty member who had really ever been |
| | 84:19 | pregnant there. |

| 94:07 - 94:18 | **Fierro, Annette 2022-08-11** | 00:00:43 | AF_FINAL.11 |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 94:07 | Q. Was there a time when the university | | AF_FINAL.11 |
| | 94:08 | conducted training to combat the potential for | | |
| | 94:09 | gender bias in selection decisions? | | |
| | 94:10 | A. Yes. And in fact, I was deeply involved | | |
| | 94:11 | in that. It was around 2010 where the | | |
| | 94:12 | university was very concerned that women were | | |
| | 94:13 | not being promoted to higher levels of academic | | |
| | 94:14 | positions, and they formed, the provost formed a | | |
| | 94:15 | committee for women and it was titled The | | |
| | 94:16 | Women's Forum. And there was a set of founding | | |
| | 94:17 | members from women all over the university, and | | |
| | 94:18 | I was one of those women. | | |
| 95:23 - 97:01 | **Fierro, Annette 2022-08-11** | | 00:01:22 | AF_FINAL.12 |
| | 95:23 | Q. In your capacity as a member of the | | |
| | 95:24 | women's forum, did you participate in any | | |
| | 96:01 | training that the university put on on the issue | | |
| | 96:02 | of gender bias? | | |
| | 96:03 | A. Yes, there was a lot of training on | | |
| | 96:04 | gender bias. There were external speakers | | |
| | 96:05 | called in from all over the country that had | | |
| | 96:06 | documented studies of gender bias. There were | | |
| | 96:07 | many statistical studies about the dynamics of | | |
| | 96:08 | the academy. | | |
| | 96:09 | And especially the concern was the | | |
| | 96:10 | kind of, the kind of fallout of women especially | | |
| | 96:11 | at the tenure review level because a percentage | | |
| | 96:12 | of untenured assistant professors, you know, | | |
| | 96:13 | everyone was trying to hire more women, but they | | |
| | 96:14 | would hit the tenure assessments and then the | | |
| | 96:15 | percentage would drop dramatically. | | |
| | 96:16 | And so there was a lot of talk | | |
| | 96:17 | about how to prevent that, how to give women | | |
| | 96:18 | equitable treatment, but also the unconscious, | | |
| | 96:19 | there was, you know, unconscious bias training, | | |
| | 96:20 | you know, how we all have to be careful, both | | |
| | 96:21 | men and women on how we evaluate and the kind of | | |
| | 96:22 | built-in prejudices that we have when we think | | |
| | 96:23 | about women versus men. Things like names and, | | |
| | 96:24 | you know, all kind of things that, you know, | | |
| | 97:01 | affect us. | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 97:15 - 98:11 | **Fierro, Annette 2022-08-11** | 00:00:49 | AF_FINAL.13 |

97:15   Q.   Okay, so I was going to ask you about
97:16        the intended audience.  Did you sit in a
97:17        presentation in connection with this effective
97:18        faculty searches material?
97:19   A.   I sat in many presentations at the
97:20        university level and I gave this presentation to
97:21        my own faculty --
97:22   Q.   Okay.
97:23   A.   -- as I was asked to do.
97:24   Q.   Okay.  And the name on the front of this
98:01        is Lynn Hollen Lees."
98:02   A.   Right.
98:03   Q.   And who was she at the time?
98:04   A.   She was the vice provost for faculty at
98:05        that time.
98:06   Q.   Do you have an understanding of what her
98:07        role of vice provost of faculty is?
98:08   A.   She essentially leads the faculty.  The
98:09        faculty senate.  She supervises all things which
98:10        have to do with the faculty across the
98:11        university.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 106:08 - 109:08 | **Fierro, Annette 2022-08-11** | 00:02:56 | AF_FINAL.14 |

106:08   Q.   Okay.
106:09        I want to go back to that slide
106:10        deck that Lynn Lee's name is on.
106:11   A.   Okay.
106:12   Q.   So you had said to us that you brought
106:13        some of the training back to your department?
106:14   A.   Right.
106:15   Q.   Was it the training on faculty searches?
106:16   A.   Yes.  In fact, it was this slide
106:17        presentation.
106:18   Q.   Okay.
106:19   A.   Yeah, yeah.
106:20   Q.   Can you tell us about that experience
106:21        when you talked about this training within the
106:22        department of architecture?
106:23   A.   Yeah.  It was very distressing.  You
106:24        know, this has been -- this is not speculation.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

107:01     This is fact.  These are academic reports that
107:02     have -- that come from many different kinds of
107:03     studies and this was coming down as a, you know,
107:04     an important piece of the university's agenda.
107:05     And many listened politely.  And one even said,
107:06     oh, that's just complete bullshit.  You know,
107:07     they didn't want to imagine that this could be
107:08     true.
107:09     And I was kind of shocked, you
107:10     know.  And I went back to the women's forum and
107:11     said, well, this is what happened.  And they
107:12     were shocked too.  Like, you know, who says that
107:13     in a presentation of academic material.
107:14  Q.  So let's go back to the faculty meeting
107:15     itself.
107:16     Who was in the room when you were
107:17     making this presentation?
107:18  A.  The standing faculty.
107:19  Q.  And can you identify who by name they
107:20     were at the time?
107:21  A.  I don't know who was there at that
107:22     particular meeting.
107:23  Q.  Okay.  Okay.  Who was it that made a
107:24     comment about it?
108:01  A.  It was Witold Rybczynski.
108:02  Q.  And was he a tenured professor?
108:03  A.  He was a full tenured professor, yes.
108:04  Q.  Do you recall Cathrine Veikos speaking
108:05     at that meeting?
108:06  A.  I do.  Again, she and I were the only
108:07     females in the room.  And this was -- Marilyn
108:08     never came to our meetings and Marion Weiss
108:09     never came to meetings either.  So I mean
108:10     Cathrine and I were the only women and she was,
108:11     you know, she's educated in these matters.  And
108:12     so she objected to that.  And so she supported
108:13     me and I was grateful for it.  I was grateful
108:14     that she supported the studies and the
108:15     importance of these matters.
108:16  Q.  Let's take a look at another exhibit.
108:17     You can put that one aside.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

108:18  A.  Okay.

108:19  Q.  I am showing you what has been marked as

108:20       P-14.

108:21  A.  Okay.

108:22  Q.  Can you tell us what this document is?

108:23  A.  It was the minutes of a faculty meeting.

108:24       Although this looks like it was not just

109:01       standing because there are several people in

109:02       here who are not standing faculty.  Julie

109:03       Beckman is not standing.  Lindsay is not

109:04       standing.

109:05  Q.  Just so we can confirm admissibility of

109:06       the exhibit.

109:07  A.  Yes, it is minutes of a faculty meeting

109:08       taken on December 1st.

| 109:17 - 112:04 | **Fierro, Annette 2022-08-11** | 00:02:39 | AF_FINAL.15 |
|---|---|---|---|

109:17  Q.  P-14, are these the minutes from the

109:18       meeting you were just describing to us?

109:19  A.  Yes, uh-huh.

109:20  Q.  And --

109:21  A.  I will actually correct myself.  She was

109:22       not the only woman there because there are other

109:23       non-standing faculty.

109:24  Q.  Was Cathrine Veikos the only other woman

110:01       you recalled speaking at the meeting?

110:02  A.  Yes, uh-huh.

110:03  Q.  Who was the chair at this point?

110:04  A.  The chair was Bill Braham.

110:05  Q.  Did the transition from chair go from

110:06       Detlef Mertins to Bill Braham?

110:07  A.  Yes.  There was a little confusion when

110:08       he was acting chair and then he became official

110:09       chair, interim chair.  There was all kinds of --

110:10  Q.  Okay.

110:11  A.  Yeah, but he was, yes.

110:12  Q.  Okay.  He had been associate chair

110:13       before that?

110:14  A.  He had been associate chair, yeah.

110:15  Q.  Okay.  All right, so the discussion,

110:16       let's look at the discussion towards the bottom

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 110:17 | of the first page. This was about a specific | | |
| | 110:18 | search of an assistant professor; is that right? | | |
| | 110:19 A. | Right. | | |
| | 110:20 Q. | Okay. And on the second page, I guess | | |
| | 110:21 | it is the first full paragraph, which is just a | | |
| | 110:22 | sentence, can you read that out loud for the | | |
| | 110:23 | jury, please? | | |
| | 110:24 A. | "The concept"? | | |
| | 111:01 Q. | Yes. | | |
| | 111:02 A. | "The concept of objective bias was | | |
| | 111:03 | raised but discounted by the committee, | | |
| | 111:04 | especially in terms of gender, because did not | | |
| | 111:05 | have this information to be biased by." I guess | | |
| | 111:06 | "because they," but the "they" is not in there, | | |
| | 111:07 | right. | | |
| | 111:08 Q. | Okay. This idea, concept of objective | | |
| | 111:09 | bias, not to be biased by, did that make any | | |
| | 111:10 | sense to you? | | |
| | 111:11 A. | No, it didn't, because we had just gone | | |
| | 111:12 | over the importance of even names and the names | | |
| | 111:13 | are on the files, so of course we knew the | | |
| | 111:14 | gender. | | |
| | 111:15 Q. | Was it your understanding that this is a | | |
| | 111:16 | reference, this is reference to the unconscious | | |
| | 111:17 | bias training you were doing? | | |
| | 111:18 A. | Yes, uh-huh. Yes. | | |
| | 111:19 Q. | So this was as of December of 2010. | | |
| | 111:20 A. | Right. | | |
| | 111:21 Q. | How did that relate in timing to when | | |
| | 111:22 | Cathrine Veikos was first evaluated for tenure? | | |
| | 111:23 A. | I think she was evaluated in 2011, | | |
| | 111:24 | correct? Yes. Yes. | | |
| | 112:01 | So she was evaluated after this. | | |
| | 112:02 Q. | Was it in the same academic cycle? | | |
| | 112:03 A. | Yes, definitely, yeah. Maybe what? A | | |
| | 112:04 | month before? Two months before? Yeah. | | |
| 112:15 - 126:22 | **Fierro, Annette 2022-08-11** | 00:16:09 | AF_FINAL.16 |
| | 112:15 Q. | Professor Fierro, I now want to turn to | | |
| | 112:16 | some questions about the tenure review process | | |
| | 112:17 | when Cathrine Veikos was reviewed for tenure. | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

112:18 Who was the dean of the school of

112:19 design at that time?

112:20 A. Marilyn Taylor was.

112:21 Q. Okay. We talked about her before, but

112:22 can you give me just a sense of what her

112:23 background was before she came to Penn?

112:24 A. Marilyn Taylor was a senior person at

113:01 Skidmore Owings & Merrill in New York, which is

113:02 a very large corporate firm. She was known as

113:03 an urbanist and as an architect, but she was not

113:04 an academic.

113:05 Q. And who was the department chair?

113:06 A. It was Bill Braham. He was then, you

113:07 know, full interim chair.

113:08 Q. Okay. And did you participate in a

113:09 reviewer capacity for Professor Veikos's review?

113:10 A. Yes, I did.

113:11 Q. Okay.

113:12 A. I wrote an internal letter, yes.

113:13 Q. Okay. And we talked about the fact of

113:14 these review letters earlier, but can you give

113:15 the jury an understanding of what do you do when

113:16 you prepare an internal review letter?

113:17 A. You read everything that they have ever

113:18 written. So all of the articles and

113:19 manuscripts.

113:20 You review the syllabi of their

113:21 courses. You review their student work in those

113:22 courses. You review the external letters that

113:23 have been sent in which pertain to their work.

113:24 Q. And then what is the internal letter,

114:01 then, your feedback on the work?

114:02 A. Yes, my feedback on the work, but also

114:03 in this case is Cathrine as a colleague, as a

114:04 teacher, which is, you know, very important at

114:05 the department level.

114:06 Q. Okay. All right, let's take a look at

114:07 some letters.

114:08 I am showing you --

114:09 A. This print is --

114:10 Q. I know. I apologize in advance for the

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

114:11  way our colleagues over at Penn produced this to

114:12  us.

114:13  A.  Okay.

114:14  Q.  We are looking at Exhibit P-15.  Can you

114:15  confirm what these letters are?

114:16  A.  Yes.  This would be an external review

114:17  letter.  The first one is from Illa Berman, who

114:18  was the director of the California College of

114:19  the Arts when she wrote this.

114:20  Q.  And the review letter relates to who?

114:21  A.  The review letter relates to Cathrine

114:22  Veikos, who was up for tenure.  So this was

114:23  reviewing her dossier.

114:24  Q.  Okay.  So I want to take a look at a

115:01  couple of things.  So you identified Professor

115:02  Berman as one of the authors of the review

115:03  letters.

115:04  A.  Right.

115:05  Q.  Taking a look at the first paragraph --

115:06  A.  Okay.

115:07  Q.  -- of her letter, can you just, the jury

115:08  will be looking at it, but could you review,

115:09  read for us the first two sentences, please?

115:10  A.  "Professor Veikos's research and

115:11  teaching is broadly focused on architecture's

115:12  role as a medium for visual and material

115:13  expression, an area of study with a wide range

115:14  of scholarship and a deep history.  Her recent

115:15  contributions to this field are certainly

115:16  significant and far reaching in scope and have

115:17  taken many forms."

115:18  Q.  All right, and then towards the end of

115:19  that same first paragraph she seems to sum up, I

115:20  think, her opinion.  Can you read that as well?

115:21  A.  "In summary, her accomplishments are

115:22  certainly at or beyond a level of what might be

115:23  expected of other scholars, professors and

115:24  practitioners at a comparable stage in their

116:01  careers and given her vitae she would no doubt

116:02  be a candidate for the rank of associate

116:03  professor with an architectural school at a

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

116:04    comparable advanced educational institution."

116:05  Q.  So did you have an understanding -- I

116:06    know your specialty is not visual studies --

116:07  A.  Right.

116:08  Q.  -- but did you have an understanding of

116:09    Professor Berman's reputation within

116:10    architecture?

116:11  A.  Professor Berman at that moment was the

116:12    chair of California College of the Arts.  I also

116:13    know her to have been the chair at Tulane.  I

116:14    have known her for many years because of

116:15    presentations that we both gave in Halifax

116:16    years, years before where she presented her

116:17    dissertation at Harvard, which was very much a

116:18    study in the visual matter of architecture.

116:19  Q.  All right.  It looks like the second --

116:20    to make it easy, these are in alphabetical

116:21    order.

116:22  A.  Good.

116:23  Q.  The second letter was written by

116:24    Christine Boyer.

117:01    Is that also an external review

117:02    letter for Cathrine's --

117:03  A.  This is also an external review letter.

117:04    I think Christine Boyer is at Princeton and she

117:05    is a historian on the city and in kind of the

117:06    digital nature of the city.

117:07  Q.  Okay.  And then I want to turn, I want

117:08    to skip ahead, I have a question about a

117:09    particular letter.  If you can page forward to

117:10    the letter written by, I guess it is the second

117:11    or third to the last, Anthony Vidler.

117:12  A.  Yes.

117:13  Q.  What is your understanding of who

117:14    Anthony Vidler is?

117:15  A.  Anthony Vidler is a very, very important

117:16    scholar.  He's probably the most important

117:17    scholar in the bunch.  He has, he has been at

117:18    Princeton for a lifetime.  He has written many

117:19    books on many different subjects.  You know,

117:20    he's probably one of the first scholars in the

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

117:21     country, if not the world.

117:22  Q.  Okay.  All right, let's look at his

117:23     assessment of Professor Veikos.  I would like to

117:24     start on the second page of his letter.

118:01  A.  Okay.

118:02  Q.  At the top, the paragraph that

118:03     begins, "so."  Could you read that out loud,

118:04     please?

118:05  A.  "So, the answer to your first question

118:06     as to the scope and significance of the

118:07     candidate's creative achievements and their

118:08     importance to the discipline would be that her

118:09     book is indeed a serious scholarly contribution

118:10     to the discipline, important not only for the

118:11     history of theory, but also for design

118:12     intelligence in the widest sense."

118:13  Q.  Okay.  Thank you.

118:14     There are a couple places, I think,

118:15     in this letter that I want to draw your

118:16     attention to to ask you questions about.  So if

118:17     we can go back to the first page of the letter,

118:18     the bottom paragraph, there is a section, the

118:19     sentence reads, "This unique aspect of

118:20     Bo Bardi's work is taken up well in Veikos's

118:21     book-length introduction, an introduction that

118:22     suits Bo Bardi in her two contexts, the Italian

118:23     and the Brazilian."

118:24     So is that the book that you were

119:01     talking about earlier that Professor Veikos had

119:02     started working on at the time of her

119:03     reappointment?

119:04  A.  Yes, uh-huh.

119:05  Q.  And so that we understand and the jury

119:06     understands what this was, she wrote an

119:07     introduction to another architect's written

119:08     work?

119:09  A.  Right.  The architect had written a

119:10     manifesto, like a treatise on her work that was

119:11     not widely known, and Cathrine was advised by

119:12     David Leatherbarrow that this would be a very

119:13     good way to establish herself as a scholar in

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

119:14   the work of Lina Bo Bardi, to translate that.

119:15   So translations are regarded as a

119:16   scholarly endeavor.  Right?  They are equivalent

119:17   to other books.  But Cathrine also augmented

119:18   that with a very long introduction, which began

119:19   to reframe some of the content of the manifesto.

119:20   Q.   Okay.  All right, let's take a look at

119:21   something else Professor Vidler says about

119:22   Cathrine.  On Page 2, below where we were

119:23   reading before, there is a paragraph that

119:24   starts, "In trying to rank the candidate."

120:01   Can you read that out loud, please.

120:02   A.   "In trying to rank the candidate

120:03   relative to leading scholars in the field at a

120:04   comparable level of professional development, I

120:05   would say that generally a tenured dossier in

120:06   history and theory for a comparable university

120:07   would require a first book already published and

120:08   reviewed and a second book completed.  But that

120:09   would be the criteria used for scholars with a

120:10   Ph.D. in hand at the time of employment.

120:11   Q.   Is that what we were talking about

120:12   earlier?

120:13   A.   Yes.

120:14   Q.   So is Anthony Vidler considered somebody

120:15   whose specialty or focus was history theory?

120:16   A.   Yes.

120:17   Q.   Did you read this to say that he thought

120:18   Cathrine Veikos's level of publication was not

120:19   qualifying for tenure?

120:20   A.   No.  I think he was making light of the

120:21   fact that she did not have a Ph.D. and did not

120:22   have to make that second book, level of a second

120:23   book completion.  Which is what I mentioned

120:24   before.

121:01   Q.   Okay, I see.

121:02   A.   Uh-huh.

121:03   Q.   All right, so taking the group -- I mean

121:04   I know you looked at these letters in detail at

121:05   the time of your tenure review.

121:06   A.   Yes.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

121:07  Q.  And probably also in preparation for

121:08      this proceeding.

121:09  A.  Yes, uh-huh.

121:10  Q.  But in your view as also a reviewer of

121:11      Cathrine Veikos's work, did you believe that the

121:12      external reviewers as a whole supported Cathrine

121:13      Veikos's promotion for tenure?

121:14  A.  Certainly.  She has someone of the kind

121:15      of stature of Anthony Vidler calling her work

121:16      serious and profound.

121:17      I thought Christine Boyer's letter,

121:18      and she is also a very well known scholar, I

121:19      think she called it brilliant.

121:20  Q.  Why don't we look at that letter.  So it

121:21      appears to be the second letter in the packet,

121:22      which is P-15.

121:23  A.  All right, P-15.  I am sorry, I am

121:24      swimming in this.

122:01  Q.  If you start at the page that says --

122:02  A.  Here it is.  I found it.  Yes.

122:03  Q.  Take a moment, and then if you want to

122:04      draw our attention to the section of that letter

122:05      that identifies her opinion of Cathrine Veikos's

122:06      work, that would be helpful.

122:07  A.  I am going to have to take my glasses

122:08      off.

122:09  Q.  Yes.  Take your time.

122:10  A.  She compliments it for being multi-

122:11      layered and she talks about the interweaving of

122:12      different kinds of studies, which is the

122:13      theatrical spectacles of Bo Bardi's architecture

122:14      influenced by minimalist stages and then goes

122:15      over issues carried over into Veikos's own

122:16      writings on "Intricacies" about contemporary

122:17      form and sheer opacity of contemporary

122:18      enclosures, which could be seen as kind of a

122:19      professional endeavor in some of this.  And she

122:20      is very complimentary on these

122:21      cross-fertilizations that they have also at

122:22      computational and digital technologies.

122:23      So she's complimenting her for

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

122:24     addressing all of these different realms at the

123:01     same time and is very complimentary on that.

123:02  Q.  Okay.  I want to now turn to, there are

123:03     two letters from Caroline Constant in this --

123:04  A.  Right.

123:05  Q.  -- group.

123:06  A.  Uh-huh.

123:07  Q.  Let's look at the one that is dated

123:08     February 9, 2011.

123:09  A.  Okay.

123:10  Q.  At the bottom right-hand corner it has

123:11     designation Penn 0544.

123:12  A.  00544, yes.

123:13  Q.  Yes.

123:14  A.  Okay.

123:15  Q.  So do you recognize this as a letter

123:16     from Caroline Constant?

123:17  A.  Yes, I do.

123:18  Q.  Okay, and who is she?

123:19  A.  Another very well known scholar, older

123:20     woman at the Taubman College of Architecture in

123:21     Michigan, which is a very, very prominent school

123:22     of architecture.

123:23  Q.  All right, let's take a look at a

123:24     specific part of her letter.  If you go to the

124:01     third paragraph down.

124:02  A.  Right.

124:03  Q.  About the fourth line it says, "Veikos

124:04     began this research in 2005 and sent her book

124:05     proposal (or manuscript?) to Routledge for

124:06     review in December 2010.  Unfortunately, she did

124:07     not include any portion of the manuscript in her

124:08     dossier."

124:09     What is your recollection about

124:10     this circumstance?

124:11  A.  Because I read these letters in order to

124:12     write my letter.  That put up huge red flags for

124:13     me because I had seen the dossier and Cathrine's

124:14     full manuscript was in that dossier.  And when I

124:15     saw this, I thought, wait, what happened?  She

124:16     didn't have the dossier -- the dossier was

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 124:17 | incomplete because it was finished.  It was, you | | |
| | 124:18 | know, ready to go to publication. | | |
| | 124:19 | So I started thinking something | | |
| | 124:20 | must have happened in the procedures, you know, | | |
| | 124:21 | when the staff or whoever put together the | | |
| | 124:22 | packages of the dossier didn't send out the | | |
| | 124:23 | completed piece. | | |
| | 124:24 | Q.  And is it your recollection that | | |
| | 125:01 | Caroline Constant wrote another letter related | | |
| | 125:02 | to Professor Veikos? | | |
| | 125:03 | A.  Yes.  I remember, or it's in the | | |
| | 125:04 | package, in fact, the next letter. | | |
| | 125:05 | Q.  And that is the one dated March 26th? | | |
| | 125:06 | A.  Yes, exactly.  Exactly.  And what had | | |
| | 125:07 | happened, if I recall, is it became evident, and | | |
| | 125:08 | I don't quite remember how, that the required | | |
| | 125:09 | phrase for taking the additional year or the | | |
| | 125:10 | year extension for probationary period was not | | |
| | 125:11 | put in the letter requesting the external | | |
| | 125:12 | reviews.  And so the external critics were sent | | |
| | 125:13 | a letter saying, would you change anything if | | |
| | 125:14 | you knew about this, if there was an extra -- | | |
| | 125:15 | that the maternity leave had already been | | |
| | 125:16 | incorporated in that tenure clock. | | |
| | 125:17 | And so I think this letter | | |
| | 125:18 | addressed that request that -- | | |
| | 125:19 | Q.  Yes.  I think we are going to get there, | | |
| | 125:20 | but I think -- | | |
| | 125:21 | A.  Okay. | | |
| | 125:22 | Q.  Why don't you take a moment to review | | |
| | 125:23 | Caroline Constant's March 26th letter.  Because | | |
| | 125:24 | there is a different issue I wanted to draw your | | |
| | 126:01 | attention to. | | |
| | 126:02 | A.  Okay. | | |
| | 126:03 | Q.  But if you could read that over, | | |
| | 126:04 | particularly the last couple of paragraphs. | | |
| | 126:05 | A.  Okay.  Let's see.  This is -- okay, so | | |
| | 126:06 | the last couple of paragraphs. | | |
| | 126:07 | Q.  On Penn 0052. | | |
| | 126:08 | A.  Okay. | | |
| | 126:09 | Would you like me to read that? | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 126:10  Q.  Just to yourself.  Now I have a question | | |
| | 126:11        about one of the statements she made. | | |
| | 126:12  A.  Okay. | | |
| | 126:13  Q.  Okay, at the end of the second to the | | |
| | 126:14        last paragraph, Professor Constant wrote, "The | | |
| | 126:15        status of that book" -- meaning her Bo Bardi | | |
| | 126:16        book -- | | |
| | 126:17  A.  Right. | | |
| | 126:18  Q.  -- "project remains a primary question, | | |
| | 126:19        however.  Acceptance for publication by | | |
| | 126:20        Routledge, if only provisional, would be a | | |
| | 126:21        significant factor on which to base a positive | | |
| | 126:22        evaluation of her case." | | |
| 128:01 - 128:23 | **Fierro, Annette 2022-08-11** | 00:00:40 | AF_FINAL.17 |
| | 128:01        BY MS. UEBLER: | | |
| | 128:02  Q.  In your view was it important for the | | |
| | 128:03        external reviewers to be notified that | | |
| | 128:04        Cathrine's book had been -- | | |
| | 128:05  A.  Absolutely. | | |
| | 128:06  Q.  -- accepted? | | |
| | 128:07  A.  Absolutely.  It is incredibly important | | |
| | 128:08        for them to know that this book has been | | |
| | 128:09        accepted by Routledge. | | |
| | 128:10  Q.  And -- | | |
| | 128:11  A.  It changes everything. | | |
| | 128:12  Q.  And when you wrote your internal letter | | |
| | 128:13        relating to Cathrine Veikos, did you know that | | |
| | 128:14        her book on Bo Bardi had been accepted for | | |
| | 128:15        publication? | | |
| | 128:16  A.  Yes, I did. | | |
| | 128:17  Q.  And at the time, and we will talk about | | |
| | 128:18        it, but at the time that the faculty met to | | |
| | 128:19        consider Cathrine Veikos' promotion for tenure, | | |
| | 128:20        did they know that the book had been accepted | | |
| | 128:21        for publication? | | |
| | 128:22  A.  Yes, they did. | | |
| | 128:23  Q.  Okay. | | |
| 129:17 - 132:04 | **Fierro, Annette 2022-08-11** | 00:02:50 | AF_FINAL.18 |
| | 129:17  Q.  Okay. | | |
| | 129:18        Let's take a look at your letter. | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

129:19    I have handed you what has been

129:20    marked as Exhibit P-16.  I guess the first thing

129:21    we should do is confirm in fact that that is

129:22    your internal letter relating to Cathrine

129:23    Veikos's tenure review?

129:24  A.  It is.  It is dated March 2011.  A long

130:01    time ago.

130:02  Q.  All right, I want to ask a couple

130:03    questions.  So in this first paragraph, it is

130:04    written to the chair at the time, Bill Braham.

130:05  A.  Right.

130:06  Q.  At the end of that first paragraph, do

130:07    you recommend Cathrine for tenure?

130:08  A.  Yes, I was very happy to recommend her

130:09    with the strongest possible recommendation,

130:10    enthusiastically and without hesitation.

130:11  Q.  As part of your letter, did you raise

130:12    any concerns about the presentation of the

130:13    external letters?

130:14  A.  I did.

130:15  Q.  Can you draw our attention to that in

130:16    your letter?

130:17  A.  Yes.  The first part of this relates to

130:18    my own reading of her work, which I still think

130:19    is very good.

130:20    Yes, "I have read carefully all of

130:21    the other external letters currently available

130:22    for Veikos's case for tenure."

130:23  Q.  And just to orient the jury who will be

130:24    looking at this as well, it is the bottom of

131:01    Page 3 of your letter?

131:02  A.  Yes, uh-huh.

131:03  Q.  Okay, thank you.

131:04  A.  And I stated again I was very concerned

131:05    just in kind of factual errors.  Okay?

131:06    "Constant mentions the unclear status of the two

131:07    manuscripts' completion.  She was clearly not

131:08    aware that the manuscript has not only been

131:09    completed, reviewed by external readers provided

131:10    by the publisher and indeed had been accepted

131:11    for publication."

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

131:12  Q.  And the area you are reviewing now, that
131:13       is at the top of Page 4?
131:14  A.  The top of Page 4.  So this is in my
131:15       letter to Bill and the faculty saying that these
131:16       were errors that were clearly indicated in the
131:17       external reviewer's responses.  They didn't know
131:18       they had been accepted by publication.
131:19       And then I was also really
131:20       concerned that Constant raised doubt as to
131:21       whether Cathrine's papers published in the
131:22       ACSA -- and this is the American Collegiate
131:23       Schools of Architecture -- this is the national
131:24       body of, you know, architecture academicians --
132:01       were not, quote, strictly speaking peer-
132:02       reviewed.
132:03       And I thought, well, that's really
132:04       odd.

| **132:11 - 132:13** | **Fierro, Annette 2022-08-11** | **00:00:10** | **AF_FINAL.19** |

132:11       I mean the ACSA is the primary
132:12       venue for assistant professors to publish
132:13       scholarly work on architecture.

| **132:15 - 139:17** | **Fierro, Annette 2022-08-11** | **00:07:33** | **AF_FINAL.20** |

132:15  Q.  Okay.
132:16  A.  Then should we go into the letter by
132:17       Judy Sheine?
132:18  Q.  Yes, the question I have pending is just
132:19       to have you draw to our attention the concerns
132:20       you had about the external letters.
132:21  A.  Yeah.  I mean I think that just
132:22       procedurally it was clear that the dossier had
132:23       not been sent out completely.  I think Judith
132:24       Sheine's letter goes further, and she starts
133:01       talking about how this really needs a
133:02       bibliography and illustrations.  And the book
133:03       had 200 illustrations and had a full
133:04       bibliography.  So either she didn't see them or
133:05       they weren't included in the package.
133:06       So again, it made me really
133:07       concerned that there had been some kind of
133:08       glitch in just sending out the correct dossier,

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|

| | 133:09 | because how could they say that wasn't there | | |
| | 133:10 | when it was clearly there. | | |
| | 133:11 | Q. Did you think, is it your recollection, | | |
| | 133:12 | or if we want to look at the external letters | | |
| | 133:13 | again, you are certainly welcome to, was there | | |
| | 133:14 | anyone of the external reviewers who had any | | |
| | 133:15 | criticisms of Professor Veikos's scholarship as | | |
| | 133:16 | compared to the volume of her work? | | |
| | 133:17 | A. I think probably Judith Sheine was most | | |
| | 133:18 | critical. I think, you know, certainly these | | |
| | 133:19 | glitches in the manuscript. I think, I agreed | | |
| | 133:20 | in fact with Sheine saying it needed editing. | | |
| | 133:21 | It certainly needed editing. It had just | | |
| | 133:22 | started, you know, at the editing process. | | |
| | 133:23 | She talked about an exhaustive use | | |
| | 133:24 | of sources that needed some hierarchy. I | | |
| | 134:01 | probably agreed a bit with that. But I don't | | |
| | 134:02 | think those were, you know, those are criticisms | | |
| | 134:03 | that are based on editing. Right? We all need | | |
| | 134:04 | that. I certainly need that now. Yeah. We all | | |
| | 134:05 | need the help of editors at some point. Yes. | | |
| | 134:06 | Uh-huh. | | |
| | 134:07 | Q. All right. Let's put your letter aside. | | |
| | 134:08 | A. Okay. | | |
| | 134:09 | Q. And I want to talk about some other | | |
| | 134:10 | aspects of the process. | | |
| | 134:11 | Who do you recall serving on the | | |
| | 134:12 | ad hoc committee for Cathrine Veikos's first | | |
| | 134:13 | tenure review? | | |
| | 134:14 | A. I believe it was Marion Weiss and Ali | | |
| | 134:15 | Rahim. | | |
| | 134:16 | Q. And they were tenured professors at the | | |
| | 134:17 | time? | | |
| | 134:18 | A. They were tenured professors at the | | |
| | 134:19 | time. | | |
| | 134:20 | Q. Who selected them, as far as you know, | | |
| | 134:21 | to serve in that capacity? | | |
| | 134:22 | A. Bill Braham as chair selects all of the | | |
| | 134:23 | reviewers and all internal, external, and the | | |
| | 134:24 | ad hoc committee. | | |
| | 135:01 | Q. Did you think that Professors Rahim and | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

135:02    Weiss were qualified to serve on the ad hoc --

135:03  A.  No.

135:04  Q.  -- committee for Professor Veikos?

135:05  A.  I did not.

135:06  Q.  Why not?

135:07  A.  I had thought that just professionally

135:08    they were not competent in the issues that she

135:09    was writing about.  They are design

135:10    practitioners.  They are not scholars.  They are

135:11    not academicians.  Their body of work is, you

135:12    know, not only drawn work, but built work.  So

135:13    they are, they are coming from the vantage of

135:14    like who she might be as a designer, and she

135:15    wasn't working that way then.  And I remember

135:16    there were several sentences that qualified what

135:17    this had to do with architecture, which were

135:18    just basically absurd.

135:19    So I didn't think that they were

135:20    qualified to review her work as a scholar.  And

135:21    I also thought that, you know, Ali Rahim had

135:22    made clear in several venues that he didn't

135:23    really favor her candidacy.  So I thought that

135:24    was very weird that he would ask for an

136:01    objective reading, Bill would ask for an

136:02    objective reading from Ali Rahim because he was

136:03    predisposed against her.  And it was

136:04    distressing.

136:05  Q.  Did you communicate with Ali Rahim or

136:06    Marion Weiss about Cathrine Veikos' tenure case

136:07    as it was unfolding?

136:08  A.  I didn't communicate with Ali, but I did

136:09    communicate with Marion, and I think I wrote her

136:10    a note because she was, of course, another woman

136:11    and I thought, you know, we should support each

136:12    other.  And I think I wrote her a note to please

136:13    be thorough and careful in assessing the work.

136:14    This was before I knew that she was on the

136:15    ad hoc committee.  And then as soon as I found

136:16    out I corrected myself, because it probably

136:17    wasn't proper for me to write to her about this,

136:18    but I hadn't really known.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

136:19   So, but yeah, I wrote to her to

136:20   please be careful with this because it was an

136:21   important case.

136:22 Q.   Okay.  All right, let's look at some of

136:23   those e-mails.  I am going to hand you what has

136:24   been marked as Exhibit P-17.

137:01 A.   Right.

137:02 Q.   It is two different e-mails.

137:03 A.   Right.

137:04 Q.   Are these the e-mails that you recall

137:05   exchanging with Marion Weiss at the time?

137:06 A.   Yes, right.

137:07 Q.   Okay.  I have a couple of questions.  So

137:08   let's start with the first, the top one, it says

137:09   April 5th, 2011.

137:10 A.   Right.

137:11 Q.   You are asking, I guess, Professor Weiss

137:12   if she will be at the meeting?

137:13 A.   Right.

137:14 Q.   Is that the faculty meeting where the

137:15   case would be discussed?

137:16 A.   Right, yeah.

137:17 Q.   Then you say, "I don't know how you are

137:18   disposed towards Cathrine's case."

137:19   Did you have a sense at that time?

137:20 A.   I didn't know.  As I said, Marion is not

137:21   present often, but I thought that, you know, I

137:22   mean Cathrine was a serious candidate and I was

137:23   hoping that she would be there to support her.

137:24 Q.   Okay.

138:01 A.   And I thought, you know, it would help

138:02   if I describe the work, because Marion is a very

138:03   busy person and is inclined not to read things

138:04   or look at things carefully.  To be honest.

138:05   Right?  Marion is a friend, but she's very busy.

138:06 Q.   There is a reference here in your

138:07   e-mail.  You know, the second line, it says,

138:08   "and heard the argument, you would be inclined

138:09   to support her.  And she does need it."

138:10   Are you referring to Cathrine

138:11   needing her help?

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

138:12  A.  You know, when Ali -- when Bill asked me

138:13      to write the internal letter, he made some kind

138:14      of vague mention about how he was concerned.

138:15      And it might have been before or after the

138:16      external letters came in.  I'm not quite sure.

138:17      But I guess I was just saying in reference to

138:18      that note of Bill's, you know, we're going to

138:19      need support for this, you know, given what Bill

138:20      had said.

138:21  Q.  But at the time you felt -- did you feel

138:22      Cathrine Veikos was qualified for tenure?

138:23  A.  Oh, certainly.  Without a doubt.

138:24  Q.  All right, let's look at the second page

139:01      of this exhibit, which it looks like it is a

139:02      subsequent e-mail to Marion Weiss the same day.

139:03  A.  Uh-huh.

139:04  Q.  Can you tell us about that

139:05      communication?

139:06  A.  Right.  This is me saying oh, I'm so

139:07      sorry, you know, you are on the ad hoc

139:08      committee.  You know, I didn't want to influence

139:09      her.  Right.

139:10  Q.  Okay.  And did you end up speaking to

139:11      her at all about Cathrine Veikos's case?

139:12  A.  No, uh-uh.  No.

139:13  Q.  Okay.  All right, let's look at the

139:14      ad hoc letter itself.

139:15  A.  In fact, she didn't come to that first

139:16      faculty meeting.  Right?  So again, she was

139:17      disconnected.

| 140:09 - 143:06 | **Fierro, Annette 2022-08-11** | 00:03:44 | AF_FINAL.21 |

140:09  Q.  Professor Fierro, I was handing you a

140:10      document that has been marked as Exhibit P-18.

140:11      Can you tell me whether or not this

140:12      is the ad hoc committee letter that was written

140:13      for Cathrine Veikos's first tenure review?

140:14  A.  Yes, it is.

140:15  Q.  Okay.  You had already indicated that

140:16      you did not think Professors Rahim and Weiss

140:17      were qualified to write about Cathrine Veikos's

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

140:18    work, but my question is different now.

140:19    Do you think that the letter they

140:20    wrote accurately assessed her work once you had

140:21    seen it?

140:22   A.   No, no.  I had all kinds of objections.

140:23    In particular, I'll point to one, "As presented

140:24    in the dossier, the patterns and ideas, although

141:01    interesting, are not calibrated in relation to

141:02    space or architecture." I had no --

141:03   Q.   Can you tell me where it is so we can

141:04    show it to the jury?

141:05   A.   Yes.  It is close to the bottom of the

141:06    second paragraph which begins, "as can be seen."

141:07   Q.   Okay, yes, I see.  Thank you.

141:08   A.   I thought that was an odd qualification,

141:09    not calibrated in relation to space or

141:10    architecture.  It was all about space or

141:11    architecture.  Certainly about kind of the

141:12    reception of, and I know this is going to get

141:13    arcane again, the reception of the building in

141:14    space.  It is about building, so I don't know

141:15    how that was not about architecture.

141:16    I thought that the citations on

141:17    what they expected her to relate to, I thought

141:18    those were their own personal views on what that

141:19    related to.  That was very random.  I'm sorry,

141:20    that's in the fourth paragraph.  In reviewing

141:21    her students' work from the seminar, it appears

141:22    to be less original, and then they cite some

141:23    museum exhibits.  I thought that was very random

141:24    to pull in in context to her work.  I thought

142:01    there is not really any relationship.

142:02    There was, I tended to agree with

142:03    the comment on Preston Scott Cohen.  I thought

142:04    he was a very relevant model for what she was

142:05    doing.  So I thought that was good.

142:06    And then they clearly could not

142:07    comment on the text because they talk about they

142:08    "could not evaluate its significance by

142:09    historians or scholars as well as contemporary

142:10    theorists with expertise in the area."

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 142:11 | So, you know, they just had no, | | |
| | 142:12 | they weren't equipped to understand what she was | | |
| | 142:13 | doing.  They were not qualified.  And they say, | | |
| | 142:14 | "We are somewhat limited in our ability to | | |
| | 142:15 | assess her strengths either as a designer or | | |
| | 142:16 | scholar due to the limited production presented | | |
| | 142:17 | in her dossier." | | |
| | 142:18 | I would say no, they are not | | |
| | 142:19 | qualified period.  But are optimistic that her | | |
| | 142:20 | scholarship will work.  Yeah. | | |
| | 142:21 Q. | The reference to limited production, did | | |
| | 142:22 | you believe there was limited production in her | | |
| | 142:23 | dossier? | | |
| | 142:24 A. | No. | | |
| | 143:01 Q. | Okay. | | |
| | 143:02 A. | I think I was, I think they were | | |
| | 143:03 | pointing to the design work, they expected her | | |
| | 143:04 | to be designing, and that's not what she was | | |
| | 143:05 | doing then.  So again, a sort of miss, missed | | |
| | 143:06 | trajectory. | | |
| 143:24 - 150:05 | **Fierro, Annette 2022-08-11** | | 00:06:57 | AF_FINAL.22 |
| | 143:24 | I want to talk now about the | | |
| | 144:01 | faculty meeting when Cathrine Veikos's tenures | | |
| | 144:02 | case -- | | |
| | 144:03 A. | Okay. | | |
| | 144:04 Q. | -- was considered the initial time. | | |
| | 144:05 | You attended that meeting? | | |
| | 144:06 A. | Yes. | | |
| | 144:07 Q. | Do you recall who else was in the room? | | |
| | 144:08 A. | I recall that Marion was not there. | | |
| | 144:09 | Witold was there.  Bill Braham was there.  David | | |
| | 144:10 | Leatherbarrow was there.  Frank Matero was | | |
| | 144:11 | there.  It's in the minutes.  Yes?  I can't | | |
| | 144:12 | completely remember. | | |
| | 144:13 Q. | It is.  Was Ali Rahim present? | | |
| | 144:14 A. | Yes, of course he was present. | | |
| | 144:15 Q. | Okay. | | |
| | 144:16 A. | Yeah. | | |
| | 144:17 Q. | Okay.  We have talked about some of | | |
| | 144:18 | these people before because we talked about | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

144:19      their tenure cases.

144:20   A.   Right.

144:21   Q.   Who is Frank Matero and what was his

144:22      field?

144:23   A.   Frank Matero was the head of the

144:24      preservation department, and so a slightly

145:01      different field, but still within architecture.

145:02   Q.   And you mentioned Witold.  Who is that,

145:03      what's his last name?

145:04   A.   Witold Rybczynski is a very well-known

145:05      author of sort of popular books on architecture.

145:06      I don't mean to be demeaning, but yes.

145:07   Q.   He is the professor --

145:08   A.   He talks about comfortable houses and he

145:09      was appointed -- he never went through the

145:10      tenure.  He was appointed as a significant

145:11      writer.

145:12   Q.   Okay.  All right, let's focus on the

145:13      meeting itself.  So you described before when

145:14      there was a faculty meeting to consider

145:15      tenure --

145:16   A.   Right.

145:17   Q.   -- the faculty is sitting around the

145:18      table.

145:19      Can you tell us and tell the jury

145:20      what you recall about that meeting?

145:21   A.   I recall that the meeting was largely

145:22      warm and receptive and supportive.  I remember

145:23      that we addressed some of the qualifying points

145:24      of the letters.  That's typical in tenure cases

146:01      because we worry about how those letters will be

146:02      read by the next tiers of reviewers.  So that we

146:03      know we have to answer to some of those if we

146:04      want the case to be successful.

146:05      So we talked about the Judith

146:06      Sheine letter, which was really the only

146:07      negative letter.  We talked about the

146:08      inconsistencies.  I raised in the meeting all of

146:09      the inconsistencies in the dossier like, you

146:10      know, if the manuscript, if they had known the

146:11      manuscript was accepted, had they received the

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

146:12   bibliography, had they received the

146:13   illustrations, because they were clearly, there

146:14   was clear mistakes.  There was just factual

146:15   errors in the external letters.

146:16   So we talked about all of that.  We

146:17   talked about Cathrine as a teacher.  We all

146:18   thought she was a tremendous teacher.

146:19   We talked about her as a team

146:20   player.  She had done, you know, mountains of

146:21   service.  She had led her field in visual

146:22   studies in terms of the curriculum.  And she had

146:23   done enormous amounts of work and progress in

146:24   defining a visual studies curriculum for

147:01   students and for coursework.

147:02   We talked about the nature of her

147:03   seminars.  And we talked about, you know, the

147:04   production of her work.

147:05 Q.   Do you recall if David Leatherbarrow was

147:06   supporting her at that time?

147:07 A.   David Leatherbarrow was very supportive

147:08   of her in that meeting, yep.

147:09 Q.   Was there a discussion about the

147:10   quantity of her publications during the faculty

147:11   meeting?

147:12 A.   There was because of the qualifications

147:13   in the letters.  I mean I cleared up that all of

147:14   the articles had been peer reviewed and I think

147:15   she had some -- I'm not quite sure now how

147:16   many -- at least a dozen, which means that was

147:17   standard.  We talked about, you know, some of

147:18   the things that had been said in the letters,

147:19   which didn't, simply weren't clear.

147:20   I remember that Frank Matero even

147:21   raised his hands and said, how is this not

147:22   enough?  Very emphatically.  Very decisively in

147:23   support of her because it was clear that her

147:24   dossier was fine.

148:01 Q.   Do you recall any of the department

148:02   faculty members expressing a negative view of

148:03   her qualifications at the meeting?

148:04 A.   Ali Rahim talked about how he did not

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

148:05    think this was enough and he didn't think the

148:06    work was strong.  And as I said, I knew that was

148:07    coming.

148:08    I think given the nature of the

148:09    Judith Sheine letter, we all knew we had to be

148:10    very supportive because these letters are read

148:11    very carefully at the different stages of

148:12    review.  But yeah, we were supportive, yeah.

148:13  Q.  Do you recall any discussion at the

148:14    meeting about Cathrine's gender or the fact that

148:15    she was a mother?

148:16  A.  Well, I brought, I brought up given the

148:17    context of the discussions in the women's forum,

148:18    I brought up that it was very important for us

148:19    as a faculty because this was so much in the

148:20    kind of limelight at the university.  And I

148:21    talked about how important it was to do

148:22    everything that we could to support, without

148:23    casting, you know, doubt on her qualifications

148:24    certainly.  And we talked about that too as

149:01    well.  You know, we could talk about it within

149:02    the meeting, that it was very important to

149:03    support women, but we could not put that in the

149:04    letters because it would be seen as qualifying

149:05    Cathrine's production.

149:06  Q.  Did you, in raising that or as

149:07    participant in the meeting, think that Cathrine

149:08    Veikos's tenure case should be evaluated on a

149:09    different standard --

149:10  A.  No.

149:11  Q.  -- because she was a woman or because

149:12    she had a child?

149:13  A.  No.  That's impossible.  Right?  We

149:14    can't do that.

149:15  Q.  Were you the only woman present at the

149:16    faculty meeting?

149:17  A.  Yes, uh-huh.

149:18  Q.  Was there a consensus among the faculty

149:19    about Cathrine Veikos's qualifications for

149:20    tenure at the end of the meeting?

149:21  A.  Yes.  We voted and the vote was

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 149:22     five/one, with Ali Rahim as the dissenting | | |
| | 149:23     person, yes. | | |
| | 149:24   Q.   As a tenured member of the department | | |
| | 150:01     who has also voted on other tenure cases, how | | |
| | 150:02     did you think Professor Veikos's qualifications | | |
| | 150:03     for promotion with tenure compared to the other | | |
| | 150:04     candidates who had been tenured, both before and | | |
| | 150:05     after her? | | |
| 150:08 - 151:19 | **Fierro, Annette 2022-08-11** | 00:01:51 | AF_FINAL.23 |
| | 150:08     THE WITNESS: I thought it was | | |
| | 150:09     equal, if not superlative to at least half of | | |
| | 150:10     those other people. | | |
| | 150:11     BY MS. UEBLER: | | |
| | 150:12   Q.   You mentioned that the vote was five to | | |
| | 150:13     one. I assume that means five in favor? | | |
| | 150:14   A.   Five in favor and one against. | | |
| | 150:15   Q.   How does that work when the faculty | | |
| | 150:16     votes, what is the process -- or let's focus | | |
| | 150:17     specifically on the vote for Cathrine Veikos's | | |
| | 150:18     tenure case, what were the logistics of that? | | |
| | 150:19   A.   After we talk about it -- we follow | | |
| | 150:20     parliamentary procedure -- someone has to move | | |
| | 150:21     that we approve Cathrine Veikos for promotion to | | |
| | 150:22     the rank of associate professor with tenure. | | |
| | 150:23     Someone has to second it. There's a final call | | |
| | 150:24     for discussion. By that time usually we have | | |
| | 151:01     discussed it to death, but sometimes there's new | | |
| | 151:02     things that come up. And then we take the vote. | | |
| | 151:03     This was a blind vote. I think we wrote -- we | | |
| | 151:04     typically write on pieces of paper that have | | |
| | 151:05     been folded and then we pass the notes to Bill | | |
| | 151:06     and then Bill announced the vote as five to one. | | |
| | 151:07     And then the meeting was adjourned. | | |
| | 151:08   Q.   At the end of the meeting, did you have | | |
| | 151:09     any expectation one way or the other as to | | |
| | 151:10     whether or not Cathrine Veikos would be promoted | | |
| | 151:11     with tenure at Penn? | | |
| | 151:12   A.   I mean there's always doubt for what can | | |
| | 151:13     happen at subsequent levels, but there had been | | |
| | 151:14     many votes that were worse that were not as | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

151:15    supportive where people got tenure.  So five/one

151:16    is a very supportive vote.  Right?  You know,

151:17    it's very rare that votes are unanimous.  So

151:18    five/one seems to be like, yes, she is going

151:19    forward.

| 153:06 - 166:10 | **Fierro, Annette 2022-08-11** | 00:14:20 | AF_FINAL.24 |
|---|---|---|---|

153:06  Q.  I want to talk about, go back to

153:07     Cathrine Veikos's tenure review.

153:08     You told me about the vote that was

153:09     taken at the end of the faculty meeting?

153:10  A.  Right.

153:11  Q.  Did you receive a draft of Professor

153:12     Braham's letter to the personnel committee

153:13     before it was sent up the chain for review?

153:14  A.  No.

153:15  Q.  Did you see it at some point?

153:16  A.  I did.  When it became part of the

153:17     dossier, I was looking for something in there.

153:18     And I stumbled on it.

153:19  Q.  Okay.

153:20  A.  And so, yeah, when I --

153:21  Q.  All right.  Let me show you a document.

153:22     You can confirm whether this is the letter.  It

153:23     is Exhibit P-19.

153:24     Is Exhibit P-19 the letter

154:01     Professor Braham wrote to the personnel

154:02     committee about Professor Veikos?

154:03  A.  Yes, this is what I stumbled upon.

154:04  Q.  Did you think that the letter that

154:05     Professor Braham wrought accurately described

154:06     the faculty meeting?

154:07  A.  No.  In fact, I wrote to him immediately

154:08     because it was so off.  First of all, the

154:09     faculty voted four in favor and two opposed to a

154:10     motion for promotion.

154:11  Q.  And you are reading from the exhibit

154:12     right now?

154:13  A.  Yes, uh-huh.

154:14  Q.  Okay.

154:15  A.  Which was not the vote.  The vote was

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 154:16 | five/one.  And I wondered what on earth had |
| | 154:17 | happened to change the vote to four/two.  It is |
| | 154:18 | a very different kind of vote. |
| | 154:19 | And then when I read through the |
| | 154:20 | letter I became even more concerned.  I didn't |
| | 154:21 | think that the text represented any of the |
| | 154:22 | superlatives either that we had accorded to |
| | 154:23 | Cathrine as a colleague or that had been give to |
| | 154:24 | her by the external reviewers.  All of the |
| | 155:01 | comments seemed to be sort of middle grade |
| | 155:02 | analysis or middle grade kind of remarks. |
| | 155:03 | For example, in her letter, |
| | 155:04 | Christine Boyer observed the "nice interweaving |
| | 155:05 | of theoretical and practical work." |
| | 155:06  Q. | Can you tell us where in the letter you |
| | 155:07 | are reading? |
| | 155:08  A. | This is the end of the one, two, three, |
| | 155:09 | four, fifth paragraph where, you know, Christine |
| | 155:10 | Boyer had also talked about how brilliant |
| | 155:11 | Cathrine was.  And so it was picking out |
| | 155:12 | comments which didn't support her to the degree |
| | 155:13 | that I thought the letters had. |
| | 155:14 | There was a lot that kind of |
| | 155:15 | pointed to Vidler's remarks for example, that we |
| | 155:16 | just read, would require a first book already |
| | 155:17 | published and a second book completed.  Without |
| | 155:18 | mentioning the fact that that was in direct |
| | 155:19 | reference to having a Ph.D.  It was clearly |
| | 155:20 | unfair. |
| | 155:21 | And then, yeah, I mean there was |
| | 155:22 | just, you know, all kind of things which didn't |
| | 155:23 | seem to be accurate.  We had all supported |
| | 155:24 | Cathrine at the meeting and there was a lot in |
| | 156:01 | those letters that were very, very positive. |
| | 156:02 | And so in the end, you know, he |
| | 156:03 | turns out to say it is with much regret that I |
| | 156:04 | must advocate against promotion in this case. |
| | 156:05 | Which means that he changed his vote.  And so |
| | 156:06 | that became clear.  And so I immediately wrote |
| | 156:07 | him a very strong e-mail. |
| | 156:08  Q. | And we will get to that. |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

156:09   A.   Okay.

156:10   Q.   I have a couple other questions --

156:11   A.   Okay.

156:12   Q.   -- about this particular letter --

156:13   A.   Okay.

156:14   Q.   -- which is Exhibit P-19.

156:15        So the letter, I guess where the

156:16        vote is reported is in that first paragraph.

156:17   A.   Right.

156:18   Q.   Did you know prior to finding the letter

156:19        in Penn's materials that Professor Braham had

156:20        changed his vote?

156:21   A.   No.

156:22   Q.   Had he notified you --

156:23   A.   No.

156:24   Q.   -- of that?

157:01   A.   No.

157:02   Q.   There is a reference in the second

157:03        paragraph of the letter where Professor Braham

157:04        is giving some background about Professor Veikos

157:05        and that last sentence -- or second to the last

157:06        sentence says, "She was reappointed in 2006 and

157:07        the following year was granted an additional

157:08        year in her tenure probation period because of

157:09        the birth of her son."

157:10        Is that accurate?

157:11   A.   Well, you know, an additional year is

157:12        not really what you are given.  You are given an

157:13        extension to the probationary period.  It is not

157:14        like someone gives you a year of your -- of more

157:15        research time.  It is that you are at home busy

157:16        with your child.  You know, this is not -- even

157:17        the language is really not fair in that simple

157:18        phrase.  It is not an additional year.  You have

157:19        the same probationary period.  It just happens

157:20        to be that you are taking care of an infant for

157:21        a year.

157:22   Q.   Going towards the bottom of the letter,

157:23        the paragraph that ends that first page and

157:24        begins with the sentence, "Over the past decade,

158:01        she has moved from creative practice to critical

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

158:02    writing and scholarship." And then it goes on.

158:03  A.  Right.

158:04  Q.  I think we talked about this before, but

158:05    at what point was it that she moved from

158:06    creative practice to critical writing?

158:07  A.  Before she came to Penn.

158:08  Q.  Okay. So at the time she was at Penn

158:09    she was already focused on her scholarship?

158:10  A.  She was already focused. She was

158:11    starting her research, yeah.

158:12  Q.  And let me look. There is a reference

158:13    on Page 2 of this letter I want to draw your

158:14    attention to, like the fourth line down, the

158:15    sentence starts "however." And the paragraph

158:16    that begins, "Cathrine's writings were admired

158:17    by the faculty."

158:18  A.  Okay.

158:19  Q.  And then the fourth line down it says,

158:20    "However, the challenges of moving from practice

158:21    to scholarship were remarked by other faculty

158:22    and especially by a number of the external

158:23    reviewers who wanted the scholarship, but

158:24    questioned whether there was a sufficient body

159:01    of work."

159:02    In your view, was it important for

159:03    the chair of the department to communicate to

159:04    higher levels that there was an issue with

159:05    whether the reviewers knew her book was accepted

159:06    for publication?

159:07  A.  Absolutely. I also think we did have a

159:08    discussion about whether that dossier was

159:09    complete. I mean it reflected badly on him that

159:10    the dossier was not complete. So I won't

159:11    speculate on that.

159:12  Q.  Okay.

159:13  A.  Yeah.

159:14  Q.  All right, before I asked the specific

159:15    questions about the letter, you were going to

159:16    tell us about how you responded to coming across

159:17    Professor Braham's letter.

159:18  A.  You know, I was just shocked. I was

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|
| 159:19 | shocked.  I had never heard of anything like |
| 159:20 | this happened before.  I mean this is a very |
| 159:21 | official vote and this is a very serious thing |
| 159:22 | for someone's life that, you know, you would |
| 159:23 | want to do this absolutely by the book.  You |
| 159:24 | know, because the whole thing was a mess. |
| 160:01 | Right?  The dossier transmission was a mess.  It |
| 160:02 | was just all incredibly sloppy.  And then having |
| 160:03 | him do this was even sloppier.  And what happens |
| 160:04 | is that it really affects the life of a person |
| 160:05 | and especially a valued colleague. |
| 160:06 | She had not just been a colleague. |
| 160:07 | She had been a friend.  Of all of us.  Not just |
| 160:08 | me.  She had poured her heart into Penn.  She |
| 160:09 | had taken on all kinds of duties and for him not |
| 160:10 | to be responsible and understand how serious |
| 160:11 | these kinds of admissions were, you know. |
| 160:12 Q. | And did you write to him about your |
| 160:13 | concerns? |
| 160:14 A. | I did write to him. |
| 160:15 Q. | Okay.  Let's take a look at Exhibit |
| 160:16 | P-20. |
| 160:17 | Is this the series of e-mails that |
| 160:18 | you exchanged with Professor Braham? |
| 160:19 A. | Yes.  This is a series -- I copied the |
| 160:20 | whole faculty because I thought everyone should |
| 160:21 | know about this. |
| 160:22 Q. | Why don't we start, I guess, with your |
| 160:23 | initial e-mail, which I guess is the third page |
| 160:24 | of this exhibit. |
| 161:01 A. | Right. |
| 161:02 Q. | I don't know that, you know, we need to |
| 161:03 | read it out loud. |
| 161:04 A. | Okay. |
| 161:05 Q. | I will have it displayed for the jury |
| 161:06 | during your testimony as we are talking now. |
| 161:07 | But could you tell the jury what |
| 161:08 | your goal was in sending this communication? |
| 161:09 A. | Well, I wanted clarification, first |
| 161:10 | about the vote, and then I wanted to point out |
| 161:11 | to him that I thought his description of the |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

161:12   meeting and our reading of Cathrine's work was

161:13   real inaccurate, and that is what his letter

161:14   should be.  Yes, a chair can have their own

161:15   opinions, you know, at the beginning, at the

161:16   end.  But his first responsibility is to

161:17   represent the discussion of the faculty

161:18   accurately, and I didn't think it was.  I didn't

161:19   think his summation of the letters was accurate.

161:20   I didn't think that his summation of the

161:21   discussion of the letters was accurate.

161:22   So I was just, you know, I was

161:23   really upset about this.  Again, this is

161:24   someone's life, you know.  This is not just some

162:01   kind of abstraction.

162:02   Q.  I see that you copied Marilyn Taylor on

162:03   this as well.

162:04   A.  I did.

162:05   Q.  Why did you do that?

162:06   A.  Because I thought she should be aware of

162:07   this.  I thought any dean should investigate it,

162:08   you know.

162:09   Q.  There is a reference, Professor Braham

162:10   responds to you in this e-mail.

162:11   A.  Right.

162:12   Q.  But I want to focus on your

162:13   communication to him, which is at the top of the

162:14   exhibit, the second paragraph of your e-mail.

162:15   You say, "The documentation put forward

162:16   moderated evidence of considerable support of a

162:17   faculty meeting, and in the letters, in favor of

162:18   that which was the qualifying -- I can cite the

162:19   letters repeatedly, as Frank did so well at the

162:20   meeting."

162:21   Who is that a reference to?

162:22   A.  It was Frank Matero.

162:23   Q.  What did Frank Matero do at the meeting

162:24   that you are referencing there?

163:01   A.  I mean, again, when he threw up his

163:02   hands and said how is that not enough, he

163:03   pointed out all the strong parts of the letter.

163:04   Q.  And you understood Professor Matero to

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

163:05      be in support of Cathrine's case?

163:06   A.   Strongly in support, yes.

163:07   Q.   Did Dean Taylor ever reach out to you in

163:08      response to this?

163:09   A.   No.

163:10   Q.   You never talked to her at all --

163:11   A.   Never talked to her.

163:12   Q.   -- about your concerns?

163:13      Did anyone from the personnel

163:14      committee considering Cathrine Veikos's case

163:15      contact you to speak about the concerns that you

163:16      had raised?

163:17   A.   No.

163:18   Q.   Did you have any formal role in

163:19      connection with Cathrine Veikos's tenure review

163:20      after the faculty meeting?

163:21   A.   No.

163:22   Q.   Did you become aware at some point that

163:23      the personnel committee voted against promoting?

163:24   A.   Yes.

164:01   Q.   Did you ever let Cathrine Veikos know

164:02      that Bill Braham had changed his vote in his

164:03      communication to the personnel committee?

164:04   A.   The proceedings of the meetings are

164:05      supposed to be confidential.  So no, I didn't

164:06      tell her anything, but I told her later when she

164:07      was going to the grievance committee, because I

164:08      thought she should know that.  If this was going

164:09      to become official, I thought she should know

164:10      that.

164:11   Q.   To your knowledge, I think we talked

164:12      about this a little earlier, but were you aware

164:13      as this was going on as to whether or not Bill

164:14      Braham's letter to the external reviewers had

164:15      that required language in the policy on the

164:16      extension of the probationary period that we

164:17      talked about earlier?

164:18   A.   I didn't know that earlier.  I think it

164:19      was Cathrine that made me aware of that later.

164:20   Q.   Okay.  Are you aware of any steps that

164:21      the university took to address that error in the

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 164:22 | process? | | |
| | 164:23 | A. I was told, and I think again Cathrine | | |
| | 164:24 | told me that they had sent out a second letter | | |
| | 165:01 | describing what language had been left out and | | |
| | 165:02 | asking for external reviewers to comment and | | |
| | 165:03 | whether they had anything to add to their | | |
| | 165:04 | letters. | | |
| | 165:05 | Q. You have had experience, as you have | | |
| | 165:06 | told us, as an external reviewer for other | | |
| | 165:07 | universities. Do you think that remedy was | | |
| | 165:08 | adequate? | | |
| | 165:09 | A. No. I mean the damage had been done. | | |
| | 165:10 | Their perception of her was already set. To ask | | |
| | 165:11 | for a change in the letters due to a procedural | | |
| | 165:12 | seemingly technical error, that wasn't enough. | | |
| | 165:13 | First of all, I wouldn't have | | |
| | 165:14 | written a letter. I would have called them. I | | |
| | 165:15 | would have taken a personal interest in it. | | |
| | 165:16 | Q. Did you communicate at all with Cathrine | | |
| | 165:17 | Veikos during her tenure review process about | | |
| | 165:18 | the potential for discriminatory bias impacting | | |
| | 165:19 | the decision? | | |
| | 165:20 | A. We were two of the only women on the | | |
| | 165:21 | faculty. We had been talking about | | |
| | 165:22 | discriminatory behavior through the women's | | |
| | 165:23 | forum stuff. We had had many conversations | | |
| | 165:24 | about this. It was, you know, it was in the | | |
| | 166:01 | air. | | |
| | 166:02 | Q. Did you communicate with anyone else at | | |
| | 166:03 | Penn about the potential for bias in Cathrine | | |
| | 166:04 | Veikos's tenure review process? | | |
| | 166:05 | A. I went back to my colleagues at the | | |
| | 166:06 | women's forum because we had talked about this. | | |
| | 166:07 | We had talked about exactly this in the context | | |
| | 166:08 | of our larger discussions of the university. | | |
| | 166:09 | And I reached out them and I said, you know, I | | |
| | 166:10 | don't know what to do to support this woman. | | |
| 166:20 - 167:04 | **Fierro, Annette 2022-08-11** | 00:00:24 | AF_FINAL.25 |
| | 166:20 | Q. Did you speak to anyone else at Penn | | |
| | 166:21 | about the potential -- | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 166:22 A.  I remember talking to David Brownlee | | |
| | 166:23      because he was a close colleague.  We sit on the | | |
| | 166:24      university committees together, and he was then | | |
| | 167:01      head of the grievance committee.  And so I | | |
| | 167:02      reached out and told him what had happened.  And | | |
| | 167:03      he thought there was an issue, and so I told | | |
| | 167:04      Cathrine she should go see him. | | |
| 168:15 - 174:19 | **Fierro, Annette 2022-08-11** | 00:06:59 | AF_FINAL.26 |
| | 168:15      Were you in a position to observe | | |
| | 168:16      how Cathrine Veikos reacted to Penn's decisions | | |
| | 168:17      relating to her tenure review? | | |
| | 168:18 A.  Sure.  She was devastated. | | |
| | 168:19 Q.  Let's go back to the time when she first | | |
| | 168:20      realized that the personnel committee had voted | | |
| | 168:21      against her. | | |
| | 168:22 A.  Uh-huh. | | |
| | 168:23 Q.  What did you observe at that point? | | |
| | 168:24 A.  This is a devastating thing for anyone. | | |
| | 169:01      But, you know, I think Cathrine had worked so | | |
| | 169:02      hard and after her reappointment review she had | | |
| | 169:03      focused on getting this text out and she had | | |
| | 169:04      gotten the text out and she had -- you know, she | | |
| | 169:05      thought, you know, she did a tremendous amount | | |
| | 169:06      of work to do this, and so she thought her | | |
| | 169:07      colleagues would support her.  And, you know, | | |
| | 169:08      when she found out that they didn't, it was | | |
| | 169:09      devastating. | | |
| | 169:10      That's already kind of a terrible | | |
| | 169:11      thing to have to face when you don't get tenure | | |
| | 169:12      because your life is upended. | | |
| | 169:13      The second time when her contract | | |
| | 169:14      was ended, that, at that point, she became | | |
| | 169:15      desperate.  She had a child.  Her husband is a | | |
| | 169:16      musician, travels a lot.  She had no way of | | |
| | 169:17      supporting herself then after that was taken | | |
| | 169:18      away from her. | | |
| | 169:19      At the drop of a hat, you know, she | | |
| | 169:20      found another position at the college, the | | |
| | 169:21      California College of the Arts, and she had to | | |
| | 169:22      move within like two weeks.  So I mean the whole | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
| --- | --- | --- | --- |

169:23 thing was just, you know, unbelievably bad.  She

169:24 was devastated.  She cried.  She carried on.

170:01 You know, it was just terrible.  And in fact,

170:02 you know, she's been devastated ever since.  You

170:03 know, she never did produce the second book

170:04 because she's, you know, she was just -- she's

170:05 devastated.  She's destroyed.  They destroyed

170:06 her career.

170:07 Q. Is it your understanding that Penn did

170:08 conduct another review of Professor Veikos's

170:09 promotion with tenure?

170:10 A. Yes.

170:11 Q. Who managed the re-review process?

170:12 A. At this time David Leatherbarrow was now

170:13 the acting chair.  So David supervised that

170:14 second process.

170:15 Q. What was your understanding about

170:16 whether you as a faculty were reviewing the same

170:17 dossier materials?

170:18 A. It was all done in a very hurried way.

170:19 I remember we got a note that we had to

170:20 re-review all of the material some time I think

170:21 during Thanksgiving of that same year, 2011.  We

170:22 were in the middle of final exams and final

170:23 reviews.  There was no way we had time to review

170:24 all of the material again.

171:01 So I remember writing a note to

171:02 David saying, you know, you know, we need more

171:03 time to do this.  And so he finally gave us more

171:04 time.

171:05 But I was not -- Cathrine by then

171:06 was gone.  I was not clear what the charge for

171:07 the external letters was at that point.  I don't

171:08 know what had been said.  I just know I was

171:09 given, you know, this new thing to write a new

171:10 letter about.

171:11 Q. Okay.  All right, let me show you what

171:12 has been marked as P-21.

171:13 A. Okay.  This was the note I wrote to

171:14 David.

171:15 Q. Okay, this is an e-mail you and David

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

171:16      exchanged about the timing --

171:17   A.   Right, right.

171:18   Q.   -- of Cathrine's review?

171:19   A.   Right.

171:20      So again, I said there's no

171:21      possible way.  11-28, so it was Thanksgiving,

171:22      and he wanted this done by December 5th and

171:23      wanted another meeting by then, which was just,

171:24      that's absurd.

172:01      Again, this has everything that she

172:02      has ever done.  And I had reviewed it.  I was

172:03      familiar with it.  But to write another letter

172:04      in that amount of time, you know, there's no

172:05      way.

172:06   Q.   Did you have any other concerns about

172:07      the way the re-review process went forward?

172:08   A.   I wasn't really involved at this point,

172:09      you know, because I had been so publicly

172:10      supportive of Cathrine, I had circulated these

172:11      e-mails to everyone, no one was really talking

172:12      to me about what was going on.  So I was sort of

172:13      cut out of the, cut out of the proceeding.  So

172:14      this was one of the first things that I had

172:15      heard about that it was scheduled again.

172:16   Q.   Do you know, do you recall whether or

172:17      not Professor Leatherbarrow this time selected

172:18      Ali Rahim and Marion Weiss again for the ad hoc

172:19      committee?

172:20   A.   I didn't know that.

172:21   Q.   Okay.

172:22   A.   Yeah.

172:23   Q.   Did you have any concerns about Ali

172:24      Rahim participating in the review process?

173:01   A.   Yes, because in the interim, Cathrine

173:02      had been a supervisor for the second year

173:03      studio.  And this is, you know, coordinating

173:04      five faculty under you and 70 students.  Right?

173:05      And Cathrine had been in charge of that for at

173:06      least three or four years.

173:07      And when Cathrine left, then Ali

173:08      Rahim's wife was put in charge of this.  And I

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

173:09   know this all sounds crazy that this actually

173:10   even happens.  But yes, Ali Rahim's wife was now

173:11   in charge of this.  She was an adjunct

173:12   professor.  She didn't have a position.  Clearly

173:13   there's a conflict of interest.

173:14   You know, so I wrote to David and I

173:15   said, are you going to ask Ali to recuse

173:16   himself?  His wife is directly implicated in

173:17   this, in Cathrine's departure.

173:18   I never heard anything.

173:19 Q.  Did Ali Rahim participate in the

173:20   re-review?

173:21 A.  Yes, he did, uh-huh.

173:22 Q.  And you wrote another internal letter?

173:23 A.  Right.

173:24 Q.  I just want to make sure the jury has a

174:01   chance to see that.  Look at Exhibit P-22 and

174:02   confirm whether or not that is your internal

174:03   letter for the re-review?

174:04 A.  Yes.  This is my internal letter for

174:05   Cathrine on her second review.

174:06 Q.  Did your position about Professor

174:07   Veikos's qualifications for promotion with

174:08   tenure change by this point?

174:09 A.  Why would it have?  Everything was

174:10   essentially the same.  I just -- I also knew

174:11   that she had gotten closer to having the book --

174:12   the second book accepted by Routledge.  So if

174:13   anything, I would be inclined to support her

174:14   more strongly.

174:15 Q.  By the time you wrote that internal

174:16   letter, were you aware that Cathrine Veikos had

174:17   filed a complaint of discrimination about the

174:18   first review?

174:19 A.  I knew that she had received counsel.

| 174:24 - 180:03 | **Fierro, Annette 2022-08-11** | 00:05:31 | AF_FINAL.27 |

174:24 Q.  Did you participate in the faculty

175:01   meeting where Cathrine Veikos's promotion for

175:02   tenure was reviewed a second time?

175:03 A.  Yes, I did.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

175:04   Q.   Do you recall who was present?

175:05   A.   All of the first group with the

175:06       exception of Frank Matero.  This time Marion

175:07       Weiss was there.  Ali Malkawi was there.  He had

175:08       not been in the first one.

175:09   Q.   What do you recall about the meeting?

175:10   A.   It was very short, you know.  I think

175:11       David walked in and the first thing that came

175:12       out of David's mouth was, "Well, Cathrine wants

175:13       us to do this over again, so I guess if -- she

175:14       finds something wrong with the case, so I guess

175:15       we have to do it over again," and was incredibly

175:16       dismissive.  And, you know, that was a kind of

175:17       clue about what was about to happen.  You know,

175:18       it was being dismissed.

175:19   Q.   Do you remember specifically any

175:20       comments or discussion at the meeting itself?

175:21   A.   They talked about the letters.  There

175:22       was a new set of letters that had come in.  I

175:23       think there was another letter that was a

175:24       problem with Sylvia Lavin.  There wasn't much

176:01       discussion.  Right?  It was over very soon.

176:02   Q.   Did David Leatherbarrow support Cathrine

176:03       Veikos for tenure?

176:04   A.   He was much more qualified the second

176:05       time around and then I realized later he voted

176:06       against her, so it is just, you know.

176:07   Q.   Let me show you another document.  This

176:08       has been marked as P-23.

176:09       Do you recognize what that is?

176:10   A.   Yes, this is a note that Frank Matero

176:11       wrote to David Leatherbarrow.  It was a letter

176:12       of review, much like mine had been.  Very, very

176:13       cursory.

176:14       Now, he changes his position

176:15       completely where before he had been a very, very

176:16       strong advocate.  Now it's just entirely

176:17       opposite of what he had said the first time

176:18       around.

176:19   Q.   And it is your recollection that

176:20       Professor Matero was not at the meeting?

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

176:21  A.  He was not at the meeting, but this

176:22       letter came up in the meeting.

176:23  Q.  Okay.  I just want to, again, focus on

176:24       the text.  So this was an e-mail, if looks like

177:01       it was forwarded to you on February 1st, 2012?

177:02  A.  Right.

177:03  Q.  And it indicates Professor Matero is

177:04       saying in the second line of his e-mail, "I

177:05       understand I will not be able to vote due to my

177:06       unavoidable absence at the meeting."

177:07  A.  Right.

177:08  Q.  So he didn't call in, or anything, he

177:09       didn't participate?

177:10  A.  No, no, you have to be, by the rule of

177:11       the department you have to be seated in the

177:12       discussion to be able to vote.

177:13  Q.  Okay, okay.

177:14  A.  Right.

177:15       So yeah, again, you know, I mean it

177:16       was sort of bewildering given how strong his

177:17       support had been the first time around.

177:18  Q.  And from your perspective there were no

177:19       changes to the dossier --

177:20  A.  No.

177:21  Q.  -- on which you were reviewing?

177:22  A.  No.

177:23  Q.  Let's take a look at another document.

177:24       This is P-24.

178:01       What is this letter?

178:02  A.  This letter is a letter from Bill

178:03       Braham -- no.  David Leatherbarrow, sorry,

178:04       sorry.  David Leatherbarrow, now to Marilyn

178:05       Taylor reporting on the, on the new meeting of

178:06       the new letters and the new vote.

178:07  Q.  All right.  So is this the department

178:08       chair letter --

178:09  A.  Yes.

178:10  Q.  -- in connection the second review?

178:11  A.  Yes.  But it went directly to the dean

178:12       this time and not to the personnel committee.

178:13  Q.  Okay.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

178:14 A. Okay.

178:15 Q. All right. So the first paragraph there

178:16    confirms who was in attendance. We talked about

178:17    that.

178:18 A. Uh-huh.

178:19 Q. And then can you read out what the vote

178:20    was?

178:21 A. Two in favor of promotion and tenure and

178:22    five against.

178:23 Q. You voted in favor?

178:24 A. Of course.

179:01 Q. Do you know who else did?

179:02 A. Yes, I think Ali Malkawi did. He had

179:03    just recently been tenured so he was now able to

179:04    vote.

179:05 Q. And then at the end of the letter, what

179:06    position does Professor Leatherbarrow take on

179:07    the case?

179:08 A. He takes, he takes an against, an

179:09    against vote. "I concur with the majority

179:10    view." I am reading this now. "Colleagues felt

179:11    that the majority of external letters expressed

179:12    significant doubts about the case, about the

179:13    level, quality, and impact of the scholarship."

179:14    He talked about Cathrine being an

179:15    effective teacher again, contributing practical

179:16    expertise, theoretical inquiry, but, you know,

179:17    essentially.

179:18 Q. And was that different from your

179:19    understanding of his position the first time?

179:20 A. Certainly. He had been very strong, he

179:21    had been a very strong supporter. So I don't

179:22    know how his position changed on her work.

179:23 Q. Other than you, are there any women in

179:24    the department of architecture who have had

180:01    children during the probationary period at Penn

180:02    who also achieved tenure?

180:03 A. No.

| | | | |
|---|---|---|---|
| 185:24 - 186:16 | **Fierro, Annette 2022-08-11** | 00:00:30 | AF_FINAL.28 |

185:24 Q. Hi, Professor Fierro. I want to

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 186:01   introduce myself.  I know we have met before. | | |
| | 186:02  A.  Yes. | | |
| | 186:03  Q.  I want to introduce myself on the | | |
| | 186:04   record.  I am Ali Kliment and I represent the | | |
| | 186:05   University of Pennsylvania in the lawsuit that | | |
| | 186:06   was filed by Cathrine Veikos. | | |
| | 186:07   My understanding from your earlier | | |
| | 186:08   testimony is that we are here today because you | | |
| | 186:09   are unavailable to testify at trial. | | |
| | 186:10  A.  Right. | | |
| | 186:11  Q.  And you are going to be in Paris on an | | |
| | 186:12   academic sabbatical? | | |
| | 186:13  A.  Yes. | | |
| | 186:14  Q.  I also will not be at trial, as you | | |
| | 186:15   know.  I will be on maternity leave.  But since | | |
| | 186:16   we met previously for your deposition -- | | |
| 186:19 - 187:12 | **Fierro, Annette 2022-08-11** | 00:00:35 | AF_FINAL.29 |
| | 186:19  Q.  I thought it would make sense for me to | | |
| | 186:20   question you in response to questions from | | |
| | 186:21   Cathrine's lawyer. | | |
| | 186:22  A.  Okay. | | |
| | 186:23  Q.  You testified earlier that you have gone | | |
| | 186:24   up for tenure and been promoted with tenure in | | |
| | 187:01   the department of architecture; right? | | |
| | 187:02  A.  Yes. | | |
| | 187:03  Q.  And that was in 2002? | | |
| | 187:04  A.  Yes. | | |
| | 187:05  Q.  At the time you went up for tenure, Bill | | |
| | 187:06   Braham, David Leatherbarrow, Marion Weiss, | | |
| | 187:07   Witold Rybcznski and Frank Matero, they were all | | |
| | 187:08   tenured professors; right? | | |
| | 187:09  A.  Yes. | | |
| | 187:10  Q.  So you would expect that they would have | | |
| | 187:11   voted on your tenure case? | | |
| | 187:12  A.  Uh-huh, yes. | | |
| 187:16 - 188:08 | **Fierro, Annette 2022-08-11** | 00:00:34 | AF_FINAL.30 |
| | 187:16  Q.  And they voted in favor of granting you | | |
| | 187:17   tenure? | | |
| | 187:18  A.  I had heard it was unanimous, so yes. | | |
| | 187:19  Q.  And that is because were you qualified | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 187:20  for tenure? | | |
| | 187:21  A.  I hope so. | | |
| | 187:22  Q.  You have no reason to doubt that they | | |
| | 187:23       voted on anything other than your qualifications, | | |
| | 187:24       do you? | | |
| | 188:01  A.  Nope. | | |
| | 188:02  Q.  And the same faculty members that I just | | |
| | 188:03       mentioned, they voted on Cathrine's tenure case; | | |
| | 188:04       right? | | |
| | 188:05  A.  Yes. | | |
| | 188:06  Q.  David Leatherbarrow and Bill Braham | | |
| | 188:07       actually submitted very positive letters in | | |
| | 188:08       support of your tenure case? | | |

| 188:13 - 188:13 | **Fierro, Annette 2022-08-11** | 00:00:03 | AF_FINAL.31 |
| | 188:13       MS. KLIMENT:  So we can do D-1. | | |

| 188:18 - 189:01 | **Fierro, Annette 2022-08-11** | 00:00:16 | AF_FINAL.32 |
| | 188:18  Q.  If you look at the second page of this | | |
| | 188:19       exhibit, it is signed by Bill Braham? | | |
| | 188:20  A.  Yes, uh-huh. | | |
| | 188:21  Q.  Would you understand this to be a letter | | |
| | 188:22       that Bill Braham wrote regarding your tenure | | |
| | 188:23       review? | | |
| | 188:24  A.  I would suppose so, yeah.  As I said, | | |
| | 189:01       I've never seen this, so I don't recognize it. | | |

| 189:07 - 189:21 | **Fierro, Annette 2022-08-11** | 00:00:30 | AF_FINAL.33 |
| | 189:07  Q.  I want to direct your attention to the | | |
| | 189:08       first paragraph of the letter. | | |
| | 189:09  A.  Okay. | | |
| | 189:10  Q.  It says, "I am more than honored to | | |
| | 189:11       write a letter of reference and support for | | |
| | 189:12       Annette Fierro's promotion to associate | | |
| | 189:13       professor in the department of architecture.  I | | |
| | 189:14       have nothing but the deepest respect for Annette | | |
| | 189:15       and her work, and my greatest difficulty in | | |
| | 189:16       writing this letter comes from recognizing how | | |
| | 189:17       much I will have to leave out." | | |
| | 189:18       Would you agree that that is a | | |
| | 189:19       positive comment from Bill Braham regarding your | | |
| | 189:20       tenure qualifications? | | |
| | 189:21  A.  It is very nice, yes. | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 190:08 - 190:19 | **Fierro, Annette 2022-08-11** | 00:00:35 | AF_FINAL.34 |

190:08  Q.  If you turn to the second page of the
190:09      exhibit, the very bottom, the last sentence it
190:10      says, "I am confident that Annette will continue
190:11      to teach and amaze us with the discoveries in
190:12      her research and can only conclude by urging you
190:13      to award her the promotion she has earned."
190:14      Is it fair to say Bill was strongly
190:15      supporting your tenure case?
190:16  A.  Yes, in this letter, if this is his
190:17      letter, yes.
190:18      MS. KLIMENT:  I wanted to show you
190:19      another document D-2.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 190:24 - 191:07 | **Fierro, Annette 2022-08-11** | 00:00:14 | AF_FINAL.35 |

190:24  Q.  Looking at the document, the top right
191:01      side dated February 17, 2002.
191:02  A.  Right.
191:03  Q.  The first sentence says, "I write in
191:04      reply to your request to consider the promotion
191:05      and tenure of Assistant Professor Annette
191:06      Fierro."
191:07  A.  Right.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 191:13 - 192:19 | **Fierro, Annette 2022-08-11** | 00:01:34 | AF_FINAL.36 |

191:13  Q.  If you turn to the second page of this
191:14      exhibit, it is signed by David Leatherbarrow?
191:15  A.  Uh-huh.
191:16  Q.  Yes?
191:17  A.  Yes, uh-huh.
191:18  Q.  All right.  The last sentence on this
191:19      page says, "This level of scholarly production
191:20      and teaching effectiveness would, I think,
191:21      entitle her to promotion and tenure at our peer
191:22      institutions."
191:23  A.  Yes.
191:24  Q.  Fair to say that he too was providing a
192:01      letter of support for your tenure case?
192:02  A.  Yes.
192:03  Q.  I think you testified earlier that you
192:04      heard that you received unanimous support from
192:05      the department faculty --

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

192:06  A.  Yes.

192:07  Q.  -- and also the personnel committee for

192:08      your tenure review?

192:09  A.  I don't know that.

192:10  Q.  D-3.

192:11      Top left side, this is a letter

192:12      dated February 26th of 2012?

192:13  A.  Uh-huh.

192:14  Q.  And if you look at the second page, it

192:15      is signed by Peter McCleary?

192:16  A.  Yes.

192:17  Q.  Who is Peter McCleary?

192:18  A.  Peter McCleary is now a professor

192:19      emeritus of architecture.  He has retired.

| 192:23 - 194:13 | **Fierro, Annette 2022-08-11** | 00:01:30 | AF_FINAL.37 |

192:23  Q.  In February of 2002, do you know what

192:24      Peter McCleary's position was?

193:01  A.  I suppose he was, as the letter says,

193:02      chair, department of architecture personnel

193:03      committee.

193:04  Q.  Okay.

193:05      So I want to direct your attention

193:06      to the first two paragraphs.

193:07  A.  Okay.

193:08  Q.  On the first page.

193:09  A.  Uh-huh.

193:10  Q.  The first one says, "At a meeting of the

193:11      department of architecture's personnel committee

193:12      comprised of all members of the standing faculty

193:13      in the department of architecture on 20 February

193:14      2002, the committee voted unanimously to

193:15      recommend the promotion of Annette Fierro to the

193:16      position of associate professor with tenure in

193:17      the department of architecture."

193:18      Do you see that?

193:19  A.  Yes, uh-huh.

193:20  Q.  Any reason to believe they did not vote

193:21      unanimously in favor of you?

193:22  A.  No reason to believe.

193:23  Q.  Okay.  The next paragraph says, "The

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 193:24   seven tenured standing faculty in architecture | | |
| | 194:01   who were present at the meeting and voted yes | | |
| | 194:02   were," and then it lists "Leatherbarrow, | | |
| | 194:03   Rybcznski, Braham, and Weiss."  And it also | | |
| | 194:04   notes that "Associate Professor Matero voted | | |
| | 194:05   yes." | | |
| | 194:06   Do you see that? | | |
| | 194:07  A.  Yes. | | |
| | 194:08  Q.  So all of them voted in favor of your | | |
| | 194:09   tenure review? | | |
| | 194:10  A.  Yes. | | |
| | 194:11  Q.  So I asked you earlier about the | | |
| | 194:12   personnel committee vote in your case as well. | | |
| | 194:13   D-4. | | |
| 194:18 - 196:19 | **Fierro, Annette 2022-08-11** | 00:01:42 | AF_FINAL.38 |
| | 194:18  Q.  This is a letter dated April 3rd, 2002. | | |
| | 194:19  A.  Okay. | | |
| | 194:20  Q.  And if you look at the second page, it | | |
| | 194:21   is signed by Witold Rybcznski. | | |
| | 194:22  A.  (Witness nods.) | | |
| | 194:23  Q.  Sorry.  Yes. | | |
| | 194:24  A.  Yes, uh-huh. | | |
| | 195:01  Q.  And he is listed as chair, personnel | | |
| | 195:02   committee; right? | | |
| | 195:03  A.  Okay. | | |
| | 195:04  Q.  If you look at the -- | | |
| | 195:05  A.  I think Peter was.  That's what the last | | |
| | 195:06   letter was. | | |
| | 195:07  Q.  I think Peter was the chair of the | | |
| | 195:08   department. | | |
| | 195:09  A.  Oh, I see, department, okay.  Got it, | | |
| | 195:10   okay. | | |
| | 195:11  Q.  So this letter that we are looking at, | | |
| | 195:12   D-4, is from Witold Rybcznski. | | |
| | 195:13  A.  Okay. | | |
| | 195:14  Q.  To Dean Gary Hack; right? | | |
| | 195:15  A.  Right, uh-huh. | | |
| | 195:16  Q.  And if you look at the first paragraph | | |
| | 195:17   of the letter, it says, "The GSFA." | | |
| | 195:18   Do you know what GSFA is? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

195:19   A.   Yes.  The Graduate School of Fine Arts.

195:20         That was our former name.

195:21   Q.   "The GSFA personnel committee met on

195:22         April 2 to review the promotion of Annette

195:23         Fierro to associate professor of architecture

195:24         with tenure.  Present were Professors John Dixon

196:01         Hunt, Witold Rybcznski and Robert Slutzky."

196:02   A.   Robert Slutzky is also an emeritus, yes.

196:03   Q.   "Professor Peter McCleary was absent.

196:04         Professor John Keene recused himself from

196:05         discussion and voting on the case."

196:06         Do you see that?

196:07   A.   Yes, uh-huh.

196:08   Q.   And if you turn to the back of this

196:09         exhibit, the second page.  Yep.  The last

196:10         sentence says, "The four members of the

196:11         committee who voted voted unanimously to promote

196:12         Annette Fierro, associate professor of

196:13         architecture, with tenure, Peter McCleary voting

196:14         in absentia."

196:15         Do you see that?

196:16   A.   Yes.

196:17   Q.   So the personnel committee voted

196:18         unanimously in favor of promoting you?

196:19   A.   Yes.

| 196:24 - 204:02 | **Fierro, Annette 2022-08-11** | 00:07:50 | AF_FINAL.39 |

196:24   A.   Okay.

197:01   Q.   I think you testified earlier that at

197:02         the time you went up for tenure you had two

197:03         young children?

197:04   A.   Uh-huh.

197:05   Q.   And after the birth of each of your

197:06         kids, you took a semester off with pay?

197:07   A.   Yes, uh-huh.

197:08   Q.   And David Leatherbarrow supported you

197:09         taking that semester off?

197:10   A.   Not entirely.

197:11   Q.   He approved the semester off?

197:12   A.   He did approve it.

197:13   Q.   Okay.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

197:14      You also got an extension of your

197:15      probationary period for both of your kids?

197:16   A.   Yes.

197:17   Q.   When the faculty in the department of

197:18      architecture considered your tenure case, they

197:19      were aware that you had two children?

197:20   A.   Yes. Uh-huh.

197:21   Q.   And that you had extended your

197:22      probationary period?

197:23   A.   Yes, uh-huh.

197:24   Q.   And Bill Braham, David Leatherbarrow,

198:01      Witold Rybcznski, Marion Weiss and Frank Matero,

198:02      they all voted in favor of you?

198:03   A.   Yes.

198:04   Q.   So you received support from some of the

198:05      same departmental faculty who voted against

198:06      Cathrine?

198:07   A.   Yes.

198:08   Q.   And you were ultimately granted tenure?

198:09   A.   Yes.

198:10   Q.   Before you went up for tenure, Marion

198:11      Weiss went up for tenure; right?

198:12   A.   Yes.

198:13   Q.   And she was promoted with tenure?

198:14   A.   Yes.

198:15   Q.   At the time that she went up for tenure,

198:16      David Leatherbarrow and Frank Matero were both

198:17      tenured faculty?

198:18   A.   Yes.

198:19   Q.   She also received unanimous support;

198:20      right?

198:21   A.   Right. Actually, I don't know that. I

198:22      was not in that meeting.

198:23   Q.   And Marion Weiss remains a tenured

198:24      faculty member within the department?

199:01   A.   No.

199:02   Q.   She is not tenured?

199:03   A.   She has stepped out of her tenured

199:04      position to work on her practice. I think she's

199:05      affiliated faculty now.

199:06   Q.   As of Cathrine's tenure review in 2011

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

199:07 and 2012, Marion Weiss was a tenured faculty

199:08 member?

199:09 A. Yes, uh-huh.

199:10 Q. You testified earlier about Franca

199:11 Trubiana?

199:12 A. Uh-huh.

199:13 Q. Since you and Marion went up for tenure,

199:14 Franca also was considered for tenure?

199:15 A. Yes.

199:16 Q. And I believe you testified earlier that

199:17 Franca is a woman?

199:18 A. Yes.

199:19 Q. You were part of the tenured faculty who

199:20 voted on her case?

199:21 A. Yes.

199:22 Q. Other faculty members who voted on her

199:23 case were Bill Braham, David Leatherbarrow,

199:24 Frank Matero and Ali Rahim?

200:01 A. Yes, uh-huh.

200:02 Q. Bill Braham submitted a letter in

200:03 support of Franca, didn't he?

200:04 A. I don't remember. I wrote one of the

200:05 letters for Franca also.

200:06 MS. KLIMENT: I think, Julie, you

200:07 have this, so give me one second.

200:08 MS. UEBLER: The department letter

200:09 and the CV is in that exhibit. Nothing else.

200:10 MS. KLIMENT: Good point. Thank

200:11 you.

200:12 BY MS. KLIMENT:

200:13 Q. So I am going to give you Bill Braham's

200:14 letter. D-5.

200:15 D-5 is a letter dated

200:16 September 14th of 2015?

200:17 A. Right.

200:18 Q. And it is signed by Bill Braham?

200:19 A. Right.

200:20 Q. As part of Franca's tenure case, you

200:21 would have reviewed this internal letter?

200:22 A. Yes. I also wrote a letter.

200:23 Q. I want to direct you to the first

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

200:24    sentence in the letter.  It reads, "I am more

201:01    than pleased to write a letter of support for

201:02    Franca Trubiana's promotion to professor with

201:03    tenure."

201:04    Do you see that?

201:05  A.  Yes.

201:06  Q.  Then in that same paragraph the last

201:07    sentence says, "At the outset, let me express my

201:08    strong support for her promotion," and then it

201:09    continues?

201:10  A.  Right, uh-huh.

201:11  Q.  If you turn to the last page of the

201:12    exhibit, the last paragraph.

201:13  A.  Okay.

201:14  Q.  It says, "Franca Trubiano has been an

201:15    excellent colleague and collaborator and is

201:16    providing valuable leadership within the

201:17    department, most recently as associate chair.  I

201:18    can only conclude with my strongest

201:19    recommendation for this promotion."

201:20    Do you see that?

201:21  A.  Yes, uh-huh.

201:22  Q.  Would you agree that this is a

201:23    supportive letter from Bill Braham for Franca?

201:24  A.  I would.

202:01  Q.  Do you recall whether Frank Matero

202:02    submitted a letter in Franca Trubiano's tenure

202:03    case?

202:04  A.  No, I don't.

202:05  Q.  D-6.

202:06    So this is a letter dated

202:07    September 15th of 2015.  Do you see that?

202:08  A.  Okay.

202:09  Q.  Do you see that?

202:10  A.  Uh-huh.

202:11  Q.  And the second page is signed by Frank

202:12    Matero; right?

202:13  A.  Yes, uh-huh.

202:14  Q.  I want to direct your attention to the

202:15    first page and it is the first paragraph, second

202:16    sentence.  It says, "After a careful review of

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

202:17     her dossier, I am delighted to voice my

202:18     strongest support for her promotion."

202:19     Do you see that?

202:20  A.  Yes, uh-huh.

202:21  Q.  And then if you turn the page, the last

202:22     sentence in the last paragraph says, "Again,

202:23     Franca Trubiana's accomplishments more than

202:24     satisfy my endorsement for promotion to

203:01     associate professor with tenure."

203:02     Do you see that?

203:03  A.  I do.

203:04  Q.  Would you agree that this is also a

203:05     supportive letter by Frank Matero for Franca's

203:06     tenure case?

203:07  A.  It is.

203:08  Q.  Franca received unanimous support from

203:09     the department of architecture; right?

203:10  A.  Yes, she did.

203:11  Q.  So Bill, David, Frank and Ali all voted

203:12     in favor of Franca's tenure case?

203:13  A.  As did I.

203:14  Q.  She also received unanimous support at

203:15     the personnel committee level?

203:16  A.  Uh-huh.

203:17  Q.  Yes?

203:18  A.  Yes, uh-huh.  I mean I don't know that.

203:19     I'm not -- I don't know.

203:20  Q.  Do you have any reason to believe she

203:21     did not get unanimous support?

203:22  A.  I am not involved at that level so I

203:23     don't know what the vote is.

203:24     I'm also not privy to those letters

204:01     so I don't know.

204:02  Q.  D-7.

| 204:08 - 206:11 | **Fierro, Annette 2022-08-11** | 00:02:07 | AF_FINAL.40 |

204:08  Q.  This is a letter dated October 28, 2015.

204:09  A.  Okay.

204:10  Q.  And if you look at the last page of the

204:11     exhibit, it is signed by Professor David

204:12     Leatherbarrow?

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

204:13  A.  Yes.

204:14  Q.  As the chair of the personnel committee?

204:15  A.  Okay.

204:16  Q.  And if you go to the first page, the

204:17     first paragraph, it says, "The personnel

204:18     committee of the school of design met on

204:19     October 28th, 2015, to consider the promotion of

204:20     Assistant Professor Franca Trubiano to the rank

204:21     of associate professor of architecture with

204:22     tenure.  The committee in attendance, Professors

204:23     Lum, Tomlin and myself voted unanimously, three

204:24     in favor and three against."

205:01     Do you see that?

205:02  A.  And none against.

205:03  Q.  Sorry.  "None against."  Thank you for

205:04     that clarification.  So they voted unanimously

205:05     in favor of Franca?

205:06  A.  Yes.

205:07  Q.  And as the chair, David Leatherbarrow

205:08     offered a supportive letter?

205:09  A.  Right.  I would assume so, yeah.

205:10  Q.  Well, let me direct your attention to

205:11     the last paragraph of this letter.  This is

205:12     David's letter; right?

205:13  A.  If you say so.  I don't have it.

205:14  Q.  The one that we are looking at.

205:15  A.  Oh, okay.

205:16  Q.  David Leatherbarrow signed it?

205:17  A.  Right, uh-huh.

205:18  Q.  The last paragraph says, "Based on these

205:19     reviews and the professional recognition she has

205:20     achieved, the committee voted unanimously in

205:21     support of this appointment as noted above.  The

205:22     personnel committee joins me in urging you to

205:23     support Franca Trubiana's promotion to the rank

205:24     of associate professor of architecture with

206:01     tenure."

206:02  A.  Yes, uh-huh.

206:03  Q.  When Franca went up for tenure, Marilyn

206:04     Taylor was the dean of the school of design;

206:05     right?

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 206:06  A.  Uh-huh. | | |
| | 206:07  Q.  Dean Taylor also supported her | | |
| | 206:08       candidacy? | | |
| | 206:09  A.  Uh-huh.  I assume so.  She got tenure, | | |
| | 206:10       yes. | | |
| | 206:11  Q.  D-8. | | |
| 206:19 - 216:06 | **Fierro, Annette 2022-08-11** | 00:09:25 | AF_FINAL.41 |
| | 206:19  Q.  This is a letter dated November 20th of | | |
| | 206:20       2015; right? | | |
| | 206:21  A.  Right, uh-huh. | | |
| | 206:22  Q.  And if you look at the final page, it is | | |
| | 206:23       signed by Marilyn Taylor? | | |
| | 206:24  A.  Right. | | |
| | 207:01  Q.  And the first sentence, so back to the | | |
| | 207:02       first page -- sorry -- | | |
| | 207:03  A.  Okay. | | |
| | 207:04  Q.  -- says I am pleased to present the | | |
| | 207:05       dossier of Dr. Franca Trubiana and to recommend | | |
| | 207:06       her with great enthusiasm for promotion to | | |
| | 207:07       associate professor with tenure in the school of | | |
| | 207:08       design." | | |
| | 207:09       Do you see that? | | |
| | 207:10  A.  Yes, I do. | | |
| | 207:11  Q.  So like you, Franca received support | | |
| | 207:12       from some of the same tenured faculty members in | | |
| | 207:13       the department who voted against Cathrine; | | |
| | 207:14       right? | | |
| | 207:15  A.  Yes, uh-huh. | | |
| | 207:16  Q.  And she was, Franca was ultimately | | |
| | 207:17       promoted with tenure? | | |
| | 207:18  A.  Yes, uh-huh. | | |
| | 207:19  Q.  I want to switch and talk a little bit | | |
| | 207:20       about external reviewers.  You have testified at | | |
| | 207:21       length about external reviewers. | | |
| | 207:22       I believe you testified earlier | | |
| | 207:23       that you and Cathrine were friends? | | |
| | 207:24  A.  Yes. | | |
| | 208:01  Q.  You had a close relationship? | | |
| | 208:02  A.  We were colleagues, close colleagues, | | |
| | 208:03       yeah. | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

208:04  Q.  You also testified that you were

208:05      disappointed that she was denied tenure?

208:06  A.  Certainly, uh-huh.

208:07  Q.  When considering a candidate for tenure,

208:08      it is important not to base the decision based

208:09      on friendship or personal feelings about the

208:10      candidate; right?

208:11  A.  Certainly.

208:12  Q.  So assessments of whether a candidate

208:13      should be promoted with tenure should be based

208:14      on their objective qualifications?

208:15  A.  Certainly.

208:16  Q.  And whether you like or dislike someone

208:17      personally should not be a factor?

208:18  A.  That is certainly right, uh-huh.

208:19  Q.  Would you agree that external reviewers

208:20      are less likely to know candidates or tenured

208:21      candidates personally than members of the

208:22      department?

208:23  A.  Certainly.  That's why they are asked.

208:24  Q.  Often external reviewers probably

209:01      haven't even met the candidates that they are

209:02      reviewing; right?

209:03  A.  I think technically external reviewers,

209:04      some have knowledge of the candidates and some

209:05      don't.

209:06  Q.  So external reviewers are different from

209:07      members of the department who worked with and

209:08      have gotten to know the candidate personally?

209:09  A.  Definitely.

209:10  Q.  I think you testified before that it is

209:11      expected that the external reviewers will be

209:12      more knowledgeable about the candidate's field

209:13      or work than members of the department?

209:14  A.  Hopefully, yes.

209:15  Q.  That is why they are selected to do the

209:16      external reviews?

209:17  A.  Hopefully, yes.

209:18  Q.  Is it fair to say that no member of the

209:19      department would have known more about

209:20      Cathrine's field than the external reviewers

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

209:21   that were selected in her case?

209:22 A.   About the field?  I'm not sure.  Because

209:23   that was a question that came up, whether these

209:24   people were in the field.  So I don't know.

210:01 Q.   You testified earlier about Anthony

210:02   Vidler; right?

210:03 A.   Yes, uh-huh.

210:04 Q.   And said that he was very knowledgeable

210:05   with Cathrine's field; right?

210:06 A.   He's very knowledgeable period.  He's

210:07   written about all kinds of things.

210:08 Q.   Do you think there were any members of

210:09   the department who were more knowledgeable than

210:10   him?

210:11 A.   About the field?  No.

210:12 Q.   Typically external reviewers are used to

210:13   help members at Penn who are less familiar with

210:14   the candidate's field to understand the work,

210:15   its impact, its significance?

210:16 A.   I think that's how they are used

210:17   everywhere, yeah.

210:18 Q.   And we talked a little bit earlier about

210:19   they are also important because they're

210:20   objective?

210:21 A.   Yes, uh-huh.

210:22 Q.   We talked or you talked with Julie about

210:23   the ad hoc committee for Cathrine's tenure case?

210:24 A.   Yes.

211:01 Q.   Do you recall that?

211:02 A.   Uh-huh.

211:03 Q.   And you testified that Marion Weiss and

211:04   Ali Rahim were members of the ad hoc committee?

211:05 A.   That's right.

211:06 Q.   When you learned that Marion and Ali

211:07   were the ad hoc committee members, did you have

211:08   any discussions with Bill Braham about why he

211:09   selected them?

211:10 A.   I think the date of that shows that I

211:11   didn't know in advance.  I wish I had because

211:12   maybe I would have.  But I didn't do anything

211:13   that day, no.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

211:14  Q.  Okay.  So you did not discuss with Bill

211:15       his selection of Marion and Ali?

211:16  A.  No, uh-uh.

211:17  Q.  So you don't know why he chose them?

211:18  A.  No.

211:19  Q.  When you learned that Marion and Ali

211:20       were selected, did you tell Bill Braham or

211:21       anyone else at Penn that you felt that they were

211:22       not the right selection for the ad hoc

211:23       committee?

211:24  A.  I think I said something to him later

212:01       about that, but at the time, no.  No.

212:02  Q.  Did you ask Bill Braham to select

212:03       someone else other than Ali Rahim or Marion

212:04       Weiss?

212:05  A.  I already said I didn't talk to him.  So

212:06       no.

212:07  Q.  Did you talk to any one on the personnel

212:08       committee about your views of selection of Ali

212:09       Rahim and Marion Weiss to the ad hoc committee?

212:10  A.  No.  You have to understand, I had

212:11       already raised serious objections in the letter

212:12       to Bill.  There is just so much stuff that you

212:13       can put out there without damaging your

212:14       credibility.  I had already really pushed hard

212:15       by the letter that I had written to Bill.

212:16  Q.  You testified earlier about the

212:17       April 6th faculty meeting during Cathrine's

212:18       initial tenure review.

212:19  A.  Right.

212:20  Q.  Do you recall that?

212:21  A.  Yes.

212:22  Q.  And you testified earlier that the

212:23       faculty heavily discussed the content of the

212:24       external letters?

213:01  A.  Yes.

213:02  Q.  The faculty discussed concerns that were

213:03       raised by some of the external reviewers?

213:04  A.  Yes, uh-huh.

213:05  Q.  And there was discussion of Judith

213:06       Sheine's letter because it was particularly

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

213:07    negative?

213:08  A.  Right.

213:09  Q.  Some faculty seemed to give more weight

213:10    to the criticisms in the external reviewers'

213:11    letters?

213:12  A.  I have a hard time remembering, you

213:13    know, how that discussion went specifically.  We

213:14    were all concerned because whenever there is

213:15    even a negative sentence in the reviewers, it

213:16    qualifies a candidate.  So a lot of time is

213:17    spent looking at the letters for negative

213:18    perceptions.

213:19  Q.  During the faculty meeting, some faculty

213:20    expressed that Cathrine's case was weak, didn't

213:21    they?

213:22  A.  I think we were concerned because of

213:23    some of the letters.  I know Ali said the case

213:24    was weak, but I don't remember anyone else

214:01    saying the case was weak in that meeting.  I

214:02    know that there has been discussion on that, but

214:03    honestly, I don't.  I think we talked about, you

214:04    know, how it was hanging in the balance because

214:05    of the letters, but I don't really remember

214:06    anyone saying that her case was weak.

214:07  Q.  Do you recall an exchange with Witold

214:08    Rybcznski after the faculty member -- after the

214:09    faculty meeting regarding any comments by

214:10    faculty that the case was weak?

214:11  A.  I think when I wrote the note to Bill

214:12    and copied all of the faculty, I think he wrote

214:13    back to Bill and said that he remembered people

214:14    saying it was weak, but I don't remember that.

214:15  Q.  And "he," is Witold?

214:16  A.  Yes, he is Witold, yes, Witold

214:17    Rybcznski, yeah.

214:18  Q.  And at the time of the meeting you had

214:19    reviewed the ad hoc committee report --

214:20  A.  Yes.

214:21  Q.  -- that was prepared by Marion and Ali?

214:22  A.  Yes.

214:23  Q.  So at the time of the meeting, at least

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 214:24   three members of the department, Marion Weiss, | | |
| | 215:01   Ali Rahim and Witold Rybcznski had expressed | | |
| | 215:02   concerns about the strength of Cathrine's tenure | | |
| | 215:03   case? | | |
| | 215:04  A.  I believe Witold voted for her. | | |
| | 215:05   So Marion wasn't at the meeting. | | |
| | 215:06   The letter was not exactly damning.  It was just | | |
| | 215:07   not really well informed.  I knew that Ali | | |
| | 215:08   wasn't going to support Cathrine.  But the | | |
| | 215:09   others were nebulous. | | |
| | 215:10  Q.  You didn't consider the ad hoc committee | | |
| | 215:11   report by Marion and Ali to be negative? | | |
| | 215:12  A.  Well, I don't think it was damning.  I | | |
| | 215:13   think they sort of said a lot of things, which | | |
| | 215:14   to me indicated they really didn't understand | | |
| | 215:15   the work. | | |
| | 215:16  Q.  So you didn't have any concerns about | | |
| | 215:17   the ad hoc committee report being negative? | | |
| | 215:18  A.  It wasn't that it was -- it was damning | | |
| | 215:19   in its neutrality, you know?  Like when letters | | |
| | 215:20   are too short, it is damning in neutrality. | | |
| | 215:21  Q.  I want to talk a little bit about what | | |
| | 215:22   we have referred as the re-review. | | |
| | 215:23  A.  Uh-huh. | | |
| | 215:24  Q.  So the second tenure review in 2012. | | |
| | 216:01  A.  Okay. | | |
| | 216:02  Q.  Is it fair to say that giving someone a | | |
| | 216:03   second tenure review is uncommon at Penn? | | |
| | 216:04  A.  Right. | | |
| | 216:05  Q.  You agreed with the decision to give | | |
| | 216:06   Cathrine a new review though; right? | | |
| 216:09 - 220:01 | **Fierro, Annette 2022-08-11** | 00:04:34 | AF_FINAL.42 |
| | 216:09   THE WITNESS:  I agreed -- I thought | | |
| | 216:10   given all of the irregularities, I thought | | |
| | 216:11   certainly she should get another review. | | |
| | 216:12   BY MS. KLIMENT: | | |
| | 216:13  Q.  You testified earlier that at the time | | |
| | 216:14   of Cathrine's re-review in 2012 David | | |
| | 216:15   Leatherbarrow was the chair; is that right? | | |
| | 216:16  A.  Yes, uh-huh. | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

216:17  Q.  And I think you also testified that in

216:18      the initial review he had supported Cathrine?

216:19  A.  Right.

216:20  Q.  And he had voted in favor of granting

216:21      her tenure in the initial review?

216:22  A.  Yes.

216:23  Q.  In the re-review, there was an entirely

216:24      new set of external reviews; right?

217:01  A.  Yes.

217:02  Q.  So that meant that David Leatherbarrow

217:03      and the rest of the faculty would be looking at

217:04      new information?

217:05  A.  New letters, yeah.  Not really new

217:06      material.

217:07  Q.  New external assessments of Cathrine?

217:08  A.  Right, uh-huh.

217:09  Q.  And all the faculty, including David,

217:10      would be expected to consider the new letters?

217:11  A.  How people on the faculty incorporate

217:12      their regard for the external letters often

217:13      depends on whether they agree with them or not.

217:14      I would say I think it is more fair to say that

217:15      their impression of the candidate is governed by

217:16      all kind of different factors.

217:17  Q.  When you got, when you were assessing

217:18      Cathrine in the re-review, did you review the

217:19      external letters?

217:20  A.  I did lots of them, yes.  I didn't

217:21      include them because I hadn't really had time to

217:22      read them.

217:23  Q.  Do you have any reason to believe that

217:24      the other faculty did not review the external

218:01      letters?

218:02  A.  I have no idea.

218:03  Q.  The external letters that were received

218:04      in the re-review --

218:05  A.  Uh-huh.

218:06  Q.  -- they were more critical of Cathrine's

218:07      case than the first set, weren't they?

218:08  A.  A bit more, yeah.  I think there was one

218:09      letter, which was interesting.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

218:10  Q.  Let's look at a few.

218:11      D-9.

218:12      This is a letter dated

218:13      November 18th of 2011.

218:14  A.  Right.

218:15  Q.  And if you look at the second page, it

218:16      is signed by Sylvia Lavin.

218:17  A.  That's right.

218:18  Q.  And she was an external reviewer during

218:19      Cathrine's re-review?

218:20  A.  That's right.

218:21  Q.  I want to direct your attention to the

218:22      second paragraph on the first page.

218:23  A.  Right.

218:24  Q.  It reads, "The most troubling feature of

219:01      the dossier is the candidate's difficulty in

219:02      distinguishing her work from that of others and

219:03      therefore in articulating the epistemological

219:04      basis of her research.  Her text on Lina

219:05      Bo Bardi is cursory rather than scholarly, and

219:06      while translation is certainly an onerous task,

219:07      it does not rise to the occasion of research and

219:08      risks, instead suggesting that Ms. Veikos does

219:09      not see where her work on Bo Bardi's stops and

219:10      Bo Bardi's own work begins.

219:11      Do you see that?

219:12  A.  I do.

219:13  Q.  Then I want to direct your attention to

219:14      the second page, the final paragraph which

219:15      reads, "While Miss Veikos seems keenly

219:16      interested in teaching, her achievements are not

219:17      on a par with others at her level and she would

219:18      not be recommended to tenure at either

219:19      Princeton, where I am a visiting professor, nor

219:20      at UCLA, where I was chair for ten years."

219:21      Do you see that?

219:22  A.  I do.

219:23  Q.  Would you agree that that is critical of

219:24      Cathrine's tenure case?

220:01  A.  It is.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 220:07 - 222:22 | **Fierro, Annette 2022-08-11** | 00:03:21 | AF_FINAL.43 |

220:07 Q. Let's look at another letter.

220:08     D-10. Let me know when you have

220:09     had a chance to look at it.

220:10 A. (Pause.)

220:11     Okay.

220:12 Q. Okay, so D-10 is a letter dated

220:13     January 25th of 2012; right?

220:14 A. Right, uh-huh.

220:15 Q. It is signed by Jean-Louis Cohen. My

220:16     French is not very good. Is that right?

220:17 A. You did well.

220:18 Q. Thank you.

220:19     I want to direct your attention to

220:20     the second page of the exhibit.

220:21 A. Okay.

220:22 Q. The middle paragraph, second sentence,

220:23     it starts with "Considering." Do you see that?

220:24 A. I do.

221:01 Q. And it reads, "Considering all the

221:02     elements communicated, my perception is Cathrine

221:03     Veikos is a competent instructor and critic, but

221:04     the incomplete status of her introduction to

221:05     Bo Bardi's writings doesn't lead me to reach

221:06     definitive conclusions in respect to her

221:07     scholarly qualification."

221:08     Do you see that?

221:09 A. I do.

221:10 Q. It continues, "Active and up to date in

221:11     respect to contemporary developments in theory

221:12     and criticism, she would probably need to break

221:13     the mold and enlarge her interpretation to

221:14     architects other than Bo Bardi after having

221:15     completed and published her first long work in

221:16     order to fully demonstrate the validity of her

221:17     critical hypothesis."

221:18     Do you see that?

221:19 A. Yes. That points to her future, yes.

221:20 Q. And one more.

221:21     D-11.

221:22     Let me know when you get a chance

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 221:23 to look at it. | | |
| | 221:24 A. (Pause.) | | |
| | 222:01 Okay. | | |
| | 222:02 Q. So this is a letter dated January 20th | | |
| | 222:03 of 2012? | | |
| | 222:04 A. Right. | | |
| | 222:05 Q. And it is signed by Mark Linder? | | |
| | 222:06 A. Uh-huh. | | |
| | 222:07 Q. He was also an external reviewer in | | |
| | 222:08 Cathrine's re-review? | | |
| | 222:09 A. Right, uh-huh. | | |
| | 222:10 Q. I want to direct your attention to the | | |
| | 222:11 second page, the second full paragraph. | | |
| | 222:12 Do you see that? | | |
| | 222:13 A. Yes, uh-huh. | | |
| | 222:14 Q. And this one is a little long, so I | | |
| | 222:15 apologize in advance. | | |
| | 222:16 A. Oh, wait. Is it the second page or the | | |
| | 222:17 first page? | | |
| | 222:18 Q. The second page, it starts with | | |
| | 222:19 "the two books." Do you see that? | | |
| | 222:20 A. Okay. | | |
| | 222:21 Q. Are you seeing that? | | |
| | 222:22 A. Is it this one, right? | | |
| 223:04 - 226:19 | **Fierro, Annette 2022-08-11** | 00:03:58 | AF_FINAL.44 |
| | 223:04 BY MS. KLIMENT: | | |
| | 223:05 Q. "The two books on Bo Bardi are thorough | | |
| | 223:06 presentations of an intriguing architect of the | | |
| | 223:07 late modern era. Like most of Ms. Veikos's | | |
| | 223:08 other writing, the subject is both important and | | |
| | 223:09 timely, but the significance of her insights or | | |
| | 223:10 scholarship is limited. Miss Veikos's extensive | | |
| | 223:11 writing on Bo Bardi tends to be descriptive and | | |
| | 223:12 explanatory rather than analytical or | | |
| | 223:13 speculative. While she is thorough and | | |
| | 223:14 scrupulous in her research, her writing does not | | |
| | 223:15 open up significant historical or theoretical | | |
| | 223:16 questions about Bo Bardi's work, such as how her | | |
| | 223:17 unique status and background may refine our | | |
| | 223:18 understanding of the political effect of modern | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

223:19    architecture or how Brazilian modernism may have

223:20    developed or produced alternative traditions or

223:21    methods.  In general, Miss Veikos's work tends

223:22    to reiterate the writings of others and to

223:23    suggest affiliations rather than construct

223:24    arguments or rigorous readings of the archival

224:01    material."

224:02    Do you see that?

224:03   A.   Are you going to read the last sentence,

224:04    which is much more complimentary?

224:05   Q.   We can.  But do you see that?

224:06   A.   I do.

224:07   Q.   And then the next paragraph says,

224:08    "Overall Miss Veikos has produced work of a

224:09    quality that is rare among design faculty in

224:10    schools of architecture, though as scholarship

224:11    the work does not compare favorably to others in

224:12    the field of history and theory."

224:13    Do you see that?

224:14   A.   Yes, uh-huh.

224:15   Q.   The comments that I just read to you

224:16    from the last three exhibits, would you agree

224:17    that they are critical?

224:18   A.   They are critical, I would say.  Do they

224:19    close a case?  No, because each one of these

224:20    goes on to say something positive.  So they are

224:21    taken out of context a bit.  Wouldn't you agree?

224:22    Because he goes on to say,

224:23    "Nevertheless, her careful presentation of

224:24    Bo Bardi's work and its place in the

225:01    international spread of modernist design offer

225:02    important contributions to the field.  The

225:03    translation of Bo Bardi's 1957 thesis is in

225:04    itself a significant resource for an English

225:05    speaking audience."

225:06   Q.   Do you think it is fair that someone

225:07    could read these comments and find them to be

225:08    negative or critical?

225:09   A.   If they were looking for it, sure, yeah.

225:10   Q.   Well, also in the inverse, you could be

225:11    looking for the positive; right?

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

225:12  A.  Always.  Always.

225:13  Q.  At the time of the re-review, the

225:14       reviewers would have been aware that Routledge

225:15       had committed to publish Cathrine's manuscript;

225:16       right?

225:17  A.  I hope so.  You know, that one note

225:18       about the incomplete nature of the manuscript is

225:19       a bit troubling in that respect.

225:20  Q.  Do you have any reason to believe that

225:21       they did not other than that comment?

225:22  A.  I don't.

225:23  Q.  Do you have any recollection of concerns

225:24       during the re-review that the reviewers did not

226:01       know that Cathrine had received a commitment to

226:02       publish her book?

226:03  A.  I don't remember that coming up, no.

226:04  Q.  And during the re-review, Cathrine could

226:05       have indicated on her CV that she had received a

226:06       commitment to publish the book; right?

226:07  A.  Yes, uh-huh.

226:08  Q.  All of the reviewers during the

226:09       re-review also would have been aware of her

226:10       extension; right?

226:11  A.  I hope so.  I didn't see the letter

226:12       requesting, but I would imagine, yes.

226:13  Q.  Did you have any concerns at the time of

226:14       the re-review that external reviewers were not

226:15       aware that she had received an extension of her

226:16       probationary period?

226:17  A.  No.

226:18  Q.  D-12.

226:19  A.  Again, very difficult to read.

| 227:01 - 227:20 | **Fierro, Annette 2022-08-11** | 00:00:43 | AF_FINAL.45 |

227:01  Q.  Have you had a chance to review it?

227:02  A.  Yes.  And I think you are looking

227:03       for "in accordance"?

227:04  Q.  Yes.  You can read that sentence.

227:05  A.  It talks about how she was granted an

227:06       extension to the mandatory review period for

227:07       family leave, yes.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

227:08  Q.  And that is the language that you had
227:09      testified earlier that should be in a
227:10      solicitation letter to an external reviewer,
227:11      right?
227:12  A.  According to the regulations of the
227:13      university, yes.
227:14  Q.  So the criticisms that I read to you
227:15      earlier by external reviewers were made at a
227:16      time that they had information about the
227:17      commitment of Routledge to publish Cathrine's
227:18      book, and also with the knowledge that she had
227:19      received an extension; right?
227:20  A.  Uh-huh.

| 227:24 - 229:01 | **Fierro, Annette 2022-08-11** | 00:01:03 | AF_FINAL.46 |
|---|---|---|---|

227:24  Q.  Counsel asked you about some other
228:01      tenure decisions, so I want to inquire about
228:02      that a little bit.
228:03      You voted on approximately nine
228:04      tenure cases --
228:05  A.  Yes.
228:06  Q.  -- during your time at Penn?
228:07  A.  Uh-huh.
228:08  Q.  When voting, you wouldn't vote in favor
228:09      unless you felt that the candidate met
228:10      qualifications for tenure; right?
228:11  A.  No.
228:12  Q.  Is it fair to say that tenured faculty
228:13      members can have differing opinions about a
228:14      candidate's qualifications?
228:15  A.  Of course.
228:16  Q.  You have disagreed with some of your
228:17      colleague's assessments of tenure candidates
228:18      before and after Cathrine Veikos; right?
228:19  A.  Yes, I have.
228:20  Q.  And the disagreements that you had --
228:21      actually, strike that.
228:22      When you had those disagreements,
228:23      they were based on the merits of the case from
228:24      your perspective?
229:01  A.  Yes, with qualifications.

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 231:15 - 232:11 | Fierro, Annette 2022-08-11 | 00:00:41 | AF_FINAL.47 |

231:15  Q.  You testified earlier about Ali Rahim's
231:16      tenure review.  Do you recall that?
231:17  A.  Yes.
231:18  Q.  And I believe you testified, but if not,
231:19      I will make sure, Ali Rahim is male?
231:20  A.  Yes.
231:21  Q.  And you voted in favor of Ali?
231:22  A.  I did, uh-huh.
231:23  Q.  So you believe he too was qualified for
231:24      tenure?
232:01  A.  Yes, according to the evidence.
232:02  Q.  David Leatherbarrow voted against Ali
232:03      Rahim, didn't he?
232:04  A.  Oh, yes.
232:05  Q.  And he, at the time, David Leatherbarrow
232:06      was also the chair of the personnel committee?
232:07  A.  That's right.
232:08  Q.  And he wrote a negative letter saying
232:09      that he could not give an unqualified
232:10      recommendation for Ali Rahim?
232:11  A.  That's right.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 234:03 - 234:04 | Fierro, Annette 2022-08-11 | 00:00:07 | AF_FINAL.48 |

234:03  Q.  During your earlier testimony, you
234:04      referenced some comments that were made.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 234:11 - 235:19 | Fierro, Annette 2022-08-11 | 00:01:19 | AF_FINAL.57 |

234:11  Q.  Comments by David Leatherbarrow
234:12      regarding you traveling to Japan?
234:13  A.  Yes.
234:14  Q.  Asking you to do research while you were
234:15      on leave?
234:16  A.  Right.
234:17  Q.  When were those comments made?
234:18  A.  Well, I was eight months pregnant, so
234:19      that would have been December 1996.  Adele
234:20      Santos, I had just come on the, onto the
234:21      faculty, so it would have been '93 to '95.  As I
234:22      said, I heard it more than once.
234:23  Q.  So they were made in the 1990s?
234:24  A.  Yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 235:01 Q. They were made about 10 to 20 years | | |
| | 235:02     before Cathrine went up for tenure? | | |
| | 235:03 A. She went up in 2011, so that would have | | |
| | 235:04     been twelve years, 13 years. | | |
| | 235:05 Q. None of the comments that you identified | | |
| | 235:06     were made to or about Cathrine; right? | | |
| | 235:07 A. No. | | |
| | 235:08 Q. And none of them were made during | | |
| | 235:09     Cathrine's tenure review? | | |
| | 235:10 A. About Cathrine or about me? | | |
| | 235:11 Q. Yeah, the comments that you had | | |
| | 235:12     referenced -- | | |
| | 235:13 A. Right. | | |
| | 235:14 Q. -- from 1993 to 1996 -- | | |
| | 235:15 A. Right. | | |
| | 235:16 Q. -- they were not made while Cathrine was | | |
| | 235:17     being reviewed for tenure; right? | | |
| | 235:18 A. No, but I was speaking to the general | | |
| | 235:19     culture and awareness of the faculty. | | |
| 237:08 - 238:18 | **Fierro, Annette 2022-08-11** | 00:01:27 | AF_FINAL.49 |
| | 237:08 Q. Just a couple questions before we wrap | | |
| | 237:09     up, Professor Fierro. | | |
| | 237:10     At the time of your tenure review, | | |
| | 237:11     was Bill Braham the chair? | | |
| | 237:12 A. No. David Leatherbarrow was the chair | | |
| | 237:13     and then -- for the appointment. And then | | |
| | 237:14     Richard Wesley was actually the acting chair, | | |
| | 237:15     right. | | |
| | 237:16 Q. So as of your tenure review, so the time | | |
| | 237:17     that the faculty was voting on your case -- | | |
| | 237:18 A. Yes, Richard Wesley was the chair then. | | |
| | 237:19 Q. So it wasn't Bill Braham? | | |
| | 237:20 A. No. | | |
| | 237:21 Q. And it wasn't David Leatherbarrow? | | |
| | 237:22 A. No. | | |
| | 237:23 Q. When counsel was questioning you about | | |
| | 237:24     the time you took off when you had your | | |
| | 238:01     children -- | | |
| | 238:02 A. Yes. | | |
| | 238:03 Q. -- and there was some questioning around | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 238:04    Professor Leatherbarrow supporting you, I think | | |
| | 238:05    you said "not entirely" that he supported you. | | |
| | 238:06  A.  Right. | | |
| | 238:07  Q.  Could you elaborate on what you meant? | | |
| | 238:08  A.  Well, it is almost admitting how naive I | | |
| | 238:09    was.  He gave me a semester off, but I agreed to | | |
| | 238:10    teach extra afterwards, not understanding what | | |
| | 238:11    that was going to be like.  So I was teaching | | |
| | 238:12    extra to try to make up for that semester | | |
| | 238:13    because I, you know, thought I owed it to the | | |
| | 238:14    department.  And, you know, I almost ended up in | | |
| | 238:15    the hospital because I was so exhausted. | | |
| | 238:16  Q.  When you say you taught more, was that | | |
| | 238:17    at somebody's request? | | |
| | 238:18  A.  David's. | | |
| 240:23 - 241:15 | **Fierro, Annette 2022-08-11** | 00:00:44 | AF_FINAL.50 |
| | 240:23  A.  Oh, yes. | | |
| | 240:24  Q.  And he was the chair in charge of | | |
| | 241:01    Cathrine's re-review; correct? | | |
| | 241:02  A.  That's right, uh-huh. | | |
| | 241:03  Q.  So he would have been the one to pick | | |
| | 241:04    the external reviewers? | | |
| | 241:05  A.  That's right. | | |
| | 241:06  Q.  There was some questioning about the | | |
| | 241:07    letter from Professor Cohen. | | |
| | 241:08  A.  Yes. | | |
| | 241:09  Q.  You wanted to elaborate a little bit on | | |
| | 241:10    counsel's questions about there were some | | |
| | 241:11    negative comments in the letter.  And I wanted | | |
| | 241:12    to give you a chance to tell the jury what you | | |
| | 241:13    thought of Professor Cohen's position on | | |
| | 241:14    Cathrine Veikos's qualifications without having | | |
| | 241:15    to respond to counsel's direction? | | |
| 241:19 - 241:20 | **Fierro, Annette 2022-08-11** | 00:00:05 | AF_FINAL.51 |
| | 241:19  Q.  In other words, how did you interpret | | |
| | 241:20    this letter as an external review letter? | | |
| 241:22 - 243:05 | **Fierro, Annette 2022-08-11** | 00:01:31 | AF_FINAL.52 |
| | 241:22    THE WITNESS:  I mean I suppose it's | | |
| | 241:23    my job to understand like these kinds of | | |
| | 241:24    critical readings.  That's how I evaluate people | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 242:01   who apply for positions.  That's how I evaluate | | |
| | 242:02   writings that I am asked to read.  So I don't | | |
| | 242:03   think it is actually outside of my purview of | | |
| | 242:04   expertise.  I thought, first of all, the letter | | |
| | 242:05   was very short.  I wondered how much time he had | | |
| | 242:06   spent on it.  Jean-Louis Cohen is known for | | |
| | 242:07   being extremely prolific.  The joke is that he | | |
| | 242:08   writes every introduction to every big book out | | |
| | 242:09   there.  It is like how on earth does he do all | | |
| | 242:10   this. | | |
| | 242:11   He noted that Bo Bardi's earlier | | |
| | 242:12   experience in Italy, these texts would reveal to | | |
| | 242:13   the public the intensity of the theoretical | | |
| | 242:14   critical conversation on architecture that | | |
| | 242:15   developed in Brazil from the 1940s onward. | | |
| | 242:16   I mean I know Cathrine talked about | | |
| | 242:17   that in the introduction.  She went to great | | |
| | 242:18   lengths to find, you know, all of the different | | |
| | 242:19   kinds of connections.  So I don't think that's | | |
| | 242:20   quite accurate. | | |
| | 242:21   And then the incomplete status of | | |
| | 242:22   her introduction, I think we've heard from many | | |
| | 242:23   other letters that that, that that introduction | | |
| | 242:24   was book length, and if anything it had too many | | |
| | 243:01   references that needed to be structured more. | | |
| | 243:02   So I don't think that was accurate either. | | |
| | 243:03   I mean that's my own kind of read | | |
| | 243:04   on this letter as an architectural professor at | | |
| | 243:05   the University of Pennsylvania. | | |
| 243:07 - 244:15 | **Fierro, Annette 2022-08-11** | 00:01:20 | AF_FINAL.53 |
| | 243:07 Q.  Let's take a look also at Mark Linder's | | |
| | 243:08       letter, that was D-11. | | |
| | 243:09 A.  Right. | | |
| | 243:10 Q.  I was interested in the questioning | | |
| | 243:11       around that second page, the last paragraph of | | |
| | 243:12       that letter.  We will wait until you have it in | | |
| | 243:13       front of you. | | |
| | 243:14 A.  Okay. | | |
| | 243:15 Q.  I might need my glasses for this one. | | |
| | 243:16       So that last paragraph of Professor | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 243:17 | Linder's letter, I think counsel directed you to | | |
| | 243:18 | the sentence that says, "Overall Miss Veikos has | | |
| | 243:19 | produced work of a quality that is rare among | | |
| | 243:20 | design faculty and schools of architecture, | | |
| | 243:21 | though as scholarship the work does not compare | | |
| | 243:22 | favorably to others in the fields of history and | | |
| | 243:23 | theory." | | |
| | 243:24 | But was she in the field of history | | |
| | 244:01 | and theory? | | |
| | 244:02  A. | No.  She was in visual studies. | | |
| | 244:03  Q. | Counsel was asking you some questions | | |
| | 244:04 | about when you have had, you as a voting member | | |
| | 244:05 | of the faculty, had disagreements with other | | |
| | 244:06 | members of the voting faculty about a tenure | | |
| | 244:07 | candidate. | | |
| | 244:08  A. | Right. | | |
| | 244:09  Q. | You, I think, can confirm that often it | | |
| | 244:10 | is about their qualifications? | | |
| | 244:11  A. | Right. | | |
| | 244:12  Q. | But you indicated, I think, that it is a | | |
| | 244:13 | gray area, but were cut off from elaborating on | | |
| | 244:14 | that.  Would you like to elaborate on your | | |
| | 244:15 | response? | | |
| 244:17 - 245:15 | **Fierro, Annette 2022-08-11** | | 00:01:17 | AF_FINAL.54 |
| | 244:17 | THE WITNESS:  When we vote on | | |
| | 244:18 | tenure, we are also voting on things like what | | |
| | 244:19 | the school needs.  We're voting on the addition | | |
| | 244:20 | to the curriculum.  We're voting on the addition | | |
| | 244:21 | of material that may not mean much to someone | | |
| | 244:22 | else, but material which one might feel is very | | |
| | 244:23 | important. | | |
| | 244:24 | Helene Furjan, for example, had | | |
| | 245:01 | resuscitated a decades dead journal called Via | | |
| | 245:02 | and had done so in a magnificent way.  She got | | |
| | 245:03 | it published by MIT. | | |
| | 245:04 | And I sort of wonder at how much | | |
| | 245:05 | weight those things are really given.  The kind | | |
| | 245:06 | of extra human effort that people go through | | |
| | 245:07 | that we are privy to on the inside.  And I think | | |
| | 245:08 | we are all vacillating on ways to regard | | |

**AF_FINAL - Annette Fierro Final Designations**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 245:09 | candidates and certainly at the department level | | |
| | 245:10 | it doesn't depend entirely on the external | | |
| | 245:11 | letters. | | |
| | 245:12 | In fact, usually the things that | | |
| | 245:13 | the external letters say are trying to be worked | | |
| | 245:14 | around.  And depending on whether there is a | | |
| | 245:15 | positive view of the candidate. | | |
| 247:08 - 247:09 | **Fierro, Annette 2022-08-11** | | 00:00:02 | AF_FINAL.55 |
| | 247:08 | MS. UEBLER:  Thank you.  I don't | | |
| | 247:09 | have anything further. | | |

| | | |
|---|---|---|
| Full Final Designations | 03:02:13 | |
| **TOTAL RUN TIME** | **03:02:13** | |