# K. Michael Hays Final Designations

Designation List Report



**Hays, Deposition**                                    **2022-11-21**

| | |
|---|---|
| Plaintiff Direct | 00:44:30 |
| **TOTAL RUN TIME** | **00:44:30** |



**ID: MH_FINAL**

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 5:12 - 8:22 | **Hays, Deposition 2022-11-21** | 00:04:14 | MH_FINAL.1 |

| | | |
|---|---|---|
| 5:12 | Q. | Good morning, Professor Hays.  Thank |
| 5:13 | | you for being available for this video trial |
| 5:14 | | deposition. |
| 5:15 | A. | Good morning.  Thank you. |
| 5:16 | Q. | I understand you currently have some |
| 5:17 | | medical restrictions; is that correct? |
| 5:18 | A. | I do.  I had a very traumatic injury to my |
| 5:19 | | leg last year, and I'm still unable to bear any |
| 5:20 | | weight on it, so I'm basically in a chair. |
| 5:21 | Q. | Okay.  And where are you currently |
| 5:22 | | located? |
| 5:23 | A. | Right now I'm on Cape Cod, in Truro, |
| 5:24 | | Massachusetts.  There are no stairs here. |
| 6:01 | Q. | Okay.  That makes sense.  Thank you. |
| 6:02 | | Even though I understand you're |
| 6:03 | | on a leave of absence right now, could you describe |
| 6:04 | | what your current academic position is? |
| 6:05 | A. | Yes.  I am Eliot Noyes Professor of |
| 6:06 | | Architectural Theory.  Architectural theory is very |
| 6:07 | | like architectural history, but with more of a |
| 6:08 | | philosophical background. |
| 6:09 | | I'm also program director of a |
| 6:10 | | post-professional program at GSD called the Master |
| 6:11 | | of Design Studies. |
| 6:12 | Q. | Okay.  And did you hold those |
| 6:13 | | positions in 2011 and 2012? |
| 6:14 | A. | I held the first, the chaired professorship. |
| 6:15 | | Before I was program director, I was associate dean |
| 6:16 | | for the Graduate School of Design, and I held that |
| 6:17 | | position -- I had just started that position during |
| 6:18 | | the events around the letter. |
| 6:19 | Q. | Okay.  And you may have said this when |
| 6:20 | | you were describing your position, but did you |
| 6:21 | | identify the university where you were? |
| 6:22 | A. | I work at the Graduate School of Design at |
| 6:23 | | Harvard University. |
| 6:24 | Q. | Have you served as an external |
| 7:01 | | reviewer for tenure candidates at other |
| 7:02 | | institutions? |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

7:03   A.   I have, yes.

7:04   Q.   Can you give me a sense of how often

7:05        you've done that?

7:06   A.   Every year there will be probably as many as

7:07        five letters solicited.  Less lately, but I would

7:08        say -- so I've done hundreds of these in my career.

7:09   Q.   How do you know Cathrine Veikos?

7:10   A.   Cathrine was actually -- I have many, many

7:11        students, obviously, but Cathrine was a bit of a

7:12        special student in this sense.  I teach a required

7:13        history course, and at that time it was about 80

7:14        people.  And at that time we did not have doctoral

7:15        teaching fellows as we do now.  So what I would do

7:16        is look at the record of the Master's of

7:17        Architecture students who did well in history

7:18        courses and from that record would nominate people

7:19        to be a teaching assistant for the history course,

7:20        the required history course, the large one.  And

7:21        Cathrine was one of the students that I nominated to

7:22        be a teaching fellow.

7:23        So in that sense I worked close

7:24        with her for a couple of years and knew her, you

8:01        know, better than most students.

8:02   Q.   Okay.  And did you stay in touch with

8:03        Cathrine Veikos when she went to Penn?

8:04   A.   I did, but there was not a lot of

8:05        correspondence.  I knew of her position.  I did

8:06        follow her work.  It was -- we corresponded, but

8:07        not -- I would say not very frequently.

8:08        (Whereupon P-32 was marked for

8:09        identification.)

8:10        BY MS. UEBLER:

8:11   Q.   Okay.  Can you take a look at the

8:12        document that we've already marked as Exhibit P-32.

8:13        It's one page.  It has a reference to Hays 15 at the

8:14        bottom.

8:15   A.   Yes.  I have it here.

8:16   Q.   Okay.  What is that document?

8:17   A.   It looks like a calendar entry for a

8:18        consultation, a phone call, between me and

8:19        Cathrine Veikos on July 21st, 2011.

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 8:20  Q.  Okay.  And do you recognize that as | | |
| | 8:21      being from your calendar? | | |
| | 8:22  A.  I do. | | |
| 9:04 - 12:02 | **Hays, Deposition 2022-11-21** | 00:03:57 | MH_FINAL.2 |
| | 9:04  Q.  Do you recall speaking with | | |
| | 9:05      Cathrine Veikos that day, July 21st, 2011? | | |
| | 9:06  A.  I do recall the conversation. | | |
| | 9:07  Q.  What do you recall about it? | | |
| | 9:08  A.  Well, I do recall it was -- okay, I said I | | |
| | 9:09      recall it. | | |
| | 9:10      There are two conversations that | | |
| | 9:11      I recall.  This one, I believe, was a consultation | | |
| | 9:12      about her tenure case, just trying to give some | | |
| | 9:13      advice of how to present her case most effectively, | | |
| | 9:14      how to frame her work, which included different | | |
| | 9:15      aspects of architecture, including history and | | |
| | 9:16      design, and just how to frame those different | | |
| | 9:17      dimensions of her work for a tenure case. | | |
| | 9:18  Q.  Do you recall speaking to her in the | | |
| | 9:19      summer of 2011 about any concerns relating to her | | |
| | 9:20      focus on Lina Bo Bardi as a subject? | | |
| | 9:21  A.  Well, this -- you know, this is not | | |
| | 9:22      univalent, let's say.  Lina Bo Bardi -- the | | |
| | 9:23      excitement -- I was actually quite excited to hear | | |
| | 9:24      about Cathrine's research into the work of | | |
| | 10:01      Lina Bo Bardi, who was an Italian immigrant who went | | |
| | 10:02      to Brazil, probably one of the best -- one of the | | |
| | 10:03      best architects -- say, top 20 maybe -- of her time | | |
| | 10:04      and completely unstudied by the historical | | |
| | 10:05      establishment.  So I was extremely interested that | | |
| | 10:06      Cathrine had found material, including some writing. | | |
| | 10:07      So I remember that very well and was very excited. | | |
| | 10:08      At the same time, Cathrine does | | |
| | 10:09      not have a Ph.D.  She, as I said, did very well in | | |
| | 10:10      the history courses, and I think turned out to be a | | |
| | 10:11      very good scholar, but she did not have a Ph.D., as | | |
| | 10:12      would be required to be, let's say, a straight | | |
| | 10:13      historian. | | |
| | 10:14      So Cathrine was carving out a | | |
| | 10:15      scholarly position, which is common in architecture | | |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 10:16 | and has been historically, insofar as architecture, | | |
| | 10:17 | being both a profession and an academic subject. | | |
| | 10:18 | She was trying to embrace both the professional and | | |
| | 10:19 | the scholarly dimension.  And this is not unusual or | | |
| | 10:20 | uncommon.  It just takes some focus and clarity. | | |
| | 10:21 | And these were the things we talked about, how to | | |
| | 10:22 | keep those things together. | | |
| | 10:23 Q. | Did you learn at the time you spoke to | | |
| | 10:24 | Professor Veikos in 2011 that she had already been | | |
| | 11:01 | considered for tenure at Penn at that point? | | |
| | 11:02 A. | I do not recall that.  I do not recall -- | | |
| | 11:03 | the only thing I remember clearly is the -- maybe | | |
| | 11:04 | I'm jumping the gun here, Julie.  Sorry -- | | |
| | 11:05 Q. | No.  Go ahead.  I mean, do you | | |
| | 11:06 | remember -- so it would have been summer of 2011, | | |
| | 11:07 | the conversation you've just been telling us about. | | |
| | 11:08 | Do you recall in that context learning from her | | |
| | 11:09 | whether or not she was previously considered for | | |
| | 11:10 | tenure? | | |
| | 11:11 A. | I do not recall -- | | |
| | 11:12 Q. | Okay. | | |
| | 11:13 A. | -- that I knew that. | | |
| | 11:14 Q. | Okay.  Thank you.  Let's take a look | | |
| | 11:15 | at another document.  This is Exhibit P-33.  It's | | |
| | 11:16 | also one page.  The number at the bottom right | | |
| | 11:17 | corner is Veikos 2223. | | |
| | 11:18 A. | Yes. | | |
| | 11:19 | (Whereupon P-33 was marked for | | |
| | 11:20 | identification.) | | |
| | 11:21 | BY MS. UEBLER: | | |
| | 11:22 Q. | Do you recognize this e-mail at all? | | |
| | 11:23 A. | I do. | | |
| | 11:24 Q. | Okay.  This is an e-mail that | | |
| | 12:01 | Professor Veikos sent to you in January of 2012? | | |
| | 12:02 A. | That's right. | | |
| 12:09 - 14:09 | **Hays, Deposition 2022-11-21** | | 00:02:40 | MH_FINAL.3 |
| | 12:09 Q. | All right.  Let's take a look, if we | | |
| | 12:10 | could, Professor Hays, at the top of this e-mail, in | | |
| | 12:11 | that first paragraph.  In her second sentence she | | |
| | 12:12 | says, "I want to thank you again for your review of | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | |
|---|---|
| 12:13 | my work." |
| 12:14 | What did you understand her to |
| 12:15 | be referring to there? |
| 12:16 | A.  Well, I knew we were talking about a tenure |
| 12:17 | case at that point, and Cathrine seemed to think |
| 12:18 | that I had been one of the referees. |
| 12:19 | In fact, I had not been called |
| 12:20 | upon to be a referee.  So it wasn't that surprising |
| 12:21 | because, you know, I'm in the field and I know her, |
| 12:22 | that I might have been called upon, but I wasn't. |
| 12:23 | But I didn't -- it struck me -- I didn't find it |
| 12:24 | unusual. |
| 13:01 | And I didn't say anything |
| 13:02 | because most schools that I know of do not |
| 13:03 | necessarily want the candidates to know who all the |
| 13:04 | referees are.  So I just kept quiet and tried to |
| 13:05 | sympathize and congratulate her.  She already had a |
| 13:06 | new position. |
| 13:07 | So that's what I remember, was |
| 13:08 | trying to, you know, sympathize a bit, without |
| 13:09 | actually telling her that I did not, in fact, write |
| 13:10 | and had not been called upon to write. |
| 13:11 | Q.  Okay.  When you say "referee," is that |
| 13:12 | the same thing as an external reviewer? |
| 13:13 | A.  Yes.  I'm sorry. |
| 13:14 | Q.  Okay.  No problem.  I just want to |
| 13:15 | clarify that.  Okay. |
| 13:16 | So at this point, let's take a |
| 13:17 | look at the third paragraph.  She says, "I haven't |
| 13:18 | had any updates from Penn on the status of my tenure |
| 13:19 | review, so I'm applying for positions," and she |
| 13:20 | lists some things.  And she also previously said |
| 13:21 | that she had been teaching somewhere else, as you |
| 13:22 | mentioned in your testimony. |
| 13:23 | At this point, did you |
| 13:24 | understand that she was no longer employed by Penn |
| 14:01 | but was undergoing a tenure review? |
| 14:02 | A.  My memory is, Ms. Uebler, that she had not |
| 14:03 | gotten tenure and had another job.  I did not |
| 14:04 | realize that there would be a second tenure review. |
| 14:05 | Q.  Okay.  Have you ever been an |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 14:06     external reviewer when the tenure candidate was not | | |
| | 14:07     currently employed by the institution considering | | |
| | 14:08     tenure? | | |
| | 14:09    A.   No. | | |
| 14:18 - 14:19 | **Hays, Deposition 2022-11-21** | 00:00:08 | MH_FINAL.4 |
| | 14:18    Q.   Let's take a look at another document. | | |
| | 14:19     This one has been marked as Exhibit P-34. | | |
| 15:15 - 15:17 | **Hays, Deposition 2022-11-21** | 00:00:05 | MH_FINAL.5 |
| | 15:15    Q.   All right.  And do you recognize this | | |
| | 15:16     e-mail exchange? | | |
| | 15:17    A.   I do. | | |
| 15:22 - 16:19 | **Hays, Deposition 2022-11-21** | 00:01:07 | MH_FINAL.6 |
| | 15:22    Q.   Professor Hays, if you can take a look | | |
| | 15:23     at Professor Veikos' e-mail to you, it starts out, | | |
| | 15:24     "Hope this note finds you well."  And in the second | | |
| | 16:01     sentence there, it says, "Thank you so much for | | |
| | 16:02     reviewing my tenure package for UPenn." | | |
| | 16:03     At this point, did you have any | | |
| | 16:04     communication with Professor Veikos about serving as | | |
| | 16:05     an external reviewer in her case? | | |
| | 16:06    A.   I did not. | | |
| | 16:07    Q.   Had you been asked to be an | | |
| | 16:08     external reviewer at that point? | | |
| | 16:09    A.   I did not recall having been asked. | | |
| | 16:10    Q.   Did you ever tell her in response to | | |
| | 16:11     this e-mail that you were not asked to be an | | |
| | 16:12     external reviewer? | | |
| | 16:13    A.   I did not mention that.  I didn't think it | | |
| | 16:14     was appropriate. | | |
| | 16:15    Q.   Did anyone at Penn ever contact you to | | |
| | 16:16     serve as one of Professor Veikos's external | | |
| | 16:17     reviewers at any time? | | |
| | 16:18    A.   No, I don't recall any time that they | | |
| | 16:19     contacted me. | | |
| 17:06 - 17:13 | **Hays, Deposition 2022-11-21** | 00:00:15 | MH_FINAL.7 |
| | 17:06    Q.   Did any -- we established | | |
| | 17:07     that you understand -- it was your experience that | | |
| | 17:08     you were never asked to serve as an external | | |
| | 17:09     reviewer, correct? | | |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 17:10   A.   I did.  Okay. | | |
| | 17:11   Q.   And I just want to understand, and I | | |
| | 17:12   want you to be able to tell the jury, why you | | |
| | 17:13   believe that never happened. | | |
| 17:16 - 20:11 | **Hays, Deposition 2022-11-21** | 00:03:10 | MH_FINAL.8 |
| | 17:16   THE WITNESS:  Okay.  Thank you. | | |
| | 17:17   There are two reasons that I | | |
| | 17:18   feel confident about my memory.  The first, | | |
| | 17:19   which I've mentioned, is that Cathrine, | | |
| | 17:20   though we had -- we didn't correspond, I | | |
| | 17:21   would say, regularly -- there was no regular | | |
| | 17:22   correspondence -- I do remember her quite | | |
| | 17:23   vividly and well, simply because of the | | |
| | 17:24   relationship of working with her as a | | |
| | 18:01   teaching assistant and my interest in the | | |
| | 18:02   work. | | |
| | 18:03   The one thing I think is worth | | |
| | 18:04   mentioning, if I may, both of you, is that, I | | |
| | 18:05   don't want to make too much about | | |
| | 18:06   Lina Bo Bardi, except that scholarship on | | |
| | 18:07   her, some of us knew, was about to become -- | | |
| | 18:08   about to explode.  Things were about to | | |
| | 18:09   happen with the scholarship there.  So I was | | |
| | 18:10   very excited. | | |
| | 18:11   So that's the first reason I | | |
| | 18:12   know that had I been asked to think, reflect | | |
| | 18:13   on Cathrine's work, I would have done that | | |
| | 18:14   happily because I was very excited about this | | |
| | 18:15   work. | | |
| | 18:16   The second is, I won't claim to | | |
| | 18:17   be overly organized in my e-mail.  What I | | |
| | 18:18   will claim is never to erase it.  And I had | | |
| | 18:19   e-mail -- many e-mails from the time, | | |
| | 18:20   including some from David Leatherbarrow about | | |
| | 18:21   another case, and so I remember vividly the | | |
| | 18:22   time and Penn asking for other material. | | |
| | 18:23   So together, those two things | | |
| | 18:24   make me feel pretty sure that, had I been | | |
| | 19:01   asked, I would have remembered. | | |
| | 19:02   And there's no written | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

|  | 19:03 | correspondence. |  |  |
|  | 19:04 | And I'll mention one more thing, |  |  |
|  | 19:05 | if I may. |  |  |
|  | 19:06 | BY MS. UEBLER: |  |  |
|  | 19:07 | Q. Please. |  |  |
|  | 19:08 | A. Just to be thorough. I did have a full-time |  |  |
|  | 19:09 | administrative assistant at that point. And she was |  |  |
|  | 19:10 | someone who could receive all my e-mails directly. |  |  |
|  | 19:11 | So even if I had missed it, Stacy Buckley, was her |  |  |
|  | 19:12 | name, would have caught any requests like that. |  |  |
|  | 19:13 | Q. Okay. Thank you. Why don't we take a |  |  |
|  | 19:14 | look at the next exhibit, which is Exhibit P-35. |  |  |
|  | 19:15 | A. Yes. |  |  |
|  | 19:16 | (Whereupon P-35 was marked for |  |  |
|  | 19:17 | identification.) |  |  |
|  | 19:18 | BY MS. UEBLER: |  |  |
|  | 19:19 | Q. This packet of documents is labeled |  |  |
|  | 19:20 | Hays 1 through 6. |  |  |
|  | 19:21 | A. Yes. |  |  |
|  | 19:22 | Q. Are these e-mails and documents that |  |  |
|  | 19:23 | you produced in response to a subpoena from Penn |  |  |
|  | 19:24 | about this case? |  |  |
|  | 20:01 | A. Yes. There are several e-mails, and I think |  |  |
|  | 20:02 | it's part of the same package -- it's still 35 -- it |  |  |
|  | 20:03 | also included a letter of reference for another |  |  |
|  | 20:04 | case. |  |  |
|  | 20:05 | Q. Right. And what do these documents |  |  |
|  | 20:06 | that are P-35, Hays 1 through 6, which professor do |  |  |
|  | 20:07 | these relate to? |  |  |
|  | 20:08 | A. These relate to Helene Furjan -- I'm not |  |  |
|  | 20:09 | positive about the pronunciation, but I believe it's |  |  |
|  | 20:10 | Furjan -- for also a tenure case at Penn, with a |  |  |
|  | 20:11 | date being also in January, 2012. |  |  |
| 20:16 - 21:13 | **Hays, Deposition 2022-11-21** | | 00:01:22 | MH_FINAL.9 |
|  | 20:16 | Q. All right. Looking at these |  |  |
|  | 20:17 | documents, if you could, Professor Hays, when did |  |  |
|  | 20:18 | Professor Leatherbarrow first request that you serve |  |  |
|  | 20:19 | as an external reviewer for Professor Furjan? |  |  |
|  | 20:20 | A. It looks like it was around -- let's see, I |  |  |
|  | 20:21 | believe I have the first one -- October 5th, 2011. |  |  |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 20:22 | Q. | Okay.  And did he -- did he send any |
| | 20:23 | | follow-up e-mails to you? |
| | 20:24 | A. | He did, as late as -- as late as |
| | 21:01 | | January 10th, 2012, and then again on Friday, 21st |
| | 21:02 | | of Oct -- oh, no.  Sorry.  Friday, 21st of October, |
| | 21:03 | | 2011; and then again, January, 2012, he was sending |
| | 21:04 | | me reminders. |
| | 21:05 | Q. | Okay.  And did you submit the review |
| | 21:06 | | letter for Professor Furjan? |
| | 21:07 | A. | I did.  Finally, in January of 2012, I |
| | 21:08 | | submitted the letter. |
| | 21:09 | Q. | Okay.  And is that letter within P-35, |
| | 21:10 | | marked Hays 4 and 5? |
| | 21:11 | A. | At least in my organization it is part of |
| | 21:12 | | that package, yes.  It's the fourth and fifth page. |
| | 21:13 | | Or -- yes. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 25:16 - 25:18 | **Hays, Deposition 2022-11-21** | 00:00:04 | MH_FINAL.10 |

| | 25:16 | | MS. UEBLER:  Thank you, |
| | 25:17 | | Professor.  I don't have any further |
| | 25:18 | | questions. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 42:19 - 45:03 | **Hays, Deposition 2022-11-21** | 00:03:17 | MH_FINAL.11 |

| | 42:19 | Q. | It looks like above your January 13 |
| | 42:20 | | letter, there is an e-mail to you from Tanya Yang. |
| | 42:21 | | Do you know who Tanya Yang is? |
| | 42:22 | A. | I only know that she was -- from the con -- |
| | 42:23 | | only from the context, must have been David's -- one |
| | 42:24 | | of David's assistants. |
| | 43:01 | Q. | Okay.  Did you know her personally? |
| | 43:02 | A. | No. |
| | 43:03 | Q. | If you had gotten an e-mail from |
| | 43:04 | | Tanya Yang asking you to write an external review |
| | 43:05 | | for Cathrine Veikos, do you think that could be |
| | 43:06 | | something you might have missed because you didn't |
| | 43:07 | | recognize her name? |
| | 43:08 | A. | No.  Because her first sentence would have |
| | 43:09 | | been, "I am writing at the request of |
| | 43:10 | | David Leatherbarrow," who is dean, and the request |
| | 43:11 | | for tenure letter must come from the dean.  So she |
| | 43:12 | | would have made some reference. |
| | 43:13 | | I would not have necessarily |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 43:14 | read right away the e-mail from Tanya Yang, but it | | |
| | 43:15 | would have David copied -- or, I'm sorry, would have | | |
| | 43:16 | the dean copied probably and have his name in the | | |
| | 43:17 | first line, and I would have seen that. I would | | |
| | 43:18 | have seen that. | | |
| | 43:19 | Q. If you read the e-mail in the first | | |
| | 43:20 | place, you would have known that Tanya Yang worked | | |
| | 43:21 | for David Leatherbarrow, right? | | |
| | 43:22 | A. Right. Right. | | |
| | 43:23 | Q. Okay. But you around that -- well, | | |
| | 43:24 | actually, a couple months earlier, wrote to | | |
| | 44:01 | David Leatherbarrow to say you were too overworked | | |
| | 44:02 | to read all your e-mails, right? | | |
| | 44:03 | A. I think -- I think, Mr. Banks, the word | | |
| | 44:04 | "read e-mails" can mean a lot of things. You know | | |
| | 44:05 | how to -- we all know how to scan quickly as we're | | |
| | 44:06 | browsing through the e-mails, and you can get | | |
| | 44:07 | enormous information reading diagonally. | | |
| | 44:08 | I don't think I ever deleted an | | |
| | 44:09 | e-mail without browsing it unless it's clearly spam, | | |
| | 44:10 | which also takes half a second to -- I just think | | |
| | 44:11 | any -- any e-mail coming from any person from | | |
| | 44:12 | upenn.edu I would stop at. No doubt about it. And | | |
| | 44:13 | then if it's -- and then I go from there. | | |
| | 44:14 | I'm not trying to say that I | | |
| | 44:15 | have perfect response time. What I'm suggesting is | | |
| | 44:16 | that, in academia, to wait for a week is not | | |
| | 44:17 | unusual. | | |
| | 44:18 | To wait for 16 days is a little | | |
| | 44:19 | irritating. But everybody -- I mean, look at the | | |
| | 44:20 | timing of this. This was, you know, the height of | | |
| | 44:21 | the fall -- yes, I was busy. Yes, I was finessing | | |
| | 44:22 | some e-mails. But I absolutely did attend to it | | |
| | 44:23 | when I possibly -- when I could. The letter for | | |
| | 44:24 | Furjan. | | |
| | 45:01 | So I don't want to be so | | |
| | 45:02 | apologetic about the delay. It's timing in academic | | |
| | 45:03 | time. | | |
| **25:22 - 27:13** | **Hays, Deposition 2022-11-21** | 00:02:08 | MH_FINAL.12 |
| | 25:22 | Q. Professor Hays, are you aware, as of | | |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

25:23    this time, that Cathrine Veikos was reviewed for

25:24    tenure on two different occasions at Penn?

26:01  A.  I am now aware of that, yes.

26:02  Q.  The first in 2011 and the second in

26:03    2012?

26:04  A.  That's right.

26:05  Q.  Is it your understanding that

26:06    candidates for tenure review have an opportunity to

26:07    request or recommend certain reviewers?  In other

26:08    words, that a candidate can ask that certain

26:09    professors outside of Penn review them for tenure?

26:10  A.  Yes.  I think almost every school has --

26:11    gives the candidate an opportunity, and certainly my

26:12    understanding is that Penn does that.

26:13  Q.  And you mentioned that you believed

26:14    you were well-suited to conduct a review on

26:15    Cathrine Veikos's work?

26:16  A.  I do.  I do feel I was suited, yes.

26:17  Q.  Do you know whether Professor Veikos

26:18    asked to have you as one of her reviewers in 2011?

26:19  A.  I do not know that directly.  I assumed that

26:20    was the case from the letter of January, two

26:21    thousand -- now I'm getting the two letters mixed

26:22    up.  But she does mention that in one of her e-mail

26:23    correspondences.  She thanks me for reviewing the

26:24    package.  So I assumed that she thought that I had.

27:01  Q.  Okay.  That was in 2012 that she

27:02    thanked you for --

27:03  A.  Yes, that's right.

27:04  Q.  -- reviewing her work.

27:05    Do you know whether, in the

27:06    prior review in 2011, the review that was conducted

27:07    in the spring of 2011, she asked that you be one of

27:08    her external reviewers?  Do you know whether she did

27:09    or didn't?

27:10  A.  I do not know about that case at all because

27:11    I received nothing from her.  As far as I know, I

27:12    don't think I received anything from her during that

27:13    time.

| 28:23 - 30:23 | **Hays, Deposition 2022-11-21** | 00:03:05 | MH_FINAL.13 |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | | | MH_FINAL.13 |

28:23   Q.   Is objectivity important for an

28:24        external reviewer?

29:01   A.   Absolutely.  But objectivity -- no one

29:02        thinks that anyone has provable, verifiable data to

29:03        say that someone -- it is a judgment call.  It is

29:04        absolutely a judgment call.

29:05   Q.   Professor Veikos asked you for

29:06        assistance in connection with her preparation of her

29:07        case for tenure; is that right?

29:08   A.   Yes.

29:09   Q.   What kind of assistance did she ask

29:10        for?

29:11   A.   I think someone who has never gone through a

29:12        tenure promotion usually faces, for the very first

29:13        time, not just their own department, which, of

29:14        course, they would know well, and the values and

29:15        kind of approach of that department.  They also, for

29:16        the first time, are going to face the

29:17        university-level evaluation by senior colleagues

29:18        that will not be in their field.  And so it's very

29:19        important that the teaching record, the publication

29:20        record, and the future research program are not

29:21        identical, because that would be too narrow, but

29:22        have some common intellectual frame.

29:23        And that's often very hard to do

29:24        when you're trying to explain your work to someone

30:01        who may come from the sciences -- in the case of

30:02        Penn, she probably has engineers or scientists on

30:03        her committee -- but also people from comparative

30:04        literature.

30:05        So it's very important and

30:06        difficult that you frame your work for people who

30:07        are not in your field.  And I think that's the

30:08        advice that I would try to have given her.  That I

30:09        would have given her.

30:10   Q.   If you had been asked by Penn to do an

30:11        external review letter for Cathrine Veikos, would

30:12        you have disclosed that she had been a student of

30:13        yours, that you had selected her to be a teaching

30:14        assistant, that you had remained in touch with her

30:15        over the years, and that you helped her to position

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 30:16 | her tenure case favorably as she was getting ready | | |
| | 30:17 | to present it to others at Penn? | | |
| | 30:18 | A.  Yes, I think one is obliged to be absolutely | | |
| | 30:19 | open and thorough in describing your relationship to | | |
| | 30:20 | the candidate, yes.  And I would have -- yes, it's | | |
| | 30:21 | not unusual, and I would have, without thinking | | |
| | 30:22 | twice, said -- say that I absolutely consulted her. | | |
| | 30:23 | She would -- yes. | | |

**31:16 - 31:21**   **Hays, Deposition 2022-11-21**   00:00:18   MH_FINAL.14

| | 31:16 | Have you read any of the other | | |
| | 31:17 | external reviews of Cathrine Veikos that were | | |
| | 31:18 | submitted to Penn either in 2011 or 2012? | | |
| | 31:19 | A.  I have not.  Those should be absolutely | | |
| | 31:20 | confidential, as far as I -- and I have not seen | | |
| | 31:21 | them. | | |

**32:05 - 36:09**   **Hays, Deposition 2022-11-21**   00:05:44   MH_FINAL.15

| | 32:05 | Q.  Have you talked to anyone at Penn, any | | |
| | 32:06 | members of either the architecture department or the | | |
| | 32:07 | School of Design, to discuss how they voted on | | |
| | 32:08 | Professor Veikos's candidacy or why they voted a | | |
| | 32:09 | certain way? | | |
| | 32:10 | A.  No.  No, no, no.  I don't think one would do | | |
| | 32:11 | that, unless -- I don't think one would ask that or | | |
| | 32:12 | do that, no. | | |
| | 32:13 | Q.  Do you have any information on how | | |
| | 32:14 | other faculty members, committee members, department | | |
| | 32:15 | chairs, or deans at Penn voted on Professor Furjan's | | |
| | 32:16 | case, other than being told by her that she -- | | |
| | 32:17 | excuse me -- that she was not granted tenure? | | |
| | 32:18 | A.  I've had no correspondence or communication | | |
| | 32:19 | or information about her case or its outcome from | | |
| | 32:20 | the school. | | |
| | 32:21 | Q.  You told us that you do not recall | | |
| | 32:22 | receiving an e-mail asking you to do a review on | | |
| | 32:23 | Cathrine Veikos in 2011 or 2012, correct? | | |
| | 32:24 | A.  That's correct. | | |
| | 33:01 | Q.  Do you get a lot of e-mails? | | |
| | 33:02 | A.  Yes. | | |
| | 33:03 | Q.  How many e-mails would you say you get | | |
| | 33:04 | a day?  Ten?  Twenty?  Thirty? | | |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

33:05   A.   Thirty.

33:06   Q.   Okay.  So 30 e-mails a day is over

33:07        10,000 a year?

33:08   A.   Quick -- quickly, I would imagine it's a

33:09        lot, yes.

33:10   Q.   So if we go back to 2011 or 2012,

33:11        you'd probably received -- what? -- over a hundred

33:12        thousand e-mails since then?

33:13   A.   Let's stipulate I receive a hundred

33:14        thousand, yes.

33:15   Q.   Okay.  You don't remember all the

33:16        e-mails you received, do you?

33:17   A.   Certainly not.

33:18   Q.   And do you sometimes fail to read

33:19        e-mails when they come in?

33:20   A.   Certainly.  But -- go ahead.  Certainly.

33:21   Q.   Now -- I'm sorry.  You look like you

33:22        were about to say something.  I didn't want to cut

33:23        you off.

33:24   A.   Well, I mean, I just wanted to point out the

34:01        obvious, that, you know, it takes you -- it takes

34:02        one, you know, two seconds to dismiss the majority

34:03        of the e-mails.

34:04        Cases of tenure, cases of any

34:05        sort of promotion or any sort of review process are

34:06        among the most important things we do that serve our

34:07        field and our discipline and not just our own

34:08        schools.

34:09        So it is -- it is

34:10        extraordinarily important that we perform these

34:11        professional duties for other schools, and they for

34:12        us, and those e-mails you don't forget and you don't

34:13        miss.

34:14        And the only other thing I would

34:15        reiterate is -- and I say this with some pride that

34:16        I had, because I think I only received a private

34:17        administrative assistant right around this time, and

34:18        you -- and I noticed as I was looking at

34:19        Helene Furjan's case, you know, there were four or

34:20        five e-mails between me and David Leatherbarrow, and

34:21        that kind of -- because these things do get delayed.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 34:22 | I missed the deadline.  My own assistant picked up | | |
| | 34:23 | the correspondence and started helping me catch up. | | |
| | 34:24 | And I think the same thing would have happened.  Had | | |
| | 35:01 | I missed an e-mail, an important one, my assistant | | |
| | 35:02 | would have direct access to it and would have | | |
| | 35:03 | caught -- certainly would have caught it. | | |
| | 35:04 | As you can actually see, she | | |
| | 35:05 | did, the assistant did, in the case of Furjan. | | |
| | 35:06 Q. | Stacy Buckley was your assistant? | | |
| | 35:07 A. | That's correct. | | |
| | 35:08 Q. | Does she still work for you? | | |
| | 35:09 A. | She does not.  She works at Harvard, as far | | |
| | 35:10 | as I know, but she left the School of Design. | | |
| | 35:11 Q. | Had you asked her to check her e-mails | | |
| | 35:12 | to see if she has any relating to Cathrine Veikos or | | |
| | 35:13 | any request to review Cathrine Veikos? | | |
| | 35:14 A. | I did ask -- the administrative people are | | |
| | 35:15 | in a separate -- she would not have been in my | | |
| | 35:16 | office.  She would have been in a separate office of | | |
| | 35:17 | administrators.  And I asked them.  And they would | | |
| | 35:18 | explain to me that, when a staff person leaves GSD, | | |
| | 35:19 | their computer is wiped -- is wiped clean before | | |
| | 35:20 | another staff person can use it.  And so any -- | | |
| | 35:21 | anything Stacy had would have either been sent to me | | |
| | 35:22 | or would have just been wiped clean. | | |
| | 35:23 Q. | So if Stacy Buckley did have an | | |
| | 35:24 | e-mail -- and I'm not saying she did, but if she did | | |
| | 36:01 | have any e-mails relating to Cathrine Veikos's | | |
| | 36:02 | tenure candidacy from 2011 or 2012, they would be | | |
| | 36:03 | gone and not recoverable, right? | | |
| | 36:04 A. | If it did not have -- if it were not copied | | |
| | 36:05 | to me also, then it would be gone. | | |
| | 36:06 Q. | You mentioned that e-mails about | | |
| | 36:07 | tenure reviews, requests for tenure reviews, are | | |
| | 36:08 | very important, and you see those and respond right | | |
| | 36:09 | away; is that correct? | | |
| **36:14 - 41:01** | **Hays, Deposition 2022-11-21** | 00:05:55 | MH_FINAL.16 |
| | 36:14 A. | I would not say respond right away, | | |
| | 36:15 | necessarily.  You would see them. | | |
| | 36:16 Q. | Do you ever just fail to see an e-mail | | |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | 36:17 | because you were too busy to read it? | |
| | 36:18 | A. I really believe this, Mr. Banks, that I | |
| | 36:19 | have never failed to respond to an e-mail regarding | |
| | 36:20 | any sort of promotion. | |
| | 36:21 | Even if I would say I simply | |
| | 36:22 | cannot, either because I don't know the person or I | |
| | 36:23 | don't have -- and you don't say you don't have time. | |
| | 36:24 | You say, you know, I'm taking a medical leave of | |
| | 37:01 | absence and cannot perform this function, but you | |
| | 37:02 | would always respond, I believe, even if you can't | |
| | 37:03 | do it. It's that important. It's our version of a | |
| | 37:04 | legal obligation. | |
| | 37:05 | Q. Okay. Let's take a look at | |
| | 37:06 | Exhibit P-35. Would you go to the second page of | |
| | 37:07 | the document. | |
| | 37:08 | I take it you have a printed | |
| | 37:09 | version there? | |
| | 37:10 | A. I do. | |
| | 37:11 | Q. All right. Let's go to the second | |
| | 37:12 | page. It's an e-mail from David Leatherbarrow to | |
| | 37:13 | you, dated October 5th of 2011? This is his | |
| | 37:14 | original request that you write an external review | |
| | 37:15 | letter for Helene Furjan, right? | |
| | 37:16 | A. Right. | |
| | 37:17 | Q. He writes to you on October 5th, 2011, | |
| | 37:18 | and says, "Dear, Michael, I hope all is well with | |
| | 37:19 | you. I'm writing with a request: Would you be | |
| | 37:20 | willing to write a letter of evaluation for one of | |
| | 37:21 | my colleagues here at Penn, Assistant Professor | |
| | 37:22 | Helene Furjan"? Do you see that? | |
| | 37:23 | A. Yes, yes, of course, yes. | |
| | 37:24 | Q. Okay. And then let's go to the first | |
| | 38:01 | page, up to the first page of the document. It | |
| | 38:02 | looks like 16 days went by with no response from | |
| | 38:03 | you; is that correct? | |
| | 38:04 | A. Yes. | |
| | 38:05 | Q. Sixteen days after he wrote to you, he | |
| | 38:06 | wrote back, on October 21st of 2011, and said, | |
| | 38:07 | "Michael, I'm wondering if I'm using an incorrect | |
| | 38:08 | e-mail address. Please let me know if you received | |
| | 38:09 | this message and if you might be able to write the | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | 38:10 | letter I request." | |
| | 38:11 | Do you see that? | |
| | 38:12 | A.  I do. | |
| | 38:13 | Q.  And you wrote back to him that same | |
| | 38:14 | day, on October 21st, 16 days after his request, | |
| | 38:15 | saying, "Hi, David.  Apologies.  You have the right | |
| | 38:16 | e-mail.  It's just that Mohsen --" M-O-H-S-E-N -- | |
| | 38:17 | "has me too overworked to read them all." | |
| | 38:18 | What is Mohsen? | |
| | 38:19 | A.  Well, that's a double thing. | |
| | 38:20 | Mohsen Mostafavi at that time was the dean of the | |
| | 38:21 | Graduate School of Design at Harvard, and he had | |
| | 38:22 | just appointed me associate dean.  This is how I got | |
| | 38:23 | the assistant I'm so proud of. | |
| | 38:24 | David Leatherbarrow and Mohsen | |
| | 39:01 | were extremely good friends.  Mohsen taught at Penn. | |
| | 39:02 | So it was kind of slightly humorous that his friend | |
| | 39:03 | Mohsen, David's friend Mohsen, was so overworking me | |
| | 39:04 | in my new job that -- it was a little bit of joke in | |
| | 39:05 | an effort to try to excuse -- by the way, may I say, | |
| | 39:06 | though, Mr. Banks, that's not that long to answer an | |
| | 39:07 | e-mail in academic circles.  We don't answer e-mails | |
| | 39:08 | necessarily the next day or the first day.  This is | |
| | 39:09 | not that long. | |
| | 39:10 | Q.  Okay.  But your response wasn't "I | |
| | 39:11 | read it."  Your response was that you were too | |
| | 39:12 | overworked to read them all.  Right? | |
| | 39:13 | A.  Yes, but what are we talking about? | |
| | 39:14 | Five days. | |
| | 39:15 | Q.  Sixteen days. | |
| | 39:16 | A.  Sixteen days.  Yes.  Okay.  I understand.  I | |
| | 39:17 | just would say that, to me, in academic circles, | |
| | 39:18 | that's a late -- that's a late response, but it's | |
| | 39:19 | not an embarrassingly late response, for me. | |
| | 39:20 | Q.  But beyond the timing of the response, | |
| | 39:21 | what you were saying was that you were so overworked | |
| | 39:22 | you didn't have time to read all your e-mails, | |
| | 39:23 | right? | |
| | 39:24 | A.  Right.  But I did read it and responded | |
| | 40:01 | two weeks later. | |
| | 40:02 | Q.  You responded when he followed up | |

| DESIGNATION | SOURCE | | | DURATION | ID |
|---|---|---|---|---|---|
| | 40:03 | | 16 days later, not to the original e-mail, correct? | | |
| | 40:04 | A. | Correct. | | |
| | 40:05 | Q. | Okay. And then you asked what kind of | | |
| | 40:06 | | deadline he would be facing. This is in your | | |
| | 40:07 | | October 21st e-mail, when you wrote, "Can it wait | | |
| | 40:08 | | until after Thanksgiving?" Do you see that? | | |
| | 40:09 | A. | Yes. | | |
| | 40:10 | Q. | That was on October 21st. He then | | |
| | 40:11 | | wrote back to you two and a half months later, on | | |
| | 40:12 | | January 10th of 2012, about six weeks after | | |
| | 40:13 | | Thanksgiving, to ask you again about your ability to | | |
| | 40:14 | | write the Furjan letter, correct? | | |
| | 40:15 | A. | Correct. | | |
| | 40:16 | Q. | And you responded to him on | | |
| | 40:17 | | January 10th, two days later, saying, "Sincere | | |
| | 40:18 | | apologies. For every pre-term fire I help | | |
| | 40:19 | | extinguish, two more flare up." | | |
| | 40:20 | | You were trying to get across to | | |
| | 40:21 | | him that you were very, very busy, right? | | |
| | 40:22 | A. | Right. | | |
| | 40:23 | Q. | And you wrote, "I will have this to | | |
| | 40:24 | | you by Friday, e-mail." | | |
| | 41:01 | A. | Right. | | |
| **42:03 - 42:12** | **Hays, Deposition 2022-11-21** | | | **00:00:29** | **MH_FINAL.17** |
| | 42:03 | Q. | Well, you e-mailed back to David | | |
| | 42:04 | | Leatherbarrow on January 12, 2012, at 9:51 a.m. Do | | |
| | 42:05 | | you see that? | | |
| | 42:06 | A. | Not -- | | |
| | 42:07 | Q. | It's the top of the first page. | | |
| | 42:08 | A. | Yes, yes, yes, yes, yes. | | |
| | 42:09 | Q. | Okay. And then your actual letter on | | |
| | 42:10 | | behalf of Helene Furjan was sent out the next day, | | |
| | 42:11 | | on January 13, correct? | | |
| | 42:12 | A. | Okay. Yes. You know -- | | |
| **45:15 - 49:22** | **Hays, Deposition 2022-11-21** | | | **00:05:46** | **MH_FINAL.18** |
| | 45:15 | Q. | Professor Hays, did it sometimes take | | |
| | 45:16 | | you months to respond to e-mails? | | |
| | 45:17 | A. | It -- I actually don't know that it's ever | | |
| | 45:18 | | taken me that long, but it didn't take me that long | | |
| | 45:19 | | in this case. | | |

**MH_FINAL - K. Michael Hays Final Designations**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

45:20  Q.  Take a look at Exhibit P-34, please.

45:21  A.  You mean the top -- what's at the top?

45:22  Q.  Yes.  It's at the top.  The top e-mail

45:23      is from you to Cathrine Veikos.

45:24  A.  Okay.

46:01  Q.  Do you see that?

46:02  A.  Yes.

46:03  Q.  Professor Veikos wrote to you on

46:04      July 24th in which she told you she had been denied

46:05      tenure at Penn, and it looked like -- looks like it

46:06      took you two months to respond, correct?

46:07  A.  Looks like.  Huh.  Yes, looks like.

46:08  Q.  Okay.  Have you ever read

46:09      Professor Veikos's book about Lina Bo Bardi?

46:10  A.  I read the manuscript.  I did not read

46:11      the -- I own the published book, but I did not read

46:12      the published book.  Again, I read the manuscript.

46:13  Q.  When did you read the manuscript?

46:14  A.  Oof.  I certainly saw the manuscript -- the

46:15      manuscript was a primary part of what I had advised

46:16      her on.  So she had somehow sent that.  Or I had --

46:17      or she probably -- I had that, you know, before --

46:18      that's part of what I was referring to when I said

46:19      that I helped her organize the work.  I don't -- I

46:20      don't recall the date.  I don't.  It was -- it was

46:21      all within a couple of months of that initial

46:22      correspondence.

46:23  Q.  So when Professor Veikos reached out

46:24      to you to ask for assistance on how to position

47:01      herself better for tenure, tenure review at Penn,

47:02      she sent you her manuscript; is that right?

47:03  A.  Yes, I don't know if -- I don't know how

47:04      many -- I don't know how many exchanges, different

47:05      exchanges there were.  I don't -- I don't remember a

47:06      lot of phone calls.  I remember the one.  But I'm

47:07      sure there were exchanges saying "Oh, could you --"

47:08      you know, I'm sure there were exchanges where

47:09      eventually she sent -- I think even -- it's funny

47:10      because this did overlap a little bit with Helene's.

47:11      And so I remember vividly Helene's submission

47:12      because it was already kind of packaged.  It was

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

|  | 47:13 | more formal. |  |  |
|  | 47:14 | I think Cathrine kind of |  |  |
|  | 47:15 | trickled in with drafts and stuff.  But that's |  |  |
|  | 47:16 | because we were -- you know, she knew that I didn't |  |  |
|  | 47:17 | mind reading incomplete things at that point. |  |  |
|  | 47:18 | It's hard to say when I got |  |  |
|  | 47:19 | that. |  |  |
|  | 47:20 | Q.  But you read it as part of the process |  |  |
|  | 47:21 | of helping her with her tenure candidacy, right? |  |  |
|  | 47:22 | A.  Yes. |  |  |
|  | 47:23 | Q.  At the time she sent you the |  |  |
|  | 47:24 | manuscript, had it been accepted for publication? |  |  |
|  | 48:01 | A.  I don't recall. |  |  |
|  | 48:02 | Q.  Was it in -- as you understood it, was |  |  |
|  | 48:03 | it in final form? |  |  |
|  | 48:04 | A.  It was in penultimate form.  It always -- it |  |  |
|  | 48:05 | had not, as I -- I don't believe that it had gone |  |  |
|  | 48:06 | final copy edit, no. |  |  |
|  | 48:07 | Q.  Did you make any suggestion, editorial |  |  |
|  | 48:08 | or otherwise, about potential revisions or changes |  |  |
|  | 48:09 | to the manuscript? |  |  |
|  | 48:10 | A.  I did not -- sometimes, if I'm reading a |  |  |
|  | 48:11 | manuscript, if it's agreed upon, I'll actually -- to |  |  |
|  | 48:12 | mark up things.  And to do a substantial content |  |  |
|  | 48:13 | edit, I did not do that with Cathrine's.  It would |  |  |
|  | 48:14 | have been a read.  It would not have been a markup |  |  |
|  | 48:15 | or a content edit. |  |  |
|  | 48:16 | It would have been -- the level |  |  |
|  | 48:17 | of generality would have been, okay, you're not |  |  |
|  | 48:18 | treating her objects as formal things without being |  |  |
|  | 48:19 | attached to her intention.  You're treating it based |  |  |
|  | 48:20 | on your -- also your work on her diaries and on her |  |  |
|  | 48:21 | notes.  And what -- the advice would have been, make |  |  |
|  | 48:22 | sure your reader understands that you're talking |  |  |
|  | 48:23 | about her practice and her -- as well as the objects |  |  |
|  | 48:24 | she produced. |  |  |
|  | 49:01 | And that's an important part in |  |  |
|  | 49:02 | the difference between the way historians work. |  |  |
|  | 49:03 | Cathrine was writing on Bo Bardi as a practicing |  |  |
|  | 49:04 | architect, which is definitely different than the |  |  |
|  | 49:05 | way a historian trained in art history would write |  |  |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 49:06    about it. | | |
| | 49:07    So it would have been that kind | | |
| | 49:08    of advice for her. | | |
| | 49:09  Q.  Did you give that kind of advice or | | |
| | 49:10    make those kind of comments when you saw the draft | | |
| | 49:11    of the manuscript? | | |
| | 49:12  A.  I did.  I did. | | |
| | 49:13  Q.  Were those comments or was that advice | | |
| | 49:14    that you gave to her over the telephone or in an | | |
| | 49:15    e-mail? | | |
| | 49:16  A.  Yes, this was would have been that phone | | |
| | 49:17    call.  I've forgotten the date now.  But it's -- the | | |
| | 49:18    phone call is documented somewhere here, yes.  It | | |
| | 49:19    would have been in that phone call. | | |
| | 49:20  Q.  Did Professor Veikos modify or amend | | |
| | 49:21    the manuscript to address your comments, if you | | |
| | 49:22    know? | | |
| 50:01 - 50:09 | **Hays, Deposition 2022-11-21** | 00:00:27 | MH_FINAL.19 |
| | 50:01  A.  Yes, I just don't know. | | |
| | 50:02  Q.  And you never read any version of the | | |
| | 50:03    manuscript after the draft that she gave you and | | |
| | 50:04    before you made comments to it. | | |
| | 50:05  A.  That's correct. | | |
| | 50:06  Q.  Is that correct? | | |
| | 50:07  A.  That's correct.  I don't know when the book | | |
| | 50:08    appeared.  And can I also say that I don't -- yes, I | | |
| | 50:09    don't know when the book appeared exactly, yes. | | |
| 51:07 - 51:15 | **Hays, Deposition 2022-11-21** | 00:00:18 | MH_FINAL.20 |
| | 51:07  Q.  I do.  Just one, actually, | | |
| | 51:08    Professor Hays. | | |
| | 51:09    Has Mr. Banks given you any | | |
| | 51:10    documents, e-mails or otherwise, that suggest that | | |
| | 51:11    you were in fact asked to be an external reviewer | | |
| | 51:12    for Cathrine Veikos's tenure case? | | |
| | 51:13  A.  No. | | |
| | 51:14    MS. UEBLER:  No further | | |
| | 51:15    questions. | | |
| | Plaintiff Direct | 00:44:30 | |

**TOTAL RUN TIME**                                      **00:44:30**