**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| **CATHRINE VEIKOS,** |
| *Plaintiff,* |
| **v.** |
| **TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,** |
| *Defendant.* |

**Case No. 2:20-cv-04408-JDW**

## MEMORANDUM

Juries are the bedrock of the American justice system. So in posttrial motions after a jury verdict, judges have to strike a balance. On the one hand, we have to avoid playing Monday morning quarterback and second-guessing a jury's verdict. Otherwise, jury trials become de facto advisory verdicts. On the other hand, we have to guard against jury decisions that are irrational. The jury system can't become a game of roulette, with random high awards for a lucky few. It has to hew to the evidence presented.

The posttrial motions in this case require me to navigate that balance. After a two-week trial, a jury found that the Trustees of the University of Pennsylvania ("Penn") retaliated against Ms. Veikos for her complaints of gender discrimination by denying Ms. Veikos tenure on re-review in 2012. The jury awarded Ms. Veikos $1,000,000 in compensatory damages for her emotional distress. Penn now seeks to overturn the jury

verdict. It argues that Ms. Veikos did not show that retaliation was the but-for cause of Penn's decision to deny her tenure and that the damage award shocks the judicial conscious. While there was sufficient evidence of retaliation to support the jury's verdict as to liability, the award of emotional distress damages does not bear a rational relationship to the evidence at trial. Therefore, I will grant Penn a new trial unless Ms. Veikos remits her emotional distress damages to $100,000.

## I. BACKGROUND

### A. Facts

#### 1. Ms. Veikos's tenure reviews at Penn

Ms. Veikos started as a Lecturer at the Penn Weitzman School of Design in the Architecture Department. In 2003, Penn appointed Ms. Veikos an Assistant Professor on the tenure track. Penn reviewed Ms. Veikos's tenure case during the 2010-2011 academic year. There were some procedural irregularities during this tenure review, including the omission of required language from letters soliciting external reviewers for the dossier, Professor Braham, the Department Chair, changing his vote from that given during the faculty meeting, and Prof. Braham not recommending Penn grant tenure despite a positive departmental vote. Penn denied Ms. Veikos tenure in the spring of 2011. Ms. Veikos's employment contract with Penn ended on June 30, 2011, because she was not granted tenure.

Ms. Veikos complained to Penn that gender discrimination impacted her tenure review process. To address Ms. Veikos's concerns, Penn agreed to perform a re-review during the 2011-2012 academic year. During the re-review there were differences in procedure and tenor that Ms. Veikos argued indicated retaliatory animus, including: (a) Professor Leatherbarrow, the Department Chair in charge of her re-review, selected external reviewers from fields other than Ms. Veikos's field of visual studies and a reviewer who may have had personal animus against Ms. Veikos; (b) Prof. Leatherbarrow selected two of Ms. Veikos's preferred reviewers for another tenure candidate at Penn, making it unlikely they would review Ms. Veikos as well; (c) Prof. Leatherbarrow asked Ms. Veikos to revise her CV to reflect that she no longer worked at Penn; (d) Prof. Leatherbarrow started the faculty meeting to discuss Ms. Veikos's tenure case with a statement that Ms. Veikos found "something wrong with the case" so "we have to do it all over again" (ECF No. 127 at 175:09-18); (e) Prof. Braham continued to be involved in Ms. Veikos's tenure review process; (f) Dean Taylor did not appoint new members of the School of Design Personnel Committee for the re-review, although she had authority to do so; (g) Dean Taylor reacted to Ms. Veikos's initial complaints of discrimination by saying the complaints "changed the tone of the conversation" and that things had "really changed since [Ms. Veikos] had gotten a lawyer" (Ex. 254)[1]; (h) Frank Matero, Witold Rybczynski, and Prof. Leatherbarrow changed their positive votes from 2011 to negative votes in 2012; and (i) no one took

---

[1] All exhibits admitted at trial are cited as (Ex. #)

notes at the meetings where Ms. Veikos's second tenure case was discussed, unlike at previous meetings.

In May 2012, Penn again denied Ms. Veikos tenure. Had Penn granted Ms. Veikos tenure on re-review, she would have become an Associate Professor with tenure as of July 1, 2012.

### 2.    Ms. Veikos's employment after Penn

As is the practice of many professors when they are up for tenure, Ms. Veikos applied for positions at other colleges and universities while Penn reviewed her initial tenure case. After her employment contract ended in June 2011, Ms. Veikos accepted a position as a Visiting Professor at the California College of the Arts ("CCA"). She moved her family to California that summer and began teaching at CCA in September 2011. The following April, Ms. Veikos accepted a position as the Chair of Interior Design at CCA. While at CCA, Ms. Veikos was also elected president of the school's faculty senate, published a manuscript, and lectured as an expert in her field around the world. Ms. Veikos remains employed at CCA.

During her initial job search Ms. Veikos declined lower-paying teaching opportunities at colleges and universities on the East Coast, such as Temple, Drexel, and the Rhode Island School of Design. Then, while awaiting CCA's decision to extend her initial visiting professorship contract, Ms. Veikos again applied to colleges and universities on the East Coast. However, after accepting the Chair of Interior Design position at CCA,

she declined an opportunity to interview for a tenure track position at Pratt, a prestigious design college in Brooklyn, New York.

### B.    Procedural History

Ms. Veikos filed her Complaint in September 2020 after lengthy administrative proceedings. She alleged that Penn discriminated and/or retaliated against her by: 1) denying her application for tenure in 2011; 2) withdrawing an offer of continued employment for one year; and 3) denying her application for tenure during the re-review process in 2012. After the close of discovery, I denied Penn's Motion for Summary Judgment with respect to all claims.

At trial, Penn's counsel made an oral Motion For Judgment As A Matter Of Law pursuant to Rule 50(a) with respect to all of Ms. Veikos's claims. I denied that Motion based on the evidence presented and proceeded to charge the jury. After two days of deliberation, the jury returned a mixed verdict. The jury concluded that Ms. Veikos did not establish that Penn denied her tenure during either review because of gender discrimination or that Penn retaliated against her by withdrawing an offer of continued employment. But the jury found that Ms. Veikos showed, by a preponderance of the evidence, that the 2012 tenure denial was retaliatory for her discrimination claims. The jury awarded Ms. Veikos $1,000,000 in non-economic compensatory damages.

In its Renewed Motion For Judgment As A Matter Of Law Or, In The Alternative, Motion For A New Trial Or Remittitur, Penn argues that the verdict must be thrown out

because the jury applied an incorrect legal standard with respect to the retaliation claim and because the damages award was unsupported by evidence of Ms. Veikos's injury. Penn's Motion is ripe for disposition.

After Penn filed its Motion, Ms. Veikos filed a notice of appeal. That premature appeal does not deprive me of jurisdiction to decide Penn's Motion. The case lacked finality when Ms. Veikos filed her notice of appeal because Penn's timely Motion was already pending. *See* 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2821 (3d ed. 2023).

## II.   LEGAL STANDARD

### A.   Judgment As A Matter Of Law

When a "court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). Upon a renewed motion, a court can either allow the judgment on the verdict, order a new trial, or direct judgment as a matter of law. *Id.* at (b)(1)-(3). If a court directs a verdict, it must also decide whether a new trial is warranted. *Id.* at (c).

A court may grant a Rule 50(b) motion "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence" to support the jury's verdict. *Warren ex rel. Good v. Reading School Dist.*, 278 F.3d 163, 168 (3d Cir. 2002) (quotations omitted). The court

must deny the motion if a reasonable jury could have reached the verdict upon the evidence in the record. *See Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Therefore, the court must not engage in credibility determinations, weighing evidence, and drawing inferences from the facts. *See id.* at 150. The Court should weigh all evidence favoring the non-movant against only the "uncontradicted and unimpeached" evidence supporting the movant. *Id.* at 151.

### B.    New Trial

A Rule 50 motion "may include an alternative or joint request for a new trial under Rule 59." FED. R. CIV. P. 50(b). After a jury trial, a court may grant a new trial under Rule 59 "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). However, a court should grant a new trial "only when the great weight of the evidence cuts against the verdict and . . . a miscarriage of justice would result if the verdict were to stand." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (cleaned up) (quotations omitted). An error of law may be grounds for a new trial, but only when the error is so prejudicial that it affects a party's "substantial rights." *See* 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2805 (3d ed. 2022) (quoting Fed. R. Civ. P. 61). Granting a new trial is discretionary. *See Foster v. Nat'l Fuel Gas Co.*, 316 F.3d 424, 429 (3d Cir. 2003).

The purpose of a motion to alter or amend judgments under Rule 59(e) is "to correct manifest errors of law or fact or to present newly discovered evidence." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (quotations omitted). Therefore, a Rule 59(e) motion is granted only when there is: "(1) a change in controlling law; (2) new evidence; or (3) a need to correct a clear error of law or prevent manifest injustice." *Id.*

### C.     Remittitur

The use of remittitur is committed to the sound discretion of the district court judge. *See Evans v. Port Auth. of N.Y. and N.J.*, 273 F.3d 346, 354 (3d Cir. 2001) (citations omitted). The Third Circuit directs district courts to consider similar cases in evaluating motions for remittitur. *See id.* at 356; *Delli Santi v. CNA Insurance Cos.*, 88 F.3d 192, 206 (3d Cir. 1996). In her opposition, Plaintiff points to the New Jersey Supreme Court's decision in *Cuevas v. Wentworth Grp.*, 226 N.J. 480 (2016) to argue that I should not use a case comparison method. I do not find that case persuasive, but even if I did, I am not free to ignore the Third Circuit's directive to use a case comparison method.

A judge should assess an award to enable him to set damages at the "'maximum recovery that does not shock the judicial conscience.'" *Evans*, 273 F.3d at 355 (quoting *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 774 (3d Cir. 1987)). Verdicts that shock the judicial conscience are those that bear no rational relationship to the evidence presented. *See Gumbs*, 823 F.2d at 773. A remittitur based on the weight of the evidence substitutes the court's judgment for the jury. *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir.

2010) (quotation omitted). Therefore, when a court remits an award based on the weight of the evidence, it must offer the plaintiff a new trial. *See id*.

## III.   DISCUSSION

### A.   Judgment As A Matter Of Law Or A New Trial

Title VII prohibits an employer from retaliating against an employee for complaining about discrimination. 42 U.S.C. § 2000e–3(a). "To state a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 256 (3d Cir. 2017). A plaintiff may prove her case with indirect evidence through application of the *McDonnell-Douglas* burden-shifting framework. *See id*. Under that framework, once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to provide a non-retaliatory justification for its actions, after which the plaintiff must show that the justification is pretextual. *See id*.

A plaintiff must establish but-for causation at the pretext stage to satisfy her ultimate burden of persuasion. *See id*. at 257. Penn argues that Ms. Veikos did not meet this burden. Penn's non-retaliatory justification for its tenure decision was that Ms. Veikos's scholarship did not justify an award of tenure. Penn points to the jury's verdict that Penn lawfully denied Ms. Veikos's 2011 tenure case and reasons that, because the

9

2012 case was weaker, she would have been denied tenure based on the merits of her case. But, when I view the evidence produced at trial in the light most favorable to Ms. Veikos, a reasonable juror could have found Penn's justification pretextual.

"[A] broad array of evidence" may support a determination of causation. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Ms. Veikos provided just such an array. *First*, Ms. Veikos presented evidence that Dean Taylor, Prof. Leatherbarrow, members of the Personnel Committee, and to some extent the department faculty knew of her complaint. *See Daniels v. Sch. Dist. Of Phila.*, 776 F.3d 181, 198-99 (3d Cir. 2015) ("The plaintiff [sic] cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.").

*Second*, Ms. Veikos presented evidence that Prof. Leatherbarrow and Dean Taylor had negative reactions to Ms. Veikos's complaints, saying things like she found "something wrong with the case" so "we have to do it all over again" (ECF No. 127 at 175:09-18) and things had "really changed since [she] had gotten a lawyer" (Ex. 254).

*Third*, Ms. Veikos provided evidence from which a reasonable juror could conclude that Prof. Leatherbarrow took steps to weaken Ms. Veikos's 2012 tenure case, such as his selection of external reviewers and "dismissive" statements at the beginning of the faculty meeting. (ECF No. 127 at 175:09-18.)

*Fourth*, Ms. Veikos presented evidence that three people changed their positive votes in 2011 to negative votes in 2012. *Cf. Maras v. Curators of Univ. of Mo.*, 983 F.3d 1023, 1028 (8th Cir. 2020) (upholding a decision to deny tenure where opinions about the candidate's qualifications for tenure were widely shared and consistent over time). *Fifth*, Ms. Veikos presented evidence that the jury could construe as procedural irregularities, such as no notes being taken during the meetings where the faculty and Personnel Committee discussed her second case. "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 433-34 (3d Cir. 1997) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)).

Penn argues that it can't have retaliated against Ms. Veikos because it denied her tenure, without discriminating against her, in 2011. There are several problems with that argument, however. *First*, it asks me to weigh the strength of Ms. Veikos's tenure cases in 2011 and 2012 without grappling with the evidence that Prof. Leatherbarrow selected external reviewers with an eye towards weakening Ms. Veikos's position in 2012. If the jury concluded that Prof. Leatherbarrow weakened Ms. Veikos's tenure case in retaliation for her complaint of discrimination the year before—and there was enough evidence for the jury to reach that conclusion—then it could conclude that Penn's tenure denial in 2012 was a product of retaliation.

Penn claims that the jury had to speculate to conclude that Prof. Leatherbarrow weakened her case. I disagree. There was evidence before the jury about the fields in which the external reviewers worked and about Prof. Leatherbarrow's communications with those reviewers. That evidence gave the jury a basis to conclude that the 2012 tenure dossier was weaker because of Prof. Leatherbarrow's selection of less favorable external reviewers, that he made those choices because he was unhappy that the Department had to conduct her tenure review "all over again" (ECF No. 127 at 175:09-18), and that the selection of less favorable reviewers led to a weaker tenure case that caused others to change their vote. "[I]t plainly is permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision." *Roebuck v. Drexel Univ.*, 852 F.2d 715, 727 (3d Cir. 1988). There was also evidence that Prof. Leatherbarrow asked the external reviewers who Ms. Veikos asked to review her case to review a different case, knowing that they would not be able to do both. The jury might have had to make inferences about the qualifications of the external reviewers, but it didn't have to speculate.

Penn also argues that the evidence only provided insight about the various decisionmakers' evaluation of Ms. Veikos's scholarship rather than causation. As a starting point, I instructed the jury that it should not try to determine whether Ms. Veikos should have received tenure. Instead, the jury was to decide whether Ms. Veikos's complaints of

12

discrimination had a determinative effect on Penn's denial of tenure in 2012. The Third Circuit has directed courts to "presume that jurors follow the instructions given to them by the trial court." *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 191 (3d Cir. 2019) (citation omitted). Penn's arguments do not overcome that presumption.

The evidence that Ms. Veikos presented was enough to establish but-for causation. For example, the jury could have concluded that but for Prof. Leatherbarrow's retaliation, Ms. Veikos's tenure case would have been stronger because the external reviewers would have been less hostile. The jury could also have concluded that Prof. Leatherbarrow's comment at the Departmental meeting that they had to undertake the process "all over again" could have poisoned other faculty-members' views of Ms. Veikos's candidacy. The jury could also have concluded that Dean Taylor's hostility caused her not to take steps that might have given Ms. Veikos's tenure re-review a more fair chance, such as reconstituting the Personnel Committee so that the members would not have viewed the tenure review as a re-run from the prior year. Ultimately, Penn's argument about but-for cause would require me to adopt its view of the facts. But I can't do that. If you put a different gloss on the facts, and the jury did, there was enough evidence for the jury to conclude that Penn retaliated against Ms. Veikos.

## B.    Remittitur

Title VII allows compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."

42 U.S.C. § 1981a(b)(3). To recover compensatory damages in a Title VII action, a plaintiff must present evidence of actual injury. *See Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988). However, neither medical evidence nor corroborating testimony is required to prove injury. *See Bolden v. Se. Pa. Transp. Auth.*, 21 F.3d 29, 34 (3d Cir. 1994). There must "be a rational relationship between the specific injury sustained and the amount awarded." *Gumbs*, 823 F.2d at 773. Courts have reduced jury awards when the damages award is "so large as to seem improbable, even though it may still be possible." *Blakey v. Continental Airlines, Inc.*, 992 F. Supp. 731, 738 (D.N.J. 1998).

As a threshold matter, it is important to distinguish between emotional distress that Ms. Veikos might have experienced from the 2011 tenure denial—for which the jury did not hold Penn liable—from the emotional distress that resulted from retaliation in 2012—for which Ms. Veikos can recover. *See id.* at 736. The jury heard significant testimony regarding the emotional distress that Ms. Veikos suffered from the 2011 tenure denial. Professor Annette Fierro testified that Ms. Veikos was devastated after that denial, that she "cried and carried on." (ECF No. 127 at 168:15-170:06.) And Ms. Veikos testified to the stress she experienced from having to find a job quickly to support her family, her difficulty adjusting to California, and the disruption her son experienced from the move. All of that happened in 2011, before any retaliatory conduct. It therefore cannot support the jury's award of emotional distress damages for Penn's retaliation.

14

There is no rational relationship between Ms. Veikos's emotional distress due to the 2012 tenure denial and the jury's $1,000,000 compensatory damages award. Ms. Veikos's evidence of emotional distress was only her own testimony. (Prof. Fierro's testimony focused on the effects of the 2011 tenure denial.) There was no evidence that Ms. Veikos suffered physically from her emotional distress or that she sought professional psychiatric counselling. Without evidence of physical manifestations of emotional distress or the need for medical treatment, plaintiffs must provide additional evidence of distress to elevate their claims beyond "garden-variety" emotional distress. Ms. Veikos did not provide that additional evidence. There was no evidence of job-insecurity from the 2012 tenure denial. When Penn denied Ms. Veikos tenure in 2012, Ms. Veikos was already the Chair of the Interior Design Department at CCA. While this position did not come with the rare guarantee of lifetime employment that accompanies tenure, it offered the same job security of all at-will employment. Any stress from job-insecurity is the same stress that most working Americans live through every day.

There was also no evidence of reputational harm due to the 2012 tenure denial. In *Spence v. Bd. Of Educ. Of Christina Sch. Dist.*, the Third Circuit upheld a district court's remittitur of all emotional distress damages where there was no evidence that a high school art teacher's peers held her in less esteem after her retaliatory transfer to an elementary school position. 806 F.2d 1198, 1201 (3d Cir. 1986). The court supported its decision with the fact that a University Professor invited the teacher to guest lecture after

the retaliatory transfer. *See id.* Similarly, Ms. Veikos testified that after 2012, she published "some research in a book that [the Getty] put out" and was "invited to Princeton for a symposium on women and architecture." (ECF No. 103 at 131:6-11.) Therefore, despite Ms. Veikos's testimony about her humiliation, there is no evidence that her peers held her in any less esteem than they had prior to the 2012 tenure denial.

Although Ms. Veikos did not present evidence that she experienced physical symptoms from her distress, sought medical treatment, endured job-insecurity, or suffered reputational harm, Ms. Veikos did testify that the 2012 tenure denial caused her emotional distress. Ms. Veikos testified that she "was humiliated," "lost total motivation to do things," and that the tenure denial "ruined [her] vision for what [her] career would be" and impacted her relationship with her parents (ECF No. 103 at 128:05-129:21.) That testimony was enough to justify an award of damages for emotional distress, just not in the amount that the jury awarded.

Comparing cases with similar evidence of emotional distress to Ms. Veikos's 2012 tenure denial, and adjusting those damage awards for inflation, I find Ms. Veikos is entitled to $100,000 in emotional distress damages. *See, e.g., Evans*, 273 F.3d at 354-55; *Zielinski v. SPS Tech., LLC*, Civ. A. No. 10-3106, 2011 WL 5902214, at * 9 (E.D. Pa. Nov. 22, 2011); *Valentin v. Crozer-Chester Med. Ctr.*, 986 F. Supp. 292, 304-05 (E.D. Pa. 1997) (remitting non-economic compensatory damages by 75% to $52,250.00 where the only evidence presented was plaintiff's testimony about her distress, which was contradicted by the fact

that she "functioned well enough to obtain a suitable position a few months after her termination"); *Glass v. Snellbaker*, Civ. A. No. 05–1971, 2008 WL 4371760, at *20-23 (D.N.J. Sept. 17, 2008) (remitting non-economic compensatory damages by 80% to $50,000.00 where there was no evidence of "lasting harm, physically or emotionally, and there was significant evidence that there was no harm to Plaintiff's reputation, although he certainly felt humiliated" due to retaliation for his first amendment activity); *Hall v. Pa. Dep't of Corr.*, Civ. A. No. 02-1255, 2006 WL 2772551, at *21-23  (M.D. Pa. Sept. 25, 2006) (remitting non-economic compensatory damages by 75% to $75,000.00 where plaintiff endured a hostile work environment for an extended period of time but there was no evidence of disruption to family relationships or need for medical treatment).

Ms. Veikos posits a number of harms that she claims justifies the jury's award, but there are problems with many of them. She notes that she lost the "financial security of lifetime employment over a period of decades." (ECF No. 125 at 21.) But I have awarded Ms. Veikos front and back pay for the loss of her tenure position. No evidence in the record suggests that Ms. Veikos was concerned about financial instability due to the difference between her at-will employment at CCA and the tenure position she might have had at Penn.

Ms. Veikos also discusses the lost opportunity to see her father in the last two years of his life because he was on the East Coast. However, Ms. Veikos's decision to stay in California after the 2012 tenure denial, rather than interviewing at Pratt or otherwise

pursuing opportunities on the East Coast, undercuts that argument. Part of Ms. Veikos's justification for turning down the Pratt opportunity was that her son had adjusted to life in California. Deciding to provide that stability for her son rather than to live close to her parents in New York was no doubt a difficult decision to make. But it was one she made. Ms. Veikos cannot now hold the consequences of her decision against Penn.

Finally, Ms. Veikos poses the rhetorical question, "Is $1 million 'too much' to compensate a person for having the vision she had for her career destroyed by illegal retaliation?" (*Id.*) The answer is "yes," by a wide margin. To be clear, Ms. Veikos was not driven out of her profession. She has a successful career as a Department Chair at a respected institution in California. At trial, she testified that in 2014, just two years after the retaliation, she was able to attend and participate in "conferences [and] symposia" about Lina Bo Bardi and that she was "proud of having the foresight to bring her work to people's attention and ... felt like I, at least, played a small part in bringing her work to the larger sphere." (ECF No. 103 at 129:4-13.) Those are not the words of someone whose career was completely derailed. Her career may have hit a speed bump, but she was able to participate in and take pride in her work, and her career has continued successfully since then. She may have suffered distress from the events in question, but an award of $1,000,000 is grossly excessive under the circumstances. I will therefore grant Penn's motion for a new trial unless Ms. Veikos remits her emotional distress damages to $100,000.

**IV.     CONCLUSION**

Ms. Veikos provided sufficient evidence of retaliation to support the jury's verdict on liability. However, there was insufficient evidence to support the emotional distress damages award. Therefore, I will remit the non-economic compensatory damages award to $100,000 and give Ms. Veikos the opportunity to accept that award or to have a new trial. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

July 12, 2023

19